RECORD NO. 07-4059(L)

**CONSOLIDATED W/ 07-4060, 07-4062, 07-4063, 07-4080, 07-4115**

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## LEARLEY REED GOODWIN; PAULETTE MARTIN; LANORA N. ALI; REECE COLEMAN WHITING, JR.; DERREK LEWIS BYNUM; LAVON DOBIE,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT
The Honorable Roger W. Titus, Presiding

---

## CONSOLIDATED OPENING PAGE-PROOF BRIEF OF APPELLANTS

---

Michael D. Montemarano*
Michael D. Montemarano, PA
5695 Main Street, Suite 201
Elkridge, MD 21075-5061
(410) 379-0067

***Lead Counsel & Counsel for
Appellant Paulette Martin***

Anthony D. Martin
Anthony D. Martin, PC
7841 Belle Point Drive
Suite 1100
Greenbelt, MD 20770
(301) 220-3700

***Counsel for Appellant
Learley Reed Goodwin***

Alan D. Bowman
Attorney at Law
Gateway One, Suite 105
Newark, NJ 07102
(973) 622-2225

***Counsel for Appellant
Lanora N. Ali***

Marc G. Hall
Hall & Cho, PC
200A Monroe Street
Suite 310
Rockville, MD 20850
(301) 309-6678

***Counsel for Appellant
Reece Coleman Whiting, Jr.***

Timothy S. Mitchell
Law Office of Timothy S. Mitchel
6301 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 945-9500

***Counsel for Appellant
Derrek Lewis Bynum***

G. Alan DuBois
Office of Federal Public Defender
150 Fayetteville Street Mall
Suite 450
Raleigh, NC 27601
(919) 856-4236

***Counsel for Appellant
Lavon Dobie***

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# **TABLE OF CONTENTS**

Page

Table of Contents ii

Table of Citations iii

Statement of Subject Matter and Appellate
Jurisdiction 2

Statement of the Issues Presented for Review 2

Statement of the Case 3

Statement of Facts 4

Summary of the Arguments 7

Argument:

I.  **THE FORFEITURE ORDERS SHOULD BE VACATED AND THE FUNDS AND PROPERTY SHOULD BE RETURNED TO THE CLAIMANTS/APPELLANTS.**
35

**A. The District Court's Finding That Appellant Martin Failed to File a Timely Claim Contesting The Forfeiture of her Property Was Clearly Erroneous And Should be Reversed by This Court**.
38

**a. The District Court Misread CBP's Notice and CAFRA's Requirements In Finding That Appellant Martin Tardily Filed Her Forfeiture Claims**
40

**b.  If the District Court Properly Read CAFRA's Requirements That Appellant Martin's Deadline To File a Forfeiture Claim Was August 14, 2004, Then CBP's Notice Was Insufficient and Violated Due Process.**
46

**B. The District Court Erred in Finding That Despite Multiple Violations of Statutory Deadlines, and Despite the Command of 18 USC § 983(a)(3)(B) That Where The Government Fails to File Either a Civil Forfeiture Complaint or Take Steps to Hold Property Pursuant to a Criminal Forfeiture Statute, "the Government Shall Promptly Release The Property," The Government Could Continue to Deprive Appellant Martin of Her Funds.**

48

**C. The District Court Lacked Jurisdiction to Enter the Belated Forfeiture Order for the First Time After Sentencing Appellant Martin and codefendants/Appellants Goodwin, Bynum and Ali**.

55

**D. This Court Should Vacate the District Court's Forfeiture Orders Purporting to Forfeit Assets Not in Appellant Martin's Possession At The Time Sentence Was Imposed**.

62

**II.   APPELLANTS WERE DENIED A SPEEDY TRIAL, DUE TO THE GOVERNMENT'S DECISION TO CHARGE TOGETHER IN A SINGLE INDICTMENT DEFENDANTS WHOM IT HAD NEITHER INTENTION NOR ABILITY TO BRING TO TRIAL TOGETHER.**

64

**III.   THE TRIAL COURT ERRED IN PERMITTING GOVERNMENT LAW ENFORCEMENT WITNESSES TO TESTIFY AS EXPERTS, AND TO INTERMIX THEIR FACTUAL AND OPINION TESTIMONY**

69

**IV.   APPELLANT GOODWIN'S 6TH AMENDMENT RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE COURT ADMITTED THE OUT OF COURT TESTIMONIAL STATEMENTS OF TWO WITNESSES WHO WERE NEVER CALLED TO TESTIFY.**

80

**A. A Violation of the Standard Established in *Crawford v.***

ii

*Washington* Occurred When Det. Martini Testified To What Criminal Witness Raynard Dorsey Had Said to Another Police Officer.

80

B. A Violation of the Standard Established in *Crawford v. Washington* Occurred When Det.  Grant Testified To What Ayeesha Goodwin, Had Said to Another Police Officer During the November 25th, 2003 Stop.

83

V.    THERE WAS A VARIANCE BETWEEN THE PROOF OFFERED AT TRIAL AND THE CHARGES CONTAINED IN THE INDICTMENT AS RELATED TO THE DISTRIBUTION OF CRACK COCAINE.

88

VI.   THE DISTRICT COURT ERRED BY FAILING TO INSTRUCT THE JURY THAT THEY WERE REQUIRED TO MAKE A SPECIFIC FINDING THAT THE APPELLANTS DISTRIBUTED CRACK COCAINE AS OPPOSED TO SOME OTHER FORM OF COCAINE BASE.

94

A.  The Trial Court Did Not Properly Instruct the Jury Regarding the Definitions of Cocaine Base and "Crack."

95

VII.  THE TRIAL COURT ERRED IN ALLOWING THE GOVERNMENT TO KNOWINGLY USE PERJURED TESTIMONY AGAINST APPELLANT WHITING, AND THERE IS A REASONABLE LIKELIHOOD THAT THE FALSE TESTIMONY COULD HAVE AFFECTED THE OUTCOME OF THE TRIAL.

97

VIII. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT APPELLANT DOBIE OF A VIOLATION OF 18 USC § 924( C) BECAUSE THE GOVERNMENT FAILED TO PROVE THAT FIREARMS AND HEROIN FOUND IN HER HOME WERE CONNECTED IN ANY WAY TO THE MARTIN DRUG CONSPIRACY IDENTIFIED IN

THE INDICTMENT AS THE PREDICATE DRUG TRAFFICKING OFFENSE SUPPORTING THE § 924( C) CHARGE.

101

IX.    THE CONVICTION RELATIVE TO THE CONSPIRACY CHARGED IN COUNT ONE IS INFIRM BECAUSE THE UNITED STATES' PROOFS ESTABLISHED A MERE BUYER/SELLER RELATIONSHIP BETWEEN APPELLANT ALI AND APPELLANT MARTIN

110

X.    THE CONVICTION OF APPELLANT ALI AS TO COUNT ONE MUST BE REVERSED BECAUSE THE GOVERNMENT AT BEST PROVED A MULTIPLE CONSPIRACIES, AS OPPOSED TO A SINGLE CONSPIRACY.

116

XI.    THE MANDATORY MINIMUM SENTENCE OF 120 MONTHS IMPOSED ON APPELLANT ALI IS DISPROPORTIONATE AND UNCONSTITUTIONAL.

127

XII.    THE GOVERNMENT FAILED TO MEET ITS BURDEN OF PROOF REGARDING APPELLANT WHITING'S PRIOR CONVICTIONS AND THE TRIAL COURT ERRED IN CONCLUDING THAT THE EVIDENCE OF WHITING'S PRIOR CONVICTIONS WERE SUFFICIENTLY PROVEN TO APPLY THE MANDATORY LIFE SENTENCE.

132

XIII.    THE DISTRICT COURT ERRED IN ENHANCING THE SENTENCE OF APPELLANT BYNUM PURSUANT TO 21 USC § 841 BASED UPON A STATE COURT CONVICTION THAT WAS BASED UPON THE SAME EVIDENCE, CONDUCT AND CIRCUMSTANCES AS THE FEDERAL CONSPIRACY, WHEN THE SAME EVIDENCE, CONDUCT AND CIRCUMSTANCES IS ALSO USED TO CONVICT HIM IN THE FEDERAL

CONSPIRACY.

137

XIV. THE DISTICT COURT ERRED IN DENYING
APPELLANT DOBIE A MITIGATING ROLE
ADJUSTMENT.

141

A. The District Court's Denial of Appellant Dobie's
Mitigating Role Adjustment was Premised on a Clearly
Erroneous Fact.

143

B. The District Court's Denial of Appellant Dobie's
Mitigating Role Adjustment was Procedurally Flawed.

148

XV. THE DISTRICT COURT IMPERMISSIBLY APPLIED A
FIREARMS ENHANCEMENT TO APPELLANT
MARTIN, PER USSG § 2D1.1(B)(1), ABSENT A BASIS
FOR THIS IN THE EVIDENCE ADDUCED AT TRIAL.

154

XVI. THE SENTENCES IMPOSED WERE IN CERTAIN
INSTANCES PRESUMPTIVELY UNREASONABLE,
AND WERE IMPOSED WITHOUT GIVING ADEQUATE
CONSIDERATION TO THE DIRECTIVES OF 18 USC
§3553.

160

Request for Oral Argument                                   176

Conclusion                                                  177

# <u>TABLE OF CITATIONS</u>

## *Cases*

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000)          160, 161

*Barker v. Wingo,*
    407 U.S. 514 (1972)          68

*Baze et al. v. Rees, et al.,*
    553 U.S. 35 (2008)          131

*Blakely v. Washington*,
    542 U.S. 296 (2004)          160, 161, 164

*Blumenthal v. United States,*
    332 U.S. 539 (1947)          123, 125

*Brady v Maryland,*
    373 U.S. 83 (1963)          100

*Burman v. United States*,
    472 F. Supp. 2d 665 (D. Md. 2007)          54

*Cabana v. Bullock*,
    474 US 376 (1986)

*Coker v,. Georgia.,*
    433 U.S. 584 (1977)          129

*Crawford v. Washington,*
    541 U.S. 36 (2004)          4, 27, 72, 73, 74, 79, 80, 83, 85, 86, 87

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993)          77, 78

*Davis v. Washington*,
    547 U.S. 813 (2006)                85, 86

*Enmund v. Florida*,
    458 U.S. 782 (1982)                129, 130

*Gall v. United States*,
    552 U.S. 38 (2007)                141, 142, 143, 163, 165, 168

*Giglio v. United States*,
    405 U.S. 150 (1972)                100

*Graham v. Florida*,
    ___ U.S. ___, 130 S.Ct. 2011 (2010)     130

*Grunewald v. United States*,
    353 U.S. 391 (1957)                123

*Ianelli v. United States*,
    420 U.S. 770 (1975)                115

*In re Mosko*,
    515 F.3d 319 (4th Cir. 2008)        143

*In Re Return of Truck*,
    2008 U.S. Dist Lexis 92175 (S.D.Ca. 2008)     44

*Jackson v. Virginia*,
    443 U.S. 302 (1979)                103

*Kimbrough v. United States*,
    552 U.S. 85 (2007)                162, 163, 165, 168

*Kotteakos v. United States*,
    328 U.S. 750 (1946)                121, 123, 124, 125

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)                78

*Louisville & Nashville RR v. Mottley*,
　　211 U.S. 149 (1908)　　　　　　　　60

*Mullane v. Central Hanover Bank & Trust Co.*,
　　339 U.S. 306 (1950)　　　　　　　　147

*Napue v. Illinois,*
　　360 U.S. 264 (1959).　　　　　　　　97

*New York Life Insurance Co. v. Brown*,
　　84 F.3d 137 (5th Cir. 1996).　　　　　60

*Ohio v. Roberts,*
　　448 U.S. 56 (1980)　　　　　　　　　74

*O'Neil v. Vermont,*
　　144 U.S. 323 (1892)　　　　　　　　129

*Ring v. Arizona*,
　　536 U.S. 584 (2002)　　　　　　　　160

*Rita v. United States*,
　　551 U.S. 338 (2007)　　　　　　　　148

*Robinson v. California*,
　　370 U.S. 660 (1962)　　　　　　　　129

*Russell v. United States,*
　　369 U.S. 749 (1962)　　　　　　　　118

*Scott v. Sears, Roebuck & Co.,*
　　789 F.2d 1052 (4th Cir.1986)　　　　78

*Solem v. Helm,*
　　463 U.S. 277 (1983)　　　　　　128, 129

*Sosna v. Iowa,*
　　419 U.S. 393 (1975)　　　　　　　　60

*Spears v. United States,*
    __ U.S. ___, 129 S.Ct. 840 (2009)         164, 165, 168

*Trop v. Pulles,*
    356 U.S. 86 (1958)         129

*United States v. Allen,*
    446 F.3d 522 (4th Cir. 2006)         143

*United States v. Amend,*
    791 F.2d 1120 (4th Cir. 1986)         64

*United States v. Ashley,*
    555 F.2d 462,
    *reh'g denied*, 559 F.2d 29 (5th Cir. 1977),
    *cert. denied,* 434 U.S. 869 (1978)         121

*United States v. Bagley,*
    473 U.S. 667 (1985)         97

*United States v. Baptiste,*
    596 F.3d 214 (4th Cir. 2010)         80

*United States v. Bellamy,*
    336 Fed. Appx. 285, 209 WL 1918675,
    No. 06-5094 (4th Cir. July 2, 2009) (unpub.)         153

*United States v. Beradi,*
    675 F.2d 894 (7th Cir. 1981)         123

*United States v. Bennett,*
    423 F.3d 271 (3d Cir. 2005)         58

*United States v. Bewig,*
    354 F.3d 731 (8th Cir. 2003)         116

*United States v. Borelli,*
    336 F.2d 376 (2d Cir.1964)         159

*United States v Booker,*
      543 U.S. 220 (2005)                    34, 127, 151, 160, 161,
                                             162, 163, 164, 168, 173,
                                             174, 175

*United States v. Booker*,
      70 F.3d 488 (7th Cir. 1995)            *90*

*United States v. Borchadt,*
      698 F.2d 697 (5th Cir. 1983)         120

*United States v. Bothun,*
      424 F.3d 582 (7th Cir. 2005)           157

*United States v. Brisbane*,
      367 F.3d 910 (D.C.Cir. 2004)           90, 91, 92

*United States v. Brown*,
      859 F.2d 974  (D.C. Cir. 1988)         90, 91

*United States v. Carpenter,*
      95 F.3d 773 (9th Cir. 1996)          119

*United States v. Carter*,
      564 F.3d 325 (4th Cir. 2009)           148

*United States v. Childress,*
      58 F.3d 693 (D.C Cir. 1995)            159

*United States v. Cohen,*
      444 F. Supp. 1314 (E.D. Pa. 1978)      123

*United States v. Coward,*
      630 F.2d 229 (4th Cir. 1980)         121

*United States v. Croce*,
    345 F. Supp. 2d 492 (E.D. Pa. 2004)
    *rev'd* 209 Fed. Appx. 208 (3d Cir. 2006)         64

*United States v. Crockett*,
    435 F.3d 1305 (10th Cir. 2006)                     97

*United States v. Crutcher*,
    2010 U.S. Dist Lexis 11262 (M.D. Tenn. 2010)       58

*United States v. Cruz,*
    981 F.2d 659 (2d Cir.1992)                         76

*United States v. Cryan,*
    490 F. Supp. 1234 (D. N.J. 1980)                   126

*United States v. Culpepper,*
    916 F.Supp. 1257 (N.D. Ga. 1995)                   94

*United States v. Davis,*
    954 F.2d 182 (4th Cir. 1992)                       68

*United States v. Dawson*,
    587 F.3d 640 (4th Cir. 2009)                       152

*United States v. DePierre,*
    599 F.3d 25 (1st Cir. 2010)                        94, 96

*United States v. Diaz-Ibarra*,
    522 F.3d 343 (4th Cir. 2008)                       143

*United States v. Dicker,*
    853 F.2d 1103 (3d Cir.1988)                        78

*United States v. Doggett* ,
    505 U.S. 647 (1992)                                68, 69

*United States v. Dukagjini,*
      326 F.3d 45 (2d Cir. 2003)                    77, 78, 79

*United States v. Edwards*,
      98 F.3d 1364 (D.C. Cir. 1996)                 90

*United States v. Farrior*,
      535 F.3d 210 (4th Cir. 2008)                  141

*United States v. Fischback and Moore, Inc.,*
      750 F.2d 1183 (3rd Cir. 1984)                 128

*United States v. Fleschner*,
      98 F.3d 155 (4th Cir. 1996)                 119

*United States v. Fuller,*
      532 F.3d 656 (7th Cir.2008)                   114, 115

*United States v. Gates,*
      967 F.2d 497 (11th Cir. 1992)                 149

*United States v. Gatling,*
      96 F.3d 1511 (D.C. Cir. 1996)                 120

*United States v. Gibbs,*
      190 F.3d 188 (3d Cir.1999)                    75, 78

*United States v. Gonzalez,*
      365 F.3d 656 (8th Cir. 2004)                  158

*United States v. Goode,*
      510 U.S. 43 (1993)                            48

*United States v. Griffith,*
      118 F.3d 318 (5th Cir.1997)                   75

*United States v. Grimmond,*
    137 F.3d 823 (4th Cir.),
    *cert. denied,* 525 U.S. 850 (1998)    69

*United States v. Guyton,*
    35 F.3d 655 (7th Cir. 1994)    94

*United States v. Hall,*
    551 F.3d 1257 (4th Cir. 2009)    69, 115

*United States v. Hall,*
    434 F.3d 42 (1st Cir.2006)    88, 95

*United States v. Hartwell,*
    448 F.3d 707 (4th Cir.),
    *cert. denied*, 2006 U.S. Lexis 7373 (2006)    60

*United States v. Hemphill*,
    514 F.3d 1350 (D.C. Cir. 2008)    120

*United States v. Henry,*
    538 F.3d 300 (4th Cir,. 2008)    67

*United States v. Highsmith,*
    268 F.3d 1141 (9th Cir. 2001)    157

*United States v. Hopkins,*
    310 F.3d 145 (4th Cir. 2002)    68

*United States v. Hubbard,*
    96 F.3d 1223 (9th Cir. 1996)    119

*United States v. Ingman,*
    541 F.2d 1329 (2nd Cir. 1972)    120

*United States v. Iskander,*
    407 F.3d 232 (4th Cir.2005)    87

*United States v. Jackson,*
    696 F.2d 578 (8th Cir. 1982)        120

*United States v. James,*
    78 F.3d 851 (3rd Cir.1996)        94

*United States v. Jimenez Recio*,
    537 U.S. 270 (2003)        139

*United States v. Jones,*
    526 U.S. 227 (1999)        161

*United States v. Jordan*,
    509 F.3d 191 (4th Cir. 2007)        86, 87

*United States v. Kearney*,
    451 F. Supp. 33 (S.D.N.Y. 1978)        122, 123

*United States v. Kennedy*,
    32 F.3d 876 (4th Cir. 1994)        116

*United States v. King*,
    368 F. Supp. 2d 509 (D.S.C. 2005)        59

*United States v. Kiulin,*
    360 F.3d 456 (4th Cir. 2004)        153

*United States v. Kremer*,
    2006 U.S. Dist Lexis 89034 (E.D.N.Y. 2006)        54

*United States v. Koch*,
    491 F.3d 929 (8th Cir. 2007)        59

*United States v. Lawrence*,
    535 F.3d 631 (7th Cir. 2008)        60, 61

*United States v. Lee,*
    694 F.2d 649 (11th Cir. 1983)        119

*United States v. Leichtman,*
     948 F.2d 370 (7th Cir. 1991)                    119

*United States v. Levine*,
     546 F.2d 658 (5th Cir. 1977 )                     121

*United States v. Locklear,*
     97 F.3d 196 (7th Cir. 1996)                     118

*United States v. Lombardozzi,*
     498 F.3d 61 (2d Cir. 2007)                        80

*United States v. Long*,
     905 F.2d 1572 (D.C. Cir. 1990)                    96

*United States v. Lopez*,
     384 F.3d 937 (8th Cir. 2004)                      157, 159

*United States v. Lopez–Gil,*
     965 F.2d 1124 (1st Cir. 1992)                     90

*United States v. Lomax,*
     293 F.3d 701 (4th Cir. 2002)                      101, 103, 110

*United States v. Love,*
     134 F.3d 595 (4th Cir.1998)                       94

*United States v. Maher,*
     454 F.3d 13 (1st Cir. 2006)                     80

*United States v. Mancillas,*
     580 F.2d 1301 (7th Cir. 1978),
     *cert. denied*, 439 U.S. 958 (1978)               114

*United States v. Martin*
     460 F. Supp. 2d 669 (D. Md. 2006)                 20, 37, 38, 42, 43, 44,
                                                       45, 46, 47, 48, 50

*United States v. Martino*,
    294 F.3d 346 (2nd Cir. 2002)                138

*United States v. Mastrapa*,
    509 F.3d 652 (4th Cir. 2007)                115

*United States v. May,*
    343 F.3d 1 (1st Cir. 2003)                  158

*United States v. McFarley*,
    991 F.2d 1188 (4th Cir. 1993)               55

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008)                 79

*United States v. Mendoza-Mesa,*
    384 F.3d 951 (8th Cir. 2004)                158

*United States v. Miche,*
    558 F.2d 994 (5th Cir. 1979)                120

*United States v. Morace,*
    594 F.3d 340 (4th Cir. 2010)                142

*United States v. Moreland*,
    568 F.Supp.2d 674 (S.D.W.V. 2008)           165, 166

*United States v. Myers*,
    353 F.Supp.2d 1026 (S.D. Iowa 2005)         174

*United States v. Nelson-Rodriguez*,
    319 F.3d 12 (1st Cir. 2003)                 174

*United States v. Nersesian,*
    824 F.2d 1294 (2d Cir. 1987)                76

*United States v. Ninety-Three (93) Firearms*,
    330 F.3d 414, 422 (6th Cir. 2003)           40

*United States v. Ochoa,*
    609 F.2d 198 (5th Cir. 1980)    121

*United States v. One Silicon Valley Bank Account,*
    549 F. Supp. 2d 940 (W.D. Mi. 2008)    54

*United States v. Osborne,*
    514 F.3d 377 (4th Cir.),
    *cert. denied,* 128 S.Ct. 2525 (2008)    143

*United States v. Patterson,*
    348 F.3d 218 (7th Cir. 2003)    119

*United States v. Petrie,*
    302 F.3d 1280 (11th Cir. 2002)    58

*United States v. Place,*
    462 U.S. 696 (1983)    55

*United States v. Polizzi,*
    801 F.2d 1543 (9th Cir. 1986)    97

*United States v. Pompey,*
    264 F.3d 1176 (10th Cir. 2001)    158

*United States v. Pratt,*
    239 F.3d 640 (4th Cir. 2001)    149, 152

*United States v. Pressler,*
    256 F.3d 144 (3rd Cir. 2001)    111, 116

*United States v. Quinn,*
    359 F.3d 666 (4th Cir. 2004)    118

*United States v. Radowitz,*
    507 F.2d 109 (3rd Cir. 1974)    118

*United States v. Randall*,
    171 F.3d 195 (4th Cir. 1999)        103, 105

*United States v. Ranum,*
    353 F.Supp.2d 984 (E.D. Wis. 2005)    162, 175

*United States v. Ray*,
    21 F.3d 1134 (D.C. Cir. 1994)    91

*United States v. Reavis*,
    48 F.3d 763 (4th Cir. 1995)    65, 149, 154

*United States v. Resendiz v. Ponce*,
    127 S.Ct.782 (2007)    118

*United States v. Reyes*,
    102 F.3d 1361 (5th Cir. 1996)    104

*United States v. Richmond,*
    700 F.2d 1183 (8th Cir. 1983)    119

*United States v. Rivera*,
    22 F.3d 430 (2d Cir.1994)    76

*United States v. Rodriquez-Moreno*,
    526 U.S. 275 (1999)    158

*United States v. Simmons,*
    923 F.2d 934 (2d Cir.1991)    75, 76

*United States v. Scop,*
    846 F.2d 135 (2d Cir.1988)    76

*United States v. Simpson,*
    910 F.2d 154  (4th Cir.1990)    94

*United States v. Spinney*,
    65 F.3d 231 (1st Cir. 1995)    103

*United States v. Soskin*,
    100 F.3d 1377 (7th Cir. 1996)                118

*United States v. Souffront*,
    338 F.3d 809 (7th Cir. 2003)                158

*United States v. Stallings*,
    463 F.3d 1218 (11th Cir. 2006)              157

*United States v. Starks,*
    515 F.2d 112 (3rd Cir. 1975)                122

*United States v. Stephens,*
    482 F.3d 669 (4th Cir. 2007)                115

*United States v. Stevens,*
    935 F.2d 1380 (3d Cir.1991)                 78

*United States v. Stockton,*
    349 F.3d 755 (4th Cir. 2003)                120

*United States v. Stoudenmire*,
    74 F.3d 60 (4th Cir. 1996)              65, 67, 154

*United States v. Surgent*,
    2009 U.S. Dist Lexis 72563,
    2009 WL 2525137 (E.D.N.Y. 2009)             64

*United States v. Tabron,*
    437 F.3d F.3d 63 (D.C Cir. 2006)            159

*United States v. Thomas,*
    55 F.3d 144 (4th Cir. 1995)                 68

*United States v. Thurman*,
    417 F.2d 752 (D.C. Cir. 1969)               96

*United States v. Topete-Plascencia,*
    351 F.3d 454 (10th Cir. 2003)        158

*United States v. Townsend,*
    924 F.2d 1385 (7th Cir. 1991)        115

*United States v. Udeozor*,
    515 F.3d 260 (4th Cir. 2008)        87

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948)        143

*United States v. Valerio*,
    48 F.3d 58 (1st Cir. 1995)        103

*United States v. Vampire Nation*,
    451 F.3d 189 (3d Cir. 2006)        64

*United States v. Vinyard,*
    266 F. 3d 320 (4th Cir. 2001)        118

*United States v. Wardell,*
    591 F.3d 1279 (10th Cir. 2009),
    *cert. denied,* 129 S.Ct. 2783 (2009)        119

*United States v. Washington*,
    41 F.3d 917 (4th Cir. 1994)        147, 148

*United States v. West,*
    15 F.3d 119 (8th Cir. 1994),
    *cert. denied*, 513 U.S. 863 (1994)        114

*United States v. Whitney*,
    229 F.3d 1296 (10th Cir. 2000)        119

*United States v. Willoughby*,
    27 F.3d 263 (7th Cir. 1994)        104

*United States v. Wilson*,
    484 F.3d 267 (4th Cir. 2007)       120

*United States v. Wilson,*
    178 F.Supp 881 (D. D.C. 1959)      94

*United States v. Yeje-Cabrera*,
    430 F.3d 1 (1st Cir. 2005)      58

*United States v. Young,*
    745 F.2d 733 (2d Cir.1984)      75, 77

*Weems v. United States,*
    217 U.S. 349 (1910)      128, 129

*Zedner v. United States,*
    547 U.S. 489 (2006)      68

## *STATUTES*

18 USC § 371      139

18 USC § 924( c)      5, 28, 29, 101, 103, 104, 105,
      108, 109, 110, 115, 156

18 USC § 983      3, 25, 44, 46, 48, 49, 52, 53, 55

18 USC § 2510      10

18 USC § 3142      155

18 USC  § 3161      66, 67, 68

18 USC § 3162      68

18 USC § 3173      66

18 USC § 3553                          7, 33, 142, 160, 161, 162, 163,
                                       167, 171, 173, 174, 175

18 USC § 3742(e)                       2, 174, 175

19 USC § 1602-1621                     41

21 USC § 841                           6, 8, 14, 32, 91, 133, 134, 136,
                                       137, 138, 140

21 USC § 844                           137

21 USC § 846                           8, 147, 104, 105

21 USC § 853                           26, 55

### SENTENCING GUIDELINES

USSG § 2D1                             91, 93, 154

USSG § 3B1                             32, 143, 144, 148, 149, 150,
                                       151, 152

USSG § 3C1                             144

USSG § 3E1                             144

USSG § 4A1                             140, 145

USSG § 5H1                             173

USSG § 5K2                             173

USSG § 6A1                             164

## *RULES*

Fed. R. Crim. P. 32.2                    26, 37, 55, 57, 59, 63

Fed. R. Evid. 403                        76, 77, 94

Fed. R. Evid. 702                        27, 70, 72, 76, 77 78, 79

Fed. R. Evid. 703                        27, 70, 72, 74

## *TREATISES, ETC.*

Stefan D. Cassella,
    *ASSET FORFEITURE LAW IN THE UNITED STATES*
    (JurisNet LLC 2007)                    37, 56

Edith Fairman Cooper,
    *THE EMERGENCE OF CRACK COCAINE ABUSE* (2002)
                               90

Stephen A. Saltzburg, et al.,
    *FEDERAL RULES OF EVIDENCE MANUAL* (7th ed.1998)
                               78
United States Sentencing Commission,
    *COCAINE AND FEDERAL SENTENCING POLICY* (2002)
    ("*Sentencing Commission Report*")        90, 91

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

————

No. 07-4059 (L)

————

**LEARLEY GOODWIN, ET AL.,**

Appellant,

v.

**THE UNITED STATES OF AMERICA**,

Appellee.

————

JOINT BRIEF OF APPELLANTS

————

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND,
SOUTHERN DIVISION

(Roger W. Titus, U.S.D.J.)

————

Michael D. Montemarano, Esq.
Michael D. Montemarano, P.A.
5695 Main Street, Suite 201
Elkridge, MD 21075-5016
(410) 379-0067
Lead Counsel For Appellants

## STATEMENT OF  SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal from final judgments in a criminal prosecution, entered against Appellants on or about December 19, 2006, as six criminal defendants who went to trial together during the summer of 2006.  Jurisdiction in the District Court was based upon 18 USC § 3231.

By timely Notices of Appeal Appellants request this Court to review the final decision of the district court as to their conviction and sentence, pursuant to the jurisdiction conferred by 28 USC § 1291.

Appellants also requests this Court to review their sentences pursuant to the provisions of 18 USC § 3742.

## STATEMENT OF
## THE ISSUES PRESENTED FOR REVIEW

*Issue I.*

Whether the forfeiture orders should be vacated and the funds and property should be returned to the claimants/Appellants?

A. Whether the district court's finding that Appellant Martin Failed to file a timely claim contesting the forfeiture of her property was clearly erroneous and should be reversed by this Court?

2

B. Whether the district court erred in finding that despite multiple violations of statutory deadlines, and despite the command of 18 USC § 983(a)(3)(B) that where the government fails to file either a civil forfeiture complaint or take steps to hold property pursuant to a criminal forfeiture statute, "the government shall promptly release yhe property," the government could continue to deprive Appellant Martin of her funds?

C. Whether the district court lacked jurisdiction to enter the belated forfeiture order for the first time after sentencing Appellant Martin and codefendants/Appellants Goodwin, Bynum and Ali?

D. Whether this Court should vacate the district court's forfeiture orders purporting to forfeit assets not in Appellant Martin's possession at the time sentence was imposed?

*Issue II.*

Whether Appellants were denied a speedy trial, due to the government's decision to charge together in a single indictment defendants whom it had neither intention nor ability to bring to trial together?

*Issue III.*

Whether the district court erred in permitting law enforcement witnesses to testify as experts, and to intermix their factual and expert testimony?

3

*Issue IV.*

Whether Appellant Goodwin's 6th amendment right to confrontation was violated

when the district court admitted the out of court testimonial statements of two

witnesses who were never called to testify?

      A.  Whether a violation of the standard established in *Crawford v.*

*Washington* occurred when Det. Martini testified to what criminal witness

Raynard Dorsey had said to another police officer.

      B. Whether a violation of the standard established in *Crawford v.*

*Washington* occurred when Det. Grant testified to what Ayeesha Goodwin

had said to another police officer during the November 25th, 2003, stop.

*Issue V.*

Whether there was a variance between the proof offered at trial and the charges

contained in the indictment as related to the distribution of crack cocaine?

*Issue VI.*

Whether the trial court erred by failing to instruct the jury that they were required

to make a specific finding that the Appellants distributed crack cocaine as opposed

to some other form of cocaine base?

    A.  Whether the district court properly instructed the jury regarding the

definitions of cocaine base and "crack?"

4

*Issue VII.*

Whether the trial court erred in allowing the government to knowingly use

perjured testimony against Appellant Whiting, and there is a reasonable likelihood

that the false testimony could have affected the outcome of the trial?

*Issue VIII.*

Whether there was sufficient evidence to convict Appellant Dobie of a violation of

18 USC § 924( C), when the government failed to prove that firearms and heroin

found in her home were connected in any way to the martin drug conspiracy

identified in the indictment as the predicate drug trafficking offense supporting the

§ 924(c) charge?

*Issue IX.*

Whether the conviction relative to the conspiracy charged in Count One is infirm

because the government's proofs established a mere buyer/seller relationship

between Appellant Ali and Appellant Martin?

*Issue X.*

Whether the conviction of Appellant Ali as to Count One must be reversed

because the government at best proved a multiple conspiracies, as opposed to a

single conspiracy?

*Issue XI.*

Whether the mandatory minimum sentence of 120 months imposed on Appellant Ali is disproportionate and unconstitutional?

*Issue XII.*

Whether the government failed to meet its burden of proof regarding Appellant Whiting's prior convictions and the trial court erred in concluding that the evidence of his prior convictions were sufficiently proven to apply the mandatory life sentence?

*Issue XIII.*

Whether the district court erred in enhancing the sentence of Appellant Bynum pursuant to 21 USC § 841 based upon a state court conviction that was based upon the same evidence, conduct and circumstances as the federal conspiracy, when the same evidence, conduct and circumstances is also used to convict him in the federal conspiracy?

*Issue  XIV.*

Whether the distict court erred in denying Appellant Dobie a mitigating role adjustment?

      A. Whether the district court's denial of Appellant Dobie's mitigating role adjustment was premised on a clearly erroneous fact?

B. Whether the district court's denial of Appellant Dobie's mitigating role adjustment was procedurally flawed?

*Issue XVI.*

Whether the district court impermissibly applied a firearms enhancement to Appellant Martin, per USSG § 2d1.1(b)(1), absent a basis for this in the evidence adduced at trial?

*Issue XVI.*

Whether the sentences imposed were in certain instances presumptively unreasonable, and were imposed without giving adequate consideration to the directives of 18 USC §3553?

## STATEMENT OF THE CASE

The several Appellants were charged by indictment with numerous federal narcotics offenses, and related charges, in the spring of 2004. The charging document and its successor filings alleged, *inter alia*, conspiracy to distribute and possession with intent to distribute cocaine, heroin and cocaine base, pursuant to 21 USC §841(a), 21 USC §841(b)(1)(A) and 21 USC §846.[1] JA indictment). Trial commenced on June 6, 2006, with jury selection. After 42 days of trial, including deliberations[2], a verdict of guilt was returned on August 31, 2006, as to virtually all counts on all of the Appellants, including the count 1 conspiracy to possess with intent to distribute, and substantive counts of possession with intent to distribute. Appellants Dobie and Bynum also were charged with and convicted of firearms offenses.

On December 19th, 2006, Appellant Martin was sentenced to life imprisonment on count 1, with concurrent sentences on the other counts of conviction, over fifty in number. JA Martin judgement. A timely notice of appeal

---

[1] The first of five indictments was entered sealed on the docket sheet on May 5, 2004. The fifth superseding indictment, on which the Appellants were tried, was filed on September 21, 2005.

[2] The jury began its deliberations on August 8, 2006 and returned a verdict on August 31, 2006.

was filed on , .  JA Martin appeal

On December 19th, 2006, Appellant Goodwin was sentenced to a term of life imprisonment as to counts 1 and 55; 360 months as to Count 2; and 48 months to run concurrently as to counts 18,26,48,51 & 54.  JA goodwin judgment.  A timely notice of appeal was filed on December 19, 2006.  JA Goodwin appeal

On December 19th, 2006, Appellant Whiting was sentenced to life imprisonment as to count 1, and 4 years of imprisonment each as to counts 3, 9, 15, 21, 27, 49 and 58.  JA Whiting judgement.  A timely notice of appeal was filed on January 10, 2006.   JA Whiting appeal

On December 19, 2006, appellant Bynum was sentenced to 240 months as to count 1, 240 months as to counts 8 and 40, 48 months as to each of counts 7, 17 and 39 concurrent to count 1, 60 months as to count 59 consecutive to count 1, and 120 months as to count 60 concurrent to count 1 for a total of 300 months.  JA Bynum Judgment. A timely notice of appeal was filed on December 20, 2006. JA Bynum Appeal

On December 19, 2006, Appellant Dobie was sentenced to 146 months on count 1, plus concurrent sentences for the other counts, with 60 months consecutive for the firearms count, for a total of 206 months.  JA Dobie jmt.  A timely notice of appeal was filed on December 21, 2006. JA Dobie Appeal

## STATEMENT OF FACTS

Appellants were charged in a narcotics distribution conspiracy, along with 25 other persons named on the original indictment in the spring of 2004. The alleged scheme began sometime in January 1997 and ended in June, 2004, with the unsealing of the indictment and the mass arrests of the indictees. The conspiracy's activities purportedly spanned several states and the District of Columbia, [3] and allegedly operated through the direction of Appellants Paulette Martin and Learley Goodwin, whose role essentially was to broker transactions between suppliers and ultimate distributors, but who also engaged in low level disttribution.

The framework for the government's case in chief was wiretaps authorized pursuant to 18 USC §2510. Government trial counsel attempted to build on this framework through the testimony of certain witnesses, both cooperators and law enforcement. Principal amongst those witnesses were Det. Sgts. Christopher Sakala, David Martini and Thomas Eveler. Each of these detectives testified in substance, if not form, as expert witnesses in the area of narcotics distribution and conspiracy to distribute the same. Det. Sakala's primary role was to interpret conversations said to be in coded language, while at the same

---

[3]

This case is a companion case to *United States v. Donna Johnson, et al.*; No. 06-4391; 587 F.3d 625 (4th Cir. 2009)

time he testified as a fact witness.  In addition to Det. Sakala there were other DEA task force members, including local law enforcement personnel involved in arrests and surveillance, who testified as fact witnesses.  While some of their testimony was based on personal first hand knowledge, important parts were deemed admissible as hearsay.  It is those portions in which the "expert" witnesses testified as conduits for hearsay that constitutes the core of certain of the arguments in this appeal.

The wiretapped calls provided information which led to the issuance of warrants for the search of numerous locations, including several related directly to the Appellants.

The six Appellants went to trial on a 62 count Fifth Superseding Indictment, JA , which commenced on June 6, 2004.  The jury returned its verdict on August 31, 2004.  JA docket.

## Appellant Paulette Martin

Appellant Martin originally came to the attention of law enforcement by way of an investigation of another narcotics case.  Government cooperators, including Nathan King and Pernell Philpot, claimed to have delivered and or/shipped cocaine in kilogram amounts to Appellant Martin during the period of the conspiracy, and smaller amounts of heroin.  Similarly, cooperators claimed to

11

have been involved in delivery kilogram amounts of cocaine to Appellant Goodwin. Another cooperator claimed to have participated in narcotics transactions with Appellants Martin and Whiting. The government claimed that intercepted telephone calls corroborated these cooperators claims.

During the period in which the wiretap was up and Appellant Martin's home was under law enforcement surveillance, a codefendant, Luis Mangual, was determined to have been supplying narcotics to her. He was seen visiting her home by law enforcement. The government claimed that these trips involved deliveries of kilograms of cocaine. During this time another codefendant, Gwendolyn Levi, was arrested transporting 2.3 kilograms of heroin from New York. Levi was claimed to be Appellant Martin's source for heroin, much of which was obtained from a cooperator, Uriarte.

While the search of Appellant Martin's business resulted in the seizure of a small amount of heroin, and nearly a kilogram of cocaine and cocaine base, the search of her home located only very small amounts of these drugs.

**Appellant Reece Whiting**

Emilio Echarte was called by the Government and testified as to his relationship with both Appellant Martin and Appellant Whiting. As to Appellant Whiting, Echarte specifically stated that he met him Whiting while Echarte was

living at Appellant Martin's home in 2001. JA 7-11-06 p. 135). Echarte testified that he knew Appellant Whiting as a drug user who bought cocaine and sometimes heroin from him. JA 7-11-06 p 135-36).

Echarte further testified that Appellant Whiting made one significant purchase of heroin from him of 100 grams at a price of $100 per gram. JA 7-11-06 p 137). Echarte fronted the majority of the purchase price and received $2,300 from Appellant Whiting up front. JA 7-11-06p 137). After a period of time, Appellant Whiting returned approximately 75% of the drugs to Echarte because he was unable to sell the heroin and was using more of the drug than he was able to sell. JA7-11-06p 138)   Accordinbg to Echarte this left Appellant Whiting with a debt owed to Echarte for a portion of the drugs.   JA7-11-06p 137). Due to this debt, Echarte enlisted  Appellant Whiting to drive for him when Echarte picked up large quantities of drugs that he had brought to Virginia from Florida. JA 7-11-06 p139. Eventually he discontinued using  Appellant Whiting as Echarte testified that  Appellant Whiting's driving was unreliable due to his consumption of drugs. JA  7-11-06p 141).

**Appellant Derrick Bynum**

The government used evidence  to convict Appellant Bynum in this case that was obtained in part from the execution of a search warrant in 1999 by the

13

Prince George's County Police Department.  Based on the evidence obtained in the State of Maryland case,  Appellant Bynum pled guilty to possession of a firearm, and possession with intent to distribute cocaine.  He received a state court sentence of a term of 5 years.  ¶ 5, JA Bynum PSR.

When Appellant Bynum was charged five years later in the prosecution underlying the instant appeal, the government used these same drugs found in 1999, for which he had been convicted and sentenced in state court, to support the distribution charges in this federal conspiracy.  The government also used other evidence, including a firearm and letters that were seized during the 2004 searches, in order to tie him into the conspiracy.  JA July 11, 2006, p. 67-94.

Having introduced all of the evidence found from the 1999 arrest and obtained a conviction based upon this evidence, the government then requested that the district court use the same evidence and the conviction derived from that evidence to obtain an enhanced sentence on Appellant Whiting, pursuant to 21 USC § 841.  The court rejected the argument that the conviction in 1999, which the government conceded was evidence of the federal conspiracy, was not a prior conviction, rather it was an identical state conviction to the federal conviction but not barred by double jeopardy.  JA December 19, 2006, p 88-91.

14

**Appellant Lavon Dobie**

In its case-in-chief, the government played a number of wiretapped conversations between Appellant Dobie and Appellant Martin for the jury. Several of these calls revealed that Appellant Dobie often contacted Appellant Martin for drugs.  JA  Call #s B829, A423, B5116, B5982, B5986, B6986, B7104, B7167, B7324, B7876). However, Appellant Dobie testified that she had never sold drugs, and although Appellant Martin provided drugs for her personal use, there was no evidence that she sold drugs for Appellant Martin. JA July 28, 2006 Trial Tr. p. 202 ). While the conspiracy was alleged to involve a large amount of drugs and hundreds of thousands of dollars, Appellant Dobie stated she never saw large quantities of drugs or money in Appellant Martin's home. JA July 28, 2006 Trial Tr. p. 247).

Out of the many individuals implicated in the charged conspiracy, Appellant Dobie was acquainted with only a handful of people who also associated with Appellant Martin. JA July 28, 2006 Trial Tr. pp. 203-208).[4]  Conversations

---

[4] Among those individuals was Gwen Levi, from whom Appellant Dobie obtained marijuana and heroin. JA July 28, 2006 Trial Tr. pp. 210-211).  Appellant Dobie was friends with Ms. Levi's daughter, and eventually, Ms. Levi came to refer to Appellant Dobie as her "goddaughter." JA July 28, 2006 Trial Tr. pp. 209-210). When Ms. Levi was arrested, Appellant Dobie discussed this with Appellant Martin and tried to arrange a jail visit with Ms. Levi on Appellant Martin's behalf. JA July 28, 2006 Trial Tr. p. 188). No evidence was introduced to

between Appellant Martin and her associates indicate that she did not want Appellant Dobie involved in her business and found Appellant Dobie to be a nuisance. JA June 23, 2006 Trial Tr. p. 29-30; June 30, 2006 Trial Tr. p. 76-79; Call #s A267 & B2383). On March 17, 2004, Appellant Martin complained to Gwen Levi that she did not want Appellant Dobie coming to her home during the night and taking things without permission. (Call A267). Appellant Martin also stated, "That's why I said I have to, you know, give you those papers at another time." (Call A267). The government's witness, Det. Christopher Sakala, conceded this call meant Appellant Martin did not want Appellant Dobie "in her business," as she did not want Appellant Dobie observing her exchange money with Ms. Levi.. JA June 30, 2006 Trial Tr. p. 79). During a conversation with John Martin, on April 1, 2004, Appellant Martin again complained about Appellant Dobie's coming to her house to try to buy drugs at night. JA June 23 Trial Tr. pp. 29-30; Call #2383).

In one conversation that took place on May 11, 2004,  Appellant Dobie, listed as "BD" in the transcript, was overheard discussing drugs with Appellant Martin, "PM," as follows:

PM:   Mm-mm-mm. Now, uh, somebody called me, they looking for

---

suggest that Appellant Dobie was successful in visiting Ms. Levi.

16

them tickets like Gwen had. I told them, "I don't know nobody with those kind, you know, that have a show like . . . I don't know."

BD:    Find out what they want. I just got, uh, fifty of them but I'm about down 'bout, 'bout, ten or fifteen of them my damn self now. I found somebody and I done got rid of most of 'em, cause it was nothing [unintelligible].

(Call # B6229). Det. Sakala interpreted this call to mean Appellant Dobie possessed ten to fifteen grams of heroin. JA June 28, 2006 Trial Tr. pp. 159-160). When questioned about this exchange, Appellant Dobie testified that she had just bought one gram of heroin on the street for her personal use. JA August 1, 2006 Trial. Tr. p. 122-123). Though she agreed that the conversation related to heroin, Appellant Dobie denied having sold any. JA August 1, 2006 Trial. Tr. p.123-124). Moreover, there was no evidence that Appellant Dobie bought this heroin from Appellant Martin, sold it to Appellant Martin, or sold it to anyone else at Appellant Martin's behest. In closing, the government claimed Appellant Dobie's statement about ten to fifteen tickets corresponded to the 11.65 grams of heroin found with the two handguns underneath Appellant Dobie's bed during the search of her residence. JA August 9, 2006 Trial Tr. p. 48.). However, the government presented no evidence linking the heroin discussed in this call with the heroin found in the home three weeks later.

In convicting her of all counts, the jury held Appellant Dobie responsible

17

for between 100 grams and 1 kilogram of heroin, less than 500 grams of cocaine powder, and between 5 and 50 grams of cocaine base. JA August 31, 2006 Trial Tr. pp. 13-14).

### Appellant Lanora Ali

Appellant Ali's home, 620 Sheridan Street, Apartment 301, Hyattsville, Maryland, which she shared with her husband Ulysses Garner, also was searched on June 1, 2004.   A locked blue suitcase was seized from a walk-in closet.  JA trx 4 Aug06 114). A tabulation of the currency contained in the suitcase resulted in an "official count of $129,600.00." JA trx 4 Aug06 120).  Appellant Ali and her husband denied having a key, and claimed the suitcase belonged to Appellant Martin.  JA trx 4 Aug06 41-43, 50

Garner explained that the suitcase had been transported to the Sheridan Street apartment "at the end of 2002 or early part of 2003." (41).  Appellant Martin contacted Appellant Ali and Garner, stating that "she had some important papers and valuables in [a] suitcase and wanted to know if [they] would hold them until she moved into her new house." JA 4 Aug06 42).  Ali and Garner agreed to this gratuitous bailment. JA 4 Aug06 42).  Martin would visit the apartment from time to time and rummage through the suitcase. (43). After each such occasion she would close and lock it. JA 4 Aug06 43).

18

The suitcase also contained documents "with the name Paulette Martin on

[them]." JA 4 Aug06 121). Indeed, every document in the suitcase "had Paulette

Martin's name on it." JA 4 Aug06 168).[5] Also located in the apartment was "a

small amount of cocaine and a straw" in the bedroom, and an empty glassine

baggie with trace amounts of cocaine in the bathroom. JA 4 Aug06 131-132). The

glassine bags were in a toiletry bag. JA 4 Aug06 133). And, consistent with

personal use of the controlled substance at issue, Muldoon also found "a crack

pipe." JA 4 Aug06 133).[6]


Defense counsel played a recorded telephone conversation involving

Garner, Appellant Goodwin and Appellant Martin. JA 4 Aug06 220). Garner

_____

[5] Several digital scales were also found within the suitcase. Muldoon
testified that he seized 15 digital scales of "two different types." He stated that the
scales were packaged and "appeared unopened and unused at the time." JA trx 4
Aug 06 123). The scales were described as being either a "Tanita digital mini-slim
scale" or "a Tanita Professional Mini." JA trx 4 AUG 06 124).

[6] The United States and Ali entered into certain stipulations. The
stipulations stated:

> .60 grams of cocaine was recovered from 620 Sheridan
> Street…a substance containing a detectable amount of
> cocaine and .14 grams of cocaine base, commonly
> known as crack was recovered [also] from 620 Sheridan
> Street. JA 4 Aug06 133-134).

Muldoon confirmed that the indications are that the substances seized established
"personal use of cocaine." JA 4 Aug06 171.

testified that the conversation embodied his (Garner's) analysis of "a work sheet which had the proposed expenses for [a prospective] Aretha Franklin show." JA 4 Aug06 220).  Garner's follow-up conversation with Martin and Ron Hood was also played. (222). Garner described Hood as Goodwin's partner. JA 4 Aug06 223, 224). Garner unequivocally denied "any knowledge that [Martin or others] may have been involved in drug activity." JA 4 Aug06 235). Garner stated:

> There was nothing there, the number of times that I was in [Martin's] home and environment that led me to believe that any illegal activities were taking place.  JA 4 Aug06 235-236).

Garner was unaware of his wife's drug abuse until "after she was arrested." JA 4 Aug06 62). Garner stated that "[he] at no time saw any cocaine in [his] house." JA 4 Aug06 95). During the course of the search, "[a] police officer came into the room [at] approximately 10 o'clock and said, your wife appears to have a drug problem. Didn't you see the cocaine on top of the dresser." JA 4 Aug06 101). With regard to that comment, Garner replied "There was no cocaine on top of the dresser in the bedroom when [he] got up that morning." JA 4 Aug06 101).

Ali testified on her own behalf. (Transcript of August 4, 2006).  Ali was born in Newark, New Jersey in 1953. She attended school and resided in that municipality until 1971. At that time, Ali graduated high school and matriculated into the American University in Washington, D.C.  JA 4 Aug06 136). She

20

subsequently achieved a Bachelor of Arts and Sciences Degree, majoring in elementary education.  JA 4 Aug06  137). In 1975, Ali also obtained the "equivalency to a Master's Degree…[completing] courses at several different universities."  JA 4 Aug06 137).

Ali maintained employment during the time period wherein she pursued the Master's Degree. Her vocational endeavors commenced with employment at the National Institute of Health in 1972.  Ali departed from that position in 1975 when she began her tenure as a teacher in the District of Columbia public school system. JA 4 Aug06 138).  Ali was continuously retained in that public school system until June 2004. (139). On July 29, 2000 she married Ulysses Garner JA 4 Aug06 140). He too was employed in the D.C. public school system as a school teacher.  JA 4 Aug06 140-141).

Ali met Paulette Martin in 1996 or 1997.  JA 4 Aug06147). Ali had no further contact with Martin after the 1996-1997 introduction until 1998. She "started a relationship with [Martin] that year." JA 4 Aug06 148). Ali remembered the date because "[she] moved to a new school…and had never seen anything like [it] before in her life." JA 4 Aug06 148).  Ali stated that she "would often leave [the school]…and go to [Martin's] house and sit and talk to her about [the stress] and actually sit down and cry." JA 4 Aug06 149).

Ali had no familiarity with Moises Uriarte, William Turner, Luis Mangual Jr., Juan Encarnacion,[7] Cuba, Michael Thurman, Tiffany Vessels, Alton McKenzie, Claude Arnold, George Harris and Larry Nunn. JA 4 Aug06 165-173. She met Gwen Levi at a fashion show in November 2003 and "once or twice" at Martin's residence JA 4 Aug06 165); and Steve Brim "one time entering [Martin's] house…[he was] introduced as Estelle's husband." JA 4 Aug06 166). Co-defendant Pernell Philpot "used to be at Martin's…and [Ali] would sit down and talk to him and eat with him." JA 4 Aug06 167). John Irby and Gene Bird were "at a concert…at Carter Baron." JA 4 Aug06 169, 171).

Ali was introduced to co-defendant Learley Goodwin whom Martin described as her "play brother." JA 4 Aug06 170). She met co-defendant Derrick Bynum at Martin's residence. JA 4 Aug06 170); co-defendant Lavon Dobie "in about 2003 at Jackie Terrell's, where Martin resided in the basement" JA 4 Aug06 171),[8] and co-defendant Larry Lane "at a birthday party." JA 4 Aug06 172). Ali met John Martin because "he was a boyfriend of [Paulette] Martin." JA 4 Aug06 172). She "dated [Millburn] Walker …in 1997…[and he] played a part in [her]

_____

[7]  Encarnacion observed Ali in Martin's residence.  He had no illegal dealings with  Ali. And, "[he] never [did] business in front of [Ali] with [Paulette Martin]."   JA Trx June 13, 2006 at 168).

[8]  Lavon Dobie testified that she has never observed Ali "with any drugs." JA Transcript of July 28, 2006 at 218).

meeting [Paulette] Martin." JA 4 Aug06 173).  Ali met co-defendant Reece

Whiting "in 1999 at [Martin's] house." JA 4 Aug06 174).[9] She was also familiar

with Martha Jean West because "[Martin] used to talk to [her] on the phone a lot,

and West would send [Martin] catalogs and [clothing] magazines."  JA 4 Aug06

175).

     In "[her] late 30's," Ali began to use marijuana on an experimental basis. JA

4 Aug06 181). Thereafter, she became involved in recreational ingestion of

cocaine. JA 4 Aug06 181). In this context, Ali testified that she and Milburn

Walker abused cocaine together during the course of their social relationship. JA 4

Aug06 182-183). Ali testified that a friend provided the cocaine to her *gratis.* JA 4

Aug06 184). Ali started purchasing cocaine in 1998. The exclusive purpose was

personal use.

     Ali denied having made any purchase for resale "ever in her life." JA 4

Aug06 185). Further, she denied any purchases of crack cocaine. However, Ali

admitted that she "freebased." JA 4 Aug06 186).  Ali stated:

> I consider freebasing [to] not [be] crack cocaine. I learned how to
> cook it. I learned that you use baking soda--cocaine was my private
> drug. My company. It was a secret that I kept. No one knew about it

_____

     [9] Whiting testified that he knew " Ali as a school teacher" and friend to one
of his friends, Mickey Lewis.  He further stated that Ali was not known by him "to
be involved with drugs." JA Transcript of July 28, 2006 at 64).

but me and the person that I got and purchased it from. JA 4 Aug06 186).[10]

Ali testified that she "never purchased more than three bags…[for] "$50.00 a piece."[11] JA 4 Aug06 188). She identified the controlled substances and paraphernalia found secreted in the apartment and admitted to ownership of it. JA 4 Aug06 190). With respect to the straw, Ali stated "I snorted drugs, too…I put it up my nostrils." JA 4 Aug06 190-192). She also identified "the homemade pipe that [she] made out of a water bottle." JA 4 Aug06 195).

Further appropriate facts will be adduced as necessary within each of the individual Arguments, *infra*.

## SUMMARY OF THE ARGUMENTS

I.

The Government seized about $651,000 in funds and property from Appellant Martin, and additional funds from her codefendants, and two different types of claims are before this Court on appeal arising from the district court's forfeiture orders.

---

[10] Ali "didn't do it around her husband…It was always in the evening." JA 4 Aug06 188). She "didn't leave anything around the house for him to discover." JA 4 Aug06 188).

[11] A purchase of three bags could be effected for a discounted price of $125.00. JA 4 Aug06 198).

First, the district court erroneously denied Martin's pretrial motion for return of property, set forth in a published opinion addressing a number of issues of first impression, *United States v. Martin*, 460 F. Supp. 2d 669 (D. Md. 2006). Martin contended below that she was entitled to return of her property because the Government violated 18 USC Section 983(a)(3) because within 90 days of her filing an administrative forfeiture claim the Government failed to (1) file a civil forfeiture complaint, or (2) take steps to hold the Martin's seized property pursuant to the criminal forfeiture statute. Section 983(a)(3)(B) plainly provides that if a claim is filed and 90 days go past, and the Government fails to take either step one or step two, "the Government shall promptly release the property." The district court erred in finding the statute inapplicable due to two errors: first, it found that Martin did not timely file an administrative claim against the property, and second, it found that if the Government belatedly seized Martin's property after 90 days had past from Martin's timely filing an administrative claim that the Government need not return the property. The factual finding on the timeliness of the administrative claim was clearly erroneous and the legal conclusion on the validity of the belated arrest of the property using a criminal seizure warrant should both be reversed by this Court.

Second, Martin's property should be returned to her and the district court's

forfeiture orders filed on January 19, 2007, and June 14, 2007, should be vacated as they were both entered after Martin was sentenced on December 19, 2006. Codefendants Goodwin, Bynum, and Ali were also sentenced before preliminary and final forfeiture orders were filed. Fed. R. Crim. P. 32.2(b) and 21 USC § 853(a) required the district court to enter a preliminary order of forfeiture at or before sentence was imposed. "An order of forfeiture that is not entered until after the defendant is sentenced violates this rule, and according to several courts, is therefore a nullity." Stefan D. Cassella, *Asset Forfeiture Law in the United States* at p. 601 (JurisNet LLC 2007). Here, the district court lacked jurisdiction to enter the forfeiture orders, so they should be vacated and Martin's property and funds should be returned to her.

II.

Appellants were denied a speedy trial, due solely to the conduct of the government. Appellants demanded a speedy trial, and the government was not prepared, 100 days after the arrest of the Appellants, even to determine how the numerous defendants would be tried. Notwithstanding their demand, the district court accorded the government an unreasonable amount of time simply to determine how and which defendants would be tried together.

III.

Law enforcement witnesses were permitted by the district court to testify as fact witnesses and as experts, without an appropriate delineation between these disparate aspects of their testimony, and to serve thereby as conduits to the jury of inadmissible hearsay, in violation of *Crawford v. Washington* and F.R.Ev. 702 and 703.

IV.

Appellant Goodwin was denied his constitutional right to confrontation when the government was permitted to offer testimonial statements of an available declarant who was never called to testify.

V.

There was insufficient evidence to find that Appellant Goodwin ever had possession of or had engaged in the distribution of "crack" cocaine. The district court failed to instruct the jury properly on the difference between cocaine base and "crack" cocaine, so as to permit them to return a verdict which properly differentiated this.

VI.

As to defendant Whiting, the District Court erred in allowing the Government to knowingly use the perjured testimony of Emilio Echarte. Echarte

testified at trial as to a heroin transaction involving Whiting never before revealed in his previous Grand Jury testimony. Echarte also admitted that he lied to the Government in his Grand Jury testimony regarding the drug dealings of another co-defendant Kimberly Rice. Because Echarte had previously testified in the Grand Jury the Government was on notice that Echarte had either committed perjury in the Grand Jury or was going to commit perjury at trial. The court should not allowed the Government to procure this perjured testimony from Echarte.

The Government also failed to meet it's burden of proof regarding defendant Whiting's prior convictions. The Government's records were insufficient to prove either the existence of these convictions or that the convictions were felonies. The Court should not have relied whatsoever on the prior foreign conviction from Mexico. Therefore, the District Court erred in consequently ruling that the prior convictions were sufficiently proven and giving a mandatory life sentence to Appellant Whiting.

VIII.

Lavon Dobie's § 924(c) conviction must be reversed because there was no evidence that two firearms found in her home were possessed in furtherance of the particular drug trafficking offense alleged in the indictment; namely, the Paulette Martin drug conspiracy. While a small amount of heroin was found in proximity to

the firearms, the government presented no evidence that Appellant Dobie received

these drugs from Appellant Martin or any of her confederates or that she intended

to sell or distribute these drugs to Appellant Martin. Simply put, the government

failed to establish any connection between this heroin and the Martin conspiracy.

Absent such a connection, Appellant Dobie's possession of the two pistols in her

home could not, as a matter of law, have been in furtherance of the Martin

conspiracy, which was the only drug trafficking crime alleged in the § 924(c)

count of the indictment. Under the law of this circuit, evidence that the firearm

may have been possessed is in furtherance of *some other* drug trafficking crime is

insufficient to support Appellant Dobie's conviction of this offense.

IX.

The proof adduced at trial did not permit a finding that Appellant Ali and

Appellant Martin had any more that a buyer/seller relationship, as there was no

evidence that Appellant Ali transferred any of the drugs she received from

Appellant Martin, and it was uncontroverted that she was an addict.

X.

The jury convicted appellant Ali of participation in the single narcotics

conspiracy charged in Count One despite a clear insufficiency in the proofs. The

evidence adduced established only that appellant shared a discreet purchaser/seller

relationship with Martin. There was no evidence presented indicating that appellant either agreed with the others named in Count One to commit the acts alleged or was aware of their activities. A mere purchaser/seller relationship with a single other is as a matter of law an insufficient evidentiary foundation for a conviction of conspiracy. The indictment herein was fatally duplicitous. A relationship between Ali and Martin was clearly distinct and separable from the single conspiracy alleged in Count One as to Martin and the others. Accordingly, Count One is clearly impermissibly duplicitous because at a minimum it cannot be refuted that it charges at least two separate conspiracies in a single count.. This error is particularly egregious because the district court did not instruct the jury concerning the distinction between a single and multiple conspiracies.

XI.

The district court was constrained to impose a mandatory minimum sentence of 120 months on appellant, notwithstanding that the advisory guidelines were substantially lower. The constraint of a mandatory minimum caused the court to impose a disproportionate and unconstitutional sentence. The principle of proportionality precluded imposition of 10 years of imprisonment on a defendant whom the court found to be a drug-addicted user who at no time either purchased narcotics for resale or sold such a substance at the behest of another.

XII.

The district court erred in ruling that the government had met its burden of proof with regard to Appellant Whiting's prior convictions, and in consequently ruling that the prior convictions were sufficiently proven to impose a mandatory sentence of life. The government failed to meet its burden of proof regarding Appellant Whiting's prior convictions, as the records it adduced were insufficient to prove either the existence of these convictions, or that the convictions of theye existed were felonies. The district court should not have relied whatsoever on the prior foreign conviction from Mexico, and therefore it erred in ruling that the prior convictions were sufficiently proven, providing a basis for the mandatory life sentence.

XIII.

THe District Court committed error when it enhanced the sentence of Appellant, Derek Bynum, to a mandatory minimum 20 year imprisonment because the Court incorrectly determined that a conviction in November 13, 1999 was prior conduct, rather than conduct during, the conspiracy in this case. There is a split among the circuits on the proper manner to view a prior conviction. The Fourth, Seventh, and Eleventh Circuits focus on the degree of criminal activity that occurs after a defendant's conviction for drug-related activity rather than when

the conspiracy began, but the Sixth and Eighth circuits view the conviction as part of the conspiracy.

The Government viewed the conviction, and the evidence arising from the arrest, as part of the conspiracy. The Government introduced evidence at sentencing indicating that the cocaine found in the 1999 conviction was part of this conspiracy, and argued that the amount of those drugs should be used to calculate the total drug weight during the conspiracy.

A related offense and conviction during a conspiracy, is merely an act in furtherance of the continuing acts of the conspiracy, not a prior conviction. Since a conspiracy is a continuing offense, a conviction for related conduct during the conspiracy could not be a prior conviction since the conspiracy is one fluid offense with one beginning and one end and therefore should not be used as a predicate offense for enhancement 21 U.S.C. 841 (b)(1)(A).

XIV.

At sentencing, counsel for Appellant Dobie argued that her mitigating role in the Martin conspiracy warranted either a two or four point reduction under U.S.S.G. § 3B1.2. The court erred when it relied upon an unsubstantiated fact– that Appellant Dobie sold drugs during the course of the conspiracy– as its rationale to deny her request for the reduction. The court further erred when it

failed to address Appellant Dobie's request for a two-level, minor role

adjustment. During the hearing, the court focused solely on why Appellant Dobie

did not qualify for the four-level minimal role adjustment, but failed to

acknowledge her request for the minor role adjustment or explain why she did not

qualify for this lesser reduction. For these reasons, Appellant Dobie submits that

the district court's sentence was unreasonable and asks to be resentenced.

XV.

Over strenuous objections by Appellant Martin, at sentencing the district

court applied an enhancement for a firearm, per USSG § 2D1.1(b)(1), to her.

There was no evidence a trial from which it could be discerned that Appellant

Martin had in any fashion used or possessed a firearm, or had condoned or

encouraged the use of a firearm by another member of the conspiracy.

XVI.

Appellants Martin and Whiting were sixty and sixty six years of age at

sentencing. They both were sentenced to life terms of imprisonment, as was

possible under statute, and within the range described by the USSG. In imposing

such sentences, however, the district court failed to consider in any adequate or

meaningful fashion the considerations which Congress has declared must control

federal sentencing, as set forth in 18 USC § 3553 and confirmed by the Supreme

Court in *United States v. Booker.*  Appellant Martin's criminal record, for example, consisted of but a single, twenty year old, prior narcotics felony.  As such, the sentences were unreasonable.

# **ARGUMENT**

I.   **THE FORFEITURE ORDERS SHOULD BE VACATED AND THE FUNDS AND PROPERTY SHOULD BE RETURNED TO THE CLAIMANTS/APPELLANTS**

### *Standard of Review & Adoption by Appellants*

This Court reviews the district court's factual finding that Appellant Martin failed to file a timely claim contesting the forfeiture of her property by a standard of clear error.

This Court reviews the district court's finding that despite multiple violations of statutory deadlines and other law, the government could continue to deprive Appellant Martin of her funds, *de novo* as the question is one of law not fact.

The standard of review applicable to any decision of the district court regarding jurisdiction is *de novo*, and a jurisdictional issue may be raised at any time and cannot be waived.

The standard of review applicable to the district court's forfeiture orders purporting to forfeit assets not in Appellant Martin's possession at the time sentence was imposed is *de novo* as the question is one of law.

This issue is put forward on behalf of the following Appellants: Martin, Goodwin, Bynum, Dobie.

35

*Argument*

The forfeiture proceedings in this case involve about $691,000.00 in funds and additional property seized from Appellant Martin alone, and additional funds and property seized from other defendants. The jury heard undisputed evidence at trial that at least $125,000 of these funds were derived from an inheritance received from a good friend of Appellant Martin, who also left her a substantial quantity of clothing, including furs. JA . The appeal concerns whether these funds must be returned to Appellant Martin, or may be retained by the Government. The principal issues on appeal concern challenges to the district court's jurisdiction and authority to order forfeiture of the funds to the Government, and Appellant Martin's fundamental statutory and constitutional rights. The law and the constitution but burdens on the Government and the courts to follow proper procedures to seize and forfeit funds, and where as here those procedures are not properly followed on multiple occasions, seized property should be returned. The Exclusionary Rule should be applied here, directly and by analogy, providing a sanction for the Government's procedural abuse of the forfeiture process. A final issue before this Court is the propriety of the district court's order purporting to forfeit funds not in the defendant's possession at the time sentence was imposed.

The first challenge to the Government's authority arose in 2005, and was

denied by the district court in a published decision which addressed a number of issues of first impression, *see United States v. Martin*, 460 F. Supp. 2d 669 (stating that as to the issues addressed by the district court "there appears to be no case law directly on point"), which are raised on this appeal. The second challenge to that authority, a jurisdictional challenge, arose when the district court entered a belated preliminary order of forfeiture on January 19, 2007, JA . Appellant Martin, along with codefendants/Appellants Goodwin, Bynum, and Ali, contend that the belated forfeiture order, which addressed all of their assets subject to forfeiture, should be vacated because the district court entered the preliminary order of forfeiture one month *after* Appellant Martin was sentenced on December 19, 2006, after the district court filed the judgment and commitment order on January 5, 2007, JA , and after codefendants/Appellants Goodwin, Bynum, and Ali were sentenced. Fed. R. Crim. P. 32.2(b) required the district court to enter a preliminary order of forfeiture at or before sentence was imposed. "An order of forfeiture that is not entered until after the defendant is sentenced violates this rule, and according to several courts, is therefore a nullity." Cassella, *Asset Forfeiture Law in the United States,* 601.

The first two issues addressed below are directed at the district court's 2006 order set forth in the published decision, and contests the district court's

alternative holdings in that decision that (1) Appellant Martin failed to file a

timely administrative claim and (2) that the seized funds need not be returned to

her by the Government although the Government failed to either file a timely civil

forfeiture action or to seize Appellant Martin's funds for criminal forfeiture until

well after the deadlines to do so had expired.  The third issue addressed below

concerns the district court's jurisdiction to order forfeiture despite entering the

first forfeiture order against the assets more than one month after sentencing, when

the rule requires the order to be entered before or at the time sentence is imposed.

**A. The District Court's Finding That Appellant Martin Failed to File a Timely Claim Contesting The Forfeiture of her Property Was Clearly Erroneous And Should be Reversed by This Court**.

The district court denied Appellant Martin's demand for return of property

for two alternative reasons, *see United States v. Martin*, 460 F. Supp. 2d 669,

neither of which should be upheld by this Court. The first basis relied upon by the

district court to deny the motion for return of property is one that the Government,

including U.S. Customs and Border Protection (CBP) did not rely upon in

maintaining control over the seized property. As the Court stated in *Martin*, *id.* at

673, neither party briefed this point decided by the district court, nor did the

district court receive any testimony about it, or explicitly ask CBP to comment on

its interpretation of  CBP's initial forfeiture notice to Appellant Martin. The

38

district court concluded that Appellant Martin did not file a timely claim

contesting the forfeiture of the property in the initial administrative forfeiture

proceedings, because the district court concluded that no forfeiture claim could be

filed by her after 35 days beyond the date of CBP's Notice to her ("Notice"), Ex. 2

to Motion, JA , However, the Notice explicitly provided as to Appellant Martin's

initial settlement proposal to CBP, "I also understand that at any time I can file a

claim with [CBP] . . . and [CBP's] consideration of my petition or offer will stop

and the case will be sent to the U.S. Attorney for court action."  As the civil

forfeiture statutes allowed CBP to set its own deadlines for the filing claims,

subject only to the requirement that the deadline not be too short, CBP was

allowed to set an open ended deadline for filing claims if a person such as

Appellant Martin first sought to settle the seizure with CBP, an option the Notice

explicitly provided. Thus, the district court was clearly mistaken when it

concluded that the Notice required Appellant Martin to file a claim within 35 days

even if she first made a settlement offer and then waited for CBP to respond to that

settlement offer, which she did, only promptly filing her claim in 2005 after CBP

denied the settlement offer in 2005 and refused to negotiate.

   Two subissues are raised by the district court's clearly erroneous finding

that the forfeiture claims were tardily filed; first, was the district court's reading of

the statutory requirements and the text of CBP's Notice governing Appellant Martin's response to the CBP notice mistaken, an issue of law to be reviewed *de novo* by this Court, and second, if the district court was right as to the requirements of law governing the situation, did CBP's Notice satisfy due process? Since the district court never asked the parties to brief the issue of the timeliness of Appellant Martin's filing her claim, these issues were never squarely addressed in the district court by the parties.

### a. The District Court Misread CBP's Notice and CAFRA's Requirements In Finding That Appellant Martin Tardily Filed Her Forfeiture Claims

Starting with the first subissue, to understand how the district court made this startling finding that the administrative forfeiture claims were untimely, and why that finding should be reversed by this Court as clearly erroneous, some brief background about administrative and judicial forfeiture is essential. Administrative forfeiture is a procedure allowing law enforcement agencies to rapidly resolve disputes over seized property without troubling the courts with a deluge of uncontested claims. *See United States v. Ninety-Three (93) Firearms*, 330 F.3d 414, 422 (6th Cir. 2003). Conceptually, the process is simple. Property is seized from persons such as Appellant Martin, who are frequently identified as "claimants," and notice is supposed to be provided describing what the claimant is

40

supposed to do if they want to try to get the property back. Some options allow the claimant to continue to dialogue with the seizing agency to try to get property returned, while other options move the forfeiture directly to the Department of Justice. The governing statutes allow the seizing agency providing notice to dictate the deadlines when a claimant is supposed to act, subject to restrictions preventing that deadline from being too short.

Administrative forfeiture is allowed pursuant to the Tariff Act of 1930, 19 USC §§ 1602-1621, the very statute enforced and overseen by CBP, the agency which handled the seizure of Appellant Martin's property. In finding that Appellant Martin's claims were untimely, the district court failed to provide due deference to CBP's forfeiture procedures, such as allowing claimants to try to settle a forfeiture without giving up filing a claim later, where CBP on its own extends the deadline to file a forfeiture claim for persons who first make a settlement offer to it, both of which are set forth in the Notice.

The district court essentially and erroneously held that CAFRA required Appellant Martin to irrevocably elect upon receipt of CBP's notice, JA (Ex. 1 to Appellant's Motion, referenced in district court's opinion) whether she would (1) try to negotiate a resolution of CBP's claims against the  seized assets, (2) ask CBP for administrative remission and mitigation of forfeiture, or (3) challenge the

41

seizure in federal court. *U.S. v. Martin*, 460 F. Supp. 2d at 674 - 675. The district court held that by making a settlement offer pursuant to option 1 that Appellant Martin gave up for all time ever being able to challenge the seizure of the property in court unless she stopped the settlement process prior to August 19, 2004, by filing a claim. The district court stated that the Notice "appear[s] to give claimants an exclusive choice between attempting an offer in compromise and maintaining their rights under CAFRA." *Martin*, 460 F. Supp. 2d at 674.  This factual finding reflects a clearly erroneous reading of CBP's Notice, which in fact explicitly and lawfully pursuant to CAFRA provided Appellant Martin with non-exclusive options.

CBP's notice plainly provided Appellant Martin with different non-exclusive options to protect her rights. JA .  A fair reading of the notice is that by asking CBP to consider an offer for the seized property (which is what Appellant Martin did initially), a Claimant would do *not* forgo judicially challenging the forfeiture by filing a claim at a later date. Notice Ex. 1 JA .  Reading the two and one half page cover letter dated July 14, 2004, from Ricardo Scheller, EX. 1, JA , along with the CAFRA FORM AF PUBLISH, id. at JA , a reasonable reader would conclude, as allowed by CAFRA, that by making a settlement offer, a claimant is not giving up the right to file a claim at a later date, triggering judicial

42

forfeiture. The notice plainly provides as to making a settlement offer, Ex. 1, JA ,

CAFRA Form AF Publish, as to option one, in language that the district court

apparently overlooked, that "I also understand that at any time I can file a claim

with [CBP] . . . and [CBP's] consideration of my petition or offer will stop and the

case will be sent to the U.S. Attorney for court action." The district court thus was

clearly erroneous in ignoring CBP's lawful exercise of discretion under CAFRA

when it stated that the offer in compromise/settlement option in CBP's Notice

allowed CBP or DOJ to avoid "the expenses of defending a challenge to the

forfeiture (either administratively or in court) and the risks the challenge will be

successful," *Martin*, 460 F. Supp. 2d at 673.

CBP plainly told Claimant Martin that if she chose the settlement option one

of the Form, which she did, that she had no immediate deadline in which to file a

claim, notwithstanding option three's language relied upon by the district court

setting a 35 day deadline to file a claim. The district court misread the Notice

because it mistakenly concluded that the Notice set a uniform 35 day deadline for

Appellant Martin to file a claim, rather than recognizing that the Notice properly

provided for a procedure for different deadlines for Appellant Martin to file a

claim depending on what option provided on the Notice that she picked.

CAFRA does not prohibit agencies such as CBP from setting different

deadlines for different types of claimants. The CAFRA statute provides that some claimants can be required to file their claims within 35 days of the date of a notice letter, 18 USC § 983(2)(B), while others who do not receive notice by mail must file their claims pursuant to a deadline set by a CBP statute, 19 USC § 1607. CAFRA and the Customs statute's interplay clearly provided CBP with discretion to pick its own deadlines for claimants to file their forfeiture claims, discretion which the district court clearly overlooked in finding that CAFRA requires a one size fits all approach, with all claimants who receive a notice of forfeiture having to file their claims by the same deadline irrespective of the options the agency provides in its notice.

　　The district court misunderstood the Notice and CAFRA when it stated that CBP in effect would be impermissibly extending the relevant time limits in CAFRA if it gave Appellant Martin more than 35 days after the Notice's date to file a claim, *Martin*, 460 F. Supp. 2d at 674. The district court, having not asked the parties to brief this issue, was unaware of the common forfeiture practice recognized by other courts where agencies such as CBP extend the deadlines applicable to forfeiture claims where a claimant makes an error or omission in an initial filing and the agency gives the claimant a second chance and extends the deadline to file a claim. *See, e.g., In Re Return of Truck*, 2008 U.S. Dist Lexis

44

92175 (S.D.Ca. 2008)(noting proper extension of time to file claim provided by agency).

Thus, CAFRA let CBP set whatever deadlines it wished, so long as they were not too short, and the Notice merely provided consistent with CAFRA different deadlines to file a claim depending on certain actions by Appellant Martin. The fact that the district court objected to CBP's policy of not setting an explicit deadline to file a claim on Appellant Martin and others proceeding under CBP's settlement option because it believed it would cause difficulties for the forfeiture process, *Martin*, 460 F. Supp. 2d at 674, was not a basis for the district court to find that CBP lacked authority under CAFRA to set different deadlines for claimants in different situations. Similarly, the fact that the district court recognized that CBP could have exercised its discretion in a different way, *id.* at 674 – by explicitly requiring in a notice to persons such as Appellant Martin that they must file a claim while an offer is pending if they want to preserve an option to file a claim – does not deprive CBP from exercising its discretion to handle matters and set deadlines to file claims in a different way which was objectionable to the district court.

**b. If the District Court Properly Read CAFRA's Requirements That Appellant Martin's Deadline To File a Forfeiture Claim Was August 14, 2004, Then CBP's Notice Was Insufficient and Violated Due Process**

Undersigned counsel contends that CBP properly allowed Appellant Martin more than 35 days from the date of the July 2004 Notice to file a forfeiture claim because she initially filed pursuant to the Notice a settlement offer, waited for CBP to respond to the settlement offer, and then promptly filed a claim when CBP denied the settlement offer in 2005. Counsel contends that the district court in effect deprived CBP with discretion to decide when claims are due, discretion which is provided explicitly by CAFRA, 18 USC § 983(a)(2)(B), "a claim . . . may be filed no later than the deadline set forth in a personal notice letter."

However, if the district court is right that regardless of what option Appellant Martin selected pursuant to CBP's Notice that she only had 35 days from the date of that Notice to file a claim, then the issue is whether CBP's Notice as interpreted by the district court met Due Process requirements. Although it never asked for briefing by the parties on this issue, as it raised and decided the timeliness issue *sua sponte*, the district court expressed uncertainty on this issue when it stated in *Martin*, 460 F. Supp. 2d that "although Customs' forms and communications may have been misleading" given the district court's interpretation of the statutory requirements. That statement puts the issue far too

46

mildly; if the district court is right about the 35 day deadline applicable to
Appellant Martin, Appellant Martin never received adequate notice from CBP.
The Notice provided that if Appellant Martin made a settlement offer, "that at any
time I can file a claim with [CBP] . . . and [CBP's] consideration of my petition or
offer will stop and the case will be sent to the U.S. Attorney for court action."
That language is entirely inconsistent with the district court's finding that the
Notice gave Ms Martin "an exclusive choice between attempting an offer in
compromise and maintaining [her] rights under CAFRA," *Martin*, 460 F. Supp. 2d
at 674. It is also inconsistent with the district court's finding that "by checking
Box #1 on CAFRA Form AF PUBLISH. . . [Appellant] Martin, " Martin, 460 F.
Supp. 2d at 674, irrevocably chose not pursue a judicial challenge to the forfeiture.

A finding that, despite the language allowing her the opportunity to file a
timely claim after the 35 day period expired, that Appellant Martin had to file a
claim within 35 days of the Notice means that the notice she received was
constitutionally inadequate. Due process requires notice "reasonably calculated,
under all the circumstances, to apprise interested parties of the pendency of the
action and afford them an opportunity to present their objections." *Mullane v.
Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "[T]he general rule
[is] that individuals must receive notice and an opportunity to be heard before the

Government deprives them of property." *United States v. Goode*, 510 U.S. 43, 48 (1993). There is nothing unclear about CBP's language in the Notice giving an open ended period of time for Appellant Martin to file her claim, and pursuant to Due Process she was entitled to rely on it. Since the Notice was inadequate to satisfy Due Process, this Court should find that Appellant Martin never received proper notice, and that due to the absence of such notice her property should be returned pursuant to CAFRA, 18 USC § 983(a)(1)(F).

**B. The District Court Erred in Finding That Despite Multiple Violations of Statutory Deadlines, and Despite the Command of 18 USC § 983(a)(3)(B) That Where The Government Fails to File Either a Civil Forfeiture Complaint or Take Steps to Hold Property Pursuant to a Criminal Forfeiture Statute, "the Government Shall Promptly Release The Property," The Government Could Continue to Deprive Appellant Martin of Her Funds**

The second issue raised by the district court's published opinion, *Martin*, 460 F. Supp. 2d 669, is strictly a matter of statutory interpretation, reviewed *de novo*, not a question of fact. The district court found in its opinion that the Government failed to file a civil forfeiture complaint within 90 days of Appellant Martin filing her claims, assuming as contended above, that her claims were timely filed. The Court also found that during that 90 day time period that the Government failed to take steps to legally hold that property pursuant to the criminal forfeiture statute, having only obtained a criminal forfeiture seizure warrant seven days after the motion for return of property was filed. However, the

48

record shows that the seizure warrant was obtained about 62 days *after* the ninety day period after the Government's receipt of the forfeiture claims on February 22-23, 2005, expired. Although the district court focused on the shorter seven day period between the filing of the motion for return of property and the execution of the criminal forfeiture warrant, calling it "brief," the relevant period pursuant to CAFRA is the longer 62 day period between the end of the 90 days and the filing of the warrant.

The district court's opinion properly identifies some of the relevant statutory provisions, however its holding fails to give full force to the CAFRA statute. Upon receipt of Appellant Martin's claims, CAFRA gave the Government a 90 day period to take any one of three steps, *see* 18 USC § 983(a)(3)(A) and (B), none of which it timely did in this case, as the district court properly found. First, it could file a civil forfeiture complaint. No such complaint has ever been filed in this case. Second, it could "obtain a criminal indictment containing an allegation that the property is subject to forfeiture," which it did, and it could "take the steps necessary to preserve the right to maintain custody of the property as provided in the applicable criminal forfeiture statute," which the district court found that it did not do in the 90 day period. Third, it could return the property to Appellant Martin, which it never did. Return of property to a claimant like Appellant Martin

49

during or after the 90 day period following the filing of a claim is addressed in both sections (a)(3)(A) and (B) above. Subsection (A) commands the Government to either file a civil forfeiture complaint within 90 days following receipt of a claim "or return the property." Subsection (B) states that if a civil complaint is not filed against the property and the property is not both subject to a criminal indictment and held pursuant to the criminal forfeiture law procedures before the 90 day period expires, "the Government shall promptly return the property."

Alas for Appellant Martin, the district court did not give full force and effect to the statute's requirements. It held that the Government could cure the problem by obtaining a tardy criminal forfeiture seizure warrant more than 60 days after the 90 day period had expired, and that such a late seizure allowed the Government to hold on to the property despite the tardy compliance with the statute. The only sanction the district court imposed was to prohibit the Government from pursuing a civil forfeiture action against Appellant Martin's assets. *Martin*, 460 F. Supp. 2d at 675.

Thus, although two different CAFRA provisions, Sections (A) and (B), spoke directly to the situation, the district court failed to compel return of the property. The district court properly noted that there was a period of time when "CAFRA required the property's return, and no other warrant authorized its

50

detention," *Id.* at 676. The Court declared that as to this interim period before the Government obtained a criminal forfeiture seizure warrant "the legality of the detention prior to that point is . . . moot," *id.* at 676.

The district court's interpretation is not faithful to CAFRA's language or structure. "When interpreting statutes we start with the plain language…. Courts must presume that a legislature says in a statute what it means and means in a statute what it says . . . when a statute is unambiguous .  . . judicial inquiry is complete . . . Courts will not . . . adopt a literal construction of a statute if such interpretation would thwart the statute's obvious purpose or lead to an absurd result." *Stone v. Instrumentation Lab. Co.,* 591 F.3d 239, 243 (4th Cir. 2009)(citations and quotation marks omitted). Here, the statute explicitly provides in two places for return of the property, but the district court read that language to be a nullity where a belated criminal forfeiture warrant is obtained. There is no such exception in CAFRA in the provisions triggered by this situation – the failure of the Government to either timely file a civil forfeiture claim or to timely legalize its possession of the property pursuant to the criminal forfeiture statute. The statute does not say that if the Government fails to obtain legal possession of the property pursuant to the criminal forfeiture statute the Government can act after the 90 days have expired and still keep the property – instead it says if that point is

51

reached "the Government shall promptly release the property," 18 USC §

983(a)(3)(B). The district court could only reach the conclusion that the

Government did not have to return Appellant Martin's property if it found that the

statute did not mean what it said.

This Court should also contrast CAFRA's language regarding return of

property following the Government's failure to timely file a complaint or legalize

possession of property pursuant to the criminal forfeiture statute, addressed at 18

USC § 983(a)(3)(B), with the language regarding return of property found at 18

USC § 983(a)(1)(F). Subsection (a)(1)(F) addresses situations where the

Government fails to provide timely notice to a claimant of a seizure and provides

that if timely notice is not provided "the Government shall return the property

without prejudice to the right of the Government to commence a forfeiture

proceeding at a later time." As to those situations, where notice of a forfeiture is

late, CAFRA provides the Government with an open invitation to attempt to

maintain control and possession of the property by commencing "a forfeiture

proceeding at a later time." No such invitation is applicable to tardy responses to

filed claims.

The language in § 983(a)(3)(C) relied upon by the district court to support

its stained interpretation of CAFRA does not detract from this analysis. This

52

section states that whether alone or together with a civil forfeiture allegation, the Government can pursue criminal forfeiture, however it is not a stand alone provision. Nothing exempts that language in (3)(C) from the time restrictions in (3)(A) and (3)(B). The language in (3)(C) is more logically read to be consistent with the other two provisions by being read as addressing the situation where civil or criminal forfeiture proceedings are timely started, not as a free floating provision allowing criminal forfeiture proceedings to start months or years after the deadline for the Government to return property due to failure to timely file an action has passed. The district court was mistaken when it held that it could only give meaning to (3)(C) by finding that it trumped (3)(B) whenever a criminal forfeiture action is filed – it is more logical that (3)(C) applies when the Government does not file a civil forfeiture action within the 90 day period but instead it files a criminal forfeiture action and secures the property pursuant to that statute in a timely fashion, not when it feels like it.

The district court read the return of property provision applicable to situations where a clam is filed and the Government responds to the claim in a tardy fashion governed by 18 USC § 983(a)(3)(B) as if that provision also contained the same language as subsection (a)(1)(F) does about commencing a proceeding later in time, however the provisions do not have the same language.

The selection of language in subsection (a)(3)(B) shows that Congress knew when to be more lenient in allowing forfeiture proceedings to go forward despite procedural glitches by the Government, and it chose not to do so when claims are timely filed and not timely responded to by the Government. Even within the District of Maryland, courts other than the district court in this case are not in agreement about the proper interpretation of CAFRA's language governing return of property on the facts in this case. *Compare Burman v. United States*, 472 F. Supp. 2d 665, 676-677 (D. Md. 2007)(funds ordered returned where claimant filed claim, and Government did not timely file civil forfeiture complaint or legalize possession of property pursuant to criminal forfeiture statute, but not mentioning *Martin*) to *United States v. One Silicon Valley Bank Account*, 549 F. Supp. 2d 940, 948 (W.D. Mi. 2008)(following *Martin* to allow belated retention of property through criminal forfeiture); *United States v. Kremer*, 2006 U.S. Dist Lexis 89034 (E.D.N.Y. 2006).

An additional factor here is that the district court's finding that the Government's illegal continued detention of the funds, which the district court held to be "moot.," was in effect an acknowledgement that the Government violated the Fourth Amendment due to an illegal seizure, during the period when the 90 days had expired and the Government had not obtained a seizure warrant.

The failure to sanction the Government for that violation other than by prohibiting it from pursuing civil forfeiture was a violation of the Exclusionary Rule. Prolonged seizures of property trigger Fourth Amendment concerns just as detentions of people do. *See United States v. Place*, 462 U.S. 696, 706-708 (1983); *United States v. McFarley*, 991 F.2d 1188, 1191-1192 (4th Cir. 1993). Here, CAFRA provides statutory limits on how long property subject to forfeiture can be held, and when those limits are violated, the statute requires the property to be returned, as does the Exclusionary Rule bar the use of the seized funds at trial. Because the assets were an issue at trial, and should have been excluded, a new trial is required.

### C. The District Court Lacked Jurisdiction to Enter the Belated Forfeiture Order for the First Time After Sentencing Appellant Martin and defendants/Appellants Goodwin, Bynum and Ali.

Due to the district court's lack of jurisdiction, this Court should vacate the district court's previously entered orders of forfeiture in this case, docketed as item #1081, on January 19, 2007, and item #1135, docketed on June 14, 2007. JA , (reference docket sheet and specific orders). The prior orders should be vacated because the district court entered the preliminary order of forfeiture one month *after* Appellant Martin was sentenced on December 19, 2006. Fed. R. Crim. P. 32.2(b) and 21 USC § 853(a) required the district court to enter a preliminary

55

order of forfeiture at or before sentence was imposed. "An order of forfeiture that is not entered until after the defendant is sentenced violates this rule, and according to several courts, is therefore a nullity." Stefan D. Cassella, *Asset Forfeiture Law in the United States* at p. 601 (JurisNet LLC 2007).

As detailed below, unlike the sequence of events addressed by this Court in *United States v. Ereme*, 339 Fed. Appx. 340, 2009 U.S. App. Lexis 16993, in this case, unlike in *Ereme*, (1) this issue with the tardy filing of the forfeiture order was raised in the district court before any briefs had been filed on direct appeal to this Court (undersigned counsel sought a stay so that the district court could first address the issue, however this Court denied the request ), and (2) there is no evidence whatsoever that the defendant or counsel requested or agreed to the tardy and fatal (for the forfeiture) entry of the first of the two district court forfeiture orders at issue.  This case is also distinguishable from a number of cases where preliminary orders of forfeiture were entered at or before sentencing, but were not referenced in the judgment and commitment order, and this Court held that a revised judgment and commitment order could be entered. *See United States v. Isaacs*, 88 Fed. Appx. 654, 655 (4th Cir. 2004); *United States v. Mitchell*, 70 Fed. Appx. 707 (4th Cir. 2003); *United States v. Thomas*, 67 Fed. Appx. 819 (4th Cir. 2003). Here, unlike these cases and others like them, no preliminary order of

56

forfeiture was entered at or before sentencing – it was entered one month after

sentencing, and the sentencing itself was bereft of reference to the forfeiture.

However, in one respect this case is like these cases – here, as in those cases, the

judgment and commitment order before this Court as of the filing of this brief is

utterly silent on forfeiture, in violation of law. Fed. R. Crim. P. 32.2 provides that

"the [district] court must include the forfeiture order, directly or by reference, in

the judgment."

This case was tried in 2006. The parties agreed that the forfeiture issue

would be decided by the district court after trial. The district court heard testimony

regarding the forfeitures on November 21, 2006, JA , and there was further

argument on the forfeiture issues on December 19, 2006, JA ,   The district court

told the Government and the parties in open court before the sentencing started at

T. 54, JA , that "if you will prepare a modified [forfeiture] order that addresses the

matter you just addressed a moment ago, I will be glad to enter [the preliminary

forfeiture] order." Later that day, at sentencing, after there had been no mention of

the filing of the preliminary order of forfeiture, the Court asked the Government

"[a]nything further," T.109, JA , and the Government made no mention of the

preliminary forfeiture order.

The docket sheet fails to reflect when the Government provided the district

court with a revised preliminary forfeiture order consistent with its instructions,

thus depriving the defense of notice of filing of the tardy order, however the

district court entered the preliminary order of forfeiture on January 19, 2007,

docket sheet item #1081, JA , (reference text of docket sheet and text of order),

having signed the order on January 18, 2007.  At no time did the defense consent

to any delay in the entry of the forfeiture judgment until after sentencing.

The preliminary order of forfeiture filed on January 19, 2007, one month

after sentence was imposed, "is a nullity." *See United States v. Bennett*, 423 F.3d

271, 276 (3d Cir. 2005)(stating that a final order of forfeiture that is not entered

until after sentencing is a "nullity" but also finding that in that case the

Government sought and obtained a preliminary order of forfeiture *before*

sentencing and shortly after the jury verdict); *see United States v. Yeje-Cabrera*,

430 F.3d 1, 14 (1st Cir. 2005)(stating same rule but finding that  two days *prior* to

sentencing, the district court granted the preliminary order of forfeiture); *United*

*States v. Petrie*, 302 F.3d 1280, 1284 (11th Cir. 2002)(district court lacked

jurisdiction to enter a preliminary order of forfeiture six months after the

defendant was sentenced);  *United States v. Crutcher*, 2010 U.S. Dist Lexis  11262

(M.D. Tenn. 2010)(surveying decisions from many circuits, concluding that it

could not enter a preliminary forfeiture order after sentence had been imposed);

58

*United States v. King*, 368 F. Supp. 2d 509 (D.S.C. 2005)(where government presented preliminary order of forfeiture 16 days after sentencing, court found it lacked jurisdiction to enter order after sentence had been imposed). In *United States v. Koch*, 491 F.3d 929 (8th Cir. 2007), the appellate court upheld the tardy entry of a forfeiture order, however the defendant requested the delayed entry of the order, and the Government consented to the request, however after a plea of guilty was entered and prior to sentencing, "the district court entered a Preliminary Order of Forfeiture."

The problem with this case and others where forfeiture orders are entered after sentencing is that Fed. R. Crim. P. 32.2(b)(2) provides that preliminary orders of forfeiture are to be entered before sentencing, not afterwards as occurred here, and that "at sentencing . . . the order of forfeiture becomes final as to the defendant and must be made part of the sentence and be included in the judgment." The key fact here is that no preliminary order of forfeiture had been signed prior to or at sentencing, and was not signed and entered until one month after sentence was imposed. Furthermore, and quite importantly, during the defendant's sentencing on December 19, 2006, in contrast to the earlier proceeding that day involving all of the defendants,  there was absolutely no mention of forfeiture during Appellant Martin's own sentencing proceeding, JA

59

Even if the defense consented to the tardy entry of the forfeiture judgment, which it did not, parties cannot confer jurisdiction on a court by consent. *United States v. Lawrence*, 535 F.3d 631, 636 - 637 (7th Cir. 2008)(where district court altered sentence after imposing sentence, appellate court stated that "the district court's subject matter jurisdiction is always properly before us and cannot be waived by a party"). There is a duty on this Court to address jurisdictional defects when they become apparent. *See Louisville & Nashville RR v. Mottley*, 211 U.S. 149 (1908); *United States v. Hartwell*, 448 F.3d 707, 714 - 715 (4th Cir.), *cert. denied*, 2006 U.S. Lexis 7373 (2006). A judgment of a court which lacks subject matter jurisdiction is void. *See New York Life Insurance Co. v. Brown*, 84 F.3d 137 (5th Cir. 1996). Parties are not allowed to confer jurisdiction otherwise lacking in a court by agreement. *See Sosna v. Iowa,* 419 U.S. 393, 398 (1975).

This issue presented is not one merely of form, or window-dressing. Forfeiture is as much a part of a sentence as restitution, a fine, the length of a period of incarceration, or the length of supervised release. A district court is not allowed to impose sentence piecemeal, with a period of incarceration imposed one day, a fine the next, leaving determining a period of supervised release for a third day. A defendant is entitled to know the full sentence at one time. Any exceptions are carefully set forth in the statutes and rules, for example, after the rest of a

60

sentence is imposed, by statute the restitution issues can still be addressed up to 90 days later. However, no such exception applied here. *See, e.g., Lawrence*, 535 F.3d at 636 - 637 (district court altered defendant's sentence after imposing sentence and appellate court stated that unless certain exceptions [BOP motion, Rule 35 motion or another statute, and Guidelines change]  apply, "district courts lack subject-matter jurisdiction to revisit sentences already imposed upon defendants").

 In addition to a defendant's rights, the jurisdictional issue is an important one.  District courts lose jurisdiction on many issues once sentence is imposed, the J & C is filed, and a notice of appeal is filed. Here, the notice of appeal was filed on January 9, 2007, JA , docket sheet item #1065, JA , by necessity well before the district court entered any forfeiture order, whether preliminary, JA , or final, JA , Since the appeal concerned issues with the sentence, among other things, all issues pertinent to sentence were already before this Court on January 19, 2007, when the preliminary forfeiture order was entered late. Thus, out of respect for the appropriate division of authority and jurisdiction between the district and appellate courts, the district court lacked jurisdiction to tinker with the sentence after the notice of appeal was filed.

 If the district court's preliminary forfeiture order of January 19, 2007, JA , is invalid, then the subsequent final order of forfeiture filed on June 14, 2007, JA ,

relying on that prior order cannot be valid either. Due to the district court's lack of jurisdiction to order forfeiture belatedly, the property should be returned.

**D. This Court Should Vacate the District Court's Forfeiture Orders Purporting to Forfeit Assets Not in Appellant Martin's Possession At The Time Sentence Was Imposed**.

Should the Court grant the relief sought above regarding the effect of the belated entry of an order of forfeiture, this issue would be moot, however absent that relief two issues with the forfeiture money judgment are before this Court: whether the district court entered a proper money judgment order enforceable by the Government, and second, whether such money judgments purporting to forfeit funds not in the Government's or the defendant's possession is legal. Counsel preserved Appellant Martin's opposition to the entry of the money judgment below, *see* JA , (Opposition to forfeiture order filed December 11, 2006, docket sheet item #1039, orally argued on December 19, 2006, at forfeiture hearing).

As to the first issue, before sentencing and a month before actually obtaining the preliminary order of forfeiture, the Government told the district court that it essentially was seeking to obtain a money judgment of over $8 million, JA , (12/16/06 DATE transcript at pp. 48 – 54). Money judgments are commonly obtained in the district courts in the Fourth Circuit. However, for several reasons, the judgment the government obtained is not a proper money judgment and must

62

be vacated. First, the judgment and commitment order makes no mention of a money judgment, JA , Second, the post sentencing preliminary forfeiture order recites Appellant Martin's liability for $8 million as if the Government already possesses that $8 million. See JA , (preliminary order of forfeiture entered January 19, 2007, docket sheet item #1081). The preliminary order, which is supposed to be final as to a defendant when properly entered before or at sentencing, which was not done here, does not mention the words "money judgment" or "entry of a money judgment," or anything of the sort. "Personal money judgments" are addressed in Fed. R. Crim. P. 32.2, however the order entered by the district court did not enter an actual money judgment, other than order forfeiting assets already in the Government's possession. Fourth, the district court's final order of forfeiture, JA (final order of forfeiture entered June 14, 2007, docket sheet item #1135), makes no mention of any forfeiture money judgment either. Accordingly, this Court should instruct the district court to vacate its prior orders of forfeiture and omit any reference to any obligation of Appellant Martin to pay any further amounts to the Government or Court other than any fine and amounts already seized by the Government.

　　As to the second issue, almost 25 years ago this Court ruled that forfeiture money judgments were proper, seeking to forfeit assets no longer in existence at

63

the time sentence was imposed, *United States v. Amend*, 791 F.2d 1120 (4th Cir. 1986). Many other courts follow the approach this Court took in *Amend, see, e.g., United States v. Vampire Nation*, 451 F.3d 189, 202 (3d Cir. 2006). However, for preservation purposes, as the Supreme Court has yet to address this issue, counsel submits that the better reasoning is set forth in the district court opinions in *United States v. Surgent*, 2009 U.S. Dist Lexis 72563, 2009 WL 2525137 (E.D.N.Y. 2009), and *United States v. Croce*, 345 F. Supp. 2d 492 (E.D. Pa. 2004)(holding that a money judgment cannot exceed a defendant's net worth), *rev'd* 209 Fed. Appx. 208 (3d Cir. 2006)(*Vampire Nation supra*. also rejected the district court's reasoning in *Croce*).  Counsel recognizes that until the Supreme Court addresses this issue or this Court *en banc* reverses *Amend*, this claim is foreclosed by current Fourth Circuit law.

Accordingly, for the reasons set forth above, the district court's forfeiture orders should be vacated and the assets subject to them returned to their rightful owners.

## II. APPELLANTS WERE DENIED A SPEEDY TRIAL, DUE TO THE GOVERNMENT'S DECISION TO CHARGE TOGETHER IN A SINGLE INDICTMENT DEFENDANTS WHOM IT HAD NEITHER INTENTION NOR ABILITY TO BRING TO TRIAL TOGETHER.

### *Standard of Review & Adoption by Appellants*

This Court reviews legal conclusions relating to the interpretation of

64

the Speedy Trial Act under a standard of *de novo* review, and factual findings for clear error. *United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir. 1996); *United States v. Reavis,* 48 F.3d 763, 770 (4th Cir. 1995).

This issue is put forward on behalf of all Appellants.

*Argument*

The indictment in this matter was returned in April, 2004. It was unsealed, search warrants were executed, and most of the charged defendants were arrested, all substantially simultaneously, on June 4, 2004. Counsel was appointed for those defendants who were not able to retain counsel, including the six Co-Appellants herein, within but a few days, and five of the six Co-Appellants were ordered held until trial. The total number of indictees was 31. JA .
[indictment, trx 13Sept2004 p 9]

An in-court on the record status conference was held with all counsel on September 13. JA trx 13Sept2004 p 8-9. This was well over 70 days from the arrest of the Co-Appellants. The initial request made by government counsel at this status conference was for an additional 60 days to decide which defendants it would choose to try together. JA id [trx 13Sept2004 8-9]. "I think it is likely we will have three trials." JA id [trx 13Sept2004 9 line 20]. Government counsel also discussed the likelihood of a superseding indictment, though without the need

to produce additional discovery for this, JA id [trx 13Sept2004 10 line 14-15

("Again, there's no new evidence and there's no new discovery."), or for a

severance for trial.  JA trx 13Sept2004 pp 12-15.  Government counsel stated that

her ongoing trial schedule,  JA trx 13Sept2004 p 10, and the grand jury schedule,

JA trx 13Sept2004 pp 20-21, imposed limitations upon how soon she could even

address these issues.

      Counsel for Appellant Martin voiced an immediate and vigorous

objection, based upon the time which already had passed, and the potential for yet

further delay, when this matter had been within the government's control for well

over a year.  JA trx 13Sept2004 p 17- 18],

      Without ruling on the already passed seventy days permitted by 18

USC § 3161(c)(1), as reiterated by 18 USC § 3173 and secured by the Sixth

Amendment, the district court proposed that the government be permitted seven

more weeks, until October 29, 2004, simply to make such a decision.  JA trx

13Sept2004 p 23.

      Trial for the six Appellants on this Joint Brief did not commence until

June 6, 2006.  JA [trial day 1].  Five of the six (all except Appellant Ali) were held

in custody for the entirety of the  intervening time.  JA . [docket entries showing

orders of detention].

The Appellants herein therefore were denied a speedy trial as guaranteed by the Constitution. Notwithstanding the lengthy and involved investigation in this matter, with over 10,000 intercepted telephone calls, video surveillance, arrests across the United States from Wyoming to Indiana to Louisiana, leading to the indictment of 31 named individuals, the government was content to let these individuals rest in custody once they had been charged and arrested. This was far past the limit imposed by Congress on the time which may pass before a trial commences, or which may be tolled by order of the court for good cause shown. Indeed, no such order was sought, nor was one entered. JA [docket]l 13Sept 2004 trx, *passim*. Therefore, the rights of the accused to a speedy trial were not respected, and their convictions must be vacated.

Initially, this Court has held that the calculation of the 70 day period begins the day after the triggering event occurs. *United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir. 1996). This would yield a 70-day period that ended fully a month before the aforementioned status conference. Accordingly, with no time excluded, *see* 18 USC § 3161(h)(1), nor a showing demanded or finding made by the trial court regarding the excessive time being in the interests of justice, *see* 18 USC § 3161(h)(8),*see United States v. Henry,* 538 F.3d 300, 303-06 (4th Cir,. 2008) and with the defense having raised this issue at its first opportunity, i.e., the

status conference, *see United States v. Davis,* 954 F.2d 182, 187 (4th Cir. 1992),

the appropriate sanction would have been dismissal with prejudice, 18 USC §

3162(a).  An "ends of justice" finding, were one to have been made, must be made

contemporaneously with the decision to continue.  *Zedner v. United States,* 547

U.S. 489, 506-07 (2006).   Nor can the government's previously described utter

lack of preparation serve as a rationale for such a continuance, 18 USC  §

3161(h)(8)( C).  This was the very reason the government posited to the trial court

at the status conference, without more.  A claim of a speedy trial violation is not

susceptible to harmless error review.  *Zedner v. United States,* 547 U.S. at 509.

Having established the triggering of the time period, the analysis then

turns to the four factors set out in *Barker v. Wingo,* 407 U.S. 514, 530-32 (1972);

*accord, United States v. Doggett* , 505 U.S. 647, 648 (1992).  These are (1) the

length of the delay, (2) the cause of the delay being attributable to the government

or the defense, (3) the assertion of the right, and (4) prejudice resulting from the

delay.  *See United States v. Thomas,* 55 F.3d 144, 148 (4th Cir. 1995), *see also*

*United States v. Hopkins,* 310 F.3d 145, 150 (4th Cir. 2002).  With a two year delay

entirely attributable to the government and objected to by the defense, and the

government's ability to develop additional evidence during this time, including

most particularly co-defendant cooperators, predjudice is manifest.  *United States*

*v. Doggett* , 505 U.S. at 651-52 (1992); *cf. United States v. Hall,* 551 F.3d 1257,

271-72 (4th Cir. 2009); *United States v. Grimmond,* 137 F.3d 823, 827-28 (4th Cir.),

*cert. denied,* 525 U.S. 850 (1998).

Accordingly, the convictions must be reversed, and this matter must

be remanded to the district court with instructions to dismiss the indictment, and to

hold a hearing, if necessary, to determine whether this should be with or without

prejudice.

**III.    THE TRIAL COURT ERRED IN PERMITTING GOVERNMENT
LAW ENFORCEMENT WITNESSES TO TESTIFY AS EXPERTS,
AND TO INTERMIX THEIR FACTUAL AND OPINION
TESTIMONY.**

**Standard of Review & Adoption by Appellants**

The decision regarding the admission of evidence is vested in the discretion

of the trial court, and is reviewed by this Court for the abuse of this discretion.

*United States v. Lancaster,* 78 F.3d 888, 896 (4th Cir. 1996)*; United States v.*

*Bostian*, 59 F.3d 474, 480 (4th Cir. 1995).

This argument is put forward on behalf of the following Appellants: Martin,

Whting, Bynum, Dobie, Ali.

**Argument**

Two police witnesses, Dets. Christopher Sakala and Thomas Eveler, were

permitted, over objection, to testify as "gang experts" as to various matters

69

concerning narcotics distribution and narcotics conspiracies.

It would not have been possible, physically, for Det. Sakala to have played a greater role in the trial below. He testified on 11 of the 30 separate trial days of testimony: June 13, 20, 21, 22, 23, 27, 28, 29; July 7; and August 2 and 3. By his testimony he served as the conduit to the jury for all sorts of information. This, however, presented an immediate problem. Det. Sakala, qualified as an expert, was permitted to explain and interpret by way of his opinion. In so doing he was testifying as an expert witness providing testimony based upon his experience and regarding those matters not susceptible to lay understanding. *See generally* F.R.Ev. 702 and 703. He listened to all of the intercepted calls, and multiple times. JA trx June  . As he did so testify, at the same time he served as a fact witness regarding portions of events that involved the defendants at trial, relating to the jury the meaning of events and conversations involving persons whom he did not know, as if he had personal knowledge of what he espoused. His factual testimony was not bifurcated or delineated in any fashion from his expert/opinion testimony, and was not in any way differentiated as to its sourcing or basis. Indeed, if anything, he reveled in the imparting  to the jury, over objection from counsel, JA trx June  ., of an undifferentiated admixture of the two, to the point where the one could not be winnowed from the other. Det. Sakala's doing so, with

the sanction of the district court, comprised error which imbued every aspect of

the trial, and mandates reversal of the convictions of all Appellants.

It is not physically possible to list every single error within Det. Sakala's

testimony within the parameters of any oversized brief which this Court will

accept for filing.[12]  Det. Eveleer's testimony, while less extensive, was of similar

ilk.

From the very outset, however, his testimony was so rife with impropriety

and error that the defense received a continuing objection on this very basis.   JA

trx June 21 p 16-24.  It will serve to and to analyze the testimony which preceded

and grounded this objection, albeit briefly, as a basis for and in illumination of this

continuing objection.

| | |
|---|---|
| [Det. Sakala]: | No.  No, I didn't say that at all.  I said I know for a more certainty what the overwhlming majoiryt of htese conersations are about.  If I don't offeran opinion I wills ay I do not know what that conversation is about. |
| [Mr. McKnett]: | What you claim to know about these conversations is basede on circumstances surrounding the conversations; correct? |
| [Det. Sakala]: | That's correct. |
| [Mr. McKnett]: | Your observances of those circumstances surrounding a conversation; right? |

---

[12] For the purposes of appellate review, however, all of Det. Sakala's testimony, comprising hundreds of pages of transcript, is contained within the JA.

[Det. Sakala]:        That is a factor, yes.

[Mr. McKnett]:        Your expertise of other cases --

[Det. Sakala]:        Yes.

[Mr. McKnett]:        – and what people in this case have told you; correct?

JA Trx 20 June p 210-11.

The admission of this testimony was a conduit for the improper admission of testimonial hearsay from unknown persons in violation of *Crawford v. Washington,* 504 U.S. 36, and Rules 702 and 703 of the F.R.Ev.[13]

At trial the expert testimony of Det. Sakala was based on information obtained by unidentified individuals that had spoken to him over a considerable period of time, and interwoven with his personal observations and conclusions. Insofar as his exercise of his expertise relied upon unrecorded statements attributed, if at all, to declarants whose pedigree is unknown or possibly suspect, and relied tacitly upon unrecorded statements made by unknown declarants to him (or to fellow police officers and filtered through those officers to the experts).

The statements underlying the opinions were inherently offered as true; they could not logically or constitutionally support an opinion in evidence unless the

---

7    Although Rule 703 allows experts to **rely** on otherwise inadmissible hearsay in formulating their opinions, such hearsay is inadmissible within said expert testimony under the standard set in *Crawford* .

expert, directly or indirectly, considered them to be true.  An especially glaring example of this took place on June 21.

| [Ms. Johnston]: | Did you form an opinion based upon your training and experience of the content of the calls that – the two calls that we've discussed before you left the witness stand as to what Mr. Mangual was doing at the residence on Marcvh 10 of 2004 at roughly between 11:30 in afternoon? |

[Det. Sakala]:    Yes.

[Ms. Johnston]:    What I your opinion?

[Mr. McKnett]:    He was delivering a kilogram of cocaine to Ms. Martin.

JA trx 21 June 50-51

"Whatever else the term (testimonial) covers, it applies as a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford,* 504 U.S. at 68.  This conclusion was presented to the jury as fact, when there was no way possible that Det. Sakala could have abstracted the kind of drug or the amount from the calls and surveillance.  This surmise necessarily had to be founded upon information obtained from persons who participated in the transaction, or it constituted mere guesswork.  Precisely how Det. Sakala "knew" that the delivery was of cocaine, or that it was in an amount of a kilogram, remains unknown to this day.  What is painfully clear, however, is that there is no rational basis upon which mere training

73

and experience could have clued in the detective to the precise amount and type of narcotic, without the influence of other information, information which constituted inadmissible hearsay.

Under Rule 703, with most experts a statement or opinion is admissible if other experts in the field agree. With police experts opining on criminal conduct the other experts are invariably working police officers; there is no scientific discipline and no dissent. There was no demonstration of the methodology underlying this guess.

The district court seems to have relied upon the continued viability of earlier interpretations of these Rules. However, it would appear that prior understandings of these Rules no longer are entirely correct once *Crawford* abrogated *Ohio v. Roberts,* 448 U.S. 56 (1980) holding that "(w)here testimonial evidence is at issue. . .the Sixth Amendment demands. . . unavailability and a prior opportunity for cross-examination." 541 U.S. at 68. This is a bright line rule that if a statement is testimonial and the defendant did not have a prior opportunity for cross-examination, the declarant must testify at trial for the confrontation clause to be satisfied.

As a general principle, expert testimony from law enforcement witnesses in this context can be admissible. "Because the primary purpose of

74

coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony. *United States v. Gibbs,* 190 F.3d 188, 211 (3d Cir.1999), *citing United States v. Griffith,* 118 F.3d 318, 321 (5th Cir.1997). Such testimony, however, necessarily is limited. The further guidance of the Third Circuit in this context provides an appropriate framework to consider such expert testimony.

We agree that the use of the case agent as an expert increases the likelihood that inadmissible and prejudicial testimony will be proffered. While expert testimony aimed at revealing the significance of coded communications can aid a jury in evaluating the evidence, particular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case. First, as we have observed elsewhere, when a fact witness or a case agent also functions as an expert for the government, the government confers upon him "[t]he aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use." *See* [*United States v.*] *Young,* 745 F.2d [733,] 766 [(2d Cir.1984)] (Newman, J., concurring), *cited with approval by* [*United States v.*] *Simmons*, 923 F.2d [934,] 946-47 [(2d Cir.1991).]

This aura creates a risk of prejudice because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial, "a risk that increases when the witness has supervised the case. Id. Simply by qualifying as an "expert," the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge. Additionally, when the expert bases his opinion on in-court testimony of fact witnesses, such testimony may improperly

75

bolster that testimony and may "suggest[ ] to the jury that a law enforcement specialist ⋯ believes the government's witness[ ] to be credible and the defendant to be guilty, suggestions we have previously condemned." *United States v. Cruz,* 981 F.2d 659, 663 (2d Cir.1992) (*citing United States v. Scop,* 846 F.2d 135, 139-43 (2d Cir.1988)).

Second, expert testimony by a fact witness or case agent can inhibit cross-examination, thereby impairing the trial's truth-seeking function. In general, impeaching an expert is difficult. The expert usually has impressive credentials, and he is providing an opinion that, unlike a factual matter, is not easily contradicted. Challenges to the expert are often risky because they can backfire and end up bolstering the credibility of the witness. Normally, this is an acceptable risk for the defense, because only the witness's expertise is at stake. However, when the expert is also a fact witness, the risks are greater. A failed effort to impeach the witness as expert may effectively enhance his credibility as a fact witness. Because of this problem, a defendant may have to make the strategic choice of declining to cross-examine the witness at all.

Third, and of particular relevance to this case, when the prosecution uses a case agent as an expert, there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's "sweeping conclusions" about appellants' activities, deviating from the strictures of Rules 403 and 702. *Simmons,* 923 F.2d at 946-47 n. 5. Although we approve of testimony interpreting drug code words, such expert testimony, unless closely monitored by the district court, may unfairly "provid [e] the government with an additional summation by having the expert interpret the evidence," and "may come dangerously close to usurping the jury's function." *[United States v. ] Nersesian,* 824 F.2d [1294,] 1308 [(2d Cir. 1987)]; *see also United States v. Rivera*, 22 F.3d 430, 434 (2d Cir.1994); *Simmons,* 923 F.2d at 947. As the testimony of the case agent moves from interpreting individual code words to providing an overall conclusion of criminal conduct, the process tends to more closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an

76

investigation by others that is not part of the record. Such summarizing also implicates Rule 403 as a "needless presentation of cumulative evidence" and a "waste of time." Fed.R.Evid. 403.

Under *Daubert* [*v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588 (1993)] and Rule 702, expert testimony should be excluded if the witness is not actually applying expert methodology. Incorporating the *Daubert* standard, the amended Rules of Evidence require that expert testimony be based on "sufficient facts or data" and on "reliable principles and methods" that the expert "witness has applied reliably to the facts of the case." The Advisory Committee Notes to the revised Rule 702 now state that, when a law enforcement agent testifies regarding the use of code words in a drug transaction, ···· [t]he method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted. Fed.R.Evid. 702 advisory committee's notes. When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded. Even if the testimony is admissible under Rule 702, it still must pass muster under Rule 403: Its probative value must not be substantially outweighed by unfair prejudice. See *Young,* 745 F.2d at 765-66 (Newman, J., concurring).

Straying from the scope of expertise may also implicate another concern under Rule 403, juror confusion. Some jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case. When the witness is a case agent who testifies about the facts of the case and states that he is basing his expert conclusions on his knowledge of the case, a juror understandably will find it difficult to navigate the tangled thicket of expert and factual testimony from the single witness, thus impairing the juror's ability to evaluate credibility.

*United States v. Dukagjini,* 326 F.3d 45, 53-54 (2d Cir. 2003).

This is a consistently-held principle.

> We have upheld the exclusion of expert testimony when that testimony ventures into areas in which the jury needs no aid or illumination. *See, e.g., United States v. Dicker,* 853 F.2d 1103, 1108-09 (3d Cir.1988) ("though courts have construed the helpfulness requirement of Fed.R.Evid. 701 and 702 to allow the interpretation by a witness of coded or 'code-like' conversations, they have held that the interpretation of clear conversations is not helpful to the jury, and thus is not admissible under either rule."); see also Fed.R.Evid. 702 advisory committee notes (stating that whether the situation is a proper one for expert testimony "is to be determined on the basis of assisting the trier"); *United States v. Stevens,* 935 F.2d 1380, 1384 (3d Cir.1991) ("[W]e agree with the district court's exclusion of Stevens's expert testimony on two of the three disputed points in that such testimony would not have been 'helpful' -the touchstone of Fed.R.Evid. 702-to the jury."); *Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir.1986) (noting that Rule 702 makes inadmissible expert testimony as to a matter that obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance; but noting that the admission of such testimony, though technical error, will almost invariably be harmless); 2 Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual 1218-19 (7th ed.1998).

*United States v. Gibbs,* 190 F.3d at 212-13.

Accordingly, the appropriate ameliorative measures were plain to the Court.

> [W]e note that the Federal Rules of Evidence and the Supreme Court place the responsibility upon the district courts to avoid falling into error by being vigilant gatekeepers of such expert testimony to ensure that it is reliable, *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (*interpreting Daubert,* 509 U.S. at 589-92, 113 S.Ct. 2786), and not substantially more unfairly prejudicial than probative. We also note that proper application of the rules of discovery will encourage the prosecution to

limit the scope of the expert testimony by a case agent or a fact witness. Rule 16 provides markedly broader discovery with respect to expert witnesses for the government than is required for other types of information from the government. Rule 16 provides that the defense is entitled to discovery of a written summary of expert testimony that the government intends to use in its case-in-chief. Fed.R.Crim.P. 16(a)(1)(G) That summary "must describe the witness's opinions, the bases and the reasons for those opinions, and the witness's qualifications." Id. This disclosure requirement creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure.

*Dukagjini,* 326 F.3d at 56; *see United States v. Mejia,* 545 F.3d 179, 197-199 (2d Cir. 2008).

In particular, the bipartite analysis of the Second Circuit in *Mejia* is of assistance in this consideration of Det. Sakala's testimony.  In determining that Rule 702 had been violated, the court noted that the expert testimony "concerned material well within the grasp of the average juror," *id.* at 194, and as "[n]o expertise is required to understand any of these facts,"  *id.* at 195, and therefore "went far beyond interpreting jargon or coded messages," *id.*  Following and reinforcing the Third Circuit's holding in *Dukagjini,* 326 F.3d at 54, the Second Circuit stated "[t]he expert may not, however, simply transmit that hearsay to the jury." *Id.* at 197.  Here, the court held, the expert "did not analyze his source materials so much as repeat their contents." *Id.* at 198.  This constituted a *Crawford* violation as the expert  "'communicated out-of-court testimonial

statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." *Id.* at 198, *citing United States v. Lombardozzi,* 498 F.3d 61, 72 (2d Cir. 2007; *accord United States v. Baptiste,* 596 F.3d 214, 223-5 (4th Cir. 2010); *United States v. Maher,* 454 F.3d 13, 19 (1st Cir. 2006).

## IV. APPELLANT GOODWIN'S 6TH AMENDMENT RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE COURT ADMITTED THE OUT OF COURT TESTIMONIAL STATEMENTS OF TWO WITNESSES WHO WERE NEVER CALLED TO TESTIFY.

### *Standard of Review & Adoption by Appellants*

This Court reviews the admission of evidence under an abuse of discretion standard. *United States v. Smith*, 451 F.3d 209 (4th Cir.), *cert. denied*, 549 U.S. 892 (2006).

This issue is put forward on behalf of the following Appellant: Goodwin.

### *Argument*

### A. A Violation of the Standard Established in *Crawford v. Washington* Occurred When Det. Martini Testified To What Criminal Witness; Raynard Dorsey Had Said to Another Police Officer.

The Supreme Court recently reaffirmed a criminal defendant's fundamental right to confront adverse witnesses in the case of *Crawford v. Washington*, 541 U.S. 36 (2004**).** The *Crawford* Court held that where testimonial statements are at

80

issue, the only indicium of reliability sufficient to satisfy constitutional demands is

confrontation.  Appellant Goodwin's rights under the 6th Amendment were

repeatedly violated over the objection of counsel on at least two key points in his

trial. JA 15Jun06 tx page 57:1-5.

Despite the best efforts of government trial counsel, the first violation

occurred on Thursday morning, June 15, 2006 when Det. Dave Martini of the

Prince Georges County, Maryland police department testified regarding a traffic

stop that took place on November 25th, 2003.  JA 15Jun06 tx page 54:1-8; 57:6-9,

22-23.  Appellant Goodwin was operating the vehicle at the time of the stop. JA

15Jun06 trx .  During the course of Det. Martini's testimony it became clear that

Raynard Dorsey had directed the police to Appellant Goodwin. JA 15Jun06 tx

53:14-15; 67:13-25;.  It was equally clear that at the time of the traffic stop Dorsey

was in custody, JA 15Jun06 tx pages 64:20-21, 96, and Appellant Goodwin was

driving Dorsey's car, JA 15Jun06 tx pages 68:9-11, 97:15-22; 21Jun06 tx page

126:1-11.  A search of the vehicle was conducted by several police officers who

were being directed by Dorsey through Det. Horace Grant.  JA  15Jun06 tx page

69: 2-6

As a result of the stop, several hundred dollars was seized from Appellant

Goodwin along with narcotics that was secreted in a false bottom Pepsi Bottle

found in the car. JA  15Jun06 tx page 70:16-25  There was no forensic evidence

linking Appellant Goodwin to the bottle. JA  15Jun06 tx page 98.   Furthermore,

there were no recordings of any phone calls by Dorsey or Appellant Goodwin on

the day of or the day preceding the stop.  There was no evidence of surveillance of

Appellant Goodwin immediately preceding the stop or the day before.  Finally,

there was no mention of the fact that Appellant Goodwin owned rental property,

that it was the end of the month and he often received rent payment in cash.  JA

15Jun06 tx page 110: 12-20\.  In short, there was evidence suggesting that

Appellant Goodwin was framed by Dorsey.

During the cross examination of Det.  Martini, by defense counsel; it

became apparent that the most damaging part of his testimony was nothing more

than double hearsay.  He was reciting what someone else had told him second

hand, as opposed to what he personally observed or heard.  JA 15Jun06 tx page

111:19-25, 137:1-6.  1249 pm.  A bench conference followed regarding the double

hearsay testimony of Martini and his references to Det.  Raphael Grant.  JA

15Jun06 tx page 141:1-14.  Despite objections, the hearsay testimony was allowed

to stand.  On the following day; Friday June 16, 2006 at 1015 am a preliminary

hearing was held in the issue.  Notwithstanding the arguments of defense counsel,

the court declined to change its original ruling and the testimony was not stricken.

JA 15Jun06 tx page 141:1-14

## B. A Violation of the Standard Established in *Crawford v. Washington* Occurred When Det. Grant Testified To What Ayeesha Goodwin, Had Said to Another Det. During the November 25th, 2003 Stop.

An examination of the Wednesday, June 21, 2006 transcript reveals the government called Det. Raphael Grant to the stand. JA 21Jul06 tx at 110. It appears he was called to salvage the earlier testimony of Det. Martini. He testified that at the time of the stop he was on the telephone with Dorsey. Dorsey was directing the search of his own vehicle through Det. Grant. JA 21Jul06 tx at 128:17-21. The officer has no witnesses to the conversation. He readily admitted that he had a cell phone and that the Det. who left with Dorsey had a cell phone as well. JA 21Jul06 tx at 128:17-21 He also admitted that he did not have Dorsey under surveillance the day before nor did he have Appellant Goodwin under surveillance the day before. JA 21Jul06 tx at pages 126:22-25, 127:1-13. Moreover, at the time of the stop, he did not know the car was the property of Dorsey. JA at

Det. Grant testified that it was not the direction or assistance of Dorsey that led to the discovery of the false bottomed Pepsi Bottle. JA 15Jun06 tx pages 83-88. Instead, it was the assistance of Appellant Goodwin's teenage daughter; Ayeesha Goodwin. JA 21Jun06 tx 112:22-25, 113:1-6, 13-19; 124:12-14.

Although he testified to this event that had occurred more than two years earlier, he wrote no reports regarding the alleged conversation with Appellant Goodwin's daughter. At the time of his testimony, Det. Grant had been on the force for more than eight (8) years. JA 21Jul06 tx at 123:17-25. In that time he had been involved in hundreds of arrests and investigations. Nevertheless, he remembers exactly what happened in this particular stop without the benefit of notes. He denied being prepped by the government regarding his testimony. (JA at ***) At this point it became clear that instead of curing the defects in Det. Martini's testimony, a different twist to the Confrontation Right had occurred; a non-emergency testimonial statement by a second available declarant was now on the record.

In a unanimous decision penned by Justice Scalia, he examined the historical basis underlying the right of confrontation. The case in question arose out of a homicide in which the out of court inculpatory statement of a wife, was used to convict her husband; Michael Crawford. Crawford stabbed a man who allegedly tried to rape his wife, Sylvia. At his trial, the State played Sylvia's tape-recorded statement to the police describing the stabbing, even though he had no opportunity for cross-examination. The Washington State Supreme Court upheld Crawford's conviction after determining that Sylvia's statement was reliable. The

question presented to the Supreme Court was whether this procedure complied

with the Sixth Amendment's guarantee that, "[i]n all criminal prosecutions, the

accused shall enjoy the right ... to be confronted with the witnesses against him."

The court unanimously decided it had not.  The facts of the case now before this

court are hauntingly similar to those of *Crawford.*

Ayeesha Goodwin is the daughter of Appellant Goodwin.  She was present

during the stop.  She was living in Appellant Goodwin's house at the time of his

arrest and did not change her residence during his trial.  There is absolutely no

indication that Ayeesha Goodwin was unavailable to testify.  Hence, the

government's failure to call her takes the case outside of any exceptions or

exemptions under Article VIII of the *Federal Rules of Evidence*.  As a result Det.

Grant's testimony regarding her statement was inadmissible given the lack of an

emergency.  The statement was clearly testimonial in nature and effect.  However,

it was not stricken from the record despite the objections of counsel.  The failure

by the court to have done so resulted in an insurmountable prejudice to Appellant

Goodwin.

Since its holding, this Circuit has visited *Crawford* on several occasions.  In

*Davis v. Washington*, 547 U.S. 813, 821 (2006), the Court cited *Crawford* in

holding the Confrontation Clause bars "admission of testimonial statements of a

witness who did not appear at trial unless he was unavailable to testify, and the

defendant had a prior opportunity for cross-examination." *See Crawford v.*

*Washington*, 541 U. S. at 53-54.  More specifically *Davis* held that statements are

nontestimonial when made in the course of police interrogation under

circumstances objectively indicating that the primary purpose of interrogation is to

enable police assistance to meet an ongoing emergency.

> A critical portion of this holding, and the portion central to resolution
> of the two cases now before us, is the phrase 'testimonial statements.'
> Only statements of this sort cause the declarant to be a 'witness'
> within the meaning of the Confrontation Clause.

*Davis v. Washington*, 547 U.S. at 82, *citing Crawford v. Washington*, 541 U. S. at

51.  The Supreme Court further underscored this very distincntion between

testimonial and nontestimonial out of court statements.  "It is entirely clear from

the circumstances that the interrogation was part of an investigation into possibly

criminal past conduct-as, indeed, the testifying officer expressly acknowledged."

*Davis v. Washington*, 547 U.S. at 829.  Such statements are testimonial when the

circumstances objectively indicate that there is no such ongoing emergency, "and

that the primary purpose of the interrogation is to establish or prove past events

potentially relevant to later criminal prosecution."  *Id.* at 822.

    In *United States v. Jordan*, 509 F.3d 191 (4th Cir. 2007), this court reiterated

the entrenched position of the Confrontation Clause by stating:

> In *Crawford*, the Supreme Court divided out-of-court statements into
> two categories: those that are "testimonial" and those that are not.
> *Crawford,* 541 U.S. at 60-69, 124 S.Ct. 1354. The Court stated that
> testimonial hearsay is the "primary" concern of the Confrontation
> Clause. *Id.* at 53, 124 S.Ct. 1354; *United States v. Iskander,* 407 F.3d
> 232, 240 (4th Cir.2005). The Confrontation Clause bars the use of
> testimonial statements unless the declarant is unavailable and the
> defendant has had a prior opportunity to cross-examine the declarant
> *Crawford,* 541 U.S. at 53-54, 124 S.Ct. 1354.

*Id.* at 201.

The *Crawford* Court gave a non-exclusive list of three examples of

"testimonial" statements: "*ex parte* in-court testimony or its functional equivalent

— that is, material such as affidavits, custodial examinations, prior testimony that

the defendant was unable to cross-examine, or similar pretrial statements that

declarants would reasonably expect to be used prosecutorially;" "extrajudicial

statements . . . contained in formalized testimonial materials, such as affidavits,

depositions, prior testimony, or confessions;" and "statements that were made

under circumstances which would lead an objective witness reasonably to believe

that the statement would be available for use at a later trial." *Crawford v.

Washington*, 541 U.S. at 51-52 (internal quotation marks omitted); *United States v.

Jordan*, 509 F.3d at 201; *United States v. Udeozor*, 515 F.3d 260, 269 (4th Cir.

2008).

Given the incontrovertible facts now before the Court, it is clear that the

stop and ensuing search of Appellant Goodwin's person while driving Dorsey's car on November 25th, 2003, was clearly outside the parameters of an exigent circumstance. Absent the requisite emergency, it is equally evident that the questioning of Ayeesha Goodwin was done for the sole purpose of discovering contraband for later use at trial. As a result, the statements elicited by law enforcement during that stop were inadmissible and created an insurmountable degree of prejudice.

## V.     THERE WAS A VARIANCE BETWEEN THE PROOF OFFERED AT TRIAL AND THE CHARGES CONTAINED IN THE INDICTMENT AS RELATED TO THE DISTRIBUTION OF CRACK COCAINE.

***Standard of Review & Adoption by Appellants***

Claims of sufficiency evidence are reviewed *de novo,* examining the evidence in the light most favorable to the Government. *United States v. Hall,* 434 F.3d 42, 49 (1st Cir.2006).

This issue is put forward on behalf of the following Appellants: Martin, Goodwin, Dobie.

***Argument***

Although the government charged the Appellants with the distribution of *crack* cocaine, the evidence at trial establish no more than the distribution of cocaine base. In its attempt to establish that the defendant

88

distributed *crack* cocaine the government called Richard Gervasoni to the stand on Friday morning, July 07, 2006.  During his voir dire, it was revealed that he has more than thirty-five (35) years as a drug examiner.   Gervasoni's academic credentials include a BS degree in chemistry and an MS in Forensic (07Jul06 tx page 45; JA at ***).  He was ultimately qualified as an expert witness in the area of forensic chemistry.

During the course of his brief testimony, Gervasoni indicated that he performed various tests on the evidence that was submitted to the lab in which he worked.  He examined exhibits 15 through 18 and after having completed his testing he opined (albeit not to a degree of scientific certainty) that the substance tested in each exhibit was cocaine base.  At no point during his testimony did he ever state that the cocaine base in question was the form of cocaine base commonly referred to as *crack* or that it was smokable.  JA 07Jul06 Tx page 101:14-19.  Moreover, during his cross examination he admitted that there are various forms of cocaine base.  JA 07Jul06 Tx page 100, 14-25; 101:1-4.  He further admitted that the substances taken from the Farragut Street address were not determined to be smokable nor was there a determination that the substance contained sodium bicarbonate.  JA 07Jul06 Tx page 103:11-14.  When asked, he could not say if the machines used to test the drugs in question had been recently

calibrated nor was there any evidence suggesting they had been calibrated on June

1st, 2004; when the search occurred.  JA 07Jul06 Tx page 105:1-12.

In a recent decision[14] by the Court of Appeals for the District of Columbia

the court stated:

> There is much evidence that Congress intended ''cocaine base'' to
> mean something different from ''cocaine'' – it was targeting *crack*.
> *See, United States v. Edwards*, 98 F.3d 1364, 1369 (D.C. Cir. 1996);
> *Brown*, 859 F.2d at 976; *Sentencing Commission Report* at 4–5 &
> n.17; [Edith Fairman] Cooper, [*The Emergence of Crack Cocaine
> Abuse* (2002),] *supra* note 1, at 60–62. The legislative debates
> suggest that at least some members of Congress had in mind two
> characteristics that distinguished *crack* from older forms of cocaine.
> First, unlike powdered cocaine, *crack* could be smoked, making it
> more potent and addictive. *See, e.g., Sentencing Commission Report*
> at 9–10. Second, *crack's* low cost and ease of manufacture made it
> more widely available than other forms of smokable cocaine,
> especially among the nation's youth. *See,e.g., United States v.
> Booker*, 70 F.3d 488, 494 n.21 (7th Cir. 1995); *Sentencing
> Commission Report* at 9–10.2 In this light, a ''literal'' approach to
> interpreting ''cocaine base'' would be problematic. **Congress could
> hardly have intended to apply the enhanced penalties to forms of
> cocaine base that are not smokable or even consumable without
> further processing**, while imposing the lesser penalties on
> defendants dealing in similar amounts of ready-to-snort cocaine
> hydrochloride. *United States v. Lopez–Gil*, 965 F.2d 1124 (1st Cir.
> 1992), illustrates the point. (*emphasis added*)....

367 F.3d at 913

Crack spread rapidly through several large cities. In 1986, Congress

---

[14] *United States of America v. George Brisbane*,  367 F.3d 910 (DC Cir.
2004)

90

passed the Anti–Drug Abuse Act of 1986, Pub. L. No. 99–570, 100 Stat. 3207, without such normal deliberative processes as committee hearings and reports. *See* United States Sentencing Commission, COCAINE AND FEDERAL SENTENCING POLICY 5–6 (2002) (''*Sentencing Commission Report*'').  Among other measures, the statute purported to impose much higher sentences for crack than for powdered cocaine. *Id.* at 4–5.  The statute established the quantities of ''cocaine, its salts TTT'' that would trigger various penalty tiers. But rather than describing crack by street name or manufacturing process, the statute established lower thresholds for any ''mixture containing cocaine base.'' Because ''cocaine'' and ''cocaine base'' carry the same chemical meaning (the word ''base'' merely refers to the fact that cocaine is a base), the statute appears ambiguous, providing two different sets of penalties for the same offense. If the ambiguity remains unresolved, the rule of lenity would suggest imposition of the lower sentence. *See, e.g., United States v. Ray*, 21 F.3d 1134, 1140 (D.C. Cir. 1994).

Despite the fact that § 841 is the frequent subject of judicial opinions, the issue just identified has rarely arisen, for two reasons. The first is that the vast majority of cocaine base prosecutions involve *crack.* Whatever Congress meant by ''cocaine base,'' there can be no doubt that it meant to include crack. *United States v. Brown*, 859 F.2d 974, 976 (D.C. Cir. 1988). Second, the Sentencing Guidelines define ''cocaine base'' as meaning only *crack*, and apply the lower penalties to other forms of cocaine base. USSG § 2D1.1(c)(D). In most cases involving cocaine base that is not crack, the ambiguity therefore has no practical consequence.  Brisbane's case is different. After the government rested, Brisbane moved for a judgment of acquittal, arguing that the government had not proven the substance was *crack* as alleged in the indictment. (The indictment alleged that he distributed ''cocaine base, also known as *crack*.'') The government's expert witness, a forensic chemist, testified that the substance was 49 percent cocaine base, but **she had done no tests to determine whether it was *crack* and could not say that it was. The district court ruled that the government had failed to prove that the substance was *crack*,** …

367 F.3d at 912

The *Brisbane* case is similar to this case in that the government charged Appellant Goodwin with having distributed crack, yet offered evidence only to the fact that cocaine base was seized from him.  Given the fact that there are several forms of cocaine base, it would appear that the government's offer of proof was in variance with the charging document and incomplete in that the expert's conclusion was not stated in terms of a scientific certainty. In the absence of any evidence that the substance seized from Appellant Goodwin and eventually tested was *crack* cocaine as opposed to some other form of cocaine base, the trial court should have granted the defendant's motion for judgment of acquittal.  (JA at 60).

On June 26, 2000, the Supreme Court decided the case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The Court stated without ambiguity that "[o]ther than the fact of a prior conviction, **any** factual determination that increases the penalty for a crime beyond the prescribed statutory maximum constitutes an element rather than a sentencing factor and **must be submitted to a jury and proved beyond a reasonable doubt.**"  *Id.* at 2090.  (emphasis supplied).

Even before the Court's decision in *Apprendi* the jury was required to make a specific finding of the nature of drug that may be attributed to an accused before he could be held liable for that particular substance.  Since a conviction for

distribution of "crack" carries with it a sentencing exposure of one hundred to one, it is clearly a fact of enhancement that had to be considered and decided by the jury.

Notwithstanding the requirement, the panel made no such finding. It would have been difficult for them to do so, since the government presented conflicting evidence in the way of expert testimony, to establish that the cocaine base in question was "crack". This should have been done, given the general confusion and ignorance regarding exactly what was meant by referring to the compound commonly known as "crack" in the indictment.

The USSG §2D1.1 was amended November 1, 1993 to clear up the ambiguity regarding "crack", cocaine and cocaine base. This section now makes clear that "crack" is a particular type of cocaine base, but not the only one, explaining in relevant part that "crack" is:

> the street name for a form of cocaine base, usually prepared by processing cocaine, hydrochloride and sodium bicarbonate and usually appearing in a lumpy, rocklike form.

The record is bereft of any incontrovertible expert evidence that the cocaine base in question contained sodium bicarbonate; an essential ingredient for the manufacture of "crack" cocaine. The government's inaction on this point is fatal to their burden of having to prove by a preponderance of evidence that the drug in

93

question was "crack" cocaine. *See, e.g. United States v. James,* 78 F.3d 851, 858 (3rd Cir.1996); *United States v. Culpepper,* 916 F.Supp. 1257 (N.D. Ga. 1995); *United States v. Guyton,* 35 F.3d 655, 663 (7th Cir. 1994)(remanded for sentencing where the district court may have sentenced defendant under guidelines for "crack" cocaine, but the drugs in question may have been cocaine).   Hence, while it is true that a great deal of respect and deference must be accorded a jury verdict, that verdict must be set aside if in a case such as this one, it is contrary to the evidence presented at trial. *United States v. Wilson,* 178 F.Supp 881, 883 (D.D.C. 1959).

The Supreme Court has taken cert on what is essentially this issue. *DePierre v. United States*, No. 09-1533; *see United States v. DePierre,* 599 F.3d 25 (1st Cir. 2010).

## VI.    THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY THAT THEY WERE REQUIRED TO MAKE A SPECIFIC FINDING THAT THE APPELLANTS DISTRIBUTED CRACK COCAINE AS OPPOSED TO SOME OTHER FORM OF COCAINE BASE.

### Standard of Review & Adoption by Appellants

This Court "review(s) a district court's admission of evidence over a Rule 403 objection under a broadly deferential standard." *See, e.g., United States v. Love,* 134 F.3d 595, 603 (4th Cir.1998); *United States v. Simpson,* 910 F.2d 154,

157 (4th Cir.1990). Claims of sufficiency evidence are reviewed *de novo,*

examining the evidence in the light most favorable to the Government. *United*

*States v. Hall,* 434 F.3d 42, 49 (1st Cir.2006).

This issue is put forward on behalf of the following Appellants: Martin,

Goodwin, Whiting, Dobie.

**Argument**

**A. The Judge Did Not Properly Instruct the Jury Regarding the Definition of Cocaine Base, and "crack".**

As a matter of law a trial judge must instruct the jury so as to require them

to make findings on each element of the crime charged. *Cabana v. Bullock*, 474

US 376, 106 S.Ct. 689 (1986). The same instructions must mandate that they use

the proper standard of proof in so doing. *Cabana v. Bullock*, 474 US 376, 106

S.Ct. 689 (1986). In this instance the trial judge failed to properly instruct the jury

regarding the character of the drugs, which were the focus of the indictment and

their responsibility to make a finding with respect to each. See, Apprendi v. New

Jersey, supra.

The trial judge's failure left the jurors with no guidance whatsoever in

making a determination on whether the petitioner was involved in the distribution

of cocaine powder, cocaine base or "crack". It has been held that a jury is entitled

to draw a vast range of reasonable inferences from evidence, but may not base a

95

verdict on mere speculation. *United States v. Long*, 905 F.2d 1572, 1567 (D.C. Cir. 1990); *United States v. Thurman*, 417 F.2d 752, 753 (D.C. Cir. 1969). In the absence of any evidence establishing use and distribution of "crack" cocaine, reasonable jurors could not have found petitioner guilty of possessing or distributing the same.

Appellant Goodwin's Sixth Amendment Right to Confrontation was trampled upon due to the admission into evidence of inculpatory testimonial statements by available declarants. That fact coupled with the government's failure to establish that the cocaine seized on November 25th, 2003, was the form of cocaine base commonly referred to as *crack,* resulted in a variance between the indictment and evidence. As a result, neither his conviction or sentence are legally sufficient.

The Supreme Court has taken cert on what is essentially this issue. *DePierre v. United States*, No. 09-1533; *see United States v. DePierre,* 599 F.3d 25 (1st Cir. 2010).

**VII.  THE TRIAL COURT ERRED IN ALLOWING THE GOVERNMENT TO KNOWINGLY USE PERJURED TESTIMONY AGAINST APPELLANT REECE WHITING, AND THERE IS A REASONABLE LIKELIHOOD THAT THE FALSE TESTIMONY COULD HAVE AFFECTED THE OUTCOME OF THE TRIAL.**

**Standard of Review & Adoption by Appellants**

The decision regarding the admission of evidence is vested in the discretion of the trial court, and is reviewed by this Court for the abuse of this discretion. *United States v. Lancaster,* 78 F.3d 888, 896 (4th Cir. 1996); *United States v. Bostian,* 59 F.3d 474, 480 (4th Cir. 1995).

This issue is put forward on behalf of the following Appellants:

**Argument**

A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the trial. *United States v. Polizzi*, 801 F.2d 1543 (9th Circuit 1986). *See United States v. Bagley*, 473 U.S. 667 (1985). Where the government knowingly relies on perjury in order to obtain a guilty verdict, reversal is required. *United States v. Crockett*, 435 F.3d 1305, 1317 (10th Cir. 2006). *See Napue v. Illinois,* 360 U.S. 264, 269 (1959).

The significance of Echarte's testimony as to Whiting's guilt cannot be underestimated. There was little direct proof in the Government's case in chief

tying Appellant Whiting to the Paulette Martin conspiracy. Out of the many calls introduced during the trial, Appellant Whiting was only a participant on 12 of them. In most of these calls, Appellant Whiting requests the availability of "tickets". The government's expert testified that tickets were a code word for drugs. Even assuming arguendo that the government's expert is correct that tickets equals drugs, the fact remains that there is no call where Paulette Martin ever agreed to provide "tickets" to Appellant Whiting. In other words, no meeting of the minds as to a conspiracy ever took place between Appellant Whiting and Appellant Martin on the basis of the recorded conversations alone. It is the testimony of Echarte indicating that Appellant Whiting purchased a large quantity of heroin from Echarte for resale that places Appellant Whiting firmly as a member of the conspiracy. Therefore, the criteria that the false testimony must affect the outcome of the trial has been met because of the crucial role Echarte plays in the government's case against Whiting.

The question of whether the government knowingly offered perjured testimony regarding Appellant Whiting through Echarte becomes critical. Echarte's Grand Jury testimony was taken on November 3, 2004. JA 7-11-06p 168). In the Grand jury transcript Echarte describes how he met Whiting through Appellant Martin. He states that Appellant Whiting was a drug user. JA(7-11-06p

135-36). He further describes the alleged 100 grams purchase of heroin that created the drug debt. JA(7-11-06p 137) Nowhere in the Grand Jury transcript does Echarte describe that as a result of the debt that Appellant Whiting began to drive for him in the transportation of the large quantities of drugs from Virginia to Maryland. Yet at trial, to the surprise of the defendant, Echarte described the Virginia purchases in detail. When questioned on cross he admits that he did not give that portion of his testimony to the Grand Jury. JA 7-11-06p 191-92)

Furthermore the Government was well aware that Echarte had committed perjury in the Grand Jury. In addition to not testifying truthfully about the fact that Whiting had driven Echarte to Virginia to pick up drugs, Echarte also left out significant information regarding another co-conspirator, Kimberley Rice, the daughter of Paulette Martin. Echarte testified to the Grand jury that Rice was not involved in her mother's drug business. The Government was well aware of this perjured statement because in Echarte's direct testimony government's counsel impeached their own witness by bringing out the fact of this lie. JA 7-11-06p 145). Echarte admitted on direct and later on cross that he had perjured himself before the Grand Jury on the issue of Rice's involvement. JA 7-11-06p 145). As to the perjury concerning Appellant Whiting, Mr. Echarte first states he told the Grand Jury about Appellant Whiting's trips to Virginia. JA7-11-06p 185) Later, when

confronted with the Grand Jury transcript Mr. Echarte recants that he told the

Grand jury about the very same trips. JA 7-11-06p 191-92

The government was well aware that the witness, Echarte was capable of

committing perjury due to his admission in the government's direct that he had

previously committed perjury in the matter involving Kimberley Rice. The

government also knew from Mr. Echarte's Grand Jury appearance that he never

testified that Appellant Whiting had transported drugs on behalf Echarte from

Virginia to Maryland. Clearly the Government knew either from their pretrial

preparation with Echarte or at the latest from his testimony that day in court that

Echarte had kept this information, to himself. While it is impossible to know

Echarte's motivation in providing this testimony at the 11th hour the Government

had an obligation to not offer the perjured testimony. If the Government failed to

see that this testimony was perjured then it had an obligation to provide it to the

defense prior to trial under the myriad of cases covering the Government's

discovery obligations since this was clearly new information, not previously

disclosed. *Brady v Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405

U.S. 150 (1972).

## VIII. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT LAVON DOBIE OF A VIOLATION OF 18 USC § 924( C), BECAUSE THE GOVERNMENT FAILED TO PROVE THAT FIREARMS AND HEROIN FOUND IN HER HOME WERE CONNECTED IN ANY WAY TO THE MARTIN DRUG CONSPIRACY IDENTIFIED IN THE INDICTMENT AS THE PREDICATE DRUG TRAFFICKING OFFENSE SUPPORTING THE § 924( C) CHARGE.

### *Standard of Review & Adoption by Appellants*

In reviewing challenges to the sufficiency of the evidence, a conviction must be affirmed, if when viewing that evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002).

This issue is put forward on behalf of the following Appellant: Dobie.

### *Argument*

There was insufficient evidence adduced at trial for a jury to convict Appellant, Lavon Dobie, of possession of a firearm during and in relation to a drug trafficking offense in violation of 18 USC § 924(c) because there was no evidence that the two pistols and heroin found in Appellant Dobie's Washington D.C. home were connected with the particular drug trafficking offense alleged in the indictment, namely the Maryland drug conspiracy allegedly centered around Appellant Martin. In fact, there was no evidence produced at trial that the heroin

found in Appellant Dobie's home came from Appellant Martin or any of her confederates nor any evidence that Appellant Dobie intended to distribute this heroin to Appellant Martin for later sale. At most, the evidence showed that either this heroin was for Appellant Dobie's personal use or that, even if intended for later distribution, she received it from a supplier unconnected to the Martin conspiracy. Accordingly, because Appellant Dobie did not possess the firearm in furtherance of the Martin conspiracy as alleged in the indictment, her conviction of this offense must be reversed.

A search warrant was obtained and executed on June 1, 2004 for Appellant Dobie's home, located at 7427 9th Street, N.W., Washington, DC JA- Search Warrant and Affidavit for 9th St.). During that search, law enforcement officers seized several items, including 11.65 grams of heroin, a nine-millimeter Taurus Millennium handgun, and a .40 caliber Lama handgun, located underneath a bed in Appellant Dobie's home. JA (Inventory list bates stamp # 000872, July 7, 2006 Trial Tr. pp. 79-82, July 18, 2006 Trial Tr. 84-87, 97-99). The two guns were found stored together in a cardboard cracker box. (July 18, 2006 Trial Tr. 84). The drugs were found in a separate box lying near the cracker box. (July 18, 2006 Trial Tr. 97)

When challenged on evidentiary sufficiency, a jury's verdict must be

sustained when "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 302, 319 (1979). While this is undoubtedly a deferential standard, it is not intended to render appellate review toothless or *pro forma*. As the First Circuit has written, "The appellate function, properly understood, requires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995); *see also, United States v. Valerio*, 48 F.3d 58, 64 (1st Cir. 1995).

Specifically, in this case, in order to convict Appellant Dobie of the § 924(c) charge, the government was required to prove that she possessed a firearm in a manner which "furthered, advanced, or helped forward a drug trafficking crime." *Lomax*, 293 F.3d at 705. It is not enough, however, that the firearm furthered *any* drug trafficking crime; it must have furthered the specific drug trafficking crime alleged in the § 924(c) count of the indictment. This Court addressed this point in *United States v. Randall*, 171 F.3d 195 (4th Cir. 1999), wherein the defendant was

103

charged with using a firearm in connection to the predicate offense of cocaine distribution. At trial, however, the government could not show any actual distribution and urged that the defendant be convicted based on his possession of the gun in connection with a *different* predicate trafficking offense; namely, possession with intent to distribute. *Id.* at 203-204. On appeal, this Court found the conviction could not stand because the government's proof of a different predicate offense than that charged in the indictment constructively and fatally amended the indictment by impermissibly broadening the bases for conviction. *Id*. at 210; *see also, United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994); *United States v. Reyes*, 102 F.3d 1361, 1365 (5th Cir. 1996).

In this case, the indictment alleged Appellant Dobie possessed the firearm in connection with the drug trafficking conspiracy alleged in Count One. Thus, Appelant Dobie could be convicted if and only if her possession of the pistols found in her home on June 1, 2004 was in furtherance of the Martin conspiracy.[15]

---

[15]In Count 61 of the Fifth Superseding Indictment, it was charged that Appellant Dobie "did knowingly and intentionally possess a firearm in furtherence of a drug trafficking crime...that is, conspiracy to distribute controlled substances, as set forth in Count One of this...Indictment" in violation of 18 USC § 924(c). Count One of the indictment, in turn, charged Appellant Dobie with conspiring with Paulette Martin, Learley Goodwin, Reece Whiting, Derrick Bynum, Ruby Harden, Lanora Ali, Milburn Walker and George Harris to distribute and to possess with intent to distribute five kilograms or more of cocaine, one kilogram or more of heroin and fifty grams or more of cocaine base in violation 21 USC §

Proof that the guns were possessed in connection with any other drug trafficking crime would not be sufficient under the holding of *Randall*. The only drug found in proximity to the pistols was a relatively small quantity of heroin. Because the government presented no evidence that this heroin was connected to the Martin conspiracy, Appellant Dobie's § 924(c) conviction must be reversed.

The government's evidence regarding the heroin found in Appellant Dobie's home was scanty at best. It presented no evidence where the heroin came from. It did not identify from whom Appellant Dobie obtained it if, indeed, the drugs were even hers.[16] It does not appear from the trial record that the government contended that she received the drugs from Appellant Martin or one of her confederates, meaning there is no connection to the conspiracy in that direction. Nor does the government claim that Appellant Dobie ever sold drugs to Appellant Martin, so there is no connection to the conspiracy running in the opposite direction.

In its closing argument, the *only* link between these particular drugs and the conspiracy suggested by the government was a single, brief telephone conversation between Appellant Martin and Apppellant Dobie, which occurred

---

846.

[16]At the time the house was searched, it was occupied by three other individuals in addition to Appellant Dobie.

almost three weeks before the June 1 search of Appellant Dobie's home. JA

August 9, 2006 Trial Trans. At 47-48).  During the course of a call by Appellant

Martin on May 11, 2004, she mentioned to Appellant Dobie that "somebody called

me, they looking for them tickets like Gwen had. I told them, "I don't know

nobody with those kind, you know, that have a show like . . . I don't know."

Appellant Dobie responded, "Find out what they want. I just got, uh, fifty of them

but I'm about down 'bout, 'bout, ten or fifteen of them my damn self now. I found

somebody and I done got rid of most of 'em, cause it was nothing [unintelligible]."

Det.  Sakala later testified that the "tickets like Gwen had" referred to heroin.

related to codefendant Gwendolyn Levi.

     This conversation is wholly insufficient to connect the heroin later found in

Appellant Dobie's house to the Martin conspiracy. First, this conversation took

place three full weeks before the search of Appellant Dobie's home. If Appellant

Dobie did indeed have 10 or 15 grams of heroin in her possession on May 11 (a

contention which Appellant Dobie denied when she testified, and which remains

uncontroverted to this day), it is inconceivable, given her severe drug habit, that it

would have remained untouched and intact until June 1  – a period of three weeks.

Thus, even assuming the speakers were referring to heroin, it is at best highly

unlikely that any drugs discussed in this phone call were the same drugs found in

Appellant Dobie's home weeks later.

More significantly, there is nothing to indicate that this May 11 phone call was anything other than idle chatter. Even assuming that Apppellant Martin was trying to find a source of heroin for the potential customers she referenced in the phone call, there is no evidence that she succeeded in doing so, and certainly no evidence that Appellant Dobie ever supplied appellant Martin or her customers with any drugs. If anything, the phone call establishes the contrary. Appellant Dobie stated that she does not have a sufficient amount of heroin to give to anyone, nor did she know of anyone that she could obtain heroin from.  JA

The truth of these statements is corroborated by the fact that there was no follow up to this phone call. The wiretap remained up, but not further calls addressed this non-existent transaction.  There simply is no evidence that a heroin deal between Appellant Martin and Appellant Dobie was arranged, much less consummated, relative to this call. Nothing in the record suggests that  Appellant Dobie ever sold or agreed to sell  Appellant  Martin any heroin or that she distributed heroin to others at  Appellant  Martin's behest. At most,  Appellant Martin asked  Appellant Dobie, in an exploratory, preliminary manner, whether she had heroin to sell or knew where she could get heroin.  Appellant  Dobie answered negatively to both questions and, for all the record shows, that was the

107

end of the matter. This brief discussion does nothing to link the heroin found in Appellant Dobie's home three weeks later to any activities of the charged conspiracy.

Appellant Dobie was a drug addict who got her drugs from many sources. In light of the entire lack of any evidence that the heroin found under her bed came from, or was going to, Appellant Martin or her associates, the government failed to prove that guns found near this heroin furthered in any way the activities of the charged conspiracy. For this reason, there was insufficient evidence to support Appellant Dobie's § 924(c) conviction.

This case highlights some of the problems inherent in trying massive, multi-defendant drug cases. The scope and amount of evidence presented is so broad and diverse and involves so many different actors, times, and places that it threatens to overwhelm the jury's ability to make the specific factual determinations to individual defendants are entitled. This is a serious problem because years of incarceration may turn on very precise factual findings, findings which may seem relatively insignificant to a lay jury attempting to sort through days of testimony and thousands of pages of documents.

Here, the jury heard months of evidence regarding a nationwide multi-drug conspiracy involving dozens of participants. It would be unsurprising if this flood

of evidence did not, in the jury's collective mind, blur all the various drug transactions, some related, some not, into one undifferentiated criminal enterprise and make it nearly impossible for the jury to tease out those transactions that, while criminal, were not components of the charged conspiracy. Indeed, this appears to be what happened in connection with Appellant Dobie's § 924(c) charge.

It is critical that this Court not fall prey to this same error. While the government introduced a mountain of evidence of drug dealing and drug possession by the various defendants, a careful, clear-eyed review of the record fails to disclose any proof, much less proof beyond a reasonable doubt, that the heroin found in Appellant Dobie's home was possessed in connection with the charged conspiracy. By Appellant Dobie's own admission, she is a drug user and sometime criminal, and her activities do her no credit. But our legal system does not allow criminal conviction and punishment to be based merely upon proof of the defendant's bad character or moral weakness, rather each such conviction must rest on the commission of specific criminal acts, proved beyond a reasonable doubt. Here, Appellant Dobie may have possessed a firearm and she may even

have done so in connection with her possession of heroin.[17] However, this not what she was charged with. The government charged Appellant Dobie with possessing a firearm in furtherance of the charged conspiracy, and because there is no evidence that this is the case, her § 924(c) conviction must be reversed.

## IX.   THE CONVICTION RELATIVE TO THE CONSPIRACY CHARGED IN COUNT ONE IS INFIRM BECAUSE THE UNITED STATES' PROOFS ESTABLISHED A MERE BUYER/SELLER RELATIONSHIP BETWEEN APPELLANT ALI AND APPELLANT MARTIN

### *Standard of Review & Adoption by Appellants*

In reviewing challenges to the sufficiency of the evidence, a conviction must be affirmed, if when viewing that evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Lomax*, 293 F.3d 701, 705

---

[17]While arguably Appellant Dobie could have been charged with a violation of § 924(c) even if the heroin was unconnected to the Martin conspiracy, that charge would have had to have been brought in the District of Columbia, not Maryland. This is so because, while the Supreme Court has held that a § 924(c) charge may be brought in any district where the underlying crime of violence or drug trafficking offense took place even if the firearm was never actually possessed in the charging district, *United States v. Rodriquez-Moreno*, 526 U.S. 275 (1999), venue is not proper if no part of the predicate offense occurred in the charging district. Because, as shown in this argument, the heroin found in D.C. was not connected to the Martin conspiracy, it could not support a § 924(c) charge brought in Maryland.

110

(4th Cir. 2002).

This issue is put forward on behalf of the following Appellant: Ali.

**Argument**

Count One of the indictment charged Appellant Ali with participation in a single conspiracy with Martin and others. As to the others, there was no evidence adduced at trial that Appellant Ali had any form of illicit contact with them or imputable knowledge of their activities with Appellant Martin. The government proved only that appellant made purchases from Appellant Martin for personal consumption. All of the purchases were in relatively small quantities consistent with the nature of Appellant Ali's undisputed habitual use. Simply put, Appellants Ali and Martin were juxtaposed as a seller and purchaser. This relationship is insufficient to underpin a conspiracy conviction. The lack of evidence that any conspiracy involving appellant existed in Count One of the indictment requires that the verdict be set aside. *See United States v. Pressler*, 256 F.3d 144 (3 Cir. 2001).

The evidence established that in 1998 Appellant Ali approached Paulette Martin and inquired whether "[Martin] knew anyone [she] could [purchase] cocaine from." JA trx 4 Aug06 202).  Ali subsequently began purchasing powder cocaine directly from Martin.  Ali made routine purchases at a cost of "$50.00

[for] a half a gram." JA trx 4 Aug06 203). The largest purchase at any time was

$125.00, the discounted price for 3 grams. Purchases by Ali from Martin occurred

"once a week or twice a week. It varied." JA JA trx 4 Aug06 205, 216).[18] Ali was

unaware that any of the other co-defendants were to any degree involved in

trafficking. JA JA trx 4 Aug06 217).

Ali explained a recorded telephone conversation between Martin and

Martha Jean West. The conversation reflected the comment "You know [Ali] ain't

gonna spend that kind of money for it." JA trx 4 Aug06 218).  Ali testified that the

reference was to clothing.  JA trx 4 Aug06  220). Other telephone calls which Ali

discussed in her testimony were also related to topics other than drug activity. JA

trx 4 Aug06 226-282).

On May 16, 2004 Martin "called [Ali] and asked [her] to come by to [assist

in transporting] some things to [Martin's dance] studio." JATranscript of August

8, 2006 at 30). The conversation included notification to Ali that Martin also

intended to visit Ali's Sheridan Street apartment subsequent to moving particular

items to the studio. Ali and Martin, in fact, traveled to Sheridan Street after

---

[18]  Ali reviewed a ledger which recorded the dates and times of clothing
purchases which she and her husband transacted with Paulette Martin.  Those
purchases included a mink coat for $3,200.00 (208). The ledger also reflected
cocaine purchases. JA trx 4 Aug06 212). The highest amount of drug purchase
indebtedness embodied in the ledger was $465.00 JA trx 4 Aug06 213).

moving the possessions of Martin to the dance studio. At Ali's apartment, Martin

"checked the suitcase that [was] there." Ali stated that Martin perused the

suitcase's contents outside the presence of both she and Garner. JA trx 4 Aug06

32).

Martin stated to Ali that her motivation for moving items to the dance studio

was a concern that police intended to raid her private residence. Martin "had been

warned through the neighborhood group that [too many] people [were] coming in

and out of [her] house." JA trx 4 Aug06 32). Ali stated:

> [Martin] thought that [the police] would come in, and she wanted to
> take some things out because she didn't want them to be destroyed or
> ruined…She thought it was about the clothing, that's what I was told,
> that it was about the clothing that Kevin had been bringing in there.

JA trx 4 Aug06 32). Ali testified that "[Martin] just gave [her] the bags, and [they]

walked directly out of the house." JA trx 4 Aug06 33). Ali emphasized that she

was completely unknowledgeable as to the contents of the bags. JA trx 4 Aug06

33). [19] When they arrived at the studio, Ali transferred full possession of the bags to

Martin, absent any inspection of them. JA trx 4 Aug06 34). She sat "in the front

office…in a chair" while Martin deposited the bags inside the studio. JA trx 4

---

[19] Recorded conversations established that Martin advised several others
that she moved her drug inventory that day. None of the evidence adduced
contradicted Ali's testimony that she was unaware that drugs were being relocated.
(188).

Aug06 34). Thereafter, Martin and Ali exited the studio and traveled to Sheridan Street. JA trx 4 Aug06 34).[20]

A simple agreement to buy drugs is insufficient to establish a conspiracy between the seller and buyer. This rule of evidentiary sufficiency is a bar to a conspiracy conviction even if the purchaser intends to resell the drugs. *United States v. Fuller*, 532 F.3d 656, 662 (7th Cir.2008). *See United States v. West,* 15 F.3d 119, 121 (8th Cir. 1994), *cert. denied*, 513 U.S. 863 (1994); *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir. 1978), cert. den. 439 U.S. 958 (1978). The test is whether the relationship extends substantially beyond buyer/seller. The rule requires that the evidence "point to a concrete, interlocking interest beyond individual buy-sell transactions [and that] the buyer-seller relationship developed into a cooperative venture." *United States v. Fuller*, 532 F.2d at 66.

The rule, commonly referred to as Wharton's Rule, is applied to agreements between two parties, which are inevitably incident to the commission of a crime, such as a sale of contraband. In circumstances where agreement is an inevitable incident, "conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be

---

[20]    Ali testified regarding the suitcase which she and Garner permitted to be stored within their apartment. Ali did not have a key to the suitcase and was unaware of its contents. (35).

maintained." *Ianelli v. United States*, 420 U.S. 770, 773 (1975); *United States v. Hall*, 551 F. 3d 257, 259 (4th Cir. 2009); *United States v. Mastrapa,* 509 F.3d 652, 657 (4th Cir. 2007); *United States v. Stephens,* 482 F.3d 669, 672 (4th Cir. 2007).

The issue as to whether appellant was a participant in a drug distribution conspiracy rather than simply a buyer or seller is a question of fact for the jury. Indeed, the nature or type of any conspiracy is a matter of fact. *See* Argument X, *infra.* We iterate that "conspiracies, like all business ventures, are typically distinguished [from simple agreements to buy criminal contraband] by cooperative relationships between the parties that facilitate achievement of the goal." *United States v. Townsend,* 924 F.2d 1385, 1391 (7th Cir. 1991).[21]

The district court instructed the jury in a manner consistent with Wharton's Rule. The legal instructions required that the jury acquit Ali on Count One. The proofs clearly were limited to a simple buyer/seller relationship. *United States v. Townsend, id.* And, the buyer (Ali) was an addict as opposed to a trafficker.[22] The fact of repeated purchases was merely a matter to be considered by the jury in

---

[21]    In *United States v. Fuller*, 532 F.3d at 662, the court referred to proof therein of "the seller's knowledge of and a shared stake in the buyer's illegal venture." Ali, the buyer herein, made purchases exclusively for personal use. There was no proof that she an any time sold or distributed cocaine in any fashion.

[22]    At sentencing the court stated "[Ali] is obviously not somebody involved in reselling. She's a user who's hooked." JA Transcript of December 19, 2006 at 133).

determining whether a conspiracy existed. *United States v. Pressler, 256 F.3d aqt 153.* Further, none of the purchases were a precursor to a resale. At sentencing the district court confirmed that it found the lack of any resales by appellant as a matter of fact. JA trx 4 Aug06 137).

Stated somewhat differently, the jury in each instance herein was required to determine whether "there [was] some understanding beyond a sales agreement before [it could] support a conviction for conspiracy". *United States v. Bewig,* 354 F.3d 73, 735 (8th Cir. 2003)**.** We stress that the sale of drugs from one drug dealer to another, even on repeat occasions, does not, standing alone, constitute participation in a larger conspiracy. *Id.* And, sales from a dealer to an addict cannot constitute conspiracy.[23] This Court must so find and reverse the conviction. Due process demands no less.

## X.    THE CONVICTION OF APPELLANT ALI AS TO COUNT ONE MUST BE REVERSED BECAUSE THE GOVERNMENT AT BEST PROVED A MULTIPLE CONSPIRACIES, AS OPPOSED TO A SINGLE CONSPIRACY.

### *Standard of Review & Adoption by Appellants*

This Court reviews challenges to the proof of multiple or single conspiracies for an abuse of discretion. *United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir.

---

[23] A legal question exists respecting whether an addict who paid for all drugs supplied to her and did not resell can legally be convicted of conspiracy.

1994).

This issue is put forward on behalf of the following Appellants: Ali.

***Argument***

The indictment in Count One charged a single conspiracy allegedly involving Martin, Ali and others. The proofs established the existence of at least two separate conspiracies; one of which may have developed between Martin and Ali, and other conspiracies between Martin and the remaining co-defendants. Indeed, there was no evidence of any interaction and/or understanding between appellant and the others. Ali was a drug addict dependent upon Martin as a source of supply for use only.

The district court committed plain error when it submitted the clearly duplicitous Count One to the jury. The district court was required *sua sponte* to dismiss Count One because the United States' proofs were at variance with the single conspiracy outlined in the indictment. The grand jury was clearly not informed that appellant was an addict who did not resale any cocaine supplied to her and did not profit in any manner. If it had been so advised, appellant would not have been charged in Count One. So too, the petit jury was not given the proper legal guidance in terms of instructions and it also errantly assessed appellant's culpability.

The purpose of an indictment is to provide the defendant with notice of charges against him in order that he may prepare a defense, to effectuate the Fifth Amendment's double jeopardy provision and to shield an accused from an unwarranted and unfounded charge of involvement in serious crimes by interposing the independent judgment of the grand jury. *United States v. Radowitz,* 507 F.2d 109 (3rd Cir. 1974). No man may be brought to trial for crime unless a grand jury shall first find sufficient cause for a charge. *United States v. Quinn,* 359 F.3d 666, 672 (4th Cir. 2004); *United States v. Locklear,* 97 F.3d 196, 199 (7th Cir. 1996).

An indictment is not amendable by a court to charge an offense not found by the grand jury. *United States v. Soskin*, 100 F.3d 1377, 1380 (7th Cir. 1996). An indictment may not be amended except by resubmission to the grand jury. *Russell v. United States*, 369 U.S. 749, 770 (1962). The possible bases for conviction are limited to those contained in the indictment. *See United States v. Resendiz v. Ponce*, 127 S.Ct.782 789 (2007); *United States v. Vinyard,* 266 F. 3d 320, 326 (4th Cir. 2001).

New bases for conviction may not be added whether they are added literally, by formal amendment to the indictment, or constructively. Moreover, new bases for conviction may not be supplied by proof at the time of trial of a crime not

118

clearly and fully charged. In short, no modifications may be made which allow a conviction on grounds not charged by the grand jury. *United States v. Leichtman*, 948 F.2d 370, 374-377 (7th Cir. 1991). *See United States v. Patterson,* 348 F.3d 218 (7th Cir. 2003).

Knowledgeable entry into an agreement with others to commit an offense is the gist of the crime conspiracy. *United States v. Hubbard,* 96 F.3d 1223, 1226 (9th Cir. 1996). *See United States v. Carpenter,* 95 F.3d 773, 775 (9th Cir. 1996); *United States v. Fleschner,* 98 F.3d 155, 159 (4th Cir. 1996). The parties must have a meeting of the minds in the common design, purpose or objects of the conspiracy. *United States v. Wardell,* 591 F.3d 1279, 1287 (10 Cir. 2009), *cert. denied,* 129 S.Ct. 2783 (2009).

Explicit in the requirement of an agreement under federal law is that each accused must be shown to have purposely and knowingly participated in the conspiracy. *United States v. Whitney*, 229 F.3d 1296, 1301 (10 Cir. 2000). See *United States v. Lee,* 694 F.2d 649, 652 (11th Cir. 1983). Neither mere association with individuals engaged in illegal conduct nor mere knowledge of the existence or acquiescence in the object of a conspiracy is sufficient to sustain a conspiracy conviction. *See United States v. Richmond,* 700 F.2d 1183, 1190 (8th Cir. 1983).

If the totality of the evidence shows a concert of action in which all the

119

parties worked together with a single design for the accomplishment of a common purpose, then there is but one conspiracy. *United States v. Hemphill,* 514 F.3d 1350, 1363 (D.C. Cir. 2008). *See United States v. Stockton,* 349 F.3d 755 (4th Cir. 2003). The evidence must demonstrate an overall collusive arrangement. *See United States v. Jackson,* 696 F.2d 578, 582-584 (8th Cir. 1982); Parties may join a single conspiracy after its inception and may withdraw and terminate their relationship prior to its completion. *United States v. Wilson,* 484 F.3d 267 (4 Cir. 2007).

For the purpose in determining whether a single conspiracy exits, a plan does not become several plans simply because some members are cast in more vital roles than others or because certain members perform only a single function. *See United States v. Miche,* 558 F.2d 994-995 (5th Cir. 1979). *Cf. United States v. Borchadt,* 698 F.2d 697, 702 (5th Cir. 1983). Each conspirator must have a general knowledge of the overall purpose and scope of the conspiracy, but it is not necessary that the conspirators know each other or the details of each enterprise making up the conspiracy. *See United States v. Gatling,* 96 F.3d 1511, 1520 (D.C. Cir. 1996). The fact there is some interrelationship between conspiracies does not necessarily make them the same criminal enterprise. *See United States v. Ingman,* 5451 F.2d 1329, 1331 (2nd Cir. 1972).

The proof elicited from the government's witnesses did not establish the agreement of purpose which a single conspiracy must incorporate. And, evidence including Ali's testimony and that of co-defendants demonstrated that separate agreements were at issue. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *United States v. Coward,* 630 F.2d 229, 231 (4th Cir. 1980). *See United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977 ); *cf. United States v. Ochoa,* 609 F.2d 198, 201 (5th Cir. 1980) (In order to have a single conspiracy, the conspirators must be directed toward a common goal). *United States v. Ashley,* 555 F.2d 462, 465 (5th Cir. 1977), *reh'g denied,* 559 F.2d 29 (5th Cir. 1977), *cert. denied,* 434 U.S. 869 (1978) (common purposes and plan must be proved by a development and a collocations of circumstances).

Notwithstanding that the proofs were at variance with the allegations set forth in the indictment, the trial court did not dismiss Count One. The trial court permitted the Governmentto present at least two separate conspiracies to the jury within the single count. That determination violated the rules as to permissible joinder of offenses and permitted the jury to convict Ali of an offense not charged in the indictment. The court in its instructions was required to instruct the jury that it must acquit if it found two distinct conspiracies in Count One. No such instruction was uttered despite the unequivocal testimony of Ali and others which

clearly established that Count One did not identify a single group of conspirators with a common purpose.

Fed. R. Crim. Proc. 8(a) states as pertinent hereto:

The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Where two more separate and distinct conspiracies are joined in the same count of an indictment, such as in Count One of the instant indictment, that count is duplicitous in contravention of Fed. R. Crim. Proc. 8(a). *See United States v. Kearney,* 451 F. Supp. 33, 35 (S.D.N.Y. 1978).

The inherent problems with respect to a duplicitous count are: (1) a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or both; (2) the defendant may be prejudiced in the context of evidentiary rulings during trial, since evidence admissible on one offense might be inadmissible on the other; and (3) there is no means to determine with a general verdict on two separate offenses joined in a single count whether the jury was unanimous with respect to either. *United States v. Starks,* 515 F.2d 112, 116 (3rd Cir. 1975).

The doctrine of duplicity is result-oriented. It prohibits the charging of

multiple offenses in a single count but allows the charging of multiple means constituting a single and continuing offense. This is true even if the components of the single offense may otherwise be treated as offenses. *United States v. Kearney, supra. See United States v. Cohen,* 444 F. Supp. 1314, 1320 (E.D. Pa. 1978); *cf. United States v. Beradi,* 675 F.2d 894, 897-898 (7th Cir. 1981).

The United States Supreme Court has repeatedly warned against "attempts to broaden the already pervasive and wide sweeping nets of conspiracy prosecutions." *Grunewald v. United States,* 353 U.S. 391, 404 (1957). The instant conspiracy count is a form of wheel conspiracy because it purports to charge a single conspiracy due to the presence of one common participant, *viz.* Paulette Martin. With respect to the type of conspiracy attempted to be charged here, it has become an axiom of conspiracy law that for a wheel to exist, those people who form the wheel's "spokes" must have been aware of each other and must do something in furtherance of some illegal enterprise. *See Blumenthal v. United States,* 332 U.S. 539, 556-557 (1947). Otherwise, "the conspiracy lacks the rim of the wheel to enclose the spokes." Kotteakos v. United States, 328 U.S. at 755.

The factual parallels between this case and *Kotteakos* are instructive. In *Kotteakos,* numerous individuals were indicted and charged with a single general conspiracy to violate the National Housing Act by inducing lending institutions to

make loans on the basis of false and fraudulent information contained in loan applications. The central and common figure in each of the fraudulent loan applications was one Simon Brown. Nineteen defendants went to trial. Thirteen defendants' cases went to the jury and seven were convicted.

With respect to the appellants in *Kotteakos,* there was no evidence to connect them to the other defendants, except that they had dealt through Brown in obtaining their loans. With respect to the other defendants, there was not only no connection between them and the appellants, but there was no illicit relationship proven between and among themselves. The singular common fact was that they had all dealt with Brown, the hub. At least eight separate conspiracies, none having any connection with the other, were found in *Kotteakos.* In reviewing the convictions, the Court stated:

> Here, toleration went to far. We do not think that either Congress, when it enacted § 259, or this Court, when deciding the *Berger* case, intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, co-conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all...But if the practice here followed were to stand, we see nothing to prevent its extension to a dozen, a score or more conspiracies and at the same time to a score of men, involved, if at all, only separate in them. The danger of transference of guilt from one another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place.

124

343 U.S. at 773-774.

Some two years after *Kotteakos* was decided, the United States Supreme

Court, in deciding *Blumenthal v. United States, supra,* took occasion to comment

on the significance of *Kotteakos*. The *Blumenthal* Court stated:

> [This] case therefore is very different from the facts admitted to exist
> in the *Kotteakos* case. Apart from the much larger number of
> agreements there involved, no two of those agreements were tied
> together as stages in the formation of a large all-inclusive
> combination, all directed to achieving a single unlawful end or result.
> On the contrary, each separate agreement had its own distinct, illegal
> end. Each loan was an end in itself, separate from all others, although
> all were alike in having similar illegal objects. Except for Brown, the
> common figure, no conspirator was interested in whether any loan
> except his own went through. And none aided in any way, by
> agreement or otherwise, in procuring another's loan. The conspiracies
> were therefore distinct and disconnected, not parts of a larger general
> scheme, both in the phase of agreement with Brown and also in the
> absence of any aid given to others as well as in the specific object and
> result. There was no drawing of all together in a single, overall,
> comprehensive plan.

332 U.S. at 558.

The government's proof as to Count One failed to draw appellant and the

named co-defendants together in a single, overall, comprehensive plan. The

testimony of appellant, other co-defendants and additional government witnesses

established separate and distinct enterprises at odds with the singularity of Count

One. There can be no other conclusion but that Count One as proved at trial does

little more than charge at least two separate agreements, each having its own

125

distinct illegal end, with only Martin common to each.

The issue raised herein was analyzed in *United States v. Cryan,* 490 F. Supp. 1234 (D. N.J. 1980). In *Cryan,* the grand jury erroneously incorporated multiple conspiracies into a single count. The Court in *Cryan* found that a conspiracy count, which charges two conspiracies as one, has no vitality. The indictment in *Cryan* was properly dismissed. The *Cryan* court stated:

> An indictment may not charge multiple conspiracies in a single count...the rational of this principle is two-fold. First, a jury verdict on any count which charges two separate offense is ambiguous: it does not reveal whether the jury considered and reached a verdict on each offense charged...second a count charging two offenses does not reveal whether the grand jury intended to charge either had it been aware that the offenses were distinct. This problem is particularly acute when the multiple offenses charged are conspiracies, because the grand jury may have indicted one defendant on the basis of evidence admissible only against other defendants.

429 F. Supp. at 1239

This Court has no just option other than to reverse the conspiracy conviction herein. There is no basis upon which it may be determined that "the grand jury intended to charge [multiple conspiracies] or whether it would have charged either had it been [correctly instructed] that the [conspiracies] were distinct." *United States v. Cryan, id.* More importantly, appellant was absolutely entitled to a dismissal because of the United States' failure to prove the single conspiracy, which it alleged in the indictment. The conviction below is a hollow mockery of

126

justice

## XI.    THE MANDATORY MINIMUM SENTENCE OF 120 MONTHS IMPOSED ON APPELLANT ALI IS DISPROPORTIONATE AND UNCONSTITUTIONAL

### *Standard of Review & Adoption by Appellants*

This Court reviews the sentence imposed upon  a criminal defendant for "reasonableness" under a standard of *de novo* review, and factual findings for clear error.  *United States v. Booker*,  543 U.S. 220, 261-62 (2005).

This issue is put forward on behalf of the following Appellants: Ali.

### *Argument*

The district court calculated the adjusted offense level applicable to appellant as 31. And, she was properly placed in criminal history category of One. The advisory guideline range counseled a sentence within the range of 108-135 months. However, the sanction scheme at issue mandated that the district court impose a minimum sentence of 120 months. JA Ali Sentencing transcript of December 19, 2006 at 146). The district court adhered to the mandatory minimum stating that it "was fully satisfied that not one day more than 120 months is appropriate in this case." JA same 146).

The district court found that appellant's "involvement [was] obviously lesser than others."  JA same 144). So too, the court stated that Ali is a dedicated

127

teacher who because of crack cocaine…fell into a very bad situation that has brought her before a federal judge." JA same 145). The court categorized appellant as "a demonstrated victim of the offenses of Paulette Martin." JA same 146). In this context, appellant was further described by the district court as "obviously not somebody involved in reselling. She's a user who is hooked." JA same133).

The sentence imposed by the district court violated the principle of proportionality. The principle of proportionality is that punishment should not be by reason of its excessive length or severity, greatly disproportionate to the offense committed by the defendant. The 120 month period of imprisonment for the conduct at issue relative to appellant is disproportionate to any harm attendant to it. It was not demonstrated that appellant possessed any substance for sale or any purpose other than personal use. *See Weems v. United States*, 217 U.S. 349 (1910); *Solem v. Helm*, 463 U.S. 277 (1983). *Cf. United States v. Fischback and Moore, Inc.,* 750 F.2d 1183, 1192 (3rd Cir. 1984). Further, she had no prior criminal record.

The leading case with reference to disproportionality is *Solem v. Helm,* supra. The opinion of the United States Supreme Court therein is predicated upon a thorough analysis of the Eighth Amendment and its proscription against unfair

sanctions. "The Eight amendment declares...excessive fines [shall not be] imposed,

nor cruel and unusual punishments inflicted". *Solem v. Helm,* 462 U.S. at 284.

This clause prohibits not only barbaric punishment, but also sentences that are

disproportionate to the crime committed. *Id.* The *Solem* Court discussed the origin

of the principle of proportionality and its inclusion into the Bill of Rights.  The

Court stated:

> It is] a longstanding principle of English law that the
> punishment...should not be, by reason of its excessive length or
> severity, greatly disproportionate to the offense charged...when the
> Framers of the Eighth Amendment adopted the language of the
> English Bill of rights, they also adopted the English principle of
> proportionality.

463 U.S. at 285.

The United States Supreme Court first "endorsed the principle of

proportionality as a constitutional standard" in *Weems v. United States*, *supra.* The

*Weems* Court stated that it is a precept of justice that punishment for crime be

graduated and proportioned to the offense." 217 U.S. at 367; *cf. O'Neil v.

Vermont*, 144 U.S. 323, 331 (1892); *Trop v. Pulles,* 356 U.S. 86, 111 (1958);

*Robinson v. California,* 370 U.S. 660, 667 (1962); *Enmund v. Florida,* 458 U.S.

782 (1982); *Coker v. Georgia,* 433 U.S. 584, 601 (1977).

The *Solem* Court identified objective factors by which courts are to be

guided in reviewing claims of disportionality. A more detailed description of those

129

factors is instructive.  The *Solem* Court stated:

> First, we look to the gravity of the offense and harshness of the
> penalty...Courts [have] examined the circumstances of the
> defendant's crime in great detail...[For example] the seriousness of
> the crime of rape, and compared it to other crimes, such as
> murder...the nature of the crime...the pettiness of the offense.  ...
> Second, it may be helpful to compare the sentences imposed on other
> criminals in the same jurisdiction. If more serious crimes are subject
> to the same penalty, or to less serious penalties, that is some
> indication that the punishment at issue may be excessive.  ...  Third,
> courts may find it useful to compare the sentences imposed for
> commission of the same crime in other jurisdictions.

463 U.S. at 290-291.

The *Solem* court recognized that "application of these factors assumes that

courts are competent to judge the gravity of an offense, at least on a relative

scale." 463 U.S. at 292. *See Graham v. Florida*, ___ U.S. ___, 130 S.Ct. 2011

(2010) (juvenile offender who did not commit homicide may not be sentenced to

life without parole). The Court in *Solem* provided an analytical framework for

comparative judgments.  The Court stated:

> Comparison can be made in light of the harm caused or threatened to
> the victim or society, and the culpability of the offender. Thus in
> *Enmund* the Court determined that the petitioner's conduct was not as
> serious as his accomplices' conduct.  ...  Turning to the culpability of
> the offender, there are again clear     distinctions that courts may
> recognize and apply. In *Enmund* the Court looked at the petitioner's
> lack of intent to kill in determining that he was less culpable than his
> accomplices.  ...  This list is by no means exhaustive. It simply
> illustrates that there are generally accepted criteria for comparing the
> severity of different crimes on a broad scale, despite the difficulties

130

courts face in attempting to draw distinctions between similar crimes.

*Id.*

There is clearly no basis for imposition of 120 month period of imprisonment in this matter. Appellant Ali has no prior record of violent and/or criminal behavior and was not demonstrated to have possessed any narcotic for the purposes of sale. The motive was not commercial – Appellant Ali was stimulated by addiction and consumed all of the substances distributed to her.

For the foregoing reasons, Appellant Ali respectfully requests that the 120 month period of imprisonmemt be reduced. Indeed, adequate ground exists for a substantially lesser sentence, and due process and the principle of proportionality demands a lesser sentence. This Court must so find. *See Baze et al. v. Rees, et al.,* 553 U.S. 35 (2008).

In the same vein, there was no basis for imposition of the mandatory life imprisonment as to Appellant Whiting. As demonstrated previously, *supra*, Argument # x, the government's § 851 enhancement was both procedurally flawed and the government failed to meet its burden of proof as to Appellant Whiting's ostensible  prior qualifying  convictions. More fundamentally, however, Appellant Whiting has no prior record of violent offenses and does have a history of drug addiction.   For the foregoing reasons, Appellant Whiting respectfully requests that

the sentence of life imprisonment be vacated, and that he be sentenced to term of

imprisonment more suitable for an offender of his advanced age and low level of

involvement.

## XII. THE GOVERNMENT FAILED TO MEET ITS BURDEN OF PROOF REGARDING APPELLANT WHITING'S PRIOR CONVICTIONS AND THE TRIAL COURT ERRED IN CONCLUDING THAT THE EVIDENCE OF WHITING'S PRIOR CONVICTIONS WERE SUFFICIENTLY PROVEN TO APPLY THE MANDATORY LIFE SENTENCE.

### *Standard of Review & Adoption by Appellants*

This Court reviews *de novo* the question of whether a prior conviction

is a predicate offense for sentencing enhancement purposes.  *United States v.*

*Williams*, 326 F.3d 535, 537 (4th Cir. 2003).

This issue is put forward on behalf of the following Appellant: Whiting.

### *Argument*

The United State's Attorney's Office served upon Appellant Whiting a

notice pursuant to 21 USC § 851 seeking a mandatory life sentence, based upon

his prior conviction for conspiracy to distribute or possess with intent to distribute

a controlled dangerous substance.  Appellant Whiting, through counsel,

challenged the application of the mandatory life sentence in his case, as well as the

adequacy of the notice provided. The Government listed the following prior

convictions as a basis for the enhanced penalty of life without parole:

132

A. Conviction for smuggling marihuana in El Paso, Texas on or about December 15, 1968.

B. Conviction for possession of cocaine in San Diego, California, on or about February 25, 1988.

C. Conviction for possession of cocaine in Mexico, Docket Number 153/84 (Chavez, J), on or about February 1, 1986, for which he received a sentence of eight years, three months incarceration.

D.  Conviction for a heroin offense for which he was sentenced to 186 months' incarceration, which was later reduced pursuant via a Rule 35 Motion to 72 months' incarceration in the Eastern District of Virginia, Docket No. 94CR00108-101 (Ellis, J.).

E.  A 1974 conviction relating to his role in the John Edward "Liddie" Jones drug organization.

Appellant Whiting challenged the adequacy of the notice provided by the document entitled "Notice/Information of Government's Intention To Seek Enhanced Penalties Pursuant to 21 USC § 851" received from the United States Attorney's Office, dated June 6, 2006 at sentencing. (12/19/06 at pp4). On page one of that notice the above five entries are listed as predicate prior convictions.

21 USC § 841 (b) provides in relevant part:

133

"If any person commits a violation of this subparagraph or of section 849, 859, 860 or 861 of this title after two or more felony convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence".

At issue is whether the defendant's prior record provides the requisite predicate offenses to trigger the harsh sentencing requirements of 21 USC §841 and §851.  In its §851 notice the Government included only one attachment reflecting the actual court records for that conviction. This is the conviction in the Eastern District of Virginia dating from 1994.  The attachment is **not** certified. In no instance did the Government submit an actual certified record of any of the purported convictions.  It is Appellant Whiting's position that these defects make the notice faulty and a violation of his due process rights. The additional following defects were present in each of the proffered prior convictions with the exception of the 1994 conviction from the Eastern District of Virginia. The other convictions listed in the notice did not state from which court, Federal or State the conviction was obtained. The notice did not state which statute was violated. The notice did not state whether the conviction was a felony or a misdemeanor or the maximum penalty. What the Government's notice lacked was sufficient specificity to put the

134

defendant on notice of which convictions the Government was relying on as predicate offenses for the enhanced penalty. Furthermore, the Government failed to provide any evidence at sentencing as to those convictions. Ultimately, the Government therefore failed in its burden of proof.

The record was not improved at the sentencing hearing on December 19, 2006. 21 U.S.C § 851(c) provides that the government has the burden of proof **beyond a reasonable doubt** as to any conviction it intends to use as a predicate for an enhanced mandatory minimum sentence.  The statute provides in part:  "the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact."

Appellant Whiting chose to exercise his constitutional right to testify at trial and predictably the Government used his priors as impeachment. The Government then tried to use his prior testimony to argue to the court that his trial testimony was sufficient to prove his convictions for sentencing. ( 12/19/06 at pp5). What the court and government ignore is that it was solely the Government's burden to prove the convictions beyond a reasonable doubt. Instead, the court simply accepted the Government's suggestion and counted all the priors for sentencing purposes. (12/19/06 at pp 5 and 6). In doing so the burden of proof was impermissibly moved from the government to him as the defendant.

Furthermore, the court at sentencing does not even address the issued raised as to whether the prior convictions are felonies as required by § 851. The statute clearly requires that the prior conviction relied upon be a felony. 21 USC § 841(b)(1)(A) states that:

"If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the proceeding sentence."

Here the government failed to prove, except arguably in the 1994 case, that theprior convictions are for felonies. The Government by not proving at sentencingfrom which the conviction was obtained or which statute was violated leaves boththe sentencing and appellate courts with no way to judge the adequacy of the proofof the predicate offense or whether it is a felony.

Appellant Whiting further challenged the adequacy of using his prior from Mexico. First, he alleged that the Government failed to prove that he was convicted of a felony. The notice provided states the conviction is for "Possession of Cocaine". However, § 841 requires a *felony* conviction, (emphasis added). Nowhere did the Government prove, beyond a reasonable doubt that a

possession offense is a *felony* in Mexico.  It is well recognized that under our own applicable Federal statute that a simple possession of cocaine offense would be considered a misdemeanor offense.  *See* 21 USC §844).

It also is Appellant Whiting's assertion that the conviction in Mexico cannot not be considered because it is from a foreign country.  18 USC §851(c) makes specific reference to a "conviction in violation of the Constitution of the United States".   It is Appellant Whiting's position that it was clearly the intent of Congress to exclude any foreign convictions as we have no way to ascertain whether a conviction in a foreign country would have been pursuant to any of the procedural or constitutional safeguards that we cherish in this country.

## XIII.  THE DISTRICT COURT ERRED IN ENHANCING THE SENTENCE OF APPELLANT BYNUM PURSUANT TO  21 USC § 841 BASED UPON A STATE COURT CONVICTION THAT WAS BASED UPON THE SAME EVIDENCE, CONDUCT AND CIRCUMSTANCES AS THE FEDERAL CONSPIRACY, WHEN THE SAME EVIDENCE, CONDUCT AND CIRCUMSTANCES IS ALSO USED TO CONVICT HIM IN THE FEDERAL CONSPIRACY.

### *Standard of Review & Adoption by Appellants*

This court reviews *de novo* the question of whether a prior conviction is a predictate offense for sentencing enhancement purposes.  *United States v. Williams*, 326 F.3d 535, 537 (4th Cir. 2003).

This issue is put forward on behalf of the following Appellant: Bynum.

137

*Argument*

The district court committed error when it enhanced the sentence of

Appellant Bynum, to a mandatory minimum 20 year imprisonment for Counts

One, Eight and Forty, pursuant to 21 USC 841 (b)(1)(A).  The relevant portion of

this statute states, "If any person commits such a violation after a prior conviction

for a felony drug offense has become final, such person shall be sentenced to a

term of imprisonment which may not be less than 20 years and not more than life

imprisonment... ."   The court found that a conviction in November 13, 1999 was

prior conduct, rather than conduct during, the conspiracy in this case.  Dec. 19,

2006 p. 98.

Contrary to the Court's finding, Bynum was not convicted of any predicate

offense, pursuant to 18 USC 841(b)(1)(A) prior to 1997, when the conspiracy

began.  Instead, his arrest and conviction in November 1999 for a gun offense and

drug possession occurred during, rather than prior to the conspiracy.   However,

there is a split among the circuits on the proper manner to view a prior conviction.

The "Fourth, Seventh, and Eleventh Circuits have held that 'it is ... appropriate to

focus on the degree of criminal activity that occurs after a defendant's conviction

for drug-related activity is final rather than when the conspiracy began.'" *United*

*States v. Martino*, 294 F.3d 346, 350 (2nd Cir. 2002), citing *US v. Garcia*, 32 F.3d

138

at 1020.  The Sixth and Eighth circuits, however, may view the conviction as part of the conspiracy.  *Id.*

The Government, however, treated this conviction as conduct part of the conspiracy.  The Government provided a Statement of Facts in the PSR that includes a reference to 200 grams of crack cocaine from the 1999 arrest as part of the conspiracy.   ¶ 53 of the Presentence Report.  Furthermore, at sentencing, the Government introduced evidence through Det.  Eveler indicating that the cocaine found in the 1999 conviction, "was part of this conspiracy."  Dec. 19, 2006, p. 66. Based on this testimony, the Government argued that the amount of those drugs should be used to calculate the total drug weight during the conspiracy.  Dec. 19, 2006.  p. 65

To use the conviction to enhance Bynum's sentence, the Government must show that the conviction began prior to the conspiracy, not during the conspiracy. A conspiracy requires an ongoing agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective.  18 USC § 371.  A conspiracy continues without interruption until the conspiracy ends when the unlawful acts or the agreement has been abandoned.  *United States v. Jimenez Recio*, 537 U.S. 270 (2003).  Therefore, a related offense and conviction during the conspiracy, is merely an act in furtherance of the continuing acts of the

139

conspiracy, not a prior conviction.   Therefore since a conspiracy is a continuing offense, a conviction for related conduct during the conspiracy could not be a prior conviction since the conspiracy is one fluid offense with one beginning and one end. *See id.*

After the government introduced all of the evidence found from the 1999 arrest, and obtained a conviction based upon this evidence, the government then requested that the court use the same evidence and the conviction derived from that evidence, to obtain an enhanced sentence pursuant to 21 USC § 841.

The PSR also correctly omitted the conviction as any prior conviction. ¶ 79 Bynum PSR.  Accordingly, pursuant to USSG § 4A1.2(a), Appellant Bynum received no criminal history points for this conviction. (PSI ¶ 81).  The probation officer correctly determined that the 1999 conviction was not unrelated to the conspiracy.  Therefore, since the conviction was neither imposed prior to the allegations in this case, nor is it a case unrelated to the present case, it should not have been used as a predicate offense to enhance Bynum's sentence pursuant to 21 USC 841 (b)(1)(A).   The court rejected the argument that the conviction in 1999, which the Government concedes was evidence of the federal conspiracy, was not a prior conviction, but was an identical state conviction to the federal conviction, but not barred by double jeopardy.  December 19, 2006, p 88-

140

91.  Appellant Bynum was sentenced to a total of 300 months.

## XIV.  THE DISTICT COURT ERRED IN DENYING APPELLANT DOBIE A MITIGATING ROLE ADJUSTMENT.

### *Standard of Review & Adoption by Appellants*

This court reviews the sentence of a district court for reasonableness, applying an abuse-of-discretion standard. *United States v. Farrior*, 535 F.3d 210, 224 (4th Cir. 2008); *Gall v. United States*, 552 U.S. 38, 51 (2007).

This issue is put forward on behalf of the following Appellant: Dobie.

### *Argument*

Appellant Dobie was introduced to Appellant Martin by a mutual friend in August 2003 JA (July 28, 2006 Trial Tr. p. 240).   Appellant Dobie, who peddled stolen jewelry and clothing, was told that Appellant Martin was interested in some earrings she was selling. JA July 28, 2006 Trial Tr. p. 200, 240). After that first meeting, Appellants Dobie and Martin soon became friends, with Dobie calling Martin her aunt and Martin referring to Dobie as a niece. JA  July 28, 2006 Trial Tr. p. 240, 242-243).

Appellant Dobie began abusing drugs in the late 1980s and became addicted within four or five years, primarily using heroin and offsetting its effects with cocaine.  JA  July 28, 2006 Trial Tr. p. 191, 197).   It was not until February, 2004, that Appellant Dobie and Appellant Martin talked about drugs, when

141

Appellant Dobie purchased cocaine from another individual in Appellant Martin's presence. JA July 28, 2006 Trial Tr. pp. 243- 244). Thereafter, Appellant Martin began selling drugs to Appellant Dobie, specifically marijuana, Percocet and cocaine powder, from February 2004 until Appellant Dobie was arrested in June 2004 in connection with the charged drug conspiracy. JA July 28, 2006 Trial Tr. pp. 243-246).

This Court's first step in reviewing a sentence is to determine whether the district court committed any "significant procedural error." *United States v. Morace*, 594 F.3d 340, 345 (4th Cir. 2010) (citing *Gall* at 51). Such error includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 USC] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . ." *Id*.[24] Consequently, even under a "deferential abuse-of-discretion standard," "[a]n error in the calculation of the applicable Guideline range, whether an error of fact or law, infects all that follows at the sentencing proceeding, including the ultimate sentence chosen by the district

---

[24] Once satisfied that the procedure was without error, this Court may then assess the substantive reasonableness of the sentence under an abuse-of-discretion standard and taking into account "the totality of the circumstances." *Gall* at 51.

142

court, and makes a sentence procedurally unreasonable . . . ." *United States v. Diaz-Ibarra*, 522 F.3d 343, 347 (4th Cir. 2008) (quoting *Gall*, 552 U.S. at 41).

In Appellant Dobie's case, the district court selected a sentence based on a clearly erroneous fact, namely that Appellant Dobie resold drugs from the conspiracy, and relied upon that fact to deny her a mitigating role adjustment under USSG § 3B1.2. JA Dobie Sent. Tr. p 26-28). The district court further erred during sentencing by failing to adequately address Appellant Dobie's argument for a minor role adjustment and explain why it was rejected. (Dobie Sent. Tr. p. 25). Accordingly, the sentence imposed is procedurally unreasonable and should be vacated and remanded for resentencing.

### A. The District Court's Denial of Appellant Dobie's Mitigating Role Adjustment was Premised on a Clearly Erroneous Fact.

When reviewing a district court's application of the Sentencing Guidelines, this court reviews findings of fact for clear error and questions of law de novo. *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir.), cert. denied, 128 S.Ct. 2525 (2008) (*quoting United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006)). A factual finding is clearly erroneous "when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re Mosko*, 515 F.3d 319, 324 (4th Cir. 2008) (quoting *U.S. v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)).

143

Prior to Appellant Dobie's sentencing hearing, she submitted a sentencing memorandum, which included her exceptions to the Pre-Sentence Report JA PSR. Dobie Sent. Memo). Appellant Dobie objected to the PSR's applying a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1, its failure to credit her for acceptance of responsibility pursuant to § 3E1.1, and its failure to include a four-level mitigating role reduction pursuant to § 3B1.2 for the minor part she played in the conspiracy.  JA Dobie Sent. Memo. p. 2).

At the hearing, counsel for Appellant Dobie argued that she testified honestly at the trial, accepted responsibility for her actions, and that her role in the conspiracy was essentially insignificant. JA Dobie Sent. Tr. p. 10-11). In support of her request for a mitigating role adjustment, counsel explained that the court may deduct four points from her base offense level if it found her to have a minimal role, two levels if she played a minor role, or up to three levels for a finding in between the two.  JA Dobie Sent. Tr. p. 8). Counsel then contrasted the large amount of drugs her co-defendants dealt to the relatively small amount for which she was held responsible. JA Dobie Sent. Tr. p. 10). Counsel also noted that, whereas her co-defendants profited millions of dollars from the organization, Appellant Dobie gained only drugs for her own personal use. JA  Dobie Sent. Tr. p. 10).

144

The government objected to Appellant Dobie's arguments, claiming that, because Appellant Dobie shared her drugs with family and friends, she did not merit a mitigating role reduction. JA Dobie Sent. Tr. p. 12). The government also requested an upward departure for under-representation of criminal history pursuant to USSG § 4A1.3. JA Dobie Sent. Tr. p. 15-17).

The district court denied Appellant Dobie any the role reduction, explaining that, "when one looks at the evidence in this case, as supported by the jury verdict, it is clear that Appellant Dobie obtained drugs from Appellant Martin not merely more for personal use but also for resale, and I conclude that she's not entitled to a reduction for a minimal role in the offense." JA Dobie Sent. Tr. p. 25-26). Based on the amount of drugs found by the jury, the court determined that Appelant Dobie's base offense level was 26. JA Dobie Sent. Tr. p. 22). When addressing her argument for this adjustment, the court recited almost verbatim the definition of a minimal participant, but failed to address whether Appellant Dobie qualified for the two-point reduction as a minor participant in the conspiracy, as she had requested. JADobie Sent. Tr. p. 25). The court also rejected Appellant Dobie's request for a reduction for acceptance of responsibility and the government's request for an upward departure, keeping her at criminal history category V. JA Dobie Sent. Tr. p. 26-28).

After applying the two-level enhancement for obstruction of justice,

Appellant Dobie's base offense level was 28. The total offense level, combined

with a criminal history category of V, produced an advisory Guidelines range of

130 -162 months. The court sentenced Appellant Dobie within the range to 146

months for the conspiracy, 48 months for each of the use of communications

device counts to run concurrently with the conspiracy sentence, and 60 months for

the firearm count, to run consecutively to the other counts for a total of 206

months in prison.   JADobie Judgment.)

        Appellant Dobie consistently maintained throughout her case that she

did not sell any drugs obtained from Appellant Martin. JA July 28, 2006 Trial Tr.

pp. 201-202, 246-247, 249, August 1, 2006 Trial Tr. pp. 39-40, Dobie Sent. Tr. p.

46). While the government introduced video surveillance of drug transactions

related to the conspiracy, none depicted Appellant Dobie selling drugs. The

wiretapped conversations played during trial further fail to indicate that Appellant

Dobie resold drugs that she acquired from Appellant  Martin.

    Although the government and the PSR both alleged that Appellant Dobie

distributed drugs, the supporting evidence reveals these as instances of Appellant

Dobie's sharing drugs, not reselling them. (JA XX- June 13, 2006 Trial Tr. p. 48,

Gov't Closing pp. 49-50, PSR p. 10 ¶45).[25] For example, in some of the intercepted calls, Appellant Dobie was either obtaining drugs for her son, TaVaughn, or her husband, Goldie Dobie, to whom she referred as Appellant Martin's "nephew." (JA XX- Call #s B5336, B7104, B7167). However, neither the government nor the PSR set forth any evidence of Appellant Dobie's selling drugs from the conspiracy for any profit or exchange. Thus, while a finding of mere distribution without remuneration may theoretically justify denying a mitigating role adjustment, there is no way to divine whether the district court in Appellant Dobie's case would have denied her the adjustment outside of its misapprehension about her reselling drugs.

Furthermore, the district court's reliance on the jury verdict to support its finding that Appellant Dobie resold drugs from the conspiracy was misplaced. Appellant Dobie was convicted of conspiring to distribute and possess with intent to distribute controlled substances pursuant to 21 USC § 846. JA Dobie Judgment). As this court has previously explained, distribution is not limited to the sale of drugs, but may also include sharing drugs. *United States v. Washington*, 41

---

[25]    While the government stated during sentencing that Appellant Dobie sold drugs, it may have been equating distribution with resale, as the example it provided of her selling drugs was an allegation that Appellant Dobie gave her son drugs. (Sent. Tr. p. 12). However, the government provided no example of Appellant Dobie's exchanging drugs for any money, goods, or services.

F.3d 917, 919 (4th Cir. 1994). Therefore, in order to convict her of this offense, the jury need only have found that Appellant Dobie entered into an agreement to distribute and possess with intent to distribute drugs, not that she sold or resold drugs.

As the record is devoid of evidence indicating that Appellant Dobie sold drugs she obtained from Appellant Martin, the district court clearly erred when it found at sentencing that Appellant Dobie had resold drugs as part of the conspiracy. Based on this erroneous finding, the court denied Appellant Dobie a mitigating role reduction pursuant to § 3B1.2 and thereby imposed an unreasonable sentence. This case must be remanded to allow the district judge to make findings on the mitigating role adjustment consistent with the facts in evidence.

**B.    The District Court's Denial of Appellant Dobie's Mitigating Role Adjustment was Procedurally Flawed.**

As this Court has previously noted, when a party presents a non-frivolous argument for a different sentence from that calculated under the Guidelines, the district court should address the argument and explain why the argument was rejected. *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (*citing Rita v. United States*, 551 U.S. 338, 356 (2007)).

When advocating for a mitigating role reduction under § 3B1.2, the

148

defendant bears the burden of proving, by a preponderance of the evidence, that the downward adjustment is warranted. *United States v. Pratt*, 239 F.3d 640, 645 (4th Cir. 2001) (*citing United States v. Gates*, 967 F.2d 497, 501 (11th Cir. 1992)). Under this provision, the Guidelines recognize two types of participants that may qualify for a downward adjustment: "minimal participant" and "minor participant." In *United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995), this court recognized the distinction between these classifications. The *Reavis* court relied on commentary to the guidelines, which explains that the term "minimal participants" under § 3B1.2(a) applies to those "who are plainly among the least culpable of those involved in the conduct of a group." USSG § 3B1.2, comment (n.4); *Reavis*, 48 F.3d at 769. For those qualifying as a minimal participant, the offense level is reduced by four levels. USSG § 3B1.2(a). The commentary further states that this downward adjustment provision "will be used infrequently." USSG § 3B1.2, comment (n.4). Under § 3B1.2(b), a "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal." USSG § 3B1.2, comment (n.5); 48 F.3d at 769. Accordingly, the offense level for a "minor participant" is reduced by two levels.[26] USSG §

---

[26]  A judge may deduct three points from the offense level should the defendant's role fall between these two classifications. USSG § 3B1.2, comment (n.5); 48 F.3d at 769.

149

3B1.2(b). The distinction makes clear that classification as a minimal participant results in a greater benefit to the defendant and, therefore, carries a more stringent burden of proof than classification as a minor participant.

During Appellant Dobie's sentencing hearing, the district court addressed Appellant Dobie's request for a reduction under § 3B1.2, focusing solely on her role as a minimal participant. Closely following the wording of the commentary to § 3B1.2 entitled, "Minimal Participant," the court explained that the reduction is "intended to cover defendants who are plainly among the least culpable among those involved in the conduct of a group." JA Dobie Sent. Trx 25). Quoting the Guidelines commentary, the court noted,

> [u]nder [USSG § 3B1.2], the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and under the activities of others is indicative of the role as a minimal participant, it's intended that the downward adjustment for a minimal participant will be used infrequently.

JA Dobie Sent. Trx 25). Without mentioning § 3B1.2(b) or addressing the parallel commentary for "Minor Participant," the court concluded Appellant Dobie was ineligible for any reduction under § 3B1.2.

When counsel for Appellant Dobie described the manner by which the court could reduce Appellant Dobie's offense level under § 3B1.2 , the district court was placed on notice that Appellant Dobie was advocating for a reduction of her

150

offense level ranging between two and four points for her lesser role in the conspiracy. JA Dobie Sent. Tr. p. 8). Her argument for a reduction under § 3B1.2 was clearly not frivolous as evidenced by the district court's acknowledgment that her involvement in the conspiracy was on a lower level than that of other co-conspirators such as Appellant Martin. JA Dobie Sent. Trx 26). Consequently, the district court clearly failed to demonstrate that it considered all of the non-frivolous arguments she set forth during her sentencing hearing, as required by this Court's post-*Booker* jurisprudence.

The district court's remarks at sentencing, which carefully elaborate on the minimal participant subsection of § 3B1.2, provide no indication that any consideration was given to the minor participant portion of this guideline. Its failing to address the second part of the mitigating role adjustment necessarily raises the question of whether Appellant Dobie may have been eligible for a reduction under this more relaxed standard had the court considered it, for it cannot be discerned from the record what reasons underlay the district court's decision to reject this sentencing option. More importantly, the omission of a minor participant analysis does not suggest that the court ever considered the two-point minor role reduction for Appellant Dobie, or whether it may have mistakenly equated the term "minimal" with "mitigating."

151

Furthermore, had the district court given proper consideration to the second part of § 3B1.2, it could reasonably have determined Appellant Dobie was a minor participant and entitled to the two-level reduction. This Court has explained that, when assessing a defendant's qualification for a mitigating role adjustment, "[t]he critical inquiry . . . 'is not just whether the defendant has done fewer bad acts than his co-defendants, but *whether the defendant's conduct is material or essential* to committing the offense.'" *United States v. Dawson*, 587 F.3d 640, 646 (4th Cir. 2009) (quoting *Pratt*, 239 F.3d at 646 (emphasis added)). In the case at hand, not only did Appellant Dobie play a smaller part in the offense compared to Appellant Martin and her confederates, the facts demonstrate that her role was not material or essential to the drug conspiracy.

As noted *supra*, there was insufficient evidence to support a finding that Appellant Dobie sold drugs acquired from the conspiracy. Additionally, Appellant Dobie knew only a handful of the approximately thirty people associated with the conspiracy, had no knowledge of the amount of drugs or money involved in the offense, was considered a nuisance by the primary co-conspirators, and the evidence adduced at trial did not identify any individual Appellant Dobie and her husband allegedly found as a cocaine supplier for Appellant Martin. JA July 28, 2006 Trial Tr. pp. 203-208, 247, June 23, 2006 Trial Tr. p. 29-30; June 30, 2006

Trial Tr. p. 76-79; Call #s A267 & B2383). Unlike other cases where this court has

affirmed a denial of this adjustment, Appellant Dobie never transported drugs,

recruited other conspirators, or manufactured drugs for the conspiracy. *See United

States v. Kiulin*, 360 F.3d 456, 463 (4th Cir. 2004) (defendant who transported

substantial amount of ecstacy across Canadian border and state lines, recruited

another to participate, and bragged about compensation for part in conspiracy was

not minor participant); *see also United States v. Bellamy*, 336 Fed. Appx. 285, 209

WL 1918675, No. 06-5094 (4th Cir. July 2, 2009) (unpublished) (defendant who

bought, sold, and transported drugs and converted cocaine powder into crack not

minor participant). At most, Appellant Dobie was a low-level conspirator who

primarily bought drugs from Appellant Martin and unsuccessfully attempted to

contact an incarcerated Gwen Levi on Appellant Martin's behalf. The scheme did

not in any way depend on Appellant Dobie's involvement. Had Appellant Dobie

severed ties with Appellant Martin, there would have been no effect on the

conspiracy's operation or survival. As such, her participation was not "material or

essential" to the drug conspiracy, making her a likely candidate for a two-level

minor role adjustment.

  In short, the district court's failure to provide a reasoned analysis of

Appellant Dobie's argument for a two-point minor role reduction rendered a

procedurally flawed and unreasonable sentence. This case must therefore be remanded to allow the district court to clarify its decision to deny a mitigating role adjustment and include an analysis of whether Appellant Dobie qualified as a minor participant in the conspiracy.

## XV. THE DISTRICT COURT IMPERMISSIBLY APPLIED A FIREARMS ENHANCEMENT TO APPELLANT MARTIN, PER USSG § 2D1.1(B)(1), ABSENT A BASIS FOR THIS IN THE EVIDENCE ADDUCED AT TRIAL.

### *Standard of Review & Adoption by Appellants*

This Court reviews legal conclusions relating to the interpretation of the Speedy Trial Act under a standard of *de novo* review, and factual findings for clear error. *United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir. 1996); *United States v. Reavis,* 48 F.3d 763, 770 (4th Cir. 1995).

This issue is put forward on behalf of the following Appellants:

### *Argument*

At sentencing, the government urged a firearms enhancement be applied to Appellant Martin, pursuant to USSG § 2D1.1(b)(1). As a basis therefor, the government pointed to three distinct firearms possessions by certain Co-Appellants. The trial court did apply this enhancement, over strenuous objection by defense counsel, and in doing erred. As will be described below, none of the possessions by a codefendant could support the application of an enhancement to

Appellant Martin.

There was not even a suggestion in the evidence adduced at trial of Appellant Martin's possession of a firearm at any time relative to this offense. This is of especial significance, in light of the fact that the genesis of this investigation, as set forth in the affidavits filed with the district court in support of the wiretap application, was predicated upon information regarding Appellant Martin's alleged possession of drugs and money in significant amounts, which came from the persons who had robbed her at her home in the early 1990s. Certainly nothing would be more calculated to incline a narcotics trafficker to arm him or herself than a home invasion robbery directed toward the drugs and money kept in the home. This flows directly from the well-established and accepted paradigm in narcotics law, *see, e.g.,* 18 USC § 3142(g)(1) (permitting government to seek detention of person charged in a narcotics offense *because of risk of violence associated with narcotics trafficking)*, and the USSG, is that firearms are "tools of the narcotics trade," and they create a risk of violence and thereby a danger to the community. Nonetheless, in spite of both these objective and subjective bases for her to seek to possess firearms, Appellant Martin did not possess a firearm at any time.

Nor was there any suggestion in the evidence at trial of Appellant

155

Martin's actual knowledge of the possession of firearms by Co-Appellants Dobie

and Bynum.  While they both were charged with (and convicted of) offenses under

18 USC § 924( c), Appellant Martin was not.  Indeed, the subject of firearms was

almost entirely absent from the testimony in the trial, notwithstanding the

thousands of monitored telephone calls, plus hours of visual and video

surveillance, etc.  Within these calls, which comprised the heart of the

government's case, of especial significance is the group of calls between

Appellant Dobie and Appellant Martin, and those between Appellant Bynum and

Appellant Martin.  At no time was there a reference by either Appellant Dobie or

Appellant Bynum to the firearms they possessed.  Likewise, there was no

reference or allusion by Appellant Martin to the availability of firearms through

either Appellant Dobie or Appellant Bynum, to either of them or to other persons.

And, of singular importance, there was no discussion of firearms or their attendant

violence relative to the narcotics conspiracy.

       Similarly, of the various cooperators who claimed to have visited

Appellant Martin's home (Encarnacion, King, Echarte), none was able to state that

he saw Appellant Martin either possess (or refer to her possession of) firearms.

Indeed, it is not difficult to observe that all of these foregoing factual absences

argue strenuously against even the notion of Appellant Martin's being accountable

for firearms that were "foreseeable" in furtherance of the conspiracy. What was foreseeable to Appellant Martin was the absence of firearms, and concomitant violence, in this conspiracy.

The government did not meet the initial burden of showing the connection of the firearm to the offense of conviction. *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005) (firearms proximate to drugs, and in areas controlled by the defendant). Had it done so, the government then would have needed to show the knowledge of Appellant Martin relative to this "connected" weapon. *United States v. Lopez*, 384 F.3d 937, 943-44 (8th Cir. 2004) (improper to "infer" knowledge based upon generalized nature of drug offense where no evidence that defendant knew of codefendant's possession of firearm); *United States v. Highsmith,* 268 F.3d 1141, 1142 (9th Cir. 2001) (enhancement improper even where defendant had access to coconspirator's weapon, where he did not know of it). Similarly, possession of a firearm by any codefendant when this is unrelated to drug dealing will not permit the enhancement. *United States v. Stallings*, 463 F.3d 1218, 1220-21 (11th Cir. 2006) (firearms in defendant's home, where no drug related activities took place).

By contrast, such knowledge of the firearm and its relation to the conspiracy can be shown by the defendant's actual use of the gun, *United States v.*

157

*Gonzalez,* 365 F.3d 656, 663 (8th Cir. 2004) (witness related defendant's use on four occasions relative to drug activities), or ordering the use of a gun in conspiracy conduct, *United States v. Souffront*, 338 F.3d 809, 833 (7th Cir. 2003) (defendant ordered coconspirator shot for his arrest and loss of drugs),  or constructive possession and proximity to the weapon during a drug deal, *United States v. Mendoza-Mesa,* 384 F.3d 951, 953-54 (8th Cir. 2004) (defendant in truck during drug deal, gun found beneath seat, defendant admitted it was his); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 58-59 (1st Cir. 2003) (defendant present when gun given to coconspirator); or discussion of a gun, *United States v. Topete-Plascencia,* 351 F.3d 454, 457-58 (10th Cir. 2003) (evidence of defendant's actual knowledge in offering payment to conconspirator to retrieve weapon from *defendant's* hiding place); or the defendant's admissions, *United States v. May,* 343 F.3d 1, 7 (1st Cir. 2003) (cooperating defendant testified at coconspirator's trial that he knew of coconspirator's possession of firearm during joint drug activity, but appealed imposition of firearms enhancement to himself); *United States v. Pompey,* 264 F.3d 1176, 1180-81 (10th Cir. 2001) (defendant's statements over phone relating to his success in obtaining gun and to its use; compatible magazines and ammo found at defendant's residence).

Even when some degree of knowledge is shown, the prosecution must

link the evidence to specific findings regarding the conspiratorial agreement of the

defendant in question, and its relationship to the weapon. *United States v. Tabron,*

437 F.3d F.3d 63, 65-66 (D.C Cir. 2006); *United States v. Lopez,* 384 F.3d at 944.

What the trial court then must ask is whether the defendant in question had an

agreement regarding the weapon's place in the conspiracy, if there even was one.

*United States v. Childress,* 58 F.3d 693, 722-26 (D.C. Cir. 1995). This is not an

especially novel concept, and merely requires the relation of long-held and well-

understood principles of conspiracy law to the construction and application of the

USSG.

> Although it is usual and often necessary in conspiracy cases for the
> agreement to be proved by inference from acts, the gist of the offense
> remains the agreement, and it is therefore essential to determine what
> kind of agreement or understanding existed *as to each defendant*.

*United States v. Borelli,* 336 F.2d 376, 384 (2d Cir.1964) (Friendly, J.; emphasis

supplied). Plainly,"[t]o hold otherwise would unfairly penalize defendants for

conduct over which they have no control." *United States v. Lopez,* 384 F.3d at

944. Nothing of the kind, neither knowledge nor agreement, was shown in the

evidence regarding Appellant Martin and any firearm, nor did the district court

point to any such relationship in any format, JA [trx 19Dec06], and the application

of the enhancement therefore was improper.

The life sentence imposed as a direct result of this enhancement, which

159

placed Appellant Martin at USSG level 43, and required a life sentence regardless of her criminal history category, therefore must be vacated, and she must be remanded for resentencing on this issue.

## XVI. THE SENTENCES IMPOSED WERE IN CERTAIN INSTANCES PRESUMPTIVELY UNREASONABLE, AND WERE IMPOSED WITHOUT GIVING ADEQUATE CONSIDERATION TO THE DIRECTIVES OF 18 USC §3553.

### *Standard of Review & Adoption by Appellants*

This Court reviews the sentence imposed upon a criminal defendant for "reasonableness" under a standard of *de novo* review, and factual findings for clear error. *United States v. Booker*, 543 U.S. 220, 261-62 (2005).

This issue is put forward on behalf of the following Appellants: Martin, Whiting.

### *Argument*

The Supreme Court held in *United States v. Booker,* 543 U.S. 220, that ultimate sentencing discretion must be vested in the trial court, and that 18 USC § 3553 sets out the guidelines for the exercise of this discretion. The decision in *Booker* followed in logical sequence from the Court's prior decisions in *Apprendi v. New Jersey,* 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Blakely v. Washington*, 542 U.S. 296 (2004).

The purpose of the holding in *Blakely* was to give "intelligible

content to the right of jury trial," a right which embodies "a fundamental

reservation of power in our constitutional structure." *Blakely*, 542 U.S. at 304-07.

It is for this reason that *Apprendi* established a "bright-line rule," *Id.* at 308, and it

was for this reason that *Booker* held that the USSG cannot, constitutionally,

*control* sentencing in federal court.  543 U.S. at 233-35, 240-43; *see United States*

*v. Jones,* 526 U.S. 227, 243 n.6 (1999).  The Court specifically stated that the

provision in the enabling statute that makes the USSG mandatory, 18 USC §

3553(b)(1), is incompatible with the Constitution.  *Id.* at 245-46.  The excision of

the mandatory aspect of the USSG "makes the Guidelines system advisory while

maintaining a strong connection between the sentence imposed and the offender's

real conduct." *Id.* at 246; *see also* 249-52.  Indeed, in the absence of the

mandatory aspect of the USSG, there is no formal limit upon the discretion of the

judge in imposing a sentence, as the imposition of a sentence is no longer

controlled by the USSG, per the terms of 18 USC § 3553(b).  This mandatory

application provision no longer can control, as "the existence of § 3553(b)(1) is a

necessary condition of the constitutional violation." *Id.* at 259 (cross references to

excised sections also must be excised).  Sentences now are reviewed as to whether

they are reasonable. *Id.* at 261-62.

   As one district court immediately observed, the playing field has

become entirely different since *Booker*. "The directives of *Booker* and § 3553(a) make clear that courts may no longer uncritically apply the guidelines." *United States v. Ranum,* 353 F.Supp.2d 984 (E.D. Wis. 2005) (thoughtful discussion of § 3553(a) factors which specifically had been precluded from consideration by the terms of the USSG).

This is not to say that federal criminal sentencing suddenly was seen to take place upon a *tabula rasa*. Indeed, in the constitutional exercise of its constitutional authority, Congress has provided for federal courts those bases upon which sentences should be predicated, rather than the specific requirements upon which they **must** be based, without thought or discretion. These factors, set out in § 3553(a)(2), state that a sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care. Indeed, the USSG are now but one of the factors under § 3553(a). *Id.* at 985-86.

Since its decision in *United States v. Booker* which clarified the USSG as being merely advisory, the Supreme Court has gone yet further to provide precision as to the discretion which the district courts may and must exercise in imposing sentence. It has held, in the linked opinions in *Kimbrough v.*

162

*United States*, 552 U.S. 85, 106-11 (2007), and *Gall v. United States,* 552 U.S. 38, 48-57 (2007), revolving around the specific question of the relationship of reasonableness and a sentence within the guidelines range, that a sentence within the USSG range is not presumptively reasonable. Appellants Martin and Whiting therefore respectfully submit that, in light of all relevant considerations, as set out in detail, *supra,* there were considerations which argued in favor the district court acting to "tailor the[ir] sentence[s] in light of other statutory concerns as well," *United States v. Booker*, *id.,* and imposing a sentence which is "reasonable." That the court failed to do so is plain, inasmuch as none of the factors set forth in § 3553 were accorded any careful consideration or explanation in either sentencing proceeding.

While *Booker*, 543 U.S. at 245-46, states that the sentencing court should consider the USSG *along with* other considerations, in particular those set out in 18 USC § 3553, the government routinely has used this language to urge sentencing courts to consider those very portions of the USSG which have been adjudged unconstitutional. In urging that the sentencing court's approach differ *only* in no longer treating the USSG as mandatory, the government's posture in every instance essentially urges the sentencing court to ignore the plain meaning of *Booker, Kimbrough* and *Gall.*

At bottom, the basis was plain for this underlying tension within the USSG. Prior to the excision of the mandatory language the USSG, in permitting a broad-based inquiry and judicial fact-finding without concomitant procedural protections such as those required by the Sixth Amendment, permitted the use of unreliable information in determining a sentence. A presumption of reasonableness does not befit such calculations. The USSG, in § 6A1.3, permit the use of information that is "probably accurate" and hearsay, even to the extent of mere allegations included in a PSR, absent the deflection of this by the defendant. Such burden-shifting cannot be countenanced, as it vitiates the clear directive of *Booker,* that for the protection of the defendant the Sixth Amendment must guide a sentencing, so as to avoid the use of inherently unreliable information which is untested in any way by counsel through the process of confrontation. In essence, any presumption of the inherent validity of the USSG range necessarily will undertake to manufacture a sentence by means absent the adversarial testing required by the Constitution. *See Blakely v.Washington,* 542 U.S. at 305-08; *United States v. Booker*, 543 U.S. at 230-44.

Furthermore, following from the rationale recently described in *Spears v. United States*, 129 S.Ct. 840, 842-44 (2009), the sentencing court is permitted to disagree with the policy underlying any part of the USSG, and such disagreement

may inform a departure from the sentence described by their application.  *See also*

*Kimbrough v. United States*, 552 U.S. at 93-110.  Indeed, *Kimbrough* can be

understood to support the proposition that "a categorical disagreement with and

variance from the Guidelines is not suspect."  *Spears,* 129 S.Ct at 843, *citing*

*Kimbrough,* 128 S.Ct at 563 [552 U.S. at 89].  While this involved a determination

made with regard to the crack/cocaine disparity, the logic is equally compelling in

other contexts, where the USSG policy is similarly unsupported by empirical

evidence, research or analysis. Although the sentencing took place in late 2006,

therefore well in advance of *Kimbrough, Gall* and *Spears*, the defense did suggest

that this extended yet further.

In *United States v. Moreland*, 568 F.Supp.2d 674 (S.D.W.V. 2008), the

district court rejected the casual "one size fits all" approach to criminal record

analysis undertaken by the Commission in promulgating the guidelines.  The court

found grouping all prior narcotics offenses together regardless of amount of drugs,

sentence imposed or time passed since the conviction, to be consummately unjust.

Equating Appellant Moreland's two distribution offenses, amounting to a single

marijuana cigarette and less than a quarter ounce of crack (6.92 grams), both

committed over a decade previously and collectively penalized by less than a year

in prison, to those committed by a drug kingpin or violent drug offender using

firearms to commit his crimes, constituted unwarranted similarity of treatment. *Id.*

at 686-87.   Indeed, this moved beyond the removal of unwarranted disparities,

and toward the unreasonable end of removing all disparities.  Furthermore, these

offenses "hardly constitute the type and pattern of offenses that would indicate Mr.

Moreland has made a career out of drug trafficking."  The court viewed the likely

30 year sentence to "disposal" of the defendant, an individual whom it found to

have an excellent chance of turning his life around.

> The career offender guideline provision provides no mechanism for
> evaluating the relative seriousness of the underlying prior
> convictions.  Instead of reducing unwarranted sentencing disparities,
> such a mechanical approach ends up creating additional disparities
> because this Guideline instructs courts to substitute an artificial
> offense level and criminal history in place of each individual's precise
> characteristics.  This substitution ignores the severity and character of
> the predicate offenses.

*Id.* at 688.

Of course, Appellant Martin was not a career offender.  She had but a

single, and comparatively minor, prior felony conviction, over twenty years old on

her sentencing date.  Although she lay at nearly the opposite end of the sentencing

spectrum from Mr. Moreland, the statute nonetheless required a mandatory

minimum sentence of DOUBLE of what Chief Judge Goodwin found appropriate,

on two separate occasions, for a serial cocaine trafficker.  The USSG called for a

sentence of life, as also permitted by the statute.  Such a construct turns the notion

166

of "reasonableness" on its head.

Appellant Martin urges this Court to give serious and particularized consideration to the sentencing considerations under § 3553 which related to her, but which were given such short shrift at her sentencing.  These include:

• *"the history and characteristics of the defendant;"* Appellant Martin had a serious addiction problem.  She had not committed any crimes, save the offense of conviction, since her conviction in 1986.  JA Martin PSR ¶¶ 71-82, pp. 18-19.  She was 60 years old on her sentencing date.  JA Martin PSR p. 1.  She had a documented and lengthy history of narcotics abuse  and mental health issues.  JA Martin PSR ¶¶ 121-129, 1, pp. 23-24.

• *"the nature and circumstances of the offense;"*  This plainly was a not-insignificant offense overall, and should not be so characterized.  That being said, it was a routine narcotics distribution offense, involving no violence, and no firearms related to Appellant Martin. The proof simply showed her in essence serving as a broker or agent in transactions between actual suppliers and actual distributors.  In this, she served as a bridge or conduit for drugs from one level of the process to the other, because of her ties at these various levels of this, serving to vertically integrate the process.  Even accepting that the gross amounts of narcotics trafficked over time indeed were large, this does not suggest that a life

sentence was either merited or appropriate.  As the defense attempted to make clear in this brief, *supra*, no less than at sentencing, the USSG and statutory categorizations of this offense (whether or not one is inclined to accept the defense arguments relative to its extent), even when juxtaposed with her single prior conviction, were entirely unmerited for a person who did not do anything more than what Appellant Martin did, in the context in which she did it.  What was described by the USSG range and by statutory mandatory minimum and potential maximum was both an unfair imposition and likewise plainly overstates the conduct of this Appellant, another demonstration of why the USSG now are advisory.  *See United States v. Booker,* 543 U.S. 220; *United States v. Gall,* 552 U.S. 38; *Kimbrough v. United States*, 552 U.S. 85; *Spears v. United States*, 129 S.Ct. 840.

• *"the seriousness of the offense;"* As mentioned, this was a significant narcotics trafficking offense, in terms of the amounts of drugs which it comprehended.  That being said, in terms of the numbers of persons involved, the time covered by the conspiracy, and the fact that states other than Maryland served as sources of supply, it cannot and should not be suggested that it was unusual or grossly disproportionate to many distribution enterprises routinely prosecuted in both state and federal court.

• *that the sentence provide "just punishment for the offense;"*   In light of Appellant Martin's a lengthy potential prison sentence, measured in decades, her isolation from her family and friends, and her personal circumstances, in is difficult to understand how this could be otherwise.

• *that the sentence promote "respect for the law;"*[27]   Likewise.  In light of Appellant Martin's lengthy term of incarceration, even if imposed in accord with the defense's suggestions, this would have had a tremendous effect.

• *"to afford adequate deterrence to criminal conduct;"*   Likewise, it is difficult to suggest that the  cumulative effect of a sentence, again even if imposed as argued by the defense, *infra*, and collateral consequences would not deter conduct by another person similarly situated.

• *"the protection of the public;"* : Likewise.

• *"the kinds of sentences available;"* The USSG called for a disproportionate sentence of incarceration.  The trial court had the discretion to impose a significantly lesser sentence, and its failure to do so amounted an abuse of its discretion thorugh its failure to recognize and to exercise this.

• *"the need to avoid unwarranted sentencing disparity among defendants*

---

[27] and, perforce, the criminal justice system, in its demonstrating a particularized understanding of an individual defendant.

169

**with similar records who have been found guilty of similar conduct;"**  The important context here is the issue of similar records.  Appellant Martin received the same sentence as several of her codefendants who had significant and extended prior narcotics trafficking records, whether or not these comprehended in addition other criminal conduct.  It therefore was entirely appropriate, merited and reasonable that Appellant Martin receive a sentence substantially lower than other similarly situated actors with substantially more involved and extended criminal records.

Appellant Whiting arrived at the mandatory life sentence he received because a series of prior convictions stemming from a lifetime of drug use and abuse.  This is born out by the repeated calls Appellant Whiting is alleged to have made to Appellant Martin to get cocaine. Yet there is never an instance where Appellant Martin actually agrees to provide drugs to him or any discussion of any quantity. And if the testimony of Echarte is to be believed, as the government urges, Appellant Whiting was extremely unreliable because of his serious addiction problem. Sentencing a sixty six year old drug addict to a life sentence is hardly reasonable unless the Federal sentencing construct only serves to exact retribution.

Appellant Whiting requests this Court to give the sentencing considerations

170

under § 3553 as they relate to Appellant Whiting a full hearing unlike the one which he received at the trial court level.

• *the history and characteristics of the defendant:* Reece Whiting, was born in 1940 in Baltimore, Maryland. He attended Douglas High School in Baltimore, Maryland until the 11th grade. At 17 he entered the U.S. Army and served his country with the 101st Airborne division. He received an honorable discharge in 1960. Appellant Whiting has a Bachelor of Arts in History from Loyola College, a Master of Arts in Sociology from Pacific Lutheran University and a Juris Doctor from Howard University School of Law. Though he never passed the bar, Appellant Whiting has worked in a number of law related jobs with several law firms in Washington, D.C. throughout his life. Appellant Whiting was 66 years old when sentenced.

• *the nature and circumstances of the offense*: Despite the serious nature of the allegations as they apply to all the defendants at trial, Appellant Whiting's role was very limited. Out of a 10-week trial, where hundreds of wiretapped calls were played or referred to, Appellant Whiting was on only twelve of those calls. The Government's case consisted of testimony that Appellant Whiting spoke to Appellant Martin on several occasions to inquire as to whether she had any drugs available and several conversations regarding the arrest of an alleged co-

conspirator, nothing more.

•  ***the seriousness of the offense:*** Despite the serious nature of the narcotics trafficking organization, the amount of drugs and the participation of Appellant Whiting was minimal.

•  ***that the sentence provide a just punishment for the offense:***  Appellant Whiting's life prison sentence, compared to others so situated, was disproportionate.

•  ***that the sentence promote respect for the law:*** A disportionally harsh sentence, coupled with Appellant Whiting's lack of significant participation and drug abuse history does not promote respect for the law in this case.

•  ***to afford adequate deterrence to criminal conduct:*** Again a sentence considered unfair, based upon the above cited factors, does not promote deterrence.

•  ***the protection of the public***: Appellant Whiting was 66 years of age when he was sentenced. He now is well over 70.  He has no history of violent conduct. While his history, at least as interpreted by the government,is poor,  there is absolutely no evidence that the public needs protection from him.

•  ***the kinds of sentences available:*** The USSG as well as the Federal narcotics sentencing ehancement statute, 21 USC § 851, called for a

disproportionate sentence of incarceration for life. Based upon the arguments raised at sentencing and the United States Supreme Court's ruling in *Booker, supra,* the mandatory nature of a life sentence, as applied here, is unconstitutional. The trial court had the discretion to impose a significantly lesser sentence, and its failure to do so amounted an abuse of its discretion through its failure to recognize and to exercise this.

• ***the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct:*** A fair reading of the record in this case would indicate that Appellant Whiting was the least involved of the co-defendants, yet received as severe a sentence as the alleged ringleaders in this case.

As the USSG now no longer are mandatory for the imposition of sentences, sentencing judges are free to exercise judicial discretion in crafting appropriate sentences for the particular circumstances involving particular defendants. Indeed, it is well understood that one of the primary failings of the mandatory scheme in the USSG was their failure to permit an adequate individualized consideration of criminal defendants, to the extent of § 5H1 and § 5K2.22 specifically delimiting, if not actually precluding, consideration of and departures regarding certain of those factors set out in 18 USC § 3553(a), and the

173

consideration of which by contrast is required of the sentencing court ("The court,

in determining the particular sentence to be imposed, *shall* consider...") (emphasis

supplied).  The previously discussed considerations, *supra*, argued in favor the

district court acting to "tailor the sentence in light of other statutory concerns as

well," *Booker*, 543 U.S. at 245-46, and to impose a sentence which is reasonable.

*Id.* at 261-63 (discussing review of sentences for "reasonableness"); *see* 18 USC §

3742(e).

> To treat the Guidelines as presumptive is to concede the converse,
> i.e., that any sentence imposed outside the Guideline range would be
> presumptively unreasonable in the absence of clearly identified
> reasons.  If presumptive, the Guidelines would continue to
> overshadow the other factors listed under section 3553(a), causing an
> imbalance in the application of the statute to a particular defendant by
> making the Guidelines, in effect, still mandatory.

*United States v. Myers*, 353 F.Supp.2d 1026, 1028 (S.D. Iowa 2005).  As the

district court noted, many of the USSG provisions, when placed alongside those of

§ 3553(a), show significant contradiction.  *Id.*  And this contradiction fairly can be

described as the removal from consideration under the USSG of the very

considerations which Congress enumerated in § 3553(a).  Plainly, the

congressional enactment of § 3553 must be given far greater weight in this

calculus.

Appellant Martin therefore respectfully submits that, in light of her

174

unremarkable history prior to her addiction, her health, her family ties and support,

the lack of injury to any person in the offense, there are considerations which

argued in favor the district court acting to "tailor the sentence in light of other

statutory concerns as well," *Booker,* 543 U.S. at 757, and to impose a sentence

which is "reasonable." *Id.* at 765; *see* 18 USC § 3742(e).  Appellant Whiting

therefore submits that, in light of his age, health, family ties and lack significant

involvement in this case the trial court should have imposed a sentence, which is

reasonable..

> The guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the "heartland."  Rather, courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the 3553(a) factors. Sentencing will be harder now than it was a few months ago.  District courts cannot just add up figures and pick a number within a narrow range.  Rather, they must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual.  *Booker* is not an invitation to do business as usual.

*United States v. Ranum*, 353 F.Supp. 2d at 987.

The district court abused its discretion in imposing an unreasonable

sentence of life imprisonment  on Appellants Martin and Whiting, which must be

vacated and remanded for new sentencing proceedings.

175

## **REQUEST FOR ORAL ARGUMENT**

This appeal presents several important questions regarding

As as far as counsel for Appellant has been able to determine, this

represents a question of first impression in this Circuit.  Accordingly, Appellant

respectfully requests oral argument.

## **CONCLUSION**

For the foregoing reasons, the Appellants herein respectfully request this Court to vacate the convictions and sentences imposed by the United States District Court for the District of Maryland, and to remand their respective causes with an order for a new trial, and to tax the costs of these proceedings to Appellee.

Respectfully submitted,

November 2, 2010                              /s/
                              MICHAEL D. MONTEMARANO

                              Michael D. Montemarano, P.A.
                              5695 Main Street
                              Suite 201
                              Elkridge, MD 21075-5016
                              (410) 379-0067
                              Counsel for Appellant Martin
                                      Lead Counsel/CJA Counsel


                              /s/
                              ANTHONY D. MARTIN

                              7841 Belle Point Drive
                              Suite 1100

177

Greenbelt, MD 20770
(301) 220-3700
Counsel for Appellant Goodwin
　　　/CJA Counsel


_____/s/_____
MARC G. HALL

Hall & Cho, LLC
200A Monroe Street
Suite 310
Rockville, MD 20850
(301) 309-6780
Counsel for Appellant Whiting
　　　/CJA Counsel


_____/s/_____
TIMOTHY MITCHELL

6301 Ivy Lane
Suite 400
Greenbelt, MD 20770
(301) 945-9500
Counsel for Appellant Bynum
　　　/CJA Counsel


_____/s/_____
G. ALAN DUBOIS

Assistant Federal Public Defender

178

Office of the Federal Defender
150 Fayetteville Street Mall
Suite 450
Fayetteville, NC 27601
(919) 856-4236
Counsel for Appellant Dobie
    /Appointed Counsel

_____/s/_____
ALAN G. BOWMAN

Gateway One
Suite 105
Newark, NJ 07102
(973) 622-2225
Counsel for Appellant Ali
    (Retained)

179

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief  complies with the Type-volume limitation of Fed. R. App.
32(a)(7)(B) because:

The page count of this brief is <u>39,380 words</u>.


2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using
<u>Word,Perfect, Times New Roman, 14 point</u>.


November 2, 2010


                                <u>/s/                                        </u>
                                MICHAEL D. MONTEMARANO


180

## **CERTIFICATE OF SERVICE**

In accordance with Rules 25 and 30( c) of the Rules of the United

States Court of Appeals for the F ourth Circuit, I hereby certify that I have this 2nd

day of November, 2010, filed this Page Proof Brief, per F.R.A.P. 30( c) via

CM/ECF with the Office of the Clerk of the Court, and forwarded it to Daniel

Goodman, Esq., US Department of Justice, Criminal Appellate Section, 1264 Main

Building, 950 Pennsylvania Avenue, NW, Washington, DC 20530. Counsel for

Appellee.


_____/s/_____
MICHAEL D. MONTEMARANO