Nos. 07-4059, 07-4060, 07-4062, 07-4063, 07-4080, 07-4115

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

LEARLEY R. GOODWIN, PAULETTE MARTIN, LANORA N. ALI,
REECE C. WHITING, DERREK L. BYNUM, and LAVON DOBIE,
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
No. 8:04-CR-00235-RWT

**PAGE PROOF BRIEF FOR THE UNITED STATES**

ROD J. ROSENSTEIN
  United States Attorney

DEBORAH A. JOHNSTON
BONNIE S. GREENBERG
STEFAN D. CASSELLA
  Assistant U.S. Attorneys
  District of Maryland

LANNY A. BREUER
  Assistant Attorney General
GREG D. ANDRES
  Acting Deputy Assistant Attorney General

DANIEL STEVEN GOODMAN
  Appellate Section, Criminal Division
  U.S. Department of Justice
  Main Justice Building, Room 1264
  950 Pennsylvania Avenue, N.W.
  Washington, D.C.  20530
  (202) 514-2338

Attorneys for Plaintiff-Appellee United States

# TABLE OF CONTENTS

**page**

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Overview... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Goodwin And Martin Distribute Large Quantities Of Illegal Drugs
           Over A Period Of Several Years.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Bynum And Dobie Purchase Resale Quantities Of Drugs
           From Martin.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.    Ali Assists Martin's Drug Distribution Operations And Purchases
           Drugs From Martin... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      E.    Whiting Also Purchases Drugs From Martin And Helps One Of
           Martin's Suppliers Pick Up Drug Shipments... . . . . . . . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

PRETRIAL ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      I.    THE DISTRICT COURT FULLY COMPLIED WITH THE
           PROVISIONS OF THE SPEEDY TRIAL ACT.  (Defendants'
           Issue II)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           B.    The District Court Adopts A Case Management Plan That
              Comports With The Speedy Trial Act... . . . . . . . . . . . . . . . . . . 23

C.    The District Court Fully Complied With Defendants' Speedy Trial Rights.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SUFFICIENCY AND RELATED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

II.    THE EVIDENCE SUPPORTED DOBIE'S SECTION 924(c) CONVICTION.  (Defendants' Issue VIII).. . . . . . . . . . . . . . . . . . . . . . . . . 31

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.    The Evidence Tied Dobie's Firearms To The Heroin She Received From Martin.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.    AS THE INDICTMENT ALLEGED, THE EVIDENCE SHOWED THAT THE DEFENDANTS ENGAGED IN A CONSPIRACY TO DISTRIBUTE CRACK COCAINE, A FORM OF COCAINE BASE. (Defendants' Issues V and VI).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.    Although The Government Was Not Required To Prove That The Cocaine Base Was Crack Cocaine, The Record Amply Supports That Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IV.    THE EVIDENCE SHOWED THAT ALI WAS AN ACTIVE PARTICIPANT IN THE DRUG DISTRIBUTION CONSPIRACY, NOT MERELY A BUYER OF ILLEGAL DRUGS.  (Defendants' Issue VIII).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.    Ali Actively Participated With Martin And Others In The Drug Distribution Conspiracy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.    THE EVIDENCE SHOWED THAT ALI PARTICIPATED IN A SINGLE CONSPIRACY.  (Defendants' Issue X).. . . . . . . . . . . . . . . . . 48

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B.      The Evidence At Trial Was Sufficient For The Jury To Conclude
        That The Defendants Engaged In a Single Conspiracy... . . . . . . . . . . 49

EVIDENTIARY ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

VI.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
        IN ALLOWING THE EXPERT TESTIMONY OF SERGEANT
        SAKALA AND DETECTIVE EVELER.  (Defendants' Issue III).. . . . . . . 52

        A.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

        B.      The District Court Admits The Expert Testimony Of Officers
                Sakala And Eveler.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        C.      The District Court Acted Well Within Its Discretion In
                Allowing Case Agents Sakala And Eveler To Testify As Experts
                On Drug Trafficking, Including Traffickers' Use Of Code
                Words... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

VII.    THE DISTRICT COURT DID NOT ERR IN ADMITTING SERGEANT
        MARTINI'S TESTIMONY ABOUT CRACK COCAINE THAT WAS
        RETRIEVED FROM GOODWIN ON NOVEMBER 25, 2003.
        (Defendants' Issue VI).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

        A.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

        B.      Goodwin Elicits The Testimony To Which He Now Objects.. . . . . . 63

        C.      The District Court Did Not Err In Denying Goodwin's Motion
                To Strike Martini's Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VIII.   WHITING DID NOT PRESERVE HIS CLAIM THAT THE
        GOVERNMENT KNOWINGLY USED PERJURED TESTIMONY,
        AND THE EVIDENCE DOES NOT SUPPORT THAT CLAIM.
        (Defendants' Issue VII).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        A.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        B.      Echarte Testifies About His Drug Dealings With Whiting.. . . . . . . 69

-iii-

C.  The Evidence Fails To Support Whiting's Claim That The Government Knowingly Allowed Echarte To Present False Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

SENTENCING AND RELATED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

IX.  THE GOVERNMENT'S SECTION 851 NOTICE ADEQUATELY INFORMED WHITING OF THE PRIOR FELONY DRUG CONVICTIONS THAT LED TO A STATUTORY ENHANCEMENT OF HIS SENTENCE.  (Defendants' Issue XII).. . . . . . . . . . . . . . . . . . . . . 75

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

B.  The District Court Correctly Determined That The Section 851 Notice Was Sufficient To Require The Enhancement Of Whiting's Sentence For His Current Felony Drug Offenses.. . . . . . 76

X.  BYNUM'S PRIOR STATE CONVICTION FOR POSSESSION OF COCAINE WITH THE INTENT TO DISTRIBUTE IT QUALIFIED AS A PRIOR FELONY DRUG CONVICTION FOR PURPOSES OF THE SECTION 841(b)(1)(A) SENTENCING ENHANCEMENT. (Defendants' Issue XIII).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

B.  The District Court Sentences Bynum To The Statutory Mandatory Minimum Recidivist Sentence On Three Drug Trafficking Counts... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

C.  Because Bynum Continued To Participate In The Instant Conspiracy After His Prior State Felony Cocaine Conviction Became Final, The District Court Properly Applied The Section 851 Enhancement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

XI.  THE DISTRICT COURT PROPERLY APPLIED A FIREARM ENHANCEMENT WHEN IT CALCULATED MARTIN'S ADVISORY GUIDELINES RANGE.  (Defendants' Issue XV).. . . . . . . . . 87

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

B.  The District Court Applies The Firearms Enhancement In Calculating Martin's Advisory Guidelines Range.. . . . . . . . . . . . . . 87

C.  The District Court Did Not Clearly Err When It Attributed The Firearms Involved In The Drug Conspiracy To Martin For Purposes Of Calculating Her Advisory Guidelines Range.. . . . . . . . 89

XII.  MARTIN'S AND WHITING'S LIFE SENTENCES WERE SUBSTANTIVELY REASONABLE. (Defendants' Issue XVI).. . . . . . . . 94

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

B.  The District Court Sentences Martin To Life Imprisonment.. . . . . . 94

C.  The District Court Sentences Whiting To Life Imprisonment.. . . . . 95

D.  The Court's Imposition Of Life Sentences On Martin And Whiting Was Substantively Reasonable.. . . . . . . . . . . . . . . . . . . . . . 98

    1.  Martin.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    2.  Whiting.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

XIII.  THE DISTRICT COURT DID NOT CLEARLY ERR IN DENYING DOBIE A MINOR ROLE ADJUSTMENT WHEN CALCULATING HER ADVISORY SENTENCING GUIDELINES RANGE. (Defendants' Issue IV).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

B.  The District Court Rejects Dobie's Request For A Minimal Or Minor Role Reduction In Her Offense Level.. . . . . . . . . . . . . . . . 102

C.  The District Court Properly Declined To Reduce Dobie's Offense Level, Because Dobie Was Not A Minor Participant In The Drug Conspiracy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

XIV.  THE DISTRICT COURT PROPERLY SENTENCED ALI TO THE STATUTORY MANDATORY MINIMUM SENTENCE OF TEN YEARS. (Defendants' Issue XI).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

B.    The District Court Did Not Abuse Its Discretion, Nor Did It
      Impose A Grossly Disproportionate Sentence, When It
      Sentenced Ali To The Mandatory Minimum Sentence Of 120
      Months Of Imprisonment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

FORFEITURE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

XV.   THE DISTRICT COURT PROPERLY ENTERED FORFEITURE
      ORDERS AGAINST SEVERAL DEFENDANTS. (Defendants'
      Issue I).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

B.    The District Court Enters An Order Of Forfeiture Against
      Martin, Goodwin, Ali, And Bynum.. . . . . . . . . . . . . . . . . . . . . . . 111

      1. The Government Initially Seizes Martin's Property
         Pursuant To Civil Forfeiture Warrants.. . . . . . . . . . . . . . . . . . . 111

      2. The Government Decides To Proceed Under The
         Criminal Forfeiture Statutes, Rather Than Under CAFRA.. . . . 113

      3. The District Court Denies Martin's Motion For Return
         Of Property.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

      4. After The Defendants Are Convicted, The District Court
         Issues A Preliminary Forfeiture Order As To Martin,
         Goodwin, Ali, And Bynum... . . . . . . . . . . . . . . . . . . . . . . . . . . 117

      5. The District Court Issues A Final Order Of Forfeiture.. . . . . . . 120

      6. Several Years Later, The District Court Denies Martin's
         Motion To Vacate The Forfeiture Orders.. . . . . . . . . . . . . . . . . 121

C.    The District Court Did Not Clearly Err In Determining That
      Martin's 2005 Motion For Return Of Property Was Untimely.. . . . 125

D.   The District Court Did Not Clearly Err In Determining That The Government's Missing A Deadline To File A Civil Forfeiture Action Became Moot When The Government Decided To Pursue Criminal Forfeiture Instead Of Civil Forfeiture.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

E.   The District Court Had Jurisdiction To Enter The Preliminary And Final Orders Of Forfeiture In 2007, After The Defendants Were Sentenced And The Judgments Were Entered, Given That The Defendants Had Full Notice Of The Content Of Those Orders When They Were Sentenced.. . . . . . . . . . . . . . . . . . . . . . . 136

F.   The District Court's Forfeiture Order Was Not Required To Use The Words "Money Judgment" Or To State That The Forfeited Assets Were In Martin's Possession... . . . . . . . . . . . 144

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

REQUEST FOR ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

# <u>TABLE OF AUTHORITIES</u>

**pages**

## CASES

<u>Baca v. United States</u>, 312 F.2d 510 (10th Cir. 1962), <u>cert. denied</u>,
  373 U.S. 952 (1963)............................................. 78

<u>Barker v. Wingo</u>, 407 U.S. 514 (1972). ..................................... 29

<u>In re Billman</u>, 915 F.2d 916 (4th Cir. 1990), <u>cert. denied</u>, 500 U.S. 952 (1991)....... 117

<u>Bullcoming v. New Mexico</u>, 131 S. Ct. 62 (2010) (No. 09-10876). ................ 61

<u>Burgess v. United States</u>, 553 U.S. 124 (2008)................................ 76

<u>Burman v. United States</u>, 472 F. Supp. 2d 665 (D. Md. 2007). ............... 133, 134

<u>Crawford v. Washington</u>, 541 U.S. 36 (2004)................... 60, 61, 62, 64, 65, 67

<u>Davis v. Washington</u>, 547 U.S. 813 (2006)................................... 61

<u>DePierre v. United States</u>, 131 S. Ct. 458 (2010) (No. 09-1533). ......... 39, 40, 42, 43

<u>Dolan v. United States</u>, 130 S. Ct. 2533 (2010)........................... 142, 143

<u>Gall v. United States</u>, 552 U.S. 38 (2007)............................ 94, 101, 107

<u>Graham v. Florida</u>, 130 S. Ct. 2011 (2010). ............................ 107, 110

<u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991)............................. 107, 110

<u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89 (1990)........................ 128

<u>Johnson v. United States</u>, 520 U.S. 461 (1997)................................ 38

<u>Joseph v. Angelone</u>, 184 F.3d 320 (4th Cir.), <u>cert. denied</u>, 528 U.S. 959 (1999)....... 66

_Langbord v. U.S. Dep't of Treasury_, 645 F. Supp. 2d 381 (E.D. Pa. 2009). . . . . . . . . . 135

_Melendez-Diaz v. Massachusetts_, 129 S. Ct. 2527 (2009). . . . . . . . . . . . . . . . . . . . . . . . 61

_Neder v. United States_, 527 U.S. 1 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

_Nelson v. United States_, 129 S. Ct. 890 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

_Pinkerton v. United States_, 328 U.S. 640 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

_In re Return of Seized 2000 F-150 Truck_, 2008 WL 4908108 (S.D. Cal. 2008).. . . . . . 127

_Rita v. United States_, 551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

_Solem v. Helm_, 463 U.S. 277 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

_State v. Bullcoming_, 147 N.M. 487 (2010) _cert. granted_,
     131 S. Ct. 62 (2010) (No. 09-10876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

_United States v. Abu Ali_, 528 F.3d 210 (4th Cir. 2008), _cert. denied_,
     129 S. Ct. 1312 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

_United States v. Amend_, 791 F.2d 1120 (4th Cir.), _cert. denied_,
     479 U.S. 930 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145, 146

_United States v. Andrade_, 232 Fed. Appx. 349 (4th Cir. 2007).. . . . . . . . . . . . . . . 69, 72

_United States v. Ashley_, 606 F.3d 135 (4th Cir.), _cert. denied_,
     131 S. Ct. 428 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  90

_United States v. Banks_, 10 F.3d 1044 (4th Cir. 1993), _cert. denied_,
     511 U.S. 1090 _and_ 512 U.S. 1208 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

_United States v. Baptiste_, 596 F.3d 214 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 56, 57

_United States v. Bennett_, 423 F.3d 271 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . 140, 141

_United States v. Bolden_, 325 F.3d 471 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 38

_United States v. Bonsu_, 291 Fed. Appx. 505 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 71

United States v. Booker, 543 U.S. 220 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . 100

United States v. Brooks, 957 F.2d 1138 (4th Cir.), cert. denied,
    505 U.S. 1228 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

United States v. Brown, 2010 WL 4366980 (4th Cir. Nov. 1, 2010). . . . . . . . . . . . . . 100

United States v. Burgos, 94 F.3d 849 (4th Cir. 1996) (en banc),
    cert. denied, 519 U.S. 1151 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 47

United States v. Butler, 61 Fed. Appx. 857 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . 66

United States v. Bynum, 604 F.3d 161 (4th Cir.), cert. denied,
    130 S. Ct. 3442 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

United States v. Campbell, 980 F.2d 245 (4th Cir. 1992),
    cert. denied, 508 U.S. 952 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Carter, 564 F.3d 325 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 106

United States v. Cobbs, 26 Fed. Appx. 98 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . 66

United States v. DePierre, 599 F.3d 25 (1st Cir. 2010), cert. granted,
    131 S. Ct. 458 (2010) (No. 09-1533). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

United States v. Diaz-Ibarra, 522 F.3d 343 (4th Cir. 2008).. . . . . . . . . . . . . . . . . . 102

United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003), cert. denied,
    541 U.S. 1092 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

United States v. Engle, 592 F.3d 495 (4th Cir.), cert. denied,
    131 S. Ct. 165 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 107

United States v. Ereme, 339 Fed. Appx. 340 (4th Cir.), cert. denied,
    130 S. Ct. 772 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

United States v. Farrior, 535 F.3d 210 (4th Cir.), cert. denied,
    129 S. Ct. 743 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101

-x-

United States v. Griley, 814 F.2d 967 (4th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

United States v. Hall, 551 F.3d 257 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

United States v. Hargrove, 625 F.3d 170 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 94, 99

United States v. Herrera, 23 F.3d 74 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 63, 66

United States v. Hickman, 626 F.3d 756 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 47, 66

United States v. Holmes, 2010 WL 2545601 (4th Cir. June 22, 2010),
  petition for cert. filed, (U.S. Nov. 9, 2010) (No. 10-8405). . . . . . . . . . . . . . . . . . . 84, 85

United States v. Hopkins, 310 F.3d 145 (4th Cir. 2002), cert. denied,
  537 U.S. 1238 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

United States v. Howard, 115 F.3d 1151 (4th Cir. 1997). . . . . . . . . . . . . . . . . 82, 84, 85

United States v. Hughes, 401 F.3d 540 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Isaacs, 88 Fed. Appx. 654 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . 141

United States v. Jackson, 544 F.3d 1176 (11th Cir. 2008),
  cert. denied, 129 S. Ct. 1925 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 81

United States v. Jeffers, 570 F.3d 557 (4th Cir.), cert. denied,
  130 S. Ct. 645 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

United States v. Donna Johnson, 587 F.3d 625 (4th Cir. 2009),
  cert. denied, 130 S. Ct. 2128 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Ronald Johnson, 54 F.3d 1150 (4th Cir.),
  cert. denied, 516 U.S. 903 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Walter Johnson, 617 F.3d 286 (4th Cir. 2010). . . . . . . . . . . . . . . . . . 59

United States v. Jordan, 509 F.3d 191 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 62, 67

United States v. Kellam, 568 F.3d 125 (4th Cir.), cert. denied,
  130 S. Ct. 657 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

-xi-

United States v. Kennedy, 32 F.3d 876 (4th Cir. 1994), cert. denied,
    513 U.S. 1128 (1995)................................................... 37, 48, 49, 50

United States v. Kimberlin, 18 F.3d 1156 (4th Cir.), cert. denied,
    511 U.S. 1093, 1148, and 513 U.S. 843 (1994)........................... 34, 90, 92

United States v. Kramer, 2006 WL 3545026 (E.D.N.Y. 2006)................ 132, 133

United States v. Koch, 491 F.3d 929 (8th Cir. 2007). ................... 138, 139

United States v. Lomax, 293 F.3d 701 (4th Cir.), cert. denied,
    537 U.S. 1031 (2002)..................................................... 34, 36

United States v. Malpica-Garcia, 489 F.3d 393 (1st Cir.), cert. denied,
    552 U.S. 929 (2007)........................................................... 63

United States v. Mangual, 278 Fed. Appx. 267 (4th Cir.), cert. denied,
    129 S. Ct. 318 (2008)................................................... 8, 92, 99

United States v. Manigan, 592 F.3d 621 (4th Cir. 2010)..................... 87, 91

United States v. Martin, 460 F. Supp. 2d 669 (D. Md. 2006). ................ passim

United States v. McAllister, 272 F.3d 228 (4th Cir. 2001). ...................... 90

United States v. Mitchell, 70 Fed. Appx. 707 (4th Cir. 2003),
    cert. denied, 540 U.S. 1135 (2004). .......................................... 141

United States v. Morgan, 224 F.3d 339 (4th Cir. 2000). ........................ 111

United States v. Olano, 507 U.S. 725 (1993)............................... 38, 69

United States v. One Silicon Valley Bank Account, 549 F. Supp. 2d 940
    (W.D. Mich. 2008)............................................................ 132

United States v. Perry, 560 F.3d 246 (4th Cir.), cert. denied,
    130 S. Ct. 177 (2009)................................................ 31, 35, 91

United States v. Pierre, 484 F.3d 75 (1st Cir.), cert. denied,
    552 U.S. 915 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

United States v. Poulin, 690 F. Supp. 2d 415 (E.D. Va. 2010). . . . . . . . . . . . . . . . . . 146

United States v. Powell, 389 Fed. Appx. 287 (4th Cir. 2010). . . . . . . . . . . . . . . . . . 75, 81

United States v. Pratt, 239 F.3d 640 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 101

United States v. Ramos, 462 F.3d 329 (4th Cir.), cert. denied,
    549 U.S. 1065 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 41, 42

United States v. Randall, 171 F.3d 195 (4th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . 35, 37

United States v. Reid, 523 F.3d 310 (4th Cir.), cert. denied, 129 S. Ct. 663 (2008). . . . . 47

United States v. Robinson, 404 F.3d 850 (4th Cir.), cert. denied,
    546 U.S. 916 and 955 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

United States v. Smith, 451 F.3d 209 (4th Cir.), cert. denied,
    549 U.S. 892 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 62, 84, 85

United States v. Stoudenmire, 74 F.3d 60 (4th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . 23

United States v. Udeozor, 515 F.3d 260 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 67

United States v. Vampire Nation, 451 F.3d 189 (3d Cir.),
    cert. denied, 549 U.S. 970 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

United States v. White, 875 F.2d 427 (4th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 90

United States v. Gregory Wilson, 484 F.3d 267 (4th Cir. 2007). . . . . . . . . . . . . . . . 59, 60

United States v. Ronald Wilson, 2010 WL 4561381 (4th Cir. Nov. 12, 2010). . . . . . . . 100

United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005). . . . . . . . . . . . . . . . . . 138, 139

United States v. Young, 609 F.3d 348 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 44

Wilson v. Lindler, 8 F.3d 173 (4th Cir. 1993) (en banc),
  cert. denied, 510 U.S. 1131 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

**STATUTES, RULES, AND SENTENCING GUIDELINES**

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 31, 32, 33, 34, 35, 36

18 U.S.C. § 982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

18 U.S.C. § 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

18 U.S.C. § 983(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 127

18 U.S.C. § 983(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114, 125, 126, 129

18 U.S.C. § 983(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130, 131

18 U.S.C. § 983(a)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . 115, 130, 131, 132, 135

18 U.S.C. § 983(a)(3)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115, 131, 132

18 U.S.C. § 3161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3161(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 3161(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 3161(h)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3161(h)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C. § 3161(h)(8)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 28

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 97

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 94, 96, 97, 99

18 U.S.C. § 3553(f)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

19 U.S.C. § 1617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 129

21 U.S.C. § 802(44) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 79

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 49, 68, 75, 78

21 U.S.C. § 841(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

21 U.S.C. § 841(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

21 U.S.C. § 843(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 49, 84, 96

21 U.S.C. § 851 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

21 U.S.C. § 851(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

21 U.S.C. § 853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

21 U.S.C. § 853(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

21 U.S.C. § 853(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

21 U.S.C. § 853(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Crim. P. 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

Fed. R. Crim. P. 32.2(a)(1) (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

Fed. R. Crim. P. 32.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 136

Fed. R. Crim. P. 32.2(b)(1)(A) (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

Fed. R. Crim. P. 32.2(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 137

Fed. R. Crim. P. 32.2(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 137, 139

Fed. R. Crim. P. 32.2(b)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . 123, 137, 141, 143, 144

Fed. R. Crim. P. 32.2(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Fed. R. Crim. P. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 124, 138, 140, 141, 142

Fed. R. Crim. P. 41(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 113, 125

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 60

U.S.S.G. § 1B1.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

U.S.S.G. § 2D1.1(a)(3)(ii) (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

U.S.S.G. § 2D1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88, 90, 92, 93

U.S.S.G. § 3B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103, 109

U.S.S.G. § 3B1.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

U.S.S.G. § 3B1.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103, 108

U.S.S.G. § 5G1.1(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

Nos. 07-4059, 07-4060, 07-4062, 07-4063, 07-4080, 07-4115

————————————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

LEARLEY R. GOODWIN, PAULETTE MARTIN, LANORA N. ALI,
REECE C. WHITING, DERREK L. BYNUM, and LAVON DOBIE
Defendants-Appellants.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

————————————

PAGE PROOF BRIEF FOR THE UNITED STATES

————————————

## STATEMENT OF JURISDICTION

Defendants Learley Goodwin, Paulette Martin, LaNora Ali, Reece Whiting,

Derrek Bynum, and Lavon Dobie appeal from the judgments of conviction in this

criminal case. The district court (Hon. Roger W. Titus), which had jurisdiction

under 18 U.S.C. § 3231, entered its judgments on January 5, 2007 (Martin, R. 1059;

Dobie, R. 1060; Goodwin, R. 1061; Whiting, R. 1062) and on January 9, 2007 (Ali,

R. 1069; Bynum, R. 1070). The court entered amended judgments as to Whiting on

January 9, 2007 (R. 1068) and Goodwin on January 16, 2007 (R. 1075).[1]  The

defendants filed timely notices of appeal (Goodwin, R. 1063; Dobie, R. 1064;

Martin, R. 1065; Whiting, R. 1066 and R. 1067; Ali, R. 1072; Bynum, R. 1073).

This Court has jurisdiction under 28 U.S.C. § 1291.

<u>ISSUES PRESENTED FOR REVIEW</u>

<u>Pretrial Issue</u>

1.  Whether the district court's case management plan was in accordance with

the Speedy Trial Act and the defendants' Sixth Amendment right to a speedy trial.

<u>Sufficiency and Related Issues</u>

2.  Whether the evidence supported Dobie's conviction for possessing a

firearm in furtherance of a drug trafficking crime.

3.  Whether the evidence showed that the defendants engaged in a conspiracy

---

[1]  As explained more fully in Argument Section XV of this brief, the district court entered amended orders of judgment nearly four years later, on December 10, 2010, with respect to five of the defendants. R. 1424 (Goodwin); R. 1426 (Martin); R. 1428 (Ali); R. 1430 (Dobie); R. 1432 (Bynum).  Those amended judgments, entered pursuant to Fed. R. Crim. P. 36, attached the final order of forfeiture, R. 1135, but did not otherwise alter the judgments entered in January 2007.  Three of the defendants, Martin, Bynum, and Goodwin, filed new notices of appeal from those amended judgments.  R. 1434 (Martin); R. 1435 (Bynum); R. 1436 (Goodwin).  On December 30, 2010, this Court consolidated the three new appeals under case number 10-5301 (4th Cir.).  It is the government's understanding that the three new appeals challenge only the district court's denial of the defendants' motion to vacate prior forfeiture orders.  <u>See</u> R. 1422 (district court's order of December 7, 2010).

-2-

to distribute crack cocaine.

4.  Whether the evidence showed that Ali was an active participant in the drug distribution conspiracy.

5.  Whether the evidence showed that Ali participated in the same drug distribution conspiracy as the other defendants.

Evidentiary Issues

6.  Whether the district court abused its discretion in admitting the expert testimony of two case agents concerning their interpretation of code words in lawfully intercepted conversations.

7.  Whether the district court committed reversible plain error when it admitted the testimony of a police officer about crack cocaine that was retrieved from a car that Goodwin was driving, testimony that Goodwin's counsel elicited.

8.  Whether the district court committed reversible plain error in admitting the testimony of a witness that Whiting now contends was perjured.

Sentencing and Related Issues

9.  Whether the notice filed by the government pursuant to 21 U.S.C. § 851 adequately informed Whiting of the prior convictions that the government would use to seek an enhanced sentence.

10.  Whether Bynum's prior state conviction for possessing cocaine with the

intent to distribute it qualified as a prior felony drug conviction for purposes of the sentencing enhancement in 21 U.S.C. § 841(b)(1)(A).

11.  Whether the district court clearly erred in applying a firearm enhancement when it calculated Martin's advisory Guidelines range.

12.  Whether the life sentences imposed upon Martin and Whiting were substantively reasonable.

13.  Whether the district court clearly erred when it denied Dobie a minor role adjustment in computing her advisory Guidelines range.

14.  Whether the district court properly sentenced Ali to the statutory mandatory minimum prison sentence of ten years.

Forfeiture Issues

15.  a.  Whether the district court clearly erred in determining that Martin's motion for return of civilly-forfeited property was untimely.

b.  Whether the district court clearly erred in determining that the government's missing a deadline to file a civil forfeiture action became moot when the government decided to pursue criminal forfeiture instead of civil forfeiture.

c.  Whether the district court had jurisdiction to enter preliminary and final orders of forfeiture after the defendants were sentenced (in December 2006) and judgments were entered (in January 2007), when the defendants had notice of

-4-

the content of the forthcoming forfeiture orders at the time of sentencing.

      d.  Whether the district court's forfeiture orders were required to use the words "money judgment" or to state that the assets to be forfeited were in the defendants' possession.

STATEMENT OF THE CASE

Following a three-month jury trial in the United States District Court for the District of Maryland, Martin, Dobie, Goodwin, Coleman, Ali, and Bynum were each convicted on multiple counts in this large drug trafficking case, including one count of conspiring to distribute and to possess with intent to distribute five kilograms or more of cocaine, one kilogram or more of heroin, and "fifty grams or more of a mixture or substance containing a detectable amount of cocaine base, commonly known as 'crack,'" in violation of 21 U.S.C. § 846.  R. 794, Fifth Superseding Indictment at 2.  Each of the defendants was also convicted on other drug trafficking counts as set forth in the 62-count superseding indictment.  Specifically, all of the defendants were convicted on one or more of the many counts charging them with using a communications facility in the commission of a narcotics felony, in violation of 21 U.S.C. § 843(b) (Counts 3, 5, 7, 9, 11-13, 15, 17-24, 26-28, 30, 32, 34-35, 37, 39, 42, 44, 46-54, 57-58).  Additionally, Goodwin, Martin, Ali, and Bynum were each convicted of possession of crack cocaine with

-5-

the intent to distribute it, in violation of 21 U.S.C. § 841 (Counts 2, 8, 36, 40, 41, 56); Martin was convicted of possession with the intent to distribute five grams or more of crack cocaine (Count 62); Goodwin and Martin were convicted of possession with the intent to distribute 500 grams or more of cocaine (Counts 4, 10, 16, 29, 33, 38, 55); Martin was convicted of possession of heroin with intent to distribute it (Counts 14, 25, 31, 43); and Martin and Ali were convicted of possession of crack cocaine, heroin, and cocaine with the intent to distribute them (Count 56).   Further, Bynum and Dobie were each convicted on one count of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts 59 and 61, respectively), and Bynum was convicted on one count of being a previously convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

The district court sentenced Goodwin to life imprisonment on the conspiracy count and one distribution count, with lesser concurrent terms of imprisonment on his remaining counts of conviction (R. 1061); sentenced Martin to life imprisonment on the conspiracy count and eight other distribution counts, with lesser terms on the other counts (R. 1059); sentenced Ali to a total of 120 months of imprisonment (R. 1069); sentenced Whiting to life imprisonment (R. 1062); sentenced Bynum to a total of 240 months of imprisonment on the drug counts, and

to a consecutive term of 60 months of imprisonment on the Section 924(c) count, for a total prison term of 300 months (R. 1070); and sentenced Dobie to 146 months of imprisonment on the drug counts and to a 60-month consecutive term on the Section 924(c) count, for a total of 206 months (R. 1060).

## STATEMENT OF FACTS

A.  Overview

Beginning at least as far back as 1997, defendants Martin and Goodwin operated and coordinated extensive drug distribution activities in Maryland and the District of Columbia, obtaining illegal drugs from multiple suppliers.[2]  Both Martin and Goodwin obtained many kilograms of cocaine and from various individuals, often sharing the same suppliers, but usually selling their drugs to different distributors.  They both converted some of the powder cocaine that they obtained into crack cocaine and sold the drugs to lower-level dealers.  Martin also obtained and distributed large quantities of heroin.  Her drug customers, including defendants Bynum and Dobie, in turn resold the illegal narcotics in Maryland, the District of Columbia, and elsewhere.  Defendants Ali and Whiting also purchased

_____

[2]  References to "Martin" are to defendant-appellant Paulette Martin.  Her partner, John Martin, is referred to by his full name.

-7-

drugs from Martin and otherwise assisted her drug distribution efforts.[3]

    B.  Goodwin And Martin Distribute Large Quantities Of Illegal Drugs
        Over A Period Of Several Years.

    In late 2001, courier Michael Thurman informed Goodwin about a potential
source in Texas who could supply kilogram quantities of cocaine.  6/16/06 Tr. 101.
Goodwin and Thurman flew together from Baltimore to Houston, where Goodwin
purchased five kilograms of cocaine for $90,000.  6/16/06 Tr. 105-115.  See
6/16/06 Tr. 22-37.  During subsequent transactions with the Texas source, Thurman
used UPS to deliver the kilograms of cocaine to Goodwin, but after a shipment of
drugs did not arrive, Thurman started driving to Texas to pick up the drugs.
6/16/06 Tr. 121-133.

    Both Goodwin and Martin used Thurman to transport drugs for them, pooling
their resources.  Thurman made at least five trips to Texas in a special van that he
obtained from Goodwin's vehicle dealership.  6/16/06 Tr. 166-183.  He drove

_____

    [3]  The six defendants-appellants in the present case were among 30
defendants who were named in the same indictment.  As explained in Argument
Section I, infra, the district court conducted three separate jury trials, which began
on November 15, 2005; June 6, 2006; and November 28, 2006, respectively.  The
defendants in this appeal were convicted following the second trial.  Appeals by
defendants in the first trial were decided by this Court in United States v. Donna
Johnson, 587 F.3d 625 (4th Cir. 2009), cert. denied, 130 S. Ct. 2128 (2010).  The
appeal of another defendant who pleaded guilty was decided in United States v.
Mangual, 278 Fed. Appx. 267 (4th Cir.), cert. denied, 129 S. Ct. 318 (2008).

-8-

money from the Baltimore-Washington area to Texas and returned with cocaine; on some of the trips, half of the money that Thurman transported came from Goodwin and the other half came from Martin. 6/16/06 Tr. 166-167, 182-183. For example, on one trip to Texas, Thurman transported $180,000, with Goodwin and Martin supplying $90,000 each. 6/16/06 Tr. 175-176, 183.

Thurman made many such round trips from Maryland or the District of Columbia to Texas during the years 2002 to 2004. 6/16/06 Tr. 186-187. On one such trip, on June 16, 2004, Thurman was arrested in Louisiana on June 16, 2004, following a traffic stop. 6/16/06 Tr. 75-77, 224-225. Thurman told the officer that he was driving from Houston back to the District of Columbia. 6/16/06 Tr. 78. After a narcotics dog alerted on the vehicle that Thurman was driving, the Louisiana trooper discovered a large quantity of cocaine, wrapped in duct tape. 6/16/06 Tr. 79-85.

Goodwin and Martin often coordinated their drug acquisition and distribution efforts, sometimes referring to each other as "brother" and "sister." 6/21/06 Tr. 66-67, 173; 6/22/06 Tr. 42, 81, 93-96; 6/23/06 Tr. 68-69; 6/27/06 Tr. 18-23; 6/28/06 Tr. 114-118; 6/29/06 Tr. 54-55; 7/5/06 Tr. 128. For example, Martin told Goodwin about courier Pernell Philpot's arrest in Wyoming while Philpot was transporting ten kilograms of cocaine for Martin. 6/22/06 Tr. 92-93. After he

-9-

stopped Philpot for a speeding violation, a Wyoming highway patrol officer discovered the cocaine in Philpot's vehicle and arrested him.  6/23/06 Tr. 74-88.

Juan Encarnacion supplied kilogram quantities of cocaine to Martin in the late 1990s, before Encarnacion returned to the Dominican Republic.  6/13/06 Tr. 131-146.  After he came back to the United States in late 2000, Encarnacion again supplied Martin with kilogram quantities of cocaine, delivering the drugs both to Martin's house in Maryland and to Paula's School of Performing Arts in the District of Columbia.  6/13/06 Tr. 147-156.[4]  Indeed, Martin first came to the attention of police officers in 2001, when they were investigating Encarnacion's drug trafficking activities.  7/19/06 Tr. 234-235.

From approximately March 8, 2004 to June 1, 2004, the government obtained court authorization to intercept wire communications occurring over the land-line telephone at Martin's residence and over the cellular telephones utilized by Martin. Through the ensuing interceptions, government agents learned about individuals who furnished drugs to Martin and Goodwin.

Luis Mangual supplied Martin with cocaine.  6/22/06 Tr. 80-81.  Emilio Echarte supplied both Martin and Goodwin with kilogram quantities of cocaine.

---

[4]  Paula's School did not appear to be functioning as an actual dance school when it was searched on June 1, 2004.  7/13/06 Tr. 59.  See 7/12/06 Tr. 205-222.

-10-

7/11/06 Tr. 103-104, 121; 7/12/06 Tr. 20-22.  Meanwhile, Gwendolyn Levi

supplied resale quantities of heroin to Martin.  6/21/06 Tr. 152-153; 6/22/06 Tr.

59-60, 69-70; 6/23/06 Tr. 55-60, 158-163.

Steve Brim, a drug supplier who was living in California, helped Nathan

King buy a truck to transport cocaine to Martin and to pick up cash from her.

6/14/06 Tr. 87-90.  King made numerous cross-country trips, delivering cocaine and

retrieving as much as $200,000 at a time from Martin.  6/14/06 Tr. 96-105.  When

King was arrested in Indiana in October 2003, officers found 18 kilograms of

cocaine hidden in the trailer of the vehicle he was driving.  6/14/06 Tr. 45-57.

While the other defendants--Bynum, Dobie, Ali, and Whiting--generally

obtained their illegal drugs from Martin, Goodwin supplied cocaine to different

individuals.  For example, Horace Smith learned that Goodwin could supply him

with as much cocaine as he needed.  6/15/06 Tr. 152.  Smith obtained crack cocaine

from Goodwin at least ten times, in quantities ranging from an eighth of a kilogram

to half a kilogram.  6/15/06 Tr. 170-171.  Smith also saw Goodwin distribute crack

cocaine to other individuals many times.  6/15/06 Tr. 168-169.

Like Martin, Goodwin had multiple sources of cocaine, including a person

called "Cuba."  6/16/06 Tr. 232-233.  In April 2004, Goodwin told Martin that Cuba

had two kilograms of cocaine, and they arranged to split the shipment.  6/27/06 Tr.

-11-

158-165.  The following month, Goodwin and Martin purchased half a kilogram of cocaine from Cuba and split it; Martin loaned Goodwin $3,000 of the purchase price.  6/28/06 Tr. 138-141.  Later, Goodwin obtained yet another kilogram of cocaine from Cuba and delivered it to Martin.  6/28/06 Tr. 185-186.  When Cuba claimed that Goodwin had shorted him on the money for the cocaine, Martin agreed to split the difference with Goodwin.  6/29/06 Tr. 13-15, 22-24.  On another occasion, Goodwin learned that Mangual was supplying Martin with a kilogram of cocaine and wanted to order a kilogram for himself, because Goodwin was having trouble obtaining cocaine from Cuba.  6/28/06 Tr. 80-87.

On June 1, 2004, officers executed a search warrant at Martin's residence in Takoma Park, Maryland.  7/12/06 Tr. 91-100.  Among the items seized were $7,865 in cash, and quantities of heroin and cocaine.  7/12/06 Tr. 101-118.  The officers also found correspondence between Martin and Philpot, the courier who was incarcerated in Wyoming, as well as a $3,000 check from Martin to Echarte. 7/12/06 Tr. 106-107, 134-135.

Also on June 1, 2004, officers executed a search warrant at Paula's School of Performing Arts in the District of Columbia.  7/12/06 Tr. 204-205.  The officers recovered 243.96 grams of crack cocaine and additional quantities of heroin and cocaine, as well as drug paraphernalia.  7/12/06 Tr. 210-227; 7/13/06 Tr. 42-44.

-12-

Officers also executed a search warrant at Goodwin's residence in the District of Columbia on June 1, 2004. 7/19/06 Tr. 50-51. They discovered a kilogram of cocaine in a file cabinet. 7/19/06 Tr. 80. Additionally, the officers retrieved drug paraphernalia, including an electric scale, money wrappers, and a bowl with cocaine residue. 7/19/06 Tr. 53-79.

Goodwin had a significant history of drug-related activity prior to his arrest in 2004. In November 2003, Prince George's County police officers had arrested Goodwin after finding crack cocaine hidden in a vehicle that Goodwin was driving and nearly $10,000 in Goodwin's pockets. 6/15/06 Tr. 49-70. After executing search warrants in October 2002, police discovered crack cocaine, drug paraphernalia, and ammunition at the discount car center that Goodwin owned, as well as handguns, ammunition, and false-bottom containers in Goodwin's apartment. 6/15/06 Tr. 205-219; 6/20/06 Tr. 136-153. As far back as 1987, DEA agents had discovered cocaine, firearms, and a safe containing $16,510 in Goodwin's home in Chillum, Maryland. 7/18/06 Tr. 35-48. Goodwin pleaded guilty to conspiracy to possess cocaine with the intent to distribute it in 1988. 7/18/06 Tr. 49-54.

C.  Bynum And Dobie Purchase Resale Quantities Of Drugs From Martin.

On many occasions prior to his arrest in 2004, Bynum Bynum ordered

-13-

powder cocaine and crack cocaine from Martin.  6/21/06 Tr. 56, 101-107, 141, 185-187.  Bynum generally ordered 62 grams of crack at a time, and he repeatedly ordered several kilograms of cocaine.  E.g., 6/21/06 Tr. 68-73; 6/22/06 Tr. 7-8, 10, 85, 100; 6/23/06 Tr. 30; 7/5/06 Tr. 151.  Martin would order the drugs from her cocaine supplier, frequently Luis Mangual.  6/22/06 Tr. 5-24.  When Martin's supply of cocaine was unavailable, Martin advised Bynum that he would have to wait to receive more drugs.  6/22/06 Tr. 62-63; 6/23/06 Tr. 39.  But when Martin received cocaine from Mangual or another source, she would let Bynum know that "everything's okay" and that she had cocaine for him.  6/21/06 Tr. 56, 106-107.  Bynum went to Martin's residence to pick up his cocaine.  E.g., 6/21/06 Tr. 70-73; 6/23/06 Tr. 53-54; 6/27/06 Tr. 11-14.  During the course of the investigation, officers discovered 858 contacts between phones associated with Bynum and phones associated with Martin from August 2001 through May 2004.  7/25/06 Tr. 102.

On June 1, 2004, officers executed a search warrant at Bynum's apartment in Hyattsville, Maryland.  7/11/06 Tr. 68-70.  Among other items, the officers recovered a loaded semi-automatic handgun and a box of ammunition, a scale with cocaine, and $14,905 in cash.  7/11/06 Tr. 73-88.  Previously, in 1999, Bynum had been arrested after a search of his apartment had revealed illegal drugs, handguns,

-14-

and large quantities of cash.  7/7/06 Tr. 135-150.  And in 1996, Bynum had been arrested for possession of crack cocaine with the intent to distribute it.  7/18/06 Tr. 185-189, 204-205.

During the period of the court-authorized wiretaps, Dobie also purchased drugs from Martin, some of which Dobie gave to her son.  6/21/06 Tr. 19.  Like Bynum, Dobie obtained the drugs at Martin's residence.  6/21/06 Tr. 60-61.  After Martin moved her drugs to Paula's School of Performing Arts, Dobie arranged to meet Martin at the school to purchase cocaine.  6/29/06 Tr. 19-20, 44-45.  When she could not pay for the cocaine prior to reselling it, Dobie asked Martin to front her the drugs.  6/21/06 Tr. 178-179.  Dobie depended upon Martin to supply her with drugs, so that Dobie could sell them and make money.  6/23/06 Tr. 26-28.  To supply her husband, Dobie also ordered crack from Martin.  6/28/06 Tr. 124-126. Dobie sold heroin as well as cocaine.  6/28/06 Tr. 159-160.

Officers executed a search warrant at Dobie's residence in the District of Columbia on June 1, 2004.  7/18/06 Tr. 64-65.  Among other items, the officers recovered two handguns, ammunition, drug paraphernalia, and 11.65 grams of heroin.  7/18/06 Tr. 68-103.  A DNA sample from the base of a firearm magazine retrieved from Dobie's residence was consistent with a DNA sample taken from a swab of Dobie's cheek.  7/14/06 Tr. 15-39.

-15-

D.  Ali Assists Martin's Drug Distribution Operations And Purchases Drugs
    From Martin.

Ali was Martin's confidante and close associate; she purchased drugs from

Martin, stored drug proceeds for Martin, and helped Martin move her drug

distribution activities from Maryland to the District of Columbia.  Ali frequently

obtained drugs from Martin, often purchasing eight-balls of cocaine, i.e., an eighth

of an ounce, from Martin.  E.g., 6/21/06 Tr. 132-134, 138-139; 6/23/06 Tr. 47-48;

6/27/06 Tr. 26-27; 6/29/06 Tr. 50-53; 7/5/06 Tr. 27, 93.  On one occasion in March

2004, Martin prepared a package of cocaine for Ali and left it outside Martin's

house for Ali to pick up.  6/22/06 Tr. 51-54.  Ali helped Martin move her drug

operation from Martin's residence to Paula's School of Performing Arts on May 16,

2004.  6/28/06 Tr. 94-97, 103-104; 7/26/06 Tr. 126-131.

On June 1, 2004, officers executed a search warrant for Ali's apartment in

Hyattsville, Maryland, and an arrest warrant for Ali.  7/19/06 Tr. 110-113.  Among

the items seized from Ali's apartment were cocaine, crack cocaine, drug

paraphernalia, and $129,600 in cash.  7/19/06 Tr. 115-133.  During the period of the

investigation, officers recorded 2,441 contacts between phones associated with Ali

and phones associated with Martin.  7/25/06 Tr. 100.

-16-

E.  Whiting Also Purchases Drugs From Martin And Helps One Of Martin's
    Suppliers Pick Up Drug Shipments.

Whiting was yet another person who purchased drugs from Martin.  6/21/06 Tr. 225-226; 7/11/06 Tr. 180; 7/12/06 Tr. 21-22.  Martin and Whiting discussed Martin's cocaine sources, and Martin let Whiting know when she obtained drugs. E.g., 6/21/06 Tr. 99-100; 6/22/06 Tr. 101-102; 6/27/06 Tr. 169-170; 6/29/06 Tr. 51-52.  Whiting assisted Emilio Echarte, a drug supplier for Martin and Goodwin, by driving Echarte to pick up drug shipments in Virginia.  7/11/06 Tr. 137-140; 7/12/06 Tr. 17-18, 35-36.

Whiting had an extensive history of drug dealing.  In 1994, he was convicted of possessing 7.743 kilograms of cocaine and sentenced to more than eight years of imprisonment.  7/18/06 Tr. 14.  Whiting also pleaded guilty in a heroin importation and distribution case involving kilogram quantities of heroin.  7/18/06 Tr. 17-27.

-17-

## SUMMARY OF ARGUMENT

<u>Pretrial Issue</u>

1.  The district court persuasively explained its reasons for granting an ends-of-justice continuance, including the number of defendants and the complexity of the case, when scheduling the trial for the defendants at the earliest time that could accommodate the schedules of the various counsel and the limitations of the courtroom facilities.  There was thus no violation of the Speedy Trial Act or of the defendants' constitutional right to a speedy trial in this complex conspiracy prosecution.

<u>Sufficiency and Related Issues</u>

2.  The evidence was sufficient to support Dobie's conviction for possession of a firearm in furtherance of a drug trafficking crime, given that officers found two firearms, heroin, and drug paraphernalia underneath Dobie's bed less than a month after Dobie and Martin discussed Dobie's drug distribution activities.

3.  Ample evidence, including stipulations, proved that the cocaine base that Goodwin, Martin, and Dobie conspired to distribute was crack cocaine.

4.  The evidence showed that Ali was not merely a buyer of cocaine and cocaine base, but actively participated in the drug distribution conspiracy, storing drug proceeds for Martin and helping Martin move her drug distribution operation.

-18-

5. The evidence further showed that Ali participated in the large drug distribution conspiracy involving Martin, Goodwin, and others, not in a separate drug conspiracy with only Martin.

Evidentiary Issues

6. The district court did not abuse its discretion when it admitted the testimony of two case agents who testified about their interpretations of code words referring to drug transactions in lawfully intercepted phone conversations. The court implemented ample safeguards to avoid jury confusion about the agents' dual roles as percipient and expert witnesses, requiring the agents to explain their expertise and the methodology they used in analyzing the conversations, and giving cautionary instructions regarding the jury's consideration of the expert testimony.

7. The district court did not err when it admitted the testimony of a police officer about crack cocaine that was retrieved from a vehicle that Goodwin was driving in November 2003. Goodwin's counsel elicited that testimony, and thus any error was invited. In any event, even if the testimony could be deemed testimonial hearsay, its admission was harmless beyond a reasonable doubt.

8. In the district court, Whiting did not preserve his appellate claim that the government knowingly used the allegedly perjured testimony of witness Emilio Echarte. In any event, there is no reason to believe that Echarte's testimony about

-19-

Whiting's role in the drug distribution conspiracy was untruthful.

<u>Sentencing and Related Issues</u>

9.  The government's notice, filed pursuant to 21 U.S.C. § 851, that it would seek enhanced penalties against Whiting under 21 U.S.C. § 841(b)(1)(A) provided Whiting with ample detail about several of Whiting's prior felony drug offenses, including significant heroin and cocaine convictions.

10.  Bynum's prior state felony cocaine conviction, which became final years before Bynum's participation in the instant drug conspiracy ended, properly served to enhance Bynum's sentence in the present case.

11.  The district court did not clearly err when it applied a firearms enhancement in calculating Martin's advisory Guidelines range, given that it was readily foreseeable to Martin that her co-conspirators would possess firearms in furtherance of the multi-year drug distribution conspiracy involving massive quantities of illegal narcotics.

12.  The life imprisonment sentences that Martin and Whiting received were substantively reasonable.  Martin was at the epicenter of the large drug distribution conspiracy, which spanned many years and encompassed vast quantities of several kinds of illegal narcotics.  Meanwhile, Whiting's life sentence was statutorily mandated by his extensive history of prior felony drug convictions.

-20-

13.  The district court did not clearly err when it declined to give Dobie a minor role adjustment in calculating her advisory Guidelines range.  The evidence showed that Dobie was an active participant in the drug distribution conspiracy, not a mere user of illegal drugs.

14.  The district court properly sentenced Ali to the statutory mandatory minimum sentence of 120 months of imprisonment for her drug conspiracy and distribution crimes.

Forfeiture Issues

15.  a.  The district court correctly determined that Martin did not file her claim under 18 U.S.C. § 983(a)(2) for the initiation of a civil forfeiture proceeding within the 35-day deadline specified in the government's notice letter.

b.  Although the government did not commence a civil forfeiture action within the 90-day statutory deadline, the district court correctly ruled that any issue concerning the missed deadline became moot when the government decided to pursue criminal, rather than civil, forfeiture and obtained criminal seizure warrants for the property in question.

c.  While the district court was technically required to issue the preliminary order of forfeiture at or before sentencing and to include that order in the 2007 judgments under the then-existing version of Fed. R. Crim. P. 32.2, the

-21-

entry of that order approximately two weeks after the judgments did not constitute

reversible error, given that the defendants had notice at sentencing of the content of

the forthcoming forfeiture order, and they did not object at the time to the brief

delay in the entry of the preliminary order of forfeiture.  Further, the district court

ultimately corrected any technical errors in the judgments in December 2010, when

it entered amended judgments pursuant to amended Fed. R. Crim. P. 32.2,

incorporating the final forfeiture order.

      d.  The forfeiture orders were not required to use the words "money

judgment" when directing the forfeiture of sums of money.  Nor was the district

court required to state that the forfeited assets were in the possession of the

defendants at the time the forfeiture order was entered.

<u>ARGUMENT</u>

<u>PRETRIAL ISSUE</u>

I.  THE DISTRICT COURT FULLY COMPLIED WITH THE PROVISIONS OF
    THE SPEEDY TRIAL ACT.  (Defendants' Issue II)

     Invoking the Speedy Trial Act ("STA"), 18 U.S.C. § 3161, the defendants all

allege that the trial in this case, which commenced in June 2006, violated their right

to a speedy trial.  Br. 64-69.[5]  That contention lacks merit.

     A.  <u>Standard of Review</u>

     This Court "reviews de novo legal conclusions of the district court related to

its interpretation of the Speedy Trial Act, while factual findings related to the STA

are reviewed for clear error."  <u>United States v. Stoudenmire</u>, 74 F.3d 60, 63 (4th Cir.

1996).

     B.  The District Court Adopts A Case Management Plan That Comports With
         The Speedy Trial Act.

     The original indictment and early superseding indictments in this drug

conspiracy case named approximately 30 defendants.  Many of those defendants

were arrested on or about June 1, 2004.  Shortly thereafter, the defendants began

filing pretrial motions, thereby tolling the 70-day speedy trial clock, pursuant to 18

U.S.C. § 3161(h)(1)(D).  <u>See</u>, <u>e.g.</u>, R. 178 (Goodwin's motion for bill of

---

     [5]  "Br." refers to the defendants' opening page proof brief.

-23-

particulars); R. 228 (Goodwin's motion for review of pre-trial detention); R. 243 (Goodwin's motion for discovery).

With several such motions pending, the district court held an initial status conference on September 13, 2004. The court observed that "as we sit here today, we have an unsevered case," but asked the parties to submit "as soon as possible . . . a plan for moving to sever any aspect of this case so that the court can come up with the most intelligent way to resolve this matter, consistent with [Fed. R. Crim. P.] 14." 9/13/04 Tr. 15. Martin's counsel did not raise a speedy trial objection, but did ask that the court "set much shorter deadlines" for the case management submissions, noting that his client had "been detained . . . with at least the suggestion that she's involved in what may well be a series of murders." 9/13/04 Tr. 17-18. The only mention of speedy trial rights was by Dobie's counsel, who noted that "Dobie had filed, on her own behalf, two motions which have not been responded to yet," one of which "is a motion for a fast and speedy trial." 9/13/04 Tr. 43-44. See R. 218, R. 219 (Dobie's motions).

The United States timely filed its proposal for case management on October 28, 2004. R. 304. At the subsequent scheduling hearing held on December 6, 2004, the district court noted that while "the Government says it doesn't see any problem . . . in trying this case all together, I don't agree." 12/6/04 Tr. 12. The

-24-

court explained that it would be "physically impossible" to squeeze all the necessary people into "the biggest courtroom in the courthouse . . . ." Id. Further, the court opined, it "would be rather difficult" to get "12 thoughtful jurors to remember and sort out this many people in one single case." Id. At the court's request, the government devised a proposed "severance plan to accommodate concerns about security and the number of defendants." 12/6/04 Tr. 13.

The court spent most of the December hearing considering the possible trial groupings, how long the trials were likely to last, and ascertaining the existing trial schedules of the many attorneys in attendance. Among the current appellants, Dobie "request[ed] a severance from all the defendants in this case" (12/6/04 Tr. 30), while Martin apparently agreed that then-pending insurance fraud allegations should be tried separately from the drug conspiracy counts. 12/6/04 Tr. 12-13, 32. The court explained that it was "trying . . . to be faithful to the Federal Rules of Criminal Procedure in terms of rational severance to protect the interests of defendants who have legitimate interests in not having a trial that's so large and so complex[] that they get lost in a sea of defendants and counts and a rational jury couldn't resolve the matter fairly." 12/6/04 Tr. 74. With respect to Dobie's pending requests for a speedy trial, the court indicated that "there is no question that the Speedy Trial Act would exclude all this time . . . ." 12/6/04 Tr. 49.

-25-

In a Memorandum Opinion issued on December 22, 2004, the district court granted in part and denied in part the government's severance proposal "without prejudice to the right of any party" to renew motions to sever at a later date. R. 365, Memorandum Opinion at 3. The court then addressed the claims of some of the defendants that the court's scheduling order would violate their right under 18 U.S.C. § 3161(c)(1) to be tried within seventy days of the filing date of the indictment, subject to various "important exceptions necessary to the administration of justice and fairness to the parties in criminal proceedings." R. 365, Memorandum Opinion at 4 (citing various exceptions in 18 U.S.C. § 3161(h)). The court concluded that "compelling an almost immediate trial of this matter with 77 counts and 29 Defendants would result in not merely a miscarriage of justice but a legal travesty," adding that "even with a breakdown of the case into four groupings," the cases would "come close to the outer limits of what the court can tolerate in terms of its ability to provide a fair trial for the Defendants . . . ." R. 365, Memorandum Opinion at 5. Invoking 18 U.S.C. § 3161(h)(8)(B)(ii), the court summarized that "the case is both unusual and complex due to the number of Defendants, the nature of the prosecution, the existence of novel questions of fact or law and the amount of time that reasonably will be required by competent counsel to prepare for pretrial proceedings and the trials within the relatively short time

-26-

limits established under the Act." <u>Id.</u>  Accordingly, the court stated that it would, by separate order, deny the speedy trial motions filed by several of the defendants. <u>Id.</u>

In a separate Order filed on December 22, 2004, the district court set four trial dates for the various defendants and various counts "in the interest of the administration of justice."  R. 366, Order at 2-3.  "Trial three," which included the six defendants in the present appeal, was scheduled to begin on June 6, 2006 and to last for approximately nine weeks.  R. 366, Order at 2.[6]  The court specifically ordered that the requests for speedy trial filed by several of the defendants named in the indictment, including Dobie's motions, be denied.  R. 366, Order at 4.

C. <u>The District Court Fully Complied With Defendants' Speedy Trial Rights.</u>

In contending that their speedy trial rights were violated, defendants fashion a hodgepodge of imprecise claims, at various times invoking both the STA and the Constitution, but without specifying when they believe that their trial should have commenced or why they contend that the district court abused its discretion when it invoked 18 U.S.C. § 3161(h)(8)(B)(ii) to toll the statutory speedy trial clock.  <u>See</u>

_____

[6] The first trial began on November 15, 2005.  The second trial was scheduled to begin on March 21, 2006.  After several of the "trial two" defendants pleaded guilty, that trial was postponed and did not commence until November 28, 2006.  Thus, the trial at issue in the instant appeal was actually the second trial.

R. 365, Memorandum Opinion at 5.  Under those circumstances, defendants clearly have not met their burden of demonstrating a speedy trial violation.  Indeed, the district court acted appropriately in quickly establishing and maintaining a schedule encompassing multiple long trials, while accommodating the schedules of many defense counsel and ensuring that each defendant received a full and fair hearing.

For "a delay resulting from a continuance to be excludable," the district court must explain its reasons for determining "that the ends of justice served by granting the continuance outweigh the interests of the public and the defendant" in a speedy trial.  United States v. Kellam, 568 F.3d 125, 137 (4th Cir.), cert. denied, 130 S. Ct. 657 (2009).  See 18 U.S.C. § 3161(h)(7)(A).  Here, the district court fully complied with that mandate, explaining that the case was "both unusual and complex" within the meaning of 18 U.S.C. § 3161(h)(8)(B)(ii), in light of "the number of Defendants, the nature of the prosecution, the existence of novel questions of facts or law and the amount of time that reasonably will be required by competent counsel to prepare . . . ."  R. 365, Memorandum Opinion at 5.  Defendants do not directly assail that finding, but instead seem to blame the government for naming 31 individuals in a single indictment.  See Br. 67.  Yet it was the court that noted that while "the Government says it doesn't see any problem for the Government or the defendants in trying this case all together, I don't agree."  12/6/04 Tr. 12.  The court

-28-

explained both that the judicial system lacked the physical capacity to fit the

necessary number of people in even its "biggest courtroom," and added that "12

thoughtful jurors" would have difficulty in affording a fair trial to that number of

defendants "in one single case."  Id.  The defendants seemingly acquiesced in that

finding, and Martin's counsel, rather than objecting, sought to clarify that his client

would be subject to two separate trials (one for the drug counts and one for the

insurance fraud counts).  12/6/04 Tr. 12-13.

To the extent that defendants raise not just a statutory claim but also a

constitutional claim that they were deprived of their Sixth Amendment right to a

speedy trial (Br. 68-69), this Court's decision in United States v. Hall, 551 F.3d 257,

270-73 (4th Cir. 2009), is particularly instructive.  In Hall, the Court applied the

four-factor test set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972), to determine

whether the defendants' Sixth Amendment speedy trial rights were violated.[7]

Although the Court agreed that the two-year period of delay between indictment

and trial, comparable to the corresponding period here, "justifies a further speedy

trial analysis" (Hall, 551 F.3d at 272), the Court ultimately concluded on the basis

of the Barker factors that the defendants' "constitutional right to a speedy trial was

---

[7]  The Court enumerated those factors as "(1) the length of the delay; (2) the reasons therefor; (3) the timeliness and vigor of the assertion of the speedy trial guarantee; and (4) prejudice to the defendant."  Hall, 551 F.3d at 271.

-29-

not contravened." Id. at 273. Significant to the Court's analysis were many of the same factors present in the current case. For example, in the present case, as in Hall, "the prosecution was complicated, involving a serious, complex conspiracy charge that implicated multiple parties in at least two jurisdictions." Id. at 272. Likewise, in both this case and Hall, the pretrial proceedings "largely result[ed] from defense motions." Id. Further, the defendants in Hall, like appellants here, "failed to show [that] the delay may have adversely impacted the defense." Id.[8] Under those circumstances, the defendants' speedy trial allegations should be denied.

---

[8] Indeed, to the extent that some of the same government witnesses testified in the first trial stemming from the indictment in this case, the defendants here may have benefitted from their in-depth preview of the government's evidence.

-30-

SUFFICIENCY AND RELATED ISSUES

II.  THE EVIDENCE SUPPORTED DOBIE'S SECTION 924(c) CONVICTION.
     (Defendants' Issue VIII)

     According to Dobie, the evidence was insufficient to support her conviction

for knowingly possessing a firearm in furtherance of a drug trafficking crime, in

violation of 18 U.S.C. § 924(c).  Br. 101-110.  To the contrary, the evidence of the

firearms seized from Dobie's house in close proximity to drugs and drug

paraphernalia amply supported her Section 924(c) conviction.

     A.  Standard Of Review

     In reviewing a challenge to the sufficiency of the evidence for a Section

924(c) conviction, this Court will affirm the jury's verdict if, viewing the evidence

in the light most favorable to the government, "a rational trier of fact could have

found the essential elements of the § 924(c) offense beyond a reasonable doubt."

United States v. Perry, 560 F.3d 246, 255 (4th Cir.), cert. denied, 130 S. Ct. 177

(2009).

     B.  The Evidence Tied Dobie's Firearms To The Heroin She Received
         From Martin.

     As Dobie concedes, law enforcement officers obtained and executed a search

warrant at her home on June 1, 2004.  Br. 102.  Further, Dobie acknowledges, "law

enforcement officers seized several items, including 11.65 grams of heroin, a

-31-

nine-millimeter Taurus Millennium handgun, and a .40 caliber Lama handgun, located underneath a bed in . . . Dobie's home." Id. See 7/18/06 Tr. 84-88, 97-98. See also 7/7/06 Tr. 43-44, 63, 82-87 (laboratory director Richard Gervasoni, an expert in forensic chemistry, identifies the drugs seized from Dobie's residence as heroin and cocaine). From under the bed, the officers also recovered a box containing narcotics paraphernalia, including a scale; a bottle of Anesetal, a cutting agent for narcotics; and glassine baggies of the type used to package narcotics for sale. 7/18/06 Tr. 91-96.

Despite her acknowledgment that guns and drugs were found together under a bed in her residence, Dobie contends that the evidence was insufficient to support her conviction on the Section 924(c) count. Dobie reasons that the Section 924(c) count, Count 61, alleged that she knowingly and intentionally possessed a firearm in furtherance of the conspiracy to distribute controlled substances set forth in Count One of the indictment, which she refers to as "the Martin conspiracy." Br. 104. According to Dobie, her Section 924(c) conviction must be reversed, because the government presented insufficient evidence that the heroin under the bed "was connected to the Martin conspiracy . . . ." Br. 105. Dobie insists that she "got her drugs from many sources" and that the government was required to prove "that the heroin found under her bed came from . . . Martin or her associates" in

-32-

order to sustain the jury's conviction on the Section 924(c) count.  Br. 108.  In fact, the evidence did suggest that the heroin found in Dobie's residence was supplied by Martin.  And even if the particular heroin had not come from Martin, there was ample evidence of Dobie's involvement in the charged conspiracy at the time the drugs were discovered.  Thus, the jury could reasonably have concluded that Dobie possessed the firearms to further her drug trafficking activities, including her drug business with Martin.

As an initial matter, Dobie does not challenge her conviction on the drug conspiracy count, specifically acknowledging that Martin sold a variety of illegal drugs to her.  Br. 142.[9]  Nor does Dobie deny that the two handguns were found under the bed in her residence "lying near" a box that contained heroin.  Br. 102. Rather, Dobie's claim is that, even "when viewing the evidence in the light most favorable to the government," no "rational trier of fact could have found" that Dobie possessed the firearms in furtherance of the drug conspiracy of which she was convicted.  Br. 101.

As this Court has explained, "[d]etermining whether an adequate connection has been made between a firearm and an underlying drug offense is a classic jury

_____

[9]  As set forth below, Dobie does challenge her sentence on the conspiracy count, alleging that she was entitled to a downward sentencing adjustment as a minor participant in the charged conspiracy.  See Br. 141-154.

-33-

question." United States v. Kimberlin, 18 F.3d 1156, 1158 (4th Cir.), cert. denied, 511 U.S. 1093, 1148, and 513 U.S. 843 (1994).  In deciding that "factual question," the jury is "free to consider numerous ways in which a firearm might further or advance drug trafficking," including serving as protection.  United States v. Lomax, 293 F.3d 701, 705 (4th Cir.), cert. denied, 537 U.S. 1031 (2002).  Whether the firearm is loaded and the proximity of the firearm to drugs are factors "that might lead a fact finder to conclude that a connection existed between a defendant's possession of a firearm and his drug trafficking activity."  Id.

The evidence here was sufficient for the jury to find that Dobie possessed the firearms in connection with the charged conspiracy.  Three weeks before the guns and heroin were seized from her home, on May 11, 2004, Dobie told Martin that she previously had 50 grams of heroin, but, after selling a portion, Dobie had only 10 or 15 grams remaining.  6/28/06 Tr. 160.  That 10-15 gram quantity is entirely consistent with the 11.65 grams of heroin that officers seized from Dobie's house on June 1, 2004.  Moreover, Dobie had an extensive discussion with Martin about the arrest of Gwendolyn Levi, who supplied Martin with heroin.  6/28/06 Tr. 160-161.  While Dobie suggests that she may have been involved in multiple drug conspiracies (Br. 108), the evidence was thus sufficient for the jury to conclude that the heroin and firearms retrieved from Dobie's residence were tied to the specific

-34-

conspiracy of which Dobie was convicted.

Dobie relies on this Court's decision in United States v. Randall, 171 F.3d 195 (4th Cir. 1999), to support her claim that the evidence was insufficient to support her Section 924(c) conviction. Br. 103-104. Randall is distinguishable, however, because in that case, unlike the present one, "the district court . . . constructively amended . . . the indictment by allowing proof of an alternative § 924(c) predicate offense not charged in the indictment . . . ." Randall, 171 F.3d at 203. Specifically, the government in Randall charged the defendants with using and carrying a firearm in connection with a distribution offense, but the proof relating to the firearm involved only a possession offense. Id. at 203-04. The evidence in this case more resembles Perry, in which the Court concluded that "there was substantial evidence to support the jury's determination that Perry possessed a firearm to further, advance, or help forward his drug trafficking activities." Perry, 560 F.3d at 254. The Court noted that "[a]t least one of the firearms in the bedroom was loaded and in close proximity to drug paraphernalia, and the firearms were easily accessible in the event needed . . . ." Id. at 255.

Finally, even assuming that Dobie is accurate in claiming that she "got her drugs from many sources" (Br. 108), it does not follow that each of those sources was tied to a different conspiracy. Dobie herself characterized the evidence as

-35-

showing "a nationwide multi-drug conspiracy involving dozens of participants." Id. Accord Donna Johnson, 587 F.3d at 628-29 ("This case involves an extensive drug-trafficking organization that operated in Maryland, the District of Columbia, New York, and elsewhere. . . . John Martin resided with Paulette Martin in Maryland and helped her distribute cocaine and heroin."). The jury could reasonably have concluded that the firearms retrieved with the heroin and drug distribution materials from Dobie's residence were connected to that nationwide conspiracy. And even if Dobie were involved in multiple drug distribution conspiracies, the same firearms could have "serve[d] as protection" or "defend[ed] Dobie's] turf" with respect to all of those conspiracies, including the Martin conspiracy. Lomax, 293 F.3d at 705.

Thus, in the present case, in which officers found loaded firearms and drugs in boxes under the bed of the master bedroom of Dobie's residence, the evidence was sufficient to support the jury's finding that Dobie possessed a firearm in furtherance of the drug trafficking conspiracy count on which she was convicted. Dobie's Section 924(c) conviction should therefore be affirmed.

-36-

III.  AS THE INDICTMENT ALLEGED, THE EVIDENCE SHOWED THAT THE
      DEFENDANTS ENGAGED IN A CONSPIRACY TO DISTRIBUTE CRACK
      COCAINE, A FORM OF COCAINE BASE.  (Defendants' Issues V and VI)

     Three of the defendants, Goodwin, Martin, and Dobie, maintain that there

was a variance between the indictment and the proof at trial as to whether they were

engaged in a conspiracy to distribute crack cocaine or cocaine base.  Br. 88-94.  The

same three defendants, joined by Whiting, make the related claim that the district

court erred by failing to instruct the jury that it was required to find that the drug in

question was crack cocaine, rather than another form of cocaine base.  Br. 94-96.

As set forth below, defendants' contentions lack merit, because the evidence,

including stipulations, consistently showed that the cocaine base in question was,

indeed, crack cocaine.

     A.  Standard of Review

     "In general, a 'variance' occurs when the evidence at trial establishes facts

materially different from those alleged in the indictment."  United States v.

Kennedy, 32 F.3d 876, 883 (4th Cir. 1994), cert. denied, 513 U.S. 1128 (1995).

This Court reviews such a claim de novo, but will find that "[a] variance constitutes

a legitimate ground[] for reversal only if the appellant shows that the variance

infringed his 'substantial rights' and thereby resulted in actual prejudice."  Id.  See

Randall, 171 F.3d at 203 (a variance is not a ground for reversal unless it prejudices

-37-

a defendant by surprising him at trial or by hindering the preparation of his defense).

When a defendant preserves an objection to a jury instruction, this Court reviews the district court's ruling for abuse of discretion.  United States v. Bolden, 325 F.3d 471, 486 (4th Cir. 2003).  In the absence of a timely objection, this Court will review the instruction on appeal only for plain error.  United States v. Ramos, 462 F.3d 329, 333 (4th Cir.), cert. denied, 549 U.S. 1065 (2006).[10]  Under plain error review, the Court first asks whether the alleged error occurred and, if so, whether it was plain.  United States v. Hughes, 401 F.3d 540, 547 (4th Cir. 2005).  Plain error exists only when the district court's error is "clear under current law."  United States v. Olano, 507 U.S. 725, 734 (1993); Johnson v. United States, 520 U.S. 461, 468 (1997).  Even when the error is plain, the defendant must establish that it affected his substantial rights in order to be eligible for relief.  Hughes, 401 F.3d at 548.

---

[10]  Defendants' discussion of the standard of review for the instructional issue seems to be misplaced, referring to standards for the admission of evidence and for sufficiency, while making no mention of jury instructions.  Br. 94-95.  In any event, defendants have not alleged that they objected to the district court's instruction on cocaine base, and the government is unaware of any such objection.

B.  Although The Government Was Not Required To Prove That The
    Cocaine Base Was Crack Cocaine, The Record Amply Supports That
    Conclusion.

The relevant portion of the conspiracy indictment in this case contained the same language as in Ramos, alleging that the defendants conspired to distribute and to possess with intent to distribute fifty grams or more of "a mixture or substance containing a detectable amount of cocaine base, commonly known as 'crack' . . . ." Compare R. 794, Fifth Superseding Indictment at 2, with Ramos, 462 F.3d at 332. In Ramos, this Court held that "[t]he inclusion in the indictment of the phrase 'commonly known as crack' is surplusage, which does not vitiate the indictment and may be ignored." Id. at 332.  As the Court explained, "the indictment alleged cocaine base," "[t]he statute . . . required cocaine base," and "[t]he jury found . . . cocaine base," and accordingly, "there was no variance." Id. at 333.

The defendants point out (Br. 94) that there is a circuit conflict on the question whether the term "cocaine base" in the drug statutes refers only to crack cocaine or to all forms of cocaine base, and the Supreme Court recently granted certiorari to resolve that issue.  United States v. DePierre, 599 F.3d 25 (1st Cir.), cert. granted, DePierre v. United States, 131 S. Ct. 458 (2010) (No. 09-1533).[11]

_____

[11]  In DePierre, the First Circuit cited this Court's decision in Ramos with approval, noting that "[t]his circuit (along with a number of others) has read the
(continued...)

-39-

Even if the Supreme Court should adopt the minority view when it decides

DePierre, however, and hold that the term "cocaine base" in the drug statutes is

limited to crack cocaine, that holding should not affect the outcome in the present

case, in which the record is abundantly clear that the cocaine base at issue was

indeed crack cocaine.

Time and again, the witnesses in this case specified that they were using the

terms "crack" and "cocaine base" interchangeably.  E.g., 6/20/06 Tr. 179 ("crack"

means cocaine base); 6/21/06 Tr. 77 ("Crack cocaine means cocaine base," as

opposed to cocaine powder); 6/22/06 Tr. 110-111 (agent who retrieved two-pound

box of baking soda from trash in front of Martin's residence testifies, "Powder

cocaine, cocaine hydrochloride, can be converted into cocaine base, commonly

known as crack cocaine, with the addition of two additional ingredients, . . . baking

soda and water"); 7/7/06 Tr. 100 ("crack is a slang term that's used for a way that

cocaine base is made"); 7/12/06 Tr. 100 ("[c]rack cocaine" is the common term for

cocaine base); 7/14/06 Tr. 118-119 (the "rock-like material" identified as "cocaine

base" is commonly referred to as crack).  Indeed, the defendants entered into

---

[11](...continued)
[drug] statute according to its terms and held that 'cocaine base' refers to 'all forms
of cocaine base, including but not limited to crack cocaine.'"  DePierre, 599 F.3d
at 30-31 (internal citations omitted).

stipulations that some of the drugs in the case were "cocaine base." 7/12/06 Tr.
97-98 ("we have a stipulation that . . . [exhibit] Drugs 9B is 6.02 grams of cocaine
base" and was recovered from Martin's residence on June 1, 2004); 7/12/06 Tr. 211
("The parties have agreed and stipulated that Government's Exhibit . . . Drugs 15
contain a total amount of 243.96 grams of cocaine base, commonly known as crack,
which was recovered from Paula's School of Performing Arts . . . on or about June
1st, 2004."); 7/13/06 Tr. 47 ("the parties have stipulated that these materials were
analyzed by the chemist and determined to be as follows:  Government's Exhibit
Drugs 12 . . . contained 64.5 grams of cocaine base commonly known as crack");
7/13/06 Tr. 58.

        This Court's decision in <u>Ramos</u> similarly controls the defendants' related
claim on appeal that the district court failed to instruct the jurors that they were
required to find that any cocaine base was crack cocaine, as opposed to another
form of cocaine base. Br. 95-96.  The Court in <u>Ramos</u>, reviewing the defendant's
claim under a plain-error standard of review, concluded that "there was not error at
all, much less plain error" in the district court's instruction. <u>Ramos</u>, 462 F.3d at
333.

        In the present case, the court gave the following instruction with respect to
the conspiracy count:

-41-

Count One of the indictment charges that the defendants
committed the crime of conspiracy in one of three ways. The first is
that they conspired to distribute or possess with the intent to distribute
cocaine. The second is that the conspired to distribute . . . heroin. The
third is that they conspired to distribute or possess with intent to
distribute cocaine base, also known as crack.

8/9/06 Tr. 43. The court added that "the government need not prove all of the

objectives of the conspiracy for you to find a defendant guilty of the conspiracy

count," but that the jury "must agree on the specific object" for each defendant. Id.

Under Ramos, the court's instructional language that cocaine base was "commonly

known as crack," while tracking the indictment, was nevertheless deemed to be

"surplusage." Ramos, 462 F.3d at 332. Yet there was no error in that instruction,

both because it did not contravene the law of this Court that the statute requires

only a finding of "cocaine base" and because it was entirely consistent with the

ample evidence that the parties were using the terms "cocaine base" and "crack

cocaine" interchangeably.

Defendants suggest that the pending Supreme Court case of DePierre,

presents "essentially the same issue." Br. 96. As with defendants' claim concerning

the alleged variance in the indictment, the outcome of DePierre should not affect

the present case. While the Supreme Court is expected to resolve the circuit

conflict as to the meaning of "cocaine base" in the federal drug statutes, the record

-42-

in the present case, as set forth above, makes it abundantly clear that the only form of cocaine base at issue here was "crack" cocaine.  Further, the defendants here, unlike Mr. DePierre, were convicted of a conspiracy involving not only cocaine base, but also large quantities of powder cocaine and heroin.  Under those circumstances, the defendants have failed to meet their burden of establishing instructional error in this case, let alone plain instructional error affecting their substantial rights, regardless of the Supreme Court's disposition of <u>DePierre</u>.

## IV. THE EVIDENCE SHOWED THAT ALI WAS AN ACTIVE PARTICIPANT IN THE DRUG DISTRIBUTION CONSPIRACY, NOT MERELY A BUYER OF ILLEGAL DRUGS. (Defendants' Issue VIII)

Ali alleges that she and Martin had "a mere buyer/seller relationship" that was insufficient to support her drug distribution conspiracy conviction. Br. 110-116. Ample evidence disputes Ali's claim.

### A. Standard of Review

When a defendant challenges the sufficiency of the evidence supporting her conspiracy conviction, alleging that the evidence "at most showed the existence of a buyer-seller relationship," this Court's review is "limited to determining whether, 'viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the [g]overnment, the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt.'" United States v. Young, 609 F.3d 348, 354-55 (4th Cir. 2010) (quoting United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996) (en banc), cert. denied, 519 U.S. 1151 (1997)).

### B. Ali Actively Participated With Martin And Others In The Drug Distribution Conspiracy.

As Ali concedes, ample evidence revealed that she purchased drugs from Martin on numerous occasions. See, e.g., 6/21/06 Tr. 132-134 (Ali, who already

-44-

had an account with Martin, places an order for more drugs and indicates that she is going to the bank to obtain money for the purchase); 6/21/06 Tr. 139 (Martin tells Ali's husband that she is delivering drugs to Ali); 6/22/06 Tr. 51-53 (Martin sells more cocaine to Ali, leaving the drugs for Ali to pick up); 6/26/06 Tr. 26-27 (Ali purchases cocaine from Martin).  Additional evidence, described below, also showed that on May 16, 2004, Ali helped Martin transport drugs from Martin's house to her "school" in the District of Columbia; that Ali stored $129,000 of drug proceeds in her home for Martin; and that Ali consulted with Martin and other members of the drug conspiracy about the arrests of co-conspirators.  That additional evidence clearly tied Ali to the drug distribution conspiracy.

Early in the evening of May 16, 2004, surveillance cameras depicted Ali parking a van in front of Martin's residence, after which Ali and Martin carried bags from the house and put them in the vehicle.  6/28/06 Tr. 94-95.  Within half an hour, a surveillance officer saw Ali and Martin leaving Paula's School of Performing Arts in the District of Columbia.  6/28/06 Tr. 96-97.  Based on an intercepted series of telephone calls, agents believed that because Martin was concerned that the police were going to execute a search warrant at her residence, she and Ali "moved all of her . . . drug activities," including "the drugs and assorted paraphernalia" to the school.  6/28/06 Tr. 103-104.  See, e.g., 6/28/06 Tr. 111

-45-

(Martin tells Milburn Walker that she has moved all the drugs to the school and that henceforth they will engage in their drug transactions at the school).

On June 1, 2004, Prince George's County police officers executed arrest and search warrants for Ali's apartment. 7/19/06 Tr. 109-114. The items seized by the officers included safes disguised as books, safes inside cans, 15 digital scales, four cell phones, and papers with Martin's name on them. 7/19/06 Tr. 115-125. In one of the book safes, the officers recovered $129,600 in neatly-wrapped cash. 7/19/06 Tr. 119-120. The officers also found small amounts of cocaine and cocaine base in Ali's apartment. 7/19/06 Tr. 129-133.

Agents recorded numerous phone conversations in which Ali discussed matters relating to drug distribution with Martin and others. For example, on April 25, 2004, Martin told Ali that Gwen Levi had been arrested and speculated that Levi's arrest was connected to the arrest of Emelio Echarte in Florida. 6/27/06 Tr. 170-171; 7/5/06 Tr. 41-43. On another occasion, when Whiting called Martin's residence, Ali picked up Martin's phone and talked to Whiting. 7/5/06 Tr. 95-96. In yet another call, Martin contacted Ali and asked Ali to prepare letterhead for Paula's School of Performing Arts. 7/5/06 Tr. 60. Ali, Martin, and Larry Nunn were involved in an effort to create a phony time sheet for Nunn. Id. at 44. Between April 8, 2001 and May 31, 2004, officers registered 2,441 contacts

-46-

between phones associated with Ali and phones associated with Martin.  7/25/06 Tr. 100.

In United States v. Reid, 523 F.3d 310 (4th Cir.), cert. denied, 129 S.Ct. 663 (2008), this Court held that "[e]vidence of a buy-sell transaction coupled with a substantial quantity of drugs[] would support a reasonable inference that the parties were coconspirators."  Id. at 317 (internal quotation marks, alteration, and citation omitted).  Similarly, continued relationships and repeated drug transactions between parties are indicative of a conspiracy, particularly when the transactions involve substantial amounts of drugs.  Id.  Here, Ali's repeated cocaine purchases from Martin, combined with other evidence that Ali assisted Martin with the large-scale drug distribution effort, was more than sufficient to support Ali's drug distribution conspiracy conviction.  See United States v. Hickman, 626 F.3d 756, 763 (4th Cir. 2010) ("only very modest inferences, if any, were required . . . to show" the defendant's knowing participation in the charged conspiracy).  The evidence amply supported Ali's conspiracy conviction, rebutting her contention that she was merely a purchaser of drugs from Martin.  See Burgos, 94 F.3d at 858 (to demonstrate a defendant's connection with a drug conspiracy, the government "need not prove that the defendant knew the particulars of the conspiracy or all of his coconspirators").

-47-

V.  THE EVIDENCE SHOWED THAT ALI PARTICIPATED IN A SINGLE
    CONSPIRACY.  (Defendants' Issue X).

        In an argument devoid of record citations, Ali maintains that the evidence

"established the existence of at least two separate conspiracies[,] one of which may

have developed between Martin and Ali, and other conspiracies between Martin and

the remaining co-defendants."  Br. 117.  See id. at 116-127.  Implicitly conceding

that she did not raise the issue below, Ali contends that "[t]he district court was

required *sua sponte* to dismiss Count One because the United States' proofs were at

variance with the single conspiracy outlined in the indictment."  Id. at 117.  Ali

adds that the district court "committed plain error when it submitted the clearly

duplicitous" count to the jury.  Id. at 117.  Ali's claim lacks merit.

    A.  Standard of Review

        Citing Kennedy, 32 F.3d at 884, Ali maintains that "[t]his Court reviews

challenges to the proof of multiple or single conspiracies for an abuse of

discretion."  Br. 116.[12]  When, however, a defendant contends for the first time on

appeal that the indictment charged a single conspiracy but that "only multiple

_____

        [12]  In Kennedy, the Court stated that the evidence "did not support a multiple
conspiracy instruction" and therefore determined that "the district court's refusal to
instruct on multiple conspiracies . . . was not in error."  Kennedy, 32 F.3d at 884.
The Court did not say whether it was reviewing the district court's instruction for
abuse of discretion.  Id.

-48-

conspiracies" were "shown by the trial evidence," thereby resulting in an alleged

"prejudicial variance," this Court reviews the contention for "plain error . . . only."

United States v. Jeffers, 570 F.3d 557, 567 (4th Cir.), cert. denied, 130 S. Ct. 645

(2009).

B.  The Evidence At Trial Was Sufficient For The Jury To Conclude That
    The Defendants Engaged In A Single Conspiracy.

Count One of the Fifth Superseding Indictment alleged that the defendants

knowingly, willfully, and unlawfully conspired to distribute and to possess with the

intent to distribute "five kilograms or more of a mixture or substance containing a

detectable amount of cocaine," "one kilogram or more of a mixture or substance

containing a detectable amount of heroin," and "fifty grams or more of a mixture or

substance containing a detectable amount of cocaine base," in violation of 21

U.S.C. § 841 and 21 U.S.C. § 846.  R. 794, at 2.  The evidence in this case plainly

showed that Ali, like the other defendants, engaged in the conspiracy described in

Count One.

In Kennedy, 32 F.3d at 883, the Court explained that a defendant who claims

that the evidence at trial varied from the allegations in the indictment must show

that he suffered prejudice as a result of the alleged variance.  Even though the Court

in Kennedy found that the "case involves eight defendants and, at most, three

-49-

related conspiracies," it concluded that "there was no possibility that evidence from unrelated conspiracies would be improperly attributed to individual defendants." Id. More recently, the Court noted that "trial evidence is sufficient to establish a single conspiracy where the conspirators are shown to share the same objectives, the same methods, the same geographic spread, and the same results." United States v. Smith, 451 F.3d 209, 218 (4th Cir.), cert. denied, 549 U.S. 892 (2006). The Court in Smith determined that "the jury was entitled to conclude that the actions of the various participants in these illegal [drug distribution] activities amounted to a single conspiracy . . . ." Id. As the Court recently reiterated in Jeffers, " a drug conspiracy may 'result[] in only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market.'" Jeffers, 570 F.3d at 568 (quoting United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993), cert. denied, 511 U.S. 1090 and 512 U.S. 1208 (1994)).

Under those principles, there is no merit to Ali's claim that the evidence established at least two separate conspiracies, one of which "may have developed" only between Martin and herself.  Br. 117.  The evidence clearly established an overarching conspiracy with Martin and Goodwin at the hub, cooperating to obtain large quantities of drugs from a variety of sources and then distributing those drugs

-50-

to lower-level dealers and users. See generally 7/25/06 Tr. 51-103 (summarizing the evidence). The fact that Ali was one of the people to whom Martin supplied drugs does not imply that there was a separate conspiracy between Martin and Ali, distinct from the conspiracy enveloping all the other people from whom Martin and Goodwin obtained and distributed illegal drugs in the Baltimore-Washington metropolitan corridor. See United States v. Ronald Johnson, 54 F.3d 1150, 1154 (4th Cir.) ("a defendant can be convicted of conspiracy if the evidence shows a defendant's participation in only one level of the conspiracy charged in the indictment"), cert. denied, 516 U.S. 903 (1995). That is particularly true when, as here, Ali not only purchased drugs from Martin, but helped her transport drugs from one sales venue to another, stored approximately $129,000 of the drug conspiracy's cash in her own apartment, and engaged in drug-related conversations not only with Martin but with other members of the conspiracy. See Argument IV, supra.

Ali points to no evidence suggesting that she was involved in a separate drug conspiracy with Martin, distinct from the larger drug conspiracy encompassing the other defendants. Ali's multiple-conspiracy contention must therefore be rejected.

EVIDENTIARY ISSUES

VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING THE EXPERT TESTIMONY OF SERGEANT SAKALA AND DETECTIVE EVELER.  (Defendants' Issue III)

Much like defendant John Martin in the Donna Johnson appeal (587 F.3d at 633-36), the defendants here, except for Goodwin, claim that the district court erred in allowing two police officers, Sergeant Christopher Sakala and Detective Thomas Eveler, to testify as experts about drug trafficking generally and about their interpretations of code words in lawfully intercepted conversations among members of the drug distribution conspiracy.  Br. 69-80.  Again, as in Donna Johnson, the district court did not abuse its discretion in allowing the officers' expert testimony.

A.  Standard of Review

This Court reviews a district court's decision to admit expert testimony under Fed. R. Evid. 702 for abuse of discretion.  United States v. Bynum, 604 F.3d 161, 167 (4th Cir.), cert. denied, 130 S. Ct. 3442 (2010).  See United States v. Hopkins, 310 F.3d 145, 151 (4th Cir. 2002) ("A trial judge's decision on whether to admit [expert] testimony . . . is given the broadest degree of latitude."), cert. denied, 537 U.S. 1238 (2003).

B.  The District Court Admits The Expert Testimony Of Officers Sakala And
    Eveler.

Prior to Sergeant Sakala's testimony, the defendants objected, not to Sakala's

"credentials as an expert," but to whether Sakala's "interpretation of codes and

conversations . . . is appropriate 'expert testimony' . . . ."  6/20/06 Tr. 170.  Defense

counsel elaborated that if Sakala's opinions were "based upon his knowledge and

expertise and training and experience," that would be "one thing," but counsel were

concerned that Sakala's opinions would instead be based upon "conversations with

cooperators" and co-defendants who pleaded guilty, as well as upon "other

information coming from within this conspiracy."  6/20/06 Tr. 171.  The court

responded by noting that Sakala "was fully qualified once before," in the related

trial that led to this Court's Donna Johnson opinion, "as having the competence,

based upon his knowledge, training and expertise," to testify about code words that

defendants used in recorded conversations.  6/20/06 Tr. 175.

During voir dire in the present case, Sakala described his 17 or 18 years of

experience in narcotics investigations.  6/20/06 Tr. 183-185.  With respect to

interpreting conversations among drug dealers, Sakala explained how he would

listen for a "conversation that doesn't make sense" when compared to conversations

that "sound normal."  6/20/06 Tr. 185-186.  Following cross-examination, the court

-53-

accepted Sakala "as an expert who can give an opinion" on drug trafficking patterns and the use of code language in drug trafficking activities.  6/20/06 Tr. 214.

Defense counsel then requested that the government indicate what part of Sakala's testimony was being offered as expert testimony, and what part as "non-expert testimony."  6/20/06 Tr. 214-215.  The court indicated that the government would "make that clear."  6/20/06 Tr. 215.

When Detective Eveler testified, the defendants raised a similar objection "concerning his opinions and the foundation and so forth."  7/25/06 Tr. 4.  Eveler then summarized his extensive training and experience in narcotics investigations since 1991and the numerous times that he had been qualified as an expert in drug trafficking in federal and state courts.  7/25/06 Tr. 9-13.  The court overruled defendants' various objections to Eveler's expert testimony, finding that Eveler is "capable of giving opinions," that "there's been notice given," and that " a substantial part of his testimony won't be expert testimony . . . ."  7/25/06 Tr. 17.  Defense counsel continued to object that the government was "rolling fact and opinion witnesses together," but the court overruled the objection "for the same reasons I gave with respect to Sergeant Sakala . . . ."  7/25/06 Tr. 18.

C.  The District Court Acted Well Within Its Discretion In Allowing Case
    Agents Sakala And Eveler To Testify As Experts On Drug Trafficking,
    Including Traffickers' Use Of Code Words.

Defendants appear to intertwine three related claims of error concerning the

expert testimony of case agents Sakala and Eveler:  that the agents were improperly

permitted to testify as experts in drug trafficking, that their expert testimony was

not "bifurcated" from their fact testimony, and that their testimony improperly

introduced the hearsay testimony of other persons.  Br. 69-74.  None of those

related claims has merit.[13]

In the companion Donna Johnson case, this Court rejected similar claims as

to the same witnesses, explaining that case agents Sakala and Eveler "had extensive

training and experience" in "drug trafficking" and were thus qualified as experts in

that field.  Donna Johnson, 587 F.3d at 633-34.  While the trial record in Donna

Johnson does not control the district court's finding that officers Sakala and Eveler

were experts in this case, the record fully supports the district court's similar

findings here.  See 6/20/06 Tr. 214 ("I will accept [Sakala] as an expert who can

give an opinion on the subjects described," i.e., "drug trafficking patterns and the

use of code language in those drug trafficking activities"); 7/25/06 Tr. 17 (court

_____

[13]   Indeed, in making those claims, defendants include multiple pages of
single-spaced blocked quotes from the decisions of other courts of appeals (Br.
75-79), while virtually ignoring the law of this Court.

overrules defendants' objections to Eveler's expert testimony, finding that "he's capable of giving opinions" and "there's been notice given").  While defendants suggest that Sakala and Eveler were also allowed "to testify as 'gang experts'" (Br. 69), that assertion both lacks record support and is irrelevant to this case, which involved a large-scale drug distribution conspiracy, but not a "gang" as that term is commonly understood.

Defendants further claim that Sergeant Sakala's "factual testimony was not bifurcated . . . from his expert/opinion testimony . . . ."  Br. 70.  As a factual matter, that claim does not withstand scrutiny.  Sakala first testified in this case as a fact witness on June 13, 2006.  6/13/06 Tr. 98-124.  Not until a week later did Sakala return to the stand as an expert witness, opining on the narcotics-related meaning of phone conversations that were intercepted during the course of the investigation. 6/20/06 Tr. 177.  See 6/20/06 Tr. 169 (court says to the prosecutor, "If my recollection is correct, you have not, thus far with him on the stand, gone into the specifics of the drug language," and the prosecutor agrees).

This Court recently addressed a similar concern about a dual-role witness in United States v. Baptiste, 596 F.3d 214, 223 (4th Cir. 2010).  In Baptiste, the Court explained that "[t]hose circuits that have considered simultaneous dual-role testimony have generally found it to be properly admitted so long as the court

-56-

implements adequate safeguards to prevent juror confusion or jurors giving undue

weight to the lay testimony." Id. at 224. Specifically, the Court identified "four

safeguards" that the district court could implement, including giving "a cautionary

instruction," permitting cross-examination of the agent about his expert opinion,

establishing a proper foundation for the witness's expertise, and the government's

prefacing the witness's expert testimony by asking the witness whether the

testimony was based on his expertise. Id. In this case, all of those safeguards were

utilized.

First, the government asked Sakala "to give the ladies and gentlemen of the

jury a summary of [his] narcotics background and training in detail" (6/20/06 Tr.

177) and proceeded to question Sakala about his decades of work in the narcotics

area. 6/20/06 Tr. 177-186. Second, the government prefaced Sakala's expert

testimony about code words in intercepted conversations by establishing that Sakala

had previously "listened to thousands or tens of thousands of" wiretapped calls and

that his opinions as to whether the calls in this case were drug-related were based

on that experience. 6/20/06 Tr. 191. The government further elicited that Sakala's

experience in interpreting code words in narcotics conversations was based not just

on his work in the present case, but on the many cases in which he had interpreted

wiretapped conversations during his career. 6/20/06 Tr. 193-194. For example,

-57-

Sakala explained that he listens to such conversations for language that does not make sense on a literal level (such as buying "half a tire"), and numbers that can refer to common drug quantities or fractions (such as "8th Street" or "16th Street"). Id. at 192.  Third, the defendants engaged in days of extensive cross-examination of Sakala.  6/29/06 Tr. 58-157 (Martin); 6/29/06 Tr. 157-202 (Goodwin); 6/29/06 Tr. 202-219; 6/30/06 Tr. 4-16 (Whiting); 6/30/06 Tr. 16-59 (Bynum); 6/30/06 Tr. 119 (Bynum); 6/30/06 Tr. 119-165 (Ruby Harden); 6/30/06 Tr. 165-178 (Ali); 7/5/06 Tr. 8-100 (Ali).[14]

Finally, the district court gave extensive cautionary instructions as to the jury's consideration of expert testimony.  R. 906, Jury Instructions, at 34-36.[15] Among other points, the court emphasized to the jury, "You should not . . . accept this witness' testimony merely because he or she is an expert."  R. 906, at 35.  With respect to "law enforcement officials" in particular, the court stated:  "The fact that a witness may be employed by the federal or state government as a law enforcement

---

[14]  Defendant Ruby Harden was tried with the other six defendants, but the jury hung as to her.  On April 17, 2007, Harden pleaded guilty as to one count. She is not a party to this appeal.

[15]  Portions of the jury instructions were not transcribed.  See 8/8/06 Tr. 313 ("Jury instructions read to the jury.").  Thus, the citations in this brief are to the jury instructions that were filed in the district court docket.  See R. 906, Jury Instructions.  There has been no suggestion that those instructions differed in any way from the instructions that were read to the jury.

official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness." Id. Indeed, the court added, "it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case." R. 906, at 35-36. The court explicitly left open the possibility that the jury could disregard the testimony of expert witnesses entirely, explaining that it was the jury's decision "whether to accept the testimony of the law enforcement witness and to give that testimony whatever weight, if any, you find it deserves." R. 906, at 36.

Because Sergeant Sakala testified as to his methodology in interpreting the code words in the conversations among the defendants, this case is distinguishable from the Court's recent decision in United States v. Walter Johnson, 617 F.3d 286, 294 (4th Cir. 2010) ("Although Agent Smith repeatedly indicated that he had the expertise to testify regarding drug jargon and the drug trade generally, he provided virtually no methodology or guiding principles that would enable him to decode the wiretapped phone calls in this case."). Rather, the present case is similar to United States v. Gregory Wilson, 484 F.3d 267 (4th Cir. 2007), in which the Court rejected the defendants' contention that Detective Seabolt's "methodology for translating drug codes was neither sufficiently explained nor reliable," finding instead both that

-59-

"Seabolt's extensive 'experience' qualified him to testify as an expert based on his 'specialized knowledge' of drug traffickers' coded vernacular" and that Seabolt "applied his methods and principles" of analysis "in the vast majority of his testimony." Id. at 273-77.[16]

Finally, there is no merit to the defendants' claim that the admission of Sakala's expert testimony "was a conduit for the improper admission of testimonial hearsay from unknown persons in violation of Crawford v. Washington," 541 U.S. 36 (2004). Br. 72. Again, this Court rejected a similar claim in the Donna Johnson case, in which it noted that if an expert "is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem." Donna Johnson, 587 F.3d at 635. Further, the conversations that Sakala interpreted bear no resemblance to the kind of evidence that the Supreme Court has found to be "testimonial" for purposes of the

---

[16] Instead of discussing the precedents of this Court, defendants rely primarily on cases from other circuits, including a three-page, single-spaced block quote from the Second Circuit's decision in United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003), cert. denied, 541 U.S. 1092 (2004). In Dukagjini, as here, the government called a DEA case agent as an expert witness under Fed. R. Evid. 702 "to testify about the meanings of the various code words used in the recorded conversations," and the district court found that the agent "qualified as an expert." Dukagjini, 326 F.3d at 50. Although the Second Circuit warned of dangers that can flow from "the use of the case agent as an expert," it ultimately concluded that "the district court did not err by allowing [the agent] to testify that code words referred to specific drugs." Id. at 53.

-60-

Confrontation Clause.  See, e.g., Crawford, 541 U.S. at 65-66 (statements by eyewitnesses to a crime, made in response to police questioning); Davis v. Washington, 547 U.S. 813, 829-30 (2006) (same); Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2531 (2009) (sworn certificates describing the results of forensic analyses performed on substances seized by the police).[17]  Far from being testimonial, the conversations interpreted by Sakala contained co-conspirators' coded language spoken to one another during the course of the conspiracy, language that was designed not to be understood by others, and to disguise the true nature of the narcotics transactions in which the speakers planned to engage.  There is thus no merit to defendants' challenge to the expert testimony of Sergeant Sakala and Detective Eveler.

---

[17]  The Supreme Court is considering another Confrontation Clause case in its October 2010 term:  State v. Bullcoming, 147 N.M. 487 (2010), cert. granted, Bullcoming v. New Mexico, 131 S. Ct. 62 (2010) (No. 09-10876).  The question presented in Bullcoming is whether prosecutors may introduce testimonial statements of a non-testifying forensic analyst through the in-court testimony of a supervisor or other person who did not perform the actual laboratory analysis described in those statements.  The defendants in the present case have not raised a Bullcoming claim.  Specifically, their Confrontation Clause argument is limited to the testimony of case agents Sakala and Eveler, and does not address the testimony of the forensic laboratory experts who testified at trial.

VII. THE DISTRICT COURT DID NOT ERR IN ADMITTING SERGEANT
MARTINI'S TESTIMONY ABOUT CRACK COCAINE THAT WAS
RETRIEVED FROM GOODWIN ON NOVEMBER 25, 2003. (Defendants'
Issue VI)

Goodwin alone contends that the district court violated his rights under the

Confrontation Clause of the Sixth Amendment when it allowed Sergeant David

Martini to testify about the crack cocaine that was retrieved from a false-bottom

Pepsi bottle in a vehicle that Goodwin was driving on November 25, 2003. Br.

80-88. While Goodwin refers to Martini's testimony as "double hearsay" (Br. 82),

he frames his argument on appeal as one of constitutional dimension arising under

Crawford v. Washington, 541 U.S. 36 (2004), rather than as a hearsay objection

under the Federal Rules of Evidence. Br. 83-88. Either way, Goodwin's claim must

be rejected, both because Goodwin elicited the testimony in question and because

the claim is without merit.

A. Standard of Review

Goodwin asserts that this Court "reviews the admission of evidence under an

abuse of discretion standard." Br. 80 (citing Smith, 451 F.3d 209). Indeed, this

Court has said, even in the context of a Sixth Amendment challenge under

Crawford, that it "review[s] the district court's decision to admit the testimony for

an abuse of discretion." United States v. Jordan, 509 F.3d 191, 200 (4th Cir.

-62-

2007).[18]  This Court, however, should not review at all a defendant's claim of

evidentiary error if the defendant invited that alleged error.  See, e.g., United States

v. Herrera, 23 F.3d 74, 76 (4th Cir. 1994).

    B.  Goodwin Elicits The Testimony To Which He Now Objects.

On November 25, 2003, a confidential informant, who was working with

Sergeant Martini and other police officers, arranged to purchase illegal drugs from

his supplier.  6/15/06 Tr. 52-67.  At the specified meeting place, Goodwin arrived in

a white Cadillac, along with his minor daughter and grandson.  6/15/06 Tr. 67.

During the ensuing stop and search of the Cadillac, Sergeant Martini served as "the

lead investigator," while the other officers called him over to take custody of items

they thought to be of evidentiary value.  6/15/06 Tr. 67-68.  Among the items that

Martini recovered was a Pepsi bottle with "a fake compartment"; the bottle "was

located on the front passenger seat of the Cadillac."  6/15/06 Tr. 82.  Inside the

bottle's hidden compartment, Martini found "[a]pproximately 30 to 32 grams of

suspected cocaine base or crack cocaine."  6/15/06 Tr. 83.

---

[18]  If a reviewing court were to conclude that evidence was admitted in
violation of the Sixth Amendment, that legal error would clearly be an abuse of
discretion.  Cf. United States v. Malpica-Garcia, 489 F.3d 393, 395 (1st Cir.) ("In
general, a district court's evidentiary rulings are reviewed for an abuse of
discretion.  When an essentially legal issue arises as to whether evidence has been
admitted in violation of the Confrontation Clause, however, we review a properly
preserved constitutional challenge de novo."), cert. denied, 552 U.S. 929 (2007).

On cross-examination, Goodwin's counsel, referring to the "drugs" that were found "in a plastic container," first elicited from Martini that the officers, "while on the scene," learned "where to look for the drugs." 6/15/06 Tr. 97. Goodwin's counsel then asked Martini, "Who gave you that information?" Id. Martini replied, "It was his 17 year-old daughter that was in the vehicle. She said that's where her father kept" the drugs. 6/15/06 Tr. 97-98. Still on cross-examination, Martini added, "Detective Grant discovered the Pepsi bottle . . . on the passenger front seat." 6/15/06 Tr. 105. Goodwin's counsel concluded by asking Martini, "Just to make absolutely certain, your testimony is that Mr. Goodwin's daughter told you her dad keeps drugs in the bottle?" 6/15/06 Tr. 111. Martini responded, "I said that she related information to us that that's where her dad kept it. She spoke those words to Detective Grant and Detective Grant spoke those words to me." Id. The government confirmed Martini's testimony on re-direct examination. 6/15/06 Tr. 135-136.

Goodwin's counsel subsequently moved to strike the testimony that he had first elicited from Sergeant Martini, stating, "I think that his testimony violates Crawford in so many ways." 6/15/06 Tr. 140. Counsel requested an expedited transcript of Martini's testimony, and the district court agreed to consider the matter the next day. Id.

-64-

The following morning, Goodwin's counsel renewed his <u>Crawford</u> objection and also argued that Martini's testimony was "double hearsay."  6/16/06 Tr. 14. Government counsel pointed out that "it was defense counsel's questioning that elicited the hearsay testimony which was an honest answer to the counsel's question."  6/16/06 Tr. 15.  The district court agreed, telling defense counsel, "I don't see how there's a basis for me to strike testimony that you elicited from this witness that he answered you truthfully."  6/16/06 Tr. 17.  At the same time, the court told counsel that he could "certainly raise [the issue] again, should Detective Grant testify . . . ."  6/16/06 Tr. 17-18.

Detective Rafael Grant did testify about the arrest of Goodwin on November 23, 2003.  6/21/06 Tr. 109-115.  When the government asked Grant what role he played in the events that day, Grant responded that after officers had stopped the vehicle that Goodwin had been driving, he "went over to the vehicle, talked to a teenage female who was there, and from talking to her . . . discovered where the drugs were at."  6/21/06 Tr. 112.  Goodwin's counsel did not renew the objection he had made to Martini's testimony.  To the contrary, Goodwin reinforced that testimony on cross-examination, asking Grant, "And it's your testimony that the daughter of Learley Reed Goodwin was the one who told you to look in the Pepsi bottle[?]," to which Grant replied, "That's correct, sir."  6/21/06 Tr. 121.

-65-

### C. The District Court Did Not Err In Denying Goodwin's Motion To Strike Martini's Testimony.

Because Goodwin elicited the testimony as to which he now complains, the invited error doctrine forecloses his claim.  See Hickman, 626 F.3d at 772 ("In the absence of extraordinary circumstances . . . this court has never reviewed errors invited by the appellant.");  Joseph v. Angelone, 184 F.3d 320, 330 (4th Cir.) ("we have held that such invited error precludes consideration of the claim"), cert. denied, 528 U.S. 959 (1999); Herrera, 23 F.3d at 76 ("The invited error doctrine . . . prevents us from addressing the merits of Herrera's claim"); Wilson v. Lindler, 8 F.3d 173, 175 (4th Cir. 1993) (en banc) (per curiam) ("no exception to the invited error doctrine has ever been adopted by this circuit"), cert. denied, 510 U.S. 1131 (1994).  See also United States v. Butler, 61 Fed. Appx. 857, 859 (4th Cir. 2003) (unpublished) ("even if the statement was improper, the fact that Butler's counsel invited the error forecloses review"); United States v. Cobbs, 26 Fed. Appx. 98, 99 (4th Cir. 2001) (unpublished) ("because any error in allowing the complained of testimony was invited by Cobbs' attorney, he is prohibited by the invited error doctrine from obtaining any relief on this claim").  Indeed, Goodwin's counsel twice invited the testimony about what Goodwin's daughter told the officers on November 23, 2005, first when he cross-examined Martini, and again several days later when

-66-

he cross-examined Grant.[19]

Even if the Court were to reach the merits of Goodwin's evidentiary claim, he would not prevail. The brief testimony about what Goodwin's daughter said does not reveal whether her statement should be classified as "testimonial" within the meaning of Crawford and its progeny. See, e.g., United States v. Udeozor, 515 F.3d 260, 268 (4th Cir. 2008) (statement is testimonial if "a reasonable person in the declarant's position would have expected his statements to be used at trial"); Jordan, 509 F.3d at 200 ("custodial examinations" are considered testimonial). Assuming, however, both that the out-of-court statement of Goodwin's daughter to Detective Grant about where to find the crack cocaine was "testimonial" under Crawford and that the statement was erroneously admitted into evidence, the testimony of officers Martini and Grant about that statement was nevertheless harmless beyond a reasonable doubt. See United States v. Abu Ali, 528 F.3d 210, 255-56 (4th Cir. 2008) (finding that a Confrontation Clause error was harmless), cert. denied, 129 S. Ct. 1312 (2009). See also Neder v. United States, 527 U.S. 1, 18 (1999) (for constitutional error, the harmlessness inquiry asks: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?").

---

[19] Further, Goodwin abandoned his objection when he failed to accept the district court's earlier invitation to renew his objection when Detective Grant testified. See 6/16/06 Tr. 17-18.

-67-

Here, a confidential informant had arranged to purchase crack cocaine from Goodwin at a specified time and place on November 25, 2003. Goodwin arrived at the designated place and time with the crack cocaine. Given that the officers found the drugs in the car that Goodwin was driving, precisely how they learned where to find the cocaine is irrelevant. Even without the testimony about the tip from Goodwin's daughter, the jury would have convicted Goodwin on Count 2 of the Fifth Superseding Indictment beyond a reasonable doubt.[20] Accordingly, even if the Court were to overlook Goodwin's having invited the alleged error by eliciting the testimony in question and to reach the merits of Goodwin's claim, that claim should be rejected.

---

[20] Count Two alleges that on November 25, 2003, Goodwin knowingly possessed with the intent to distribute a detectable amount of cocaine base, commonly known as "crack," in violation of 21 U.S.C. § 841. R. 794, Fifth Superseding Indictment at 3. Although Goodwin does not specify as much in the opening brief, it appears that his Confrontation Clause claim is directed only to his conviction on Count Two.

-68-

## VIII. WHITING DID NOT PRESERVE HIS CLAIM THAT THE GOVERNMENT KNOWINGLY USED PERJURED TESTIMONY, AND THE EVIDENCE DOES NOT SUPPORT THAT CLAIM. (Defendants' Issue VII)

Whiting alone contends that the district court erred in allowing the government knowingly to use the allegedly perjured testimony of witness Emilio Echarte. Br. 97-100. There is no merit to Whiting's claim.

### A. Standard of Review

When a defendant fails to raise a claim in the district court "that the Government knowingly used perjured testimony to secure his conviction," this Court reviews that claim on appeal only for plain error. United States v. Andrade, 232 Fed. Appx. 349, 351 (4th Cir. 2007) (unpublished) (citing Olano, 507 U.S. at 732).

### B. Echarte Testifies At Trial About His Drug Dealings With Whiting.

At trial, convicted felon Emilo Echarte testified that he fronted 50 or 100 grams of heroin to Whiting. 7/11/06 Tr. 137. According to Echarte, Whiting returned most of the drugs but owed Echarte $2,300. Id. To repay that debt, Echarte testified, Whiting served as a driver for Echarte, taking Echarte to a restaurant in Virginia on several occasions to pick up cocaine and heroin that were being transported to Echarte from a source in Miami. 7/11/06 Tr. 137-141.

-69-

On cross-examination, Whiting's counsel challenged Echarte's credibility. Whiting's counsel elicited the facts that Echarte had used several aliases, that Echarte was currently serving a 14-year federal sentence for manufacturing PCP, that Echarte had another federal drug conviction on cocaine charges, and that Echarte had spent 17 years of his life in prison.  7/11/06 Tr. 157-164.

Subsequently, Whiting's counsel asked Echarte whether he had told the grand jury about Whiting's driving him to a restaurant in Virginia to pick up drugs. 7/11/06 Tr. 185.  Echarte responded, "Yes, sir.  I think so."  Id.  Before the bench, defense counsel asked to impeach Echarte by having him read relevant portions of his grand jury testimony.  7/11/06 Tr. 186.  Government counsel readily acknowledged that Echarte had not testified about that matter before the grand jury, explaining that the government "didn't cover everything with this witness" before the grand jury "that would occur in a trial, and I didn't ask him the question about this."  7/11/06 Tr. 188.

The district court permitted Whiting's counsel to show Echarte the transcript of his grand jury testimony, after which Whiting's counsel again asked Echarte, "Did you ever tell the Grand Jury the story about my client driving you to Virginia to pick up drugs?"  7/11/06 Tr. 190-191.  Again, Echarte responded, "Yes, sir, I did," although he conceded that he did not see such testimony in the grand jury

-70-

transcript.  7/11/06 Tr. 191.  In response to further cross-examination, Echarte added, "Maybe the question not being asked to me."  7/11/06 Tr. 192.  At that point, Whiting's counsel moved on to other areas of impeachment, eliciting that Echarte had a 1967 conviction involving heroin and a 1969 conviction for making a false claim of citizenship.  7/11/06 Tr. 192-193.  Whiting's counsel did not suggest at trial that the government had knowingly allowed Echarte to offer perjured testimony about Whiting's driving Echarte to Virginia to pick up drugs.

C.  The Evidence Fails To Support Whiting's Claim That The Government Knowingly Allowed Echarte To Present False Testimony.

This Court has explained the two showings that a defendant must make in order to raise a successful "claim of prosecutorial misconduct based on perjured testimony":  first, the defendant must "show that perjured testimony was used against him at trial"; and second, the defendant must "show that the government knowingly used that perjured testimony to secure a conviction."  United States v. Bonsu, 291 Fed. Appx. 505, 510 (4th Cir. 2008) (unpublished).  "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony."  United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987).

Even if he had preserved the issue below, Whiting fails to make either of the

-71-

showings necessary to support his claim that the government knowingly used
perjured testimony to convict him.  Like the defendant in <u>Griley</u>, Whiting "has not
met the heavy burden of showing that [the witness] testified falsely" at trial.  <u>Griley</u>,
814 F.2d at 971.  Further, even if Echarte's testimony were deemed to be perjured
and not merely confused or inconsistent, Whiting "has failed to establish that the
Government knowingly used perjured testimony in securing his conviction."
<u>Andrade</u>, 232 Fed. Appx. at 351.

On direct examination, the government was completely candid in eliciting the
fact that Echarte had lied to the grand jury about another matter, his drug dealings
with Martin's daughter, Kimberly Rice.  7/11/06 Tr. 142-145.  Specifically,
government counsel had the following exchange with Echarte:

> Q.  And did you talk to the Grand Jury about your dealings with Ms.
>  Rice while you're under oath?
>
> A.  Yes, I did.
>
> Q.  Did you lie to me and did you lie to the Grand Jury?
>
> A.  Yes, I did.
>
> * * *
>
> Q.  What drug dealings did you have with her?
>
> A.  Heroin and cocaine.

-72-

Q. And you lied under oath in the Grand Jury about that?

A. Yes, I did.

7/11/06 Tr. 144-145.

In contrast, there was no indication that Echarte lied about his drug dealings with Whiting, either before the grand jury or at trial. Rather, as government counsel explained to the court, when Echarte testified before the grand jury, he was not asked about Whiting's driving him to Virginia to retrieve drugs. 7/11/06 Tr. 188. The absence of such grand jury testimony does not suggest that Echarte's trial testimony about Whiting was perjured, let alone that the government knowingly offered perjured testimony. Indeed, Echarte's testimony about the drug pick-ups in Virginia contains enough detail--including the name of the restaurant in Alexandria where the transactions occurred (7/11/06 Tr. 185), the name of the bus company whose vehicle was used to transport the drugs, and the role of the bus driver in the drug smuggling operation (7/12/06 Tr. 16-17)--to suggest that Echarte was telling the truth at trial, notwithstanding his extensive criminal history. Further, Echarte's testimony hardly suggests that he was fabricating evidence in an effort to implicate Whiting. While Echarte testified that he sold kilogram quantities of cocaine to Martin, he further testified that he provided only "a small amount," three or four grams, to Whiting. 7/12/06 Tr. 20-22.

-73-

Finally, Whiting errs in contending that "[t]he significance of Echarte's testimony as to Whiting's guilt cannot be underestimated." Br. 97. Even without Echarte's testimony, sufficient evidence linked Whiting to the drug distribution conspiracy. For example, Sergeant Sakala testified about intercepted phone conversations in which Whiting indicated that he wanted to purchase cocaine from Martin and asked Martin whether she had received a shipment of cocaine yet. 6/20/06 Tr. 225-228; 6/29/06 Tr. 52. Likewise, Detective Eveler testified about a drug ledger retrieved from Martin's residence that showed that Whiting's "balance owed" was $11,530. 7/25/06 Tr. 94-95. And DEA Agent Clyde Shelley testified about Whiting's history of importing kilogram quantities of heroin into the United States and distributing it within the country. 7/18/06 Tr. 17-27. Whiting's claim about "the crucial role Echarte plays in the government's case against Whiting" (Br. 98) is thus significantly overblown. The district court did not commit reversible plain error in admitting Echarte's testimony about Whiting.

SENTENCING AND RELATED ISSUES

IX.  THE GOVERNMENT'S SECTION 851 NOTICE ADEQUATELY
     INFORMED WHITING OF THE PRIOR FELONY DRUG CONVICTIONS
     THAT LED TO A STATUTORY ENHANCEMENT OF HIS SENTENCE.
     (Defendants' Issue XII)

        Whiting contends that the information filed by the government pursuant to 21

U.S.C. § 851, stating that the government would seek enhanced penalties against

him under 21 U.S.C. § 841, was inadequate.  Br. 132-137.  According to Whiting,

because the government did not "submit an actual certified record of any of the

purported convictions," the Section 851 notice "lacked . . . sufficient specificity to

put the defendant on notice of which convictions the Government was relying on as

predicate offenses for the enhanced penalty."  Id. at 134-135.  Whiting's contention

does not withstand scrutiny.

     A.  Standard of Review

     "Questions regarding the adequacy of a 21 U.S.C. § 851 notice are reviewed

de novo."  United States v. Powell, 389 Fed. Appx. 287, 288 (4th Cir. 2010)

(unpublished) (citing United States v. Jackson, 544 F.3d 1176, 1185 (11th Cir.

2008), cert. denied, 129 S. Ct. 1925 (2009)).

-75-

B.  The District Court Correctly Determined That The Section 851 Notice
Was Sufficient To Require The Enhancement Of Whiting's Sentence For
His Current Felony Drug Offenses.

On June 6, 2006, the United States filed a notice of the government's

intention to seek enhanced penalties as to Whiting, pursuant to 21 U.S.C. § 851.

R. 843.  The Section 851 notice stated that Whiting had been convicted not just of

two, but of five, prior felony drug offenses, listing each one with varying degrees of

specificity.

As defined in 21 U.S.C. § 802(44), the term "'felony drug offense' means an

offense that is punishable by imprisonment for more than one year under any law of

the United States or of a State or foreign country that prohibits or restricts conduct

relating to narcotic drugs . . . ."  See generally Burgess v. United States, 553 U.S.

124, 129-132 (2008) (construing Section 802(44)).  In this case, the Section 851

notice informed Whiting that the government intended to rely on his five prior

felony drug convictions that were subsequently described in paragraphs 82-83,

84-85, 87, 88, and 93-105 of Whiting's presentence report:   a conviction for

smuggling marijuana into the United States on or about December 15, 1968, for

which Whiting was sentenced to seven years of imprisonment; a 1974 conviction

for possession of heroin, for which Whiting was sentenced to five years of

imprisonment; a 1986 conviction for possession of cocaine, for which Whiting was

-76-

sentenced to eight years and three months of imprisonment; a 1988 conviction for

possession of cocaine; and a 1994 conviction for conspiracy to distribute one

kilogram of heroin, for which Whiting was originally sentenced to 186 months of

imprisonment, a sentence that was subsequently reduced to 72 months. R. 843,

Section 851 Notice, at 1. See Whiting PSR ¶¶ 79-113.

At trial, Whiting and the United States stipulated that Whiting had been

convicted in 1986 of possessing more than seven kilograms of cocaine and had

been sentenced to eight years and three months for that crime. 7/18/06 Tr. 14.

Then, Clyde Shelley, Jr., a DEA agent, described Whiting's prior conviction for

importing between three and ten kilograms of heroin into the United States.

7/18/06 Tr. 15-24.

At sentencing, however, Whiting denied that he had previously been

convicted of those felony drug offenses "for purposes of this hearing . . . ." Whiting

Sent. Tr. 4. The government relied on Whiting's stipulation and the other trial

evidence of Whiting's prior felony drug convictions, adding that Whiting's prior

convictions "are accurately reflected" in his presentence report and that Whiting

made no objection to his resulting criminal history calculation. Whiting Sent. Tr. 5.

The district court determined that "the factual matters reported in the presentence

report are accurate," accepted "the entirety of the presentence report" as its findings

-77-

of fact, and further determined "that the government has adequately proved the convictions underlying the Section 851 notice and that [Whiting] is therefore subject to the enhanced penalties under" 21 U.S.C. § 841.  Whiting Sent. Tr. 6-8.

Despite his stipulation and the other evidence of his prior crimes introduced at trial, Whiting now objects to the use of his prior convictions at sentencing. Specifically, Whiting contends that the Section 851 notice is inadequate, because the government did not "submit an actual certified record of any of the purported convictions."  Br. 134.  Nothing in Section 851 requires such certified records, however.  The government must simply state "in writing the previous convictions to be relied upon."  21 U.S.C. § 851(a).  As this Court has explained, "[t]he purpose of the section 851 information 'is to give the person convicted and about to be sentenced . . . an opportunity to show that he is not the person previously convicted.'"  United States v. Campbell, 980 F.2d 245, 252 (4th Cir. 1992) (quoting Baca v. United States, 312 F.2d 510 (10th Cir. 1962), cert. denied, 373 U.S. 952 (1963)), cert. denied, 508 U.S. 952 (1993).

Nevertheless, Whiting maintains that the government's Section 851 notice "lacked . . . sufficient specificity to put the defendant on notice of which convictions the Government was relying on as predicate offenses for the enhanced penalty."  Br. 134-135.  To be sure, the notice of Whiting's prior conviction for

-78-

"possession of cocaine in San Diego, California, on or about February 25, 1988,"
lacks further details, such as a case number, court, or date of arrest.  R. 843, Section
851 Notice, at 1.  <u>See</u> Whiting PSR ¶ 88.  Only two prior felony drug convictions
are required, however:  "If any person commits a violation of this subparagraph . . .
after two or more prior convictions for a felony drug offense have become final,
such person shall be sentenced to a mandatory term of life imprisonment without
release . . . ."  21 U.S.C. § 841(b)(1)(A).

The government's Section 851 notice provided such unequivocal notice for at
least two of Whiting's prior felony drug convictions.  Among the convictions
described with more than adequate detail are Whiting's conviction for distribution
of heroin in Case No. 94-CR-00108 (E.D. Va.), and Whiting's conviction for
conspiracy and possession of heroin in Case. No. CR-72-616 (D. Md.).  R. 843,
Section 851 Notice at 1.  <u>See</u> Whiting PSR ¶¶ 84, 93-105.  Further, Whiting
stipulated to his felony cocaine conviction in Mexico, for which he received a
sentence of more than eight years.  7/18/06 Tr. 14.  <u>See</u> R. 843, at 1; Whiting PSR
¶¶ 87-88.  <u>See</u> <u>also</u> 21 U.S.C. § 802(44) (a conviction under the law of a foreign
country can qualify as a "felony drug offense" for purposes of 21 U.S.C.
§ 841(b)(1)(A)).

Whiting thus cannot show that he did not qualify for an enhanced sentence

-79-

under 21 U.S.C. § 851.  As Whiting's counsel acknowledged at sentencing,

"obviously the [Section] 851 Notice and the prior convictions that my client has is

really the driving factor" in Whiting's sentence and, given the mandatory statutory

minimum, "an extensive argument concerning the [18 U.S.C. §] 3553 factors at

sentencing is probably not going to be persuasive."  Whiting Sent. Tr. 19.  The

district court agreed and properly sentenced Whiting to the required sentence of life

imprisonment on Count One, the drug conspiracy count.  Whiting Sent. Tr. 28.  See

21 U.S.C. § 841(b)(1)(A).  Whiting's life sentence should therefore be affirmed.

X.  BYNUM'S PRIOR STATE CONVICTION FOR POSSESSION OF COCAINE
    WITH THE INTENT TO DISTRIBUTE IT QUALIFIED AS A PRIOR
    FELONY DRUG CONVICTION FOR PURPOSES OF THE SECTION
    841(b)(1)(A)  SENTENCING ENHANCEMENT.  (Defendants' Issue XIII)

Like Whiting, Bynum raises an issue concerning a prior felony drug
conviction that resulted in the government's filing a notice of intention to seek
enhanced penalties under 21 U.S.C. § 851.  Br. 137-141.  While Bynum
acknowledges that he was convicted of the prior felony drug offense (Bynum Sent.
Tr. 76), he contends that because that offense occurred during the course of the
conspiracy at issue in the present case, it should not count as a prior conviction for
purposes of Section 851.  This Court's precedents foreclose Bynum's argument.

A.  Standard of Review

As with Whiting's argument, "[q]uestions regarding the adequacy of a 21
U.S.C. § 851 notice are reviewed de novo."  Powell, 389 Fed. Appx. at 288 (citing
Jackson, 544 F.3d at 1185).

B.  The District Court Sentences Bynum To The Statutory Mandatory
    Minimum Recidivist Sentence On Three Drug Trafficking Counts.

On June 6, 2006, the United States filed a notice of intention to seek
enhanced penalties for Bynum, pursuant to 21 U.S.C. § 851.  R. 844, Notice.  In that
notice, the government alleged that on July 20, 2000, Bynum was convicted in
Montgomery County Circuit Court for possession of a firearm during a drug

-81-

trafficking crime and for possession of cocaine with the intent to distribute it. Id. The Section 851 notice informed Bynum that as a result of that prior conviction, the government would seek enhanced penalties for Bynum in the instant federal drug trafficking case. Id.

After Bynum was convicted, the Probation Office ultimately agreed with the government that Bynum faced a "mandatory minimum sentence" of 20 years for his convictions on the conspiracy count (Count 1), and two counts of possession of cocaine base with the intent to distribute it (Counts 8 and 40). Bynum PSR Addendum at 1. Count 1 alleged that the defendants' drug trafficking activities continued through June 2004, while Counts 8 and 40 alleged that Bynum possessed cocaine base on or about March 12, 2004, and between April 1 and April 7, 2004, respectively. R. 794, Fifth Superseding Indictment. The Probation Office explained that Bynum had been released on parole from his state cocaine sentence on April 19, 2001, and that he had then "continued as part of the conspiracy in the instant offense until his arrest on June 1, 2004." Bynum PSR Addendum at 1. Relying on United States v. Howard, 115 F.3d 1151, 1158 (4th Cir. 1997), the Probation Office concluded that because of his continued involvement in the federal crimes after his state court conviction, Bynum was subject to the recidivist enhancement in 21 U.S.C. § 841(b)(1)(A), as set forth in the government's Section

-82-

851 notice.  Id.

At sentencing, Bynum did not deny that he had sustained the prior state court conviction.  Bynum Sent. Tr. 76.[21]  Rather, Bynum claimed that the state conviction should not have counted as a "predicate offense" for purposes of the federal sentencing enhancement.  Bynum Sent. Tr. 76.  See Bynum Sent. Tr. 81 ("Bynum's conviction . . . is not a prior conviction of any sort.").  The district court disagreed, explaining that "the circuits have unanimously concluded that the conduct upon which a prior conviction rests need not be entirely separate from the conduct underlying the conviction for which the defendant is currently being sentenced." Bynum Sent. Tr. 89.  Moreover, the court added, the Fourth Circuit focuses "on the degree of criminal activity that occurs after a defendant's conviction for drug-related activity is final, rather than [on] when the conspiracy began."  Bynum Sent. Tr. 89-90.  Based on that principle, the court concluded that "the government's notice under [Section] 851 is appropriate" (Bynum Sent. Tr. 90) and sentenced Bynum to the statutory mandatory minimum sentence of 240 months on Counts 1,

---

[21]  Bynum's counsel referred at sentencing to Bynum's "1999 conviction" (Bynum Sent. Tr. 76) and continues to refer to the "1999 conviction" in defendants' opening brief.  Br. 140.  The government's information is that Bynum pleaded guilty to that prior crime in April 2000 and was sentenced in July 2000. R. 844, at 1; Bynum PSR Addendum.  Hence, the reference should be to Bynum's "2000 conviction."

8, and 40 of the indictment.  Bynum Sent. Tr. 99.  See R. 1070, Bynum Judgment.[22]

### C.  Because Bynum Continued To Participate In The Instant Conspiracy After His Prior State Felony Cocaine Conviction Became Final, The District Court Properly Applied The Section 851 Enhancement.

Bynum's argument that he should not have received an enhanced sentence because his prior "conviction was not unrelated to the conspiracy" in the federal case (Br. 140) is foreclosed by this Court's precedent.  In Howard, this Court rejected a similar argument raised by defendant George Jones, explaining that "the government presented ample evidence of Jones' continued involvement in the conspiracy *after* his North Carolina conviction."  Howard, 115 F.3d at 1158.  Indeed, the Court added, "Jones' continued participation in the conspiracy after his North Carolina drug conviction is precisely the type of recidivism to which section 841 is addressed."  Id.  More recently, the Court elaborated that "[w]hen a defendant is convicted of a drug conspiracy under 21 U.S.C. § 846, prior felony drug convictions that fall within the conspiracy period may be used to enhance the defendant's sentence if the conspiracy continued after his earlier convictions were final."  Smith, 451 F.3d at 224-25.  Accord United States v. Holmes, 2010 WL 2545601, at *9 (4th Cir. June 22, 2010) (unpublished) ("The fact that the prior

_____

[22]  The sentencing transcript mistakenly says that Bynum was sentenced to 240 months on "counts 840," rather than on "counts 8 and 40."  Bynum Sent. Tr. 99.

-84-

felony drug offenses occurred during the period of the conspiracy for which he was convicted also does not entitle Holmes to relief.") (citing Smith and Howard), petition for cert. filed (U.S. Nov. 9, 2010) (No. 10-8405).

In the instant case, there was ample evidence that Bynum continued with his cocaine distribution activities after he was released on parole from his state court sentence in April 2001. See, e.g., 6/21/06 Tr. 106-107 (in a recorded phone conversation on March 13, 2004, Martin tells Bynum that she has received cocaine); 6/21/06 Tr. 140 (Bynum goes to Martin's residence on March 15, 2004, to pay for the cocaine that he received two days earlier); 6/22/06 Tr. 7-10, 23-24 (on March 17, 2004, Luis Mangual brings Martin a kilogram of cocaine to sell to Bynum, and Bynum picks it up the following morning); 6/22/06 Tr. 100 (Bynum brings Martin the money to pay for the kilogram); 6/23/06 Tr. 130-144 (in a series of calls in early April 2004, Martin and Bynum discuss another sale of cocaine, with Martin agreeing to refund Bynum's money and take back the drugs because of their low quality). Indeed, this case provides an even stronger vehicle for the application of a Section 851 recidivist enhancement than either Howard or Smith, because the enhancement here was applied not only with respect to a conviction for an ongoing drug conspiracy count, but also with respect to two possession convictions that occurred years after the predicate state felony drug offense became

final.  <u>See</u> R. 844 (Section 851 notice for Bynum applies to Counts 8 and 40, as well as to Count 1); Bynum Sent. Tr. 99 (Bynum is sentenced to the recidivist mandatory minimum sentence of 240 months on each of Counts 1, 8, and 40). Bynum's drug trafficking sentences should therefore be affirmed.

XI.  THE DISTRICT COURT PROPERLY APPLIED A FIREARM
     ENHANCEMENT WHEN IT CALCULATED MARTIN'S ADVISORY
     GUIDELINES RANGE.  (Defendants' Issue XV)

     Martin argues that she should not have received a two-level advisory

Guidelines enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing firearms in

furtherance of the drug distribution conspiracy.  Br. 154-160.  Because the

possession of firearms by co-conspirators was reasonably foreseeable to Martin and

was within the scope of her participation in the conspiracy, her argument lacks

merit.

     A.  Standard Of Review

     This Court reviews a district court's findings under the advisory Sentencing

Guidelines, including the application of the firearms enhancement, for clear error.

United States v. Manigan, 592 F.3d 621, 630-31 (4th Cir. 2010).

     B.  The District Court Applies The Firearms Enhancement In Calculating
         Martin's Advisory Guidelines Range.

     Although Martin herself was never discovered with a firearm, officers

recovered several firearms from her co-conspirators, in connection with the

conspiracy's drug-trafficking activities.  When officers searched the residence of

co-conspirator Larry Lane on June 1, 2004, they recovered crack cocaine, a .22

caliber firearm, a handgun, and ammunition from toolboxes in the basement.

-87-

7/13/06 Tr. 130-174.  Other officers discovered firearms and drugs when they

searched the residence of Martin's co-defendant Dobie.  7/18/06 Tr. 84-98.

Similarly, officers found a loaded semi-automatic handgun with ammunition, drugs,

and cash when they searched the residence of co-defendant Bynum the same day.

7/11/06 Tr. 68-88.  Further, co-defendant Goodwin supplied guns for courier

Thurman to carry when he drove to Texas to retrieve cocaine for Goodwin and

Martin; those guns came from Lane's basement.  6/16/06 Tr. 200-203.

Based on the numerous firearms recovered during the investigation of the

drug-trafficking conspiracy, the Probation Office applied a two-level upward

enhancement to Martin's offense level under the advisory Guidelines, pursuant to

U.S.S.G. §§ 2D1.1(b)(1) and 1B1.3(a).  Martin PSR ¶ 63 (referencing the firearms

retrieved from Dobie, Bynum, Lane, and Thurman).  The Probation Office

concluded that the co-defendants' "possession of firearms was reasonably

foreseeable and within the scope of [Martin's] participation in the drug conspiracy."

Id.  As a result, Martin's total offense level rose from 42 to 44, although it was

subsequently capped at 43 pursuant to the Guidelines application note dealing with

offense levels greater than 43.  Martin PSR ¶¶ 63-70, 93, 96.  See Sentencing

Guidelines, Ch. 5, Pt. A, Application Note 2 ("An offense level of more than 43 is

to be treated as an offense level 43.").  At total offense level 43, Martin faced an

-88-

advisory Guidelines range of life imprisonment. Martin PSR ¶ 93.

Martin objected to the firearm enhancement in her presentence report.

Martin PSR Addendum at 1-3. At Martin's sentencing, the district court overruled

that objection:

> Based upon the extensive evidence that I heard at trial in this case, it is clear that the center of this drug conspiracy was Ms. Martin; that she's been in this business for an extended period of time; that she's dealt with a variety of people; and that their possession of firearms was reasonably foreseeable and within the scope of the defendant's participation in the drug conspiracy.

12/19/06 Martin Sent. Tr. 80.

> C. The District Court Did Not Clearly Err When It Attributed The Firearms Involved In The Drug Conspiracy To Martin For Purposes Of Calculating Her Advisory Guidelines Range.

Martin is mistaken when she contends that there was not "any suggestion in

the evidence at trial of . . . Martin's actual knowledge of the possession of firearms

by . . . Dobie and Bynum." Br. 155-156. To the contrary, in a recorded

conversation between Martin and Goodwin on March 11, 2004, Martin, referring to

Dobie, made a reference to "that trigger on that hammer." 6/21/06 Tr. 67.[23] Based

on his training and experience, Sergeant Sakala interpreted that phrase as referring

_____

[23] As reflected in Government Exhibit B 289, the transcript of that conversation, Martin related to Goodwin that she had said to Tony Hall, in reference to Dobie, "She's probably shaking to keep from pulling that trigger on that hammer she had with her." Gov't Exh. B 289, at p. 0032.

to a "trigger on a gun, to keep from pulling the trigger on the gun that she had with her."  6/21/06 Tr. 67.

In any event, under Pinkerton v. United States, 328 U.S. 640, 646-47 (1946), and its progeny, a conspirator is generally liable for all reasonably foreseeable acts committed by co-conspirators in furtherance of the conspiracy.  See United States v. Ashley, 606 F.3d 135, 142-43 (4th Cir.) ("The Pinkerton doctrine makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy."), cert. denied, 131 S. Ct. 428 (2010).  This Court has long applied that principle to the attribution of firearms to co-conspirators for purposes of the Guidelines enhancement in U.S.S.G. § 2D1.1(b).  See, e.g., Kimberlin, 18 F.3d at 1160 ("the government presented ample evidence to support a finding that appellants could foresee one of their co-conspirators carrying a weapon").  The same holds true for aiders and abettors.  See United States v. White, 875 F.2d 427, 433 (4th Cir. 1989) ("The district court did not err in applying Guideline § 2D1.1(b)(1) . . . .  [I]t was reasonably foreseeable to Jackson that his co-participant was in possession of a firearm.").  The firearms Guideline adjustment in U.S.S.G. § 2D1.1(b)(1) "should be applied" when a weapon is present, unless it is clearly improbable that the weapon was possessed in furtherance of the drug activity.  United States v. McAllister, 272

-90-

F.3d 228, 234 (4th Cir. 2001).

Further, in cases not involving conspiracy charges, this Court has said that "a sentencing court might reasonably infer, in the proper circumstances, that a handgun seized from the residence of a drug trafficker was possessed in connection with his drug activities." Manigan, 592 F.3d at 630. In that regard, the Court has noted that the close proximity of firearms to drugs and drug paraphernalia is "consistent with drug trafficking," because the firearms are "easily accessible" to drug traffickers in the event that the firearms are needed. Perry, 560 F.3d at 255.

Applying those principles, the district court did not clearly err in attributing the numerous firearms involved in the instant drug conspiracy to Martin. Given the extensive nature of the drug conspiracy, in terms of both the duration and quantity of drugs involved, it was clearly foreseeable to Martin that some of her co-conspirators possessed firearms in furtherance of the conspiracy, even though she herself was never discovered to be in possession of a gun. As set forth above, appellants Bynum and Dobie were found to keep loaded firearms in their residences within easy reach of their drugs and drug paraphernalia, as was co-defendant Lane. Further, Martin's "brother," Goodwin, with whom she shared drug suppliers, provided their mutual courier, Thurman, with guns to protect their shipments of cash and cocaine.

-91-

Indeed, this Court reached a similar conclusion when it considered the appeal of Luis Mangual, who was one of Martin's suppliers of kilogram quantities of cocaine. E.g., 6/21/06 Tr. 104-108 (Mangual delivered a kilogram of cocaine to Martin, after which Martin told Bynum that he had cocaine available for him). In Mangual's appeal from his life sentence following his conviction for the same drug distribution conspiracy involved in the present appeals, Mangual, like Martin here, argued that "the district court erred by holding him responsible for a firearm recovered from the residence of a co-conspirator . . . ." Mangual, 278 Fed. Appx. at 271-72. This Court disagreed, explaining that because Mangual was part of a large drug distribution conspiracy involving many individuals and a "sizeable amount of cocaine," it was "reasonably foreseeable" that a co-conspirator "would carry a firearm in furtherance of their joint drug distribution efforts." Mangual, 278 Fed. Appx. at 272-73. Citing Kimberlin, the Court further rejected Mangual's claim that Guidelines § 2D1.1(b)(1) "demands some form of a physical nexus between the defendant and the firearm held by a co-conspirator," stating instead that the evidence need only show that it was reasonably foreseeable to the defendant that his co-conspirator possessed a firearm in furtherance of the conspiracy. Mangual, 278 Fed. Appx. at 272. Because it was reasonably foreseeable that Martin's co-conspirators would possess firearms during the course of the extensive

-92-

drug-trafficking conspiracy, the district court did not clearly err in applying a

two-level firearm enhancement under U.S.S.G. § 2D1.1(b)(1) when it calculated

Martin's advisory Guidelines range.[24]

---

[24]  Martin's suggestion that her life sentence was imposed "as a direct result of this [firearms] enhancement" (Br. 159-160) misperceives the advisory nature of the Sentencing Guidelines.  The district court considered not just Martins' advisory Guidelines range, but also the other sentencing factors under 18 U.S.C. § 3553(a), and determined "that any sentence that does not keep Ms. Martin away from the public would be a violation of my oath as a judge."  Martin Sent. Tr. 105.  And while Martin was sentenced before the Supreme Court made clear that the presumption of reasonableness for a Guidelines sentence is only an appellate presumption (Nelson v. United States, 129 S. Ct. 890, 892 (2009); Rita v. United States, 551 U.S. 338, 351 (2007)), here the district court concluded that Martin's sentence should be life imprisonment "with or without a presumption of reasonableness" for a sentence within the applicable Guidelines range.  Martin Sent. Tr. 106-107.

XII.  MARTIN'S AND WHITING'S LIFE SENTENCES WERE
       SUBSTANTIVELY REASONABLE.  (Defendants' Issue XVI)

Martin and Whiting challenge the substantive reasonableness of their life

sentences on the drug distribution conspiracy count (and, with respect to Martin, on

several other drug distribution counts).  Br. 160-175.  Again, the record belies the

defendants' claims.

A.  Standard of Review

This Court reviews the substantive reasonableness of a sentence "'under a

deferential abuse-of-discretion standard.'"  United States v. Engle, 592 F.3d 495,

500 (4th Cir.), cert. denied, 131 S. Ct. 165 (2010)  (quoting Gall v. United States,

552 U.S. 38, 41 (2007)).  Accord United States v. Hargrove, 625 F.3d 170, 183 (4th

Cir. 2010) ("Ordinarily, we review the substantive reasonableness of a sentence for

abuse of discretion.").[25]

B.  The District Court Sentences Martin To Life Imprisonment.

After determining that Martin's total offense level was 44 (Martin Sent. Tr.

84) and that Martin was therefore facing an advisory Guidelines sentence of life

imprisonment, the district court considered at length the factors under 18 U.S.C.

§ 3553(a) that might call for a non-Guidelines sentence, as well as those factors that

---

[25]  Martin and Whiting erroneously claim that this Court should review the
reasonableness of their sentences de novo.  Br. 160.

-94-

weighed in favor of a life sentence.  Martin Sent. Tr. 86-100.  The court noted that "the guidelines call for a sentence of life imprisonment on certain of the counts" and gave a detailed explanation for imposing a life sentence on Martin.  Martin Sent. Tr. 102-107.  Among other factors, the court observed that Martin was "at the center of a significant operation involving very large quantities of a multitude of drugs."  Martin Sent. Tr. 103.  See Martin Sent. Tr. 75 (government estimates that the conspiracy involved "at least 228 kilograms of cocaine," "at least 60 to 80 kilograms of heroin," and "more than 1.5 kilograms of crack cocaine").  The court added that "the history and characteristics of [Martin] are that of a long-term drug dealer."  Martin Sent. Tr. 103.  Further, the court determined that Martin's "occupation" as a drug dealer "and the crimes that she commits in order to pursue it are ones that are very injurious to the public."  Martin Sent. Tr. 104.  For those reasons, the court stated that "any sentence that does not keep Ms. Martin away from the public would be a violation of my oath as a judge."  Martin Sent. Tr. 105.  Accordingly, the court sentenced Martin to life imprisonment on those counts for which the statutory maximum sentence was life.  Martin Sent. Tr. 107.

C.  The District Court Sentences Whiting To Life Imprisonment.

Because the government alleged that Whiting was subject to a statutory mandatory minimum sentence of life imprisonment, his sentencing focused less on

-95-

the factors in 18 U.S.C. § 3553(a) than did Martin's.  Under the drug conspiracy statute, a person who "conspires to commit any offense defined in this subchapter," which includes 21 U.S.C. § 841(a), "shall be subject to the same penalties as those prescribed" for the underlying offense.  21 U.S.C. § 846.  The jury found Whiting guilty of such a drug conspiracy.  Pursuant to the applicable penalty provisions, any person who commits an offense, including conspiracy, involving the statutory threshold drug quantities "shall be sentenced to a mandatory term of life imprisonment" if he commits the violation after "two or more prior convictions for a felony drug offense have become final . . . ."  21 U.S.C. § 841(b)(1)(A).  For that reason, as discussed in Argument section IX of this brief, Whiting's sentencing largely concerned the adequacy of the government's notice of prior drug convictions pursuant to 21 U.S.C. § 851, rather than upon the more general sentencing factors in 18 U.S.C. § 3553(a).

With respect to Whiting's advisory Guidelines range, the district court adopted the findings of the presentence report and determined that Whiting had a total offense level of 36, a Criminal History Category of V, and a resulting Guidelines range of 292-365 months of imprisonment.  Whiting Sent. Tr. 19.  See Whiting PSR ¶¶ 63-75, 79-117, 126.  As Whiting's counsel conceded, however, "the [Section] 851 Notice and the prior convictions that my client has is really the

-96-

driving factor in all of this, and therefore . . . an extensive argument concerning the [Section] 3553 factors at sentencing is not going to be persuasive." Whiting Sent. Tr. 19. The district court agreed that the "sentencing guideline recommendation here is affected by the" Section 851 notice which, in light of Whiting's prior felony drug convictions, called for a mandatory life sentence. Whiting Sent. Tr. 24.

Nevertheless, the district court did give careful consideration to the factors set forth in 18 U.S.C. § 3553(a). Whiting Sent. Tr. 24-28. With respect to the nature and circumstances of the offense, the court stated that Whiting "stands convicted of being a participant in a broad-ranging conspiracy for the distribution of drugs." Whiting Sent. Tr. 24. The court continued that "[t]he history and characteristics of the defendant are appalling," characterizing Whiting as "a person who's basically led a life of crime." Id. Turning to "just punishment" for Whiting's offense, the court determined that even if it "were not required to follow a mandatory minimum sentence, this would be a case in which I would conclude that . . . [Whiting] should be put in prison for the rest of his natural life, period." Whiting Sent. Tr. 26. Indeed, with respect to avoiding unwarranted sentencing disparities, the court noted that it would "be hard for me to find somebody with a record as bad as this one against whom to compare [Whiting]," adding that "there's not any risk of unwarranted sentence disparity to impose a sentence of life in this

-97-

case . . . ."  Whiting Sent. Tr. 27.  The court therefore sentenced Whiting to life

imprisonment on the conspiracy count.  Whiting Sent. Tr. 28.

D.  The Court's Imposition Of Life Sentences On Martin And Whiting Was Substantively Reasonable.

1.  Martin

Given the magnitude of Martin's drug distribution crimes, spanning many

years, encompassing several types of illegal drugs, and involving dozens of

individuals, including suppliers, distributors, and couriers, the district court did not

clearly abuse its discretion when it sentenced Martin to life imprisonment, a

Guidelines sentence that is presumed to be reasonable on appeal.  While not

dispositive in the present appeal, the Court's consideration of the substantive

reasonableness of the 375-month sentence imposed upon Martin's partner, John

Martin, is certainly instructive.  Donna Johnson, 587 F.3d at 638-39.  The Court

concluded that John Martin's within-Guidelines sentence was "substantively

reasonable," given his long-running involvement in the same drug distribution

conspiracy.  Id. at 639.  Indeed, the Court reached that conclusion after finding that

John Martin (unlike Paulette Martin) was not one of the three "major figures" in the

"extensive drug-trafficking organization that operated in Maryland, the District of

Columbia, New York, and elsewhere," but had a lesser role, as someone who

-98-

"resided with Paulette Martin in Maryland and helped her distribute cocaine and heroin." Id. at 628-29.

Also instructive is this Court's decision affirming as substantively reasonable the life sentence that the district court imposed upon Luis Mangual, one of Martin's cocaine suppliers. Mangual, 278 Fed. Appx. at 275. As with Martin, the district court "adequately stated its reasons for imposing a life sentence" on Mangual, "including the extremely serious nature of the offense" and "the harm to society caused by the wide-ranging drug conspiracy." Id. Because Mangual had "failed to overcome the presumptive reasonableness" on appeal of his within-Guidelines sentence, this Court found that "the district court did not abuse its discretion in sentencing [Mangual] to life in prison." Id. The same is true of the life sentence that the district court imposed upon Martin; Martin's life sentence should be affirmed. See Hargrove, 625 F.3d at 185 (affirming a life sentence as substantively reasonable when, as here, the district court suggested that it would have imposed a life sentence even if the defendant's advisory Guidelines range had been lower); Martin Sent. Tr. 102-107.

    2. Whiting

Although Whiting analyzes the Section 3553(a) sentencing factors applicable to him differently from the district court (Br. 170-174), Whiting's analysis is largely

-99-

irrelevant, given the statutory mandatory minimum life sentence that he faced.

When a district court imposes a mandatory life sentence pursuant to 21 U.S.C.

§ 841(b)(1)(A), that "statutorily required sentence . . . is *per se* reasonable," and any

reasonableness challenge to the sentence is therefore "without merit."  United States

v. Farrior, 535 F.3d 210, 224 (4th Cir.), cert. denied, 129 S. Ct. 743 (2009).  Accord

United States v. Brown, 2010 WL 4366980, at *1 (4th Cir. Nov. 1, 2010)

(unpublished).

    While Whiting cites United States v. Booker, 543 U.S. 220 (2005), for the

proposition that the district court "had the discretion to impose a significantly lesser

sentence, and its failure to do so amounted to an abuse of its discretion" (Br. 174),

Whiting misconstrues Booker.  "Booker did nothing to alter the rule that judges

cannot depart below a statutorily provided minimum sentence."  United States v.

Robinson, 404 F.3d 850, 862 (4th Cir.), cert. denied, 546 U.S. 916 and 955 (2005).

Accord United States v. Ronald Wilson, 2010 WL 4561381, at *2 (4th Cir. Nov. 12,

2010) (unpublished) (aside from a downward departure based on the government's

substantial-assistance motion, "the district court had no discretion to sentence [the

defendant] below the mandatory minimum").  Whiting's statutory mandatory

minimum sentence of life imprisonment was thus substantively reasonable and

should therefore be affirmed.

-100-

XIII.  THE DISTRICT COURT DID NOT CLEARLY ERR IN DENYING DOBIE
A MINOR ROLE ADJUSTMENT WHEN CALCULATING HER
ADVISORY SENTENCING GUIDELINES RANGE.  (Defendants' Issue IV)

Dobie contends that she should have received a minor role adjustment in her offense level pursuant to U.S.S.G. § 3B1.2(b).  Br. 141-154.  She advances two arguments in that regard:  first, that the district court erroneously considered her to be a drug distributor, rather than a mere user of illegal drugs (Br. 143-148); and second, that the district court determined that she was not a minimal participant under U.S.S.C. § 3B1.2(a) without adequately considering whether she was a minor participant under U.S.S.G. § 3B1.2(b) (Br. 148-154).  Under the deferential standard of review, neither argument has merit.

A.  Standard of Review

This Court reviews a district court's determination that a defendant does not merit a downward adjustment for his role in the offense only for clear error.  United States v. Pratt, 239 F.3d 640, 646 (4th Cir. 2001).  That standard of review continues to apply now that the Sentencing Guidelines are only advisory.  See, e.g., United States v. Franklin, 350 Fed. Appx. 816, 817 (4th Cir. 2009) (unpublished).  More generally, under Gall, 552 U.S. at 41, this Court now reviews sentences "under a deferential abuse-of-discretion standard."  Farrior, 535 F.3d at 224.  At the same time, however, "[a]n error in the calculation of the applicable Guidelines

-101-

range . . . makes a sentence procedurally unreasonable even under [the] 'deferential abuse-of-discretion standard.'" United States v. Diaz-Ibarra, 522 F.3d 343, 347 (4th Cir. 2008) (quoting Gall, 552 U.S. at 41).

B. The District Court Rejects Dobie's Request For A Minimal Or Minor Role Reduction In Her Offense Level.

The Probation Office calculated Dobie's base offense level for the drug conspiracy count of conviction as 26, based on the amount of drugs attributable to her. Dobie PSR ¶¶ 60-62. The Probation Office did not give Dobie an adjustment, either upward or downward, for her role in the offense (Dobie PSR ¶ 64) but did increase her offense level by 2 levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, based on Dobie's "false testimony . . . regarding her involvement in the conspiracy . . . ." Dobie PSR ¶ 66. With a total offense level of 28 and a Criminal History Category of V, Dobie's advisory Guidelines range, as calculated by the Probation Office, was 130-162 months of imprisonment for her conspiracy conviction. Dobie PSR ¶¶ 69-124, 151.

At sentencing, defense counsel suggested that Dobie qualified for a minimal or minor role adjustment, alleging that Dobie was dealing "in relatively small amounts" of drugs, "primarily to satisfy her habit." Dobie Sent. Tr. 9. See Dobie Sent. Tr. 8-12. Counsel added that "[a]ll of [Dobie's] prior convictions are entirely

-102-

consistent with her testimony in court, which was that she was a drug abuser and supported herself and her habit by engaging in addict-type crimes: theft, fraud, credit card fraud, that sort of thing." Dobie Sent. Tr. 12. The government countered that "someone who sells drugs doesn't have a minor role in the drug conspiracy," adding that Dobie obtained her drugs directly from Martin, "a fairly large supplier." Dobie Sent. Tr. 12-13. The government thus concluded that Dobie had not "made out her case for a minor role deduction." Dobie Sent. Tr. 13.

The district court first concluded that Dobie deserved an upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1, finding that Dobie's "testimony was false, that it concerned a material matter, and that [Dobie testified falsely] with intent to deceive." Dobie Sent. Tr. 24. The court then rejected Dobie's request for a downward role-in-the-offense adjustment under U.S.S.G. § 3B1.2. Dobie Sent. Tr. 24-26. The court explained that "when one looks at the evidence in this case, as supported by the jury verdict, it is clear that Ms. Dobie obtained drugs from Ms. Martin not merely . . . for personal use but also for resale . . . ." Dobie Sent. Tr. 25-26. To the extent that Dobie's drug trafficking was not "on the level" of Martin's, the court added, "that is reflected by the verdict of the jury on drug quantities and is also reflected in [Dobie's lower] base offense level." Dobie Sent. Tr. 26. The court ultimately sentenced Dobie to 146 months of imprisonment on

-103-

the drug conspiracy count, in the middle of her advisory Guidelines range of 130-162 months.  Dobie Sent. Tr. 56.

### C.   The District Court Properly Declined To Reduce Dobie's Offense Level, Because Dobie Was Not A Minor Participant In The Drug Conspiracy.

The trial evidence strongly supported a finding that Dobie was a drug distributor.  Detective David Papalia was among a team of officers who executed a search warrant at Dobie's residence in the District of Columbia on June 1, 2004. 7/18/06 Tr. 62-68.  The officers recovered two handguns from a box under the bed in the master bedroom:  a loaded .40-caliber handgun and a Taurus 9-millimeter handgun, along with ammunition.  7/18/06 Tr. 84-88.  From under the bed, the officers also recovered a box containing narcotics paraphernalia, including a scale; a bottle of Anesetal, a cutting agent for narcotics; and glassine baggies of the type used to package narcotics for sale.  7/18/06 Tr. 91-96.  In another box under the same bed, the officers retrieved bags with a tan powder inside.  7/18/06 Tr. 97-98. One of the bags contained 11.65 grams of heroin.  7/18/06 Tr. 98.  See 7/7/06 Tr. 43-44, 63, 82-87 (laboratory director Richard Gervasoni, an expert in forensic chemistry, identifies the drugs seized from Dobie's residence as heroin and cocaine).

This Court has long held that a person who sells drugs is not entitled to a

-104-

minor-role offense level reduction for his part in a drug distribution conspiracy.
See United States v. Brooks, 957 F.2d 1138, 1149 (4th Cir.), cert. denied, 505 U.S.
1228 (1992). Accord United States v. Bellamy, 336 Fed. Appx. 285, 286-87 (4th
Cir. 2009) (unpublished) (citing Brooks for the proposition that a drug seller plays a
central role in a drug distribution conspiracy). Here, while there was no direct
evidence of Dobie's being caught selling drugs to someone else, the presence of
scales, baggies, and cutting agents in her residence strongly supports an inference
that she was selling drugs. Indeed, police recorded a conversation between Martin
and Dobie in which Dobie said that she needed to obtain some drugs and sell them
quickly in order to raise money to pay a lawyer. 6/23/06 Tr. 27-28.

Additionally, Dobie's recorded phone conversations revealed her active
participation in the drug conspiracy. In one conversation, Dobie explained to John
Martin that it is better for drug traffickers to deal drugs from an inexpensive car, to
avoid the risk of the police seizing and forfeiting a more valuable vehicle. 6/21/06
Tr. 171-172. Dobie also told Martin about a potential cocaine supplier. 6/28/06 Tr.
172-173. And Dobie contacted the detention center where Gwen Levi was being
held in order to assist Martin's efforts to determine whether Levi's arrest was related
to Martin's drug distribution activities. 6/29/06 Tr. 9-10.

Under those circumstances, the district court did not clearly err in denying

-105-

Dobie a downward adjustment for her role in the drug distribution conspiracy.

While Dobie cites United States v. Carter, 564 F.3d 325, 328-30 (4th Cir. 2009), for the proposition that the district court did not adequately consider her argument for a minor-role adjustment (Br. 148), the sentencing transcript refutes that contention. The district court explained that Dobie was "not entitled to a reduction" for her role in the offense, because it was "clear" that Dobie obtained drugs from Martin "not merely" for personal use, but also for resale. Dobie Sent. Tr. 25-26. As reflected in the district court's factual findings, to which this Court owes deference, Dobie was neither a minimal nor a minor participant in the drug distribution crime. Her 146-month conspiracy sentence should therefore be affirmed.

XIV.  THE DISTRICT COURT PROPERLY SENTENCED ALI TO THE
      STATUTORY MANDATORY MINIMUM SENTENCE OF TEN YEARS.
      (Defendants' Issue XI)

Ali, who received a 120-month sentence, the lowest sentence of any of the six

appellants, contends that her sentence is "disproportionate" and "unconstitutional."

Br. 127.  See Br. 127-131.  Ali's sentencing claim lacks merit.

A.  Standard of Review

Invoking Sentencing Guidelines cases, Ali mistakenly asserts that "[t]his

Court reviews the sentence imposed upon a criminal defendant for 'reasonableness'

under a standard of de novo review . . . ."  Br. 127.  In fact, Guidelines sentences are

reviewed "under a deferential abuse-of-discretion standard."  Gall, 552 U.S. at 41

See Engle, 592 F.3d at 500 (citing the Gall standard).  Ali's sentencing claim,

however, while less than clear, appears to encompass an argument that her sentence

was "unconstitutionally excessive" under the Eighth Amendment, in which case this

Court would ask whether the sentence was "'grossly disproportionate' to the crime."

Graham v. Florida, 130 S. Ct. 2011, 2021 (2010) (citing Harmelin v. Michigan, 501

U.S. 957, 997 (1991) (Kennedy, J., concurring)).  See Br. 130 (citing Graham).

-107-

B.  The District Court Did Not Abuse Its Discretion, Nor Did It Impose A
    Grossly Disproportionate Sentence, When It Sentenced Ali To The
    Statutory Mandatory Minimum Sentence Of 120 Months Of
    Imprisonment.

Using the 2005 Guidelines Manual (Ali PSR ¶ 4), the Probation Office

calculated Ali's base offense level as 34, based on the quantities of heroin, cocaine,

and crack cocaine attributable to her.  Ali PSR ¶ 60.  The Probation Office added

two levels for obstruction of justice under U.S.S.G. § 3C1.1, in light of Ali's trial

testimony that she was unaware that she was helping Martin transport drugs to

Paula's School of Performing Arts on May 16, 2004, and that she was unaware of

the drug activities of Gwendolyn Levi and Emilio Echarte when she discussed their

arrests in recorded phone conversations.  Ali PSR ¶ 64.  The Probation Office thus

arrived at a total offense level of 36 for Ali, and a resulting advisory Guidelines

range of 188-235 months of imprisonment.  Ali PSR ¶¶ 68, 81.  In addition, the

Probation Office determined that Ali was facing a statutory minimum term of 120

months of imprisonment for the conspiracy count, pursuant to 21 U.S.C.

§ 841(b)(1)(A).  Ali PSR ¶ 77.

At sentencing, the district court reduced Ali's total offense level by five levels

from the level calculated by the Probation Office.  Ali Sent. Tr. 88.  With the

acquiescence of the government, the court eliminated the two levels for obstruction

of justice and then applied a three-level mitigating role adjustment under U.S.S.G. §§ 3B1.2 and 2D1.1(a)(3)(ii) (2005). Id. After concluding that Ali did not qualify for "safety valve" relief, because she had not satisfied the requirement in 18 U.S.C. § 3553(f)(5) that she truthfully provide all information and evidence to the government, the court determined that Ali had a total offense level of 31 and a Criminal History Category of I, resulting in an advisory Guidelines range of 108-135 months of imprisonment. Ali Sent. Tr. 132-134, 146. The court then sentenced Ali to the statutory mandatory minimum sentence of 120 months for her conspiracy offense (see 21 U.S.C. § 841(b)(1)(A)), with lesser concurrent sentences on Ali's other counts of conviction. Ali Sent. Tr. 146-147.[26]

The court explained that Ali "became . . . the willing participant with Ms. Martin in her activities, which [Ali] still professes to have been blind to, but it is difficult to accept blindness under all of the indicators in this case." Ali Sent. Tr. 143. "[A]iding a trafficker in a multitude of drugs is not a minor offense," the court added, "and those who engage in it, whether blind or not, must respond to the seriousness of the offense." Ali Sent. Tr. 144. The court emphasized that it was

---

[26] The advisory Sentencing Guidelines provide that the sentence imposed on a defendant may not be "less than any statutorily required minimum sentence." U.S.S.G. § 5G1.1(c)(2). Thus, Ali actually faced an advisory Guidelines range of 120-135 months.

-109-

bound by the statutory minimum: "Congress has established that the lowest I can go, except in circumstances that I have found not to be applicable here, is ten years." Id.

Under those circumstances, Ali's claim that "[t]here is no basis for imposition of [a] 120 month period of imprisonment in this matter" cannot withstand scrutiny. Br. 131. Any lesser sentence was forbidden by the statute.

While Ali discusses at length Eighth Amendment cases such as Solem v. Helm, 463 U.S. 277 (1983), in claiming that her 120-month sentence was unconstitutionally disproportionate to her crimes of conviction (Br. 128-131), those cases involve far longer sentences for far lesser crimes. In Solem, for example, the Supreme Court held unconstitutional a life sentence without parole for a state defendant convicted of passing a worthless check. Ali's crimes were more akin to those in Harmelin, in which the Supreme Court upheld, in the face of an Eighth Amendment challenge, a sentence of life without parole for possession of cocaine. Ali's federal 120-month sentence, the statutory minimum mandated by Congress for her serious drug conspiracy crime, was far from "unconstitutionally excessive" under the Supreme Court's Eighth Amendment jurisprudence. Graham, 130 S. Ct. at 2021. Her sentence should therefore be affirmed.

-110-

FORFEITURE ISSUES

## XV.  THE DISTRICT COURT PROPERLY ENTERED FORFEITURE ORDERS AGAINST SEVERAL DEFENDANTS.  (Defendants' Issue I)

Martin, Goodwin, Bynum, and Ali contend that the forfeiture orders entered

against them should be vacated, raising several distinct arguments.  Br. 35-64.[27]

None of the defendants' four forfeiture claims has merit.

### A.  Standard of Review

In criminal forfeiture proceedings, this Court reviews a district court's

findings of fact for clear error and reviews the district court's legal interpretations

de novo.  United States v. Morgan, 224 F.3d 339, 342 (4th Cir. 2000).

### B.  The District Court Enters An Order Of Forfeiture Against Martin, Goodwin, Ali, And Bynum.

#### 1.  The Government Initially Seizes Martin's Property Pursuant To Civil Forfeiture Warrants.

The facts underlying Martin's first two forfeiture claims are set forth in the

district court's published memorandum opinion of June 6, 2006.  United States v.

---

[27]  On page 35 of their opening page-proof brief, the defendants allege that the forfeiture issues are raised by Dobie, rather than Ali.  Br. 35.  The defendants subsequently indicate that the forfeiture issues are raised by Ali, rather than Dobie.  Br. 37.  In any event, it appears that the first two forfeiture issues pertain only to Martin and only to those assets that were seized from Martin in 2004, not to the entire sum of $8,160,000 that Martin was ultimately ordered to forfeit.  See R. 1081 (preliminary order of forfeiture); R. 1135 (final order of forfeiture).

Martin, 460 F. Supp. 2d 669 (D. Md. 2006) (R. 839).  On June 1, 2004, the date on which officers arrested the defendants and executed numerous search warrants, law enforcement agents seized many of the defendants' assets, including money held in bank accounts, pursuant to warrants issued in accordance with the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983, a civil forfeiture statute. Martin, 460 F. Supp. 2d at 670-71.  In a letter dated July 14, 2004, U.S. Customs and Border Protection notified Martin that her property had been seized, because the government had probable cause to believe that the property represented the proceeds of illegal activity.  Id. at 671; R. 578, Exh. 1.[28]  The letter described Martin's legal options with respect to the seized property.  Id.

Initially, Martin chose to file offers in compromise, pursuant to 19 U.S.C. § 1617.  Martin, 460 F. Supp. 2d at 671.  When ICE rejected Martin's offer with respect to some property, Martin withdrew her offers of compromise and, on February 22, 2005, filed a claim for the property, requesting that the claim be forwarded to the U.S. Attorney for the initiation of a civil forfeiture action.  Id. at 672.  On July 18, 2005, Martin filed a motion for return of property pursuant to Fed. R. Crim. P. 41(g), arguing that she was entitled to the return of the seized property

---

[28]  Customs and Border Protection ("Customs") and Immigration and Customs Enforcement ("ICE") are both entities within the Department of Homeland Security.

because the government had not initiated a timely civil forfeiture proceeding.  Id.

See R. 578 (Martin's motion).

      2.   The Government Decides To Proceed Under The Criminal
           Forfeiture Statutes, Rather Than Under CAFRA.

While retaining control of the property it had seized from Martin, the

government, on July 25, 2005, obtained warrants for the seizure of that property

pursuant to affidavits describing the property as forfeitable under the criminal

forfeiture statutes applicable to narcotics crimes, 21 U.S.C. §§ 853(a), 853(p).

Martin, 460 F. Supp. 2d at 672.  The government then opposed Martin's motion for

the return of property under Rule 41(g), arguing that the intervening criminal

seizures had rendered Martin's motion moot.  Id.  See R. 586 (Government's reply to

Martin's motion).  Martin countered that the government had not obtained its

criminal forfeiture warrants in a timely manner.  See Martin, 460 F. Supp. 2d at

672.

      3.   The District Court Denies Martin's Motion For Return Of Property.

The district court denied Martin's Rule 41(g) motion, finding "dispositive"

the fact that Martin did not file her claim for the initiation of a civil forfeiture

proceeding within 35 days of the deadline set forth in the ICE letter of July 14,

2004 (i.e., 35 days from July 14, 2004).  Martin, 460 F. Supp. 2d at 673.  See 18

-113-

U.S.C. § 983(a)(2)(B) (35-day provision).  Although the district court acknowledged that the ICE form letter was not a model of clarity, the court determined that the inartful wording of the notice letter, which specified that Martin had 35 days to file her claim, could not "trump the mandate of the statute and give rise to an estoppel or equitable tolling argument," particularly because "Martin was represented by competent counsel" and "explicitly refused an opportunity to initiate judicial forfeiture proceedings."  Martin, 460 F. Supp. 2d at 674.  The court concluded that "Martin's failure to timely file a claim is a sufficient basis for denying her motions."  Id.

        In the alternative, the district court determined that even if Martin's claim had been timely filed, the government had "fulfilled its obligations under CAFRA," because it "did not proceed with civil forfeiture," but instead decided to pursue criminal forfeiture pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982.  Martin, 460 F. Supp. 2d at 674-75.  The court rejected Martin's argument that because the government had not returned the civilly-seized property within 90 days of the filing of Martin's claim, the government was precluded from proceeding under the criminal forfeiture provisions.  Id. at 675.  Reading the subsections of CAFRA "in concert," the district court determined that because the government had chosen to pursue only criminal forfeiture, the "statutory scheme" for criminal forfeiture

-114-

"provides an independent basis for [the government's] holding the property after the CAFRA time limits have elapsed." Id. Specifically, the court concluded that if the government were required to return the civilly-seized property when it missed the 90-day deadline in 18 U.S.C. § 983(a)(3)(B), then a sentence in the statutory provision governing criminal forfeitures, 18 U.S.C. § 983(a)(3)(C), "would be surplusage." Id.[29] Under Martin's interpretation, the government's "right to continued possession of the property would rise or fall with the validity of the civil forfeiture warrant," not the criminal warrants, "and the second sentence of § 983(a)(3)(C) would accomplish nothing," a result that Congress could not have intended. Martin, 460 F. Supp. 2d at 676.

Further, the district court continued, if it were to adopt Martin's reading of the applicable forfeiture statutes, then "as to the property that was seized pursuant to search and/or arrest warrants, the Government would be worse off having initiated civil forfeiture proceedings than if it had simply done nothing." Id. The court found it "unlikely that Congress intended to discourage the use of the civil forfeiture system by imposing its new deadlines on all proceedings where the civil

---

[29] That sentence states: "If criminal forfeiture is the only forfeiture proceeding commenced by the Government, the Government's right to continued possession of the property shall be governed by the applicable criminal forfeiture statute." 18 U.S.C. § 983(a)(3)(C).

forfeiture system has ever been invoked," even if the government later decided to pursue criminal forfeiture in lieu of civil forfeiture.  Id.  The court acknowledged the "seeming anomaly" by which the government lacked authority to retain the civilly-seized property for the brief interval between the expiration of the 90-day period for the government's filing of a civil forfeiture complaint (assuming that Martin's claim for the initiation of a civil forfeiture action had been timely filed) and the government's obtaining criminal seizure warrants.  Id.  The court found that anomaly to be "largely theoretical," however, because, even if the court were to require the government to return the civilly-seized property, the government "could turn right around, get a new criminal forfeiture warrant, and proceed with criminal forfeiture . . . ."  Id.  Thus, the court concluded, "whatever the status of Martin's property when she filed the instant motion for its return, the Government's continued detention of the property became legal" when the government "obtained the criminal warrants," thereby rendering the legality of the government's possession of the property for the brief interim period "moot."  Id.

Finally, the district court rejected two additional arguments that Martin does not pursue in this Court.  The court held that, in obtaining the criminal seizure warrants, the government had satisfied the probable cause requirement in 21 U.S.C. § 853(f).  Martin, 460 F. Supp. 2d at 677.  Further, the court ruled that, "under

-116-

Fourth Circuit precedent, substitute assets are subject to pretrial seizure." Id. (citing

In re Billman, 915 F.2d 916, 917 (4th Cir. 1990), cert. denied, 500 U.S. 952

(1991)).  The district court thus denied Martin's motion for return of property.

Martin, 460 F. Supp. 2d at 678.  In a separate order, the court also denied Martin's

motion to suppress the use or mention of the seized property at trial.  R. 840.  See

R. 833 (Martin's motion to suppress).

> ### 4.  After The Defendants Are Convicted, The District Court Issues A Preliminary Forfeiture Order As To Martin, Goodwin, Ali, And Bynum.

Following the three-month jury trial that resulted in the defendants'

convictions on drug trafficking counts, the district court held hearings to address

the criminal forfeiture allegations in the indictment.[30]  At a hearing on November

21, 2006, Detective Eveler summarized his conservative estimate of the amount of

illegal drugs, and the resulting forfeitable proceeds, attributable to Martin,

Goodwin, Ali, and Bynum.  11/21/06 Tr. 71-95.  Detective Eveler calculated, based

on the trial testimony, that 228 kilograms of cocaine, at $20,000 per kilogram, were

attributable to Martin and Goodwin, for a total of $4,560,000.  11/21/06 Tr. 71-79.

Similarly, Detective Eveler attributed a low-end figure of 60 kilograms of heroin to

---

[30]  The defendants had previously waived their right to have the jury
determine the forfeiture allegations.  See 11/21/06 Tr. 4, 66.

-117-

Martin, which, at $60 per gram, totaled $3,600,000. 11/21/06 Tr. 80-82. Based on the trial evidence, Detective Eveler identified several specific assets constituting proceeds derived from Martin's involvement in the drug conspiracy. 11/21/06 Tr. 83-93. The government asked the court to forfeit those assets as drug proceeds, or, alternatively, to order them forfeited as substitute assets. 11/21/06 Tr. 153-154. Detective Eveler further identified five kilograms of cocaine attributable to Bynum, which, at a resale price of $24,500 per kilogram, totaled $122,500 in forfeitable drug proceeds. 11/21/06 Tr. 93-95. For Ali, Detective Eveler identified as drug proceeds only the $129,700 in cash that was seized from her apartment on June 1, 2004. 11/21/06 Tr. 93.

At the follow-up forfeiture hearing on December 19, 2006, the court summarized that the government had identified $8,160,000 that was subject to forfeiture by Martin and had further identified specific assets that it sought to forfeit as a portion of that amount. 12/19/06 Tr. 21. Those specifically enumerated assets totaled approximately $700,000. 12/19/06 Tr. 38. The United States sought to forfeit lesser amounts attributable as drug proceeds to Goodwin and Ali, and neither Goodwin nor Ali objected to the draft forfeiture order proposed by the government.

12/19/06 Tr. 21-22.[31]  The district court concluded "that the government's preliminary forfeiture order is fully supported by the evidence at trial and . . . the evidence presented to me at the prior proceeding on forfeiture in this case," i.e., the November 21, 2006 forfeiture hearing.  12/19/06 Tr. 53.

With respect to the relatively small sums attributable as drug proceeds to Bynum and Ali, the government suggested that it could modify the proposed forfeiture order to reflect that the defendants were jointly and severally liable for the amounts attributable to them.  12/19/06 Tr. 53.  The court directed the government to "prepare a modified order that addresses" joint and several liability. 12/19/06 Tr. 55.

Between January 5, 2007, and January 16, 2007, the court entered its judgments as to the defendants.  R. 1059 (Martin); R. 1060 (Dobie); R. 1061 (Goodwin); R. 1062 (Whiting); R. 1068 (Whiting, amended judgment); R. 1069 (Ali); R. 1070 (Bynum); R. 1075 (Goodwin, amended judgment).  The defendants all filed timely notices of appeal.

---

[31]  During the three-month trial, the district court generally allowed an objection by one defendant to preserve the objection of the other defendants.  It is unclear whether that practice extended to the subsequent forfeiture proceeding before the court or whether Goodwin and Ali forfeited their forfeiture objections by not objecting to the government's draft forfeiture order.  In any event, Martin adequately preserved the forfeiture issues on appeal.  Likewise, Bynum preserved his objections to the forfeiture.  12/19/06 Tr. 45-49.

On January 19, 2007, the district court issued its preliminary forfeiture order, based on the order that the government had drafted and subsequently modified at the court's direction. R. 1081. That order concluded that "Martin derived at least $8,160,000.00 in proceeds directly or indirectly as a result of" her involvement in the drug conspiracy. R. 1081, at 3. The court listed 15 specific "accounts and property," the contents of which "constitutes proceeds directly or indirectly derived from Martin's involvement in the drug conspiracy . . . ." R. 1081, at 3-4.[32] As to Goodwin, the preliminary forfeiture order found that $4,560,000 constituted the "direct or indirect" proceeds of his drug trafficking and ordered forfeiture in that amount. R. 1081, at 6-7. Likewise, the court preliminarily ordered that Bynum forfeit $122,500, and that Ali forfeit $129,700. R. 1081, at 7-8.

5. The District Court Issues A Final Order Of Forfeiture.

The United States forwarded copies of the preliminary order of forfeiture to third parties with a potential interest in the identified assets and also published a notice of forfeiture in a local newspaper. R. 1131, at 3. When no third party claim was filed within 30 days of that notice, the government moved for a final order of forfeiture. R. 1131. The district court issued a final "Order of Forfeiture" on June 14, 2007, attributing the same dollar amounts and listing the same seized assets as

---

[32] Those items were numbered i. through xiv. and xvi. Id.

in the preliminary order of forfeiture.  R. 1135.

> 6.  Several Years Later, The District Court Denies Martin's Motion To Vacate The Forfeiture Orders.

On April 15, 2010, more than three years after the defendants had filed their notices of appeal from the judgments entered in January 2007, Martin filed a motion in the district court to vacate the prior forfeiture orders and to return all forfeited property.  R. 1367.  Martin alleged that, pursuant to the prior version of Fed. R. Crim. P. 32.2(b)(2) and 32.2(b)(3), preliminary orders of forfeiture are required to be entered before sentencing and that orders of forfeiture must be made final as to the defendants at sentencing and included in the judgment.  R. 1367, at 3.[33]  According to Martin, because the preliminary order of forfeiture in this case was entered on January 19, 2007, one month after Martin's December 16, 2006 sentencing, the preliminary order was invalid, as was the final order of forfeiture of June 14, 2007.  R. 1367, at 3-5.  Martin objected both to the district court's failure to issue the preliminary order of forfeiture at or before sentencing and to the court's failure to include that order in the written judgment.  Id.  Goodwin, Ali, and Bynum explicitly joined in Martin's motion to vacate the prior forfeiture orders.  R. 1367, at 6.

---

[33]  Rule 32.2 was substantially amended, effective December 1, 2009.

The United States opposed Martin's motion on the merits.  R. 1381.  While

the government acknowledged that the district court "did not comply with the letter

of" Rule 32.2 in 2007, the government pointed out that "a substantial body of case

law holds that the court's belated entry of a forfeiture order *is not fatal* if the record

reflects that the defendant was aware at the time she was sentenced that a forfeiture

order would be imposed and made no objection to the court's delay in issuing the

order . . . ."  R. 1381, at 4 (emphasis in original).  Additionally, the government

argued that because Martin did not appeal from the entry of the forfeiture order in

2007, but "waited more than three years to raise the issue" in the district court,

Martin "waived her right to object to the court's failure to comply with the technical

requirements of Rule 32.2(b)."  R. 1381, at 5.[34]

On November 19, 2010, the district court held a hearing on Martin's motion

---

[34]  Defendants apparently assume that their January 2007 notices of appeal, filed prior to the entry of the preliminary order of forfeiture, were sufficient to encompass their claim that the district court lacked jurisdiction to enter a preliminary order of forfeiture on January 19, 2007, after the January 2007 judgments were entered in the case.  Br. 2 (statement of jurisdiction); Br. 55-62 (claiming that the district court lacked jurisdiction to enter the post-judgment orders of forfeiture).  If the defendants are correct in that regard, then the issue whether the district court's orders of forfeiture are valid is properly before the Court in the present appeals.  Otherwise, the propriety of the orders of forfeiture is properly before the Court in appeals Nos. 10-5301, 10-5304, and 10-5306 (4th Cir.) (consolidated), discussed infra.  The United States does not object to the Court's resolving the forfeiture issue in the context of the present appeals, where the issue has already been briefed.

to vacate the prior forfeiture orders.  See R. 1419 (motion hearing); R. 1423 (notice

of filing of transcript).  The court acknowledged that the criminal judgments

entered in the case "did not include any reference to the forfeiture" and asked

whether it "should now vacate its preliminary and final orders of forfeiture" or

instead deny the defendants' motion "and make an amendment to the criminal

judgment to bring that criminal judgment fully into conformity with Rule 32.2."

11/19/10 Tr. 40.  The court concluded "that the omission from the criminal

judgment of the preliminary order of forfeiture was an oversight."  11/19/10 Tr. 41.

At the same time, the court recognized that it had "announced to the defendants that

there was going to be an order of forfeiture" and that the defendants had left the

sentencing hearing knowing that the court "had given clear directives as to what

was to be in that forfeiture order and . . . had agreed with . . . the government as to

how that order should read."  Id.  The court therefore concluded that it would "enter

an order denying the defendant's motion to vacate prior forfeiture orders" and

would "direct the preparation of an amended criminal judgment that will

incorporate the forfeiture order into it as authorized by [Fed. R. Crim. P.] 36."

11/19/10 Tr. 44.[35]

---

[35]  The 2009 amendments to Fed. R. Crim. P. 32.2 include a new Rule
32.2(b)(4)(B).  That provision states in part:  "The court must also include the
(continued...)

-123-

As promised, the district court entered an order denying Martin's motion to vacate prior forfeiture orders on December 7, 2010.  R. 1422.  Then, on December 10, 2010, the court entered amended judgments as to Goodwin, Martin, Ali, Dobie, and Bynum, that, pursuant to Rule 36, attached the final order of forfeiture of June 14, 2007 to the judgments.  R. 1424 (Goodwin); R. 1426 (Martin); R. 1428 (Ali); R. 1430 (Dobie); R. 1432 (Bynum).  See R. 1135 (final order of forfeiture).[36]  On the same day, Martin filed a new notice of appeal.  R. 1434.  Bynum filed a new notice of appeal on December 15, 2010 (R. 1435), while Goodwin filed a new notice of appeal on December 16, 2010 (R. 1436).[37]  Neither Ali nor Dobie filed a timely new notice of appeal.  In the absence of a new judgment as to him, Whiting

---

[35](...continued)
forfeiture order, directly or by reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36."  As explained in the Advisory Committee Notes to the 2009 Amendments, "New subparagraphs (B) and (C) are intended to clarify what the district court is required to do at sentencing, and to respond to conflicting decisions in the courts regarding the application of Rule 36 to correct clerical errors."

[36]  It is not clear why the court issued an amended judgment as to Dobie, inasmuch as she is not mentioned in the order of forfeiture.   An amended judgment was not issued as to Whiting, who also is not mentioned in the order of forfeiture.

[37]  This Court has assigned case numbers 10-5301 (Martin), 10-5304 (Bynum), and 10-5306 (Goodwin) to the new appeals.  Those three appeals were consolidated with each other pursuant to this Court's order of December 30, 2010.

also did not file a new notice of appeal.

C.  The District Court Did Not Clearly Err In Determining That Martin's 2005 Motion For Return Of Property Was Untimely.

Martin (joined by Goodwin, Bynum, and Ali) maintains that the district court erred in determining that Martin's motion for return of property pursuant to Fed. R. Crim. P. 41(g) and 18 U.S.C. § 983(a)(2)(B) was untimely.  Br. 38-48.  To the contrary, the district court correctly found that the government's form letter of July 14, 2004, in compliance with 18 U.S.C. § 983(a)(2)(B), provided Martin with 35 days from that July 14 date to file a claim for the return of her civilly forfeited property.  Martin, 460 F. Supp. 2d at 673-74 (R. 839).  Because Martin did not file her motion for return of property within that 35-day period, the district court properly denied her motion as untimely.  Id.

Section 983(a)(2)(B) provides that a person claiming property seized in a civil forfeiture proceeding may file a claim for that property "not later than the deadline set forth in a personal notice letter (which deadline may not be earlier than 35 days after the date the letter is mailed) . . . ."  18 U.S.C. § 983(a)(2)(B).  As Martin acknowledges (Br. 39), the United States informed her that it had seized $230,428.49 of money from her accounts and that she had the option of choosing "to file a claim" for that property "and have that claim referred to the United States

-125-

Attorney for the commencement of a court forfeiture action," provided that she "do so within 35 days of the date of this letter."  R. 578, Exh. 1, at 1-2 (July 14, 2004 letter from U.S. Customs and Border Protection to Martin).  Despite the plain language of Section 983(a)(2)(B) and the letter of July 14, 2004, Martin contends that "the district court was clearly mistaken when it concluded that" Martin could not extend the 35-day period "if she first made a settlement offer and then waited for [the government] to respond to that settlement offer."  Br. 39.  According to Martin, her 35-day period to file a claim for the civilly seized property commenced not on July 14, 2004, but only after the government "denied the settlement offer in 2005 and refused to negotiate."  Id.

As the district court correctly determined, Martin's argument that she could file a claim for return of the civilly-seized property "in February 2005, more than seven months after the date of the notice letter . . . is contrary to the plain language of CAFRA, and would turn 18 U.S.C. § 983(a)(2)(B) into surplusage."  Martin, 460 F. Supp. 2d at 674.  The court explained that "nothing in the statute . . . suggests that an offer in compromise," such as the one that Martin filed on July 30, 2004, "cannot be considered after a claim has been filed or even in parallel with a court proceeding."  Id.

Martin insists that the district court was "unaware of the common forfeiture

-126-

practice recognized by other courts" pursuant to which agencies "extend the

deadlines applicable to forfeiture claims where a claimant makes an error or

omission in an initial filing . . . ." Br. 44. In support of that claim, however, Martin

cites but a single case, an unpublished district court opinion from California. Id. at

44-45 (citing In re Return of Seized 2000 F-150 Truck, 2008 WL 4908108 (S.D.

Cal. 2008) (unpublished)). Even if it were a published appellate decision binding

on this Court, the F-150 Truck case would not assist Martin. In that case, unlike the

present one, the movant did respond to the government's notice-of-seizure letter by

purporting to file a claim under 18 U.S.C. § 983(a)(2) for the seized truck within the

35-day period specified in the government's notice letter. Because the movant had

not submitted sufficient proof of his interest in the seized truck, the government, in

its discretion, provided him with an additional 20 days to do so. F-150 Truck, 2008

WL 4908108, at *1. Then, when the movant missed the additional 20-day deadline,

the government dismissed his claim as untimely. Id. The district court

subsequently denied the movant's motion for return of property, holding that

because the movant had not submitted "a valid, timely claim . . . , the government

had no obligation to file a complaint of forfeiture." Id. at *4.

    As the district court in the present case recognized, Martin "did not 'file[] a

defective pleading within the statutory period' . . . ." Martin, 460 F. Supp. 2d at 674

(citing <u>Irwin</u> v. <u>Dep't of Veterans Affairs</u>, 498 U.S. 89, 96 (1990)). Her failure to file a claim for the civilly-seized assets within 35 days of the July 14, 2004 personal notice letter thus constituted "a sufficient basis for denying her motions" for return of property. <u>Martin</u>, 460 F. Supp. 2d at 674.

Martin further contends that if the district court correctly determined that her 35-day deadline for filing a claim for the return of the seized property ran from the date of the Customs letter, July 14, 2004, then she received inadequate notice of that deadline, in contravention of her due process rights. Br. 46-48. That argument ignores the language of the July 14 letter. The letter set forth six legal options available to Martin, including number six, filing of a claim that would be referred to the United States Attorney's Office "for the commencement of a court forfeiture action." R. 578, Exh. 1, at 2. The same paragraph instructed Martin: "If you choose to file a claim directly in response to this letter, you must do so within 35 days of this letter." <u>Id.</u> Nothing in the letter suggested that Martin could first choose another of the six legal options and then, if she were dissatisfied with the outcome of her initial choice, file a claim pursuant to option six, even if the 35-day period had long since expired.

Martin nevertheless claims that the July 14 Customs letter violated her due process rights, noting that the district court characterized portions of the letter as

-128-

"unfortunate" and "misleading." <u>Martin</u>, 460 F. Supp. 2d at 674.  <u>See</u> Br. 46-47.  At the same time, however, the district court explained that the letter could not "trump the mandate of the statute and give rise to an estoppel or equitable tolling argument." <u>Martin</u>, 460 F. Supp. 2d at 674.  In that regard, the civil forfeiture statute unambiguously states that a claim for the return of property seized in a non-judicial civil forfeiture proceeding "may be filed not later than the deadline set forth in a personal notice letter," such as the July 14 letter in the present case.  18 U.S.C. § 983(a)(2)(B).  Further, the district court explained, "Martin was represented by competent counsel, and, through that counsel, explicitly refused an opportunity to initiate judicial forfeiture proceedings." <u>Martin</u>, 460 F. Supp. 2d at 674.  Under those circumstances, Martin's claim that the letter of July 14, 2004 violated her due process rights by somehow implying that she could first submit an offer of compromise under 19 U.S.C. § 1617, and then, if that offer proved to be unsuccessful, later file a claim for the return of the property without regard to the deadline in the personal notice letter, must fail.

D.  The District Court Did Not Clearly Err In Determining That The Government's Missing A Deadline To File A Civil Forfeiture Action Became Moot When The Government Decided To Pursue Criminal Forfeiture Instead Of Civil Forfeiture.

Assuming, contrary to the discussion above, that she did file a timely claim for the return of property on February 22, 2005 (see Martin, 460 F. Supp. 2d at 672), Martin argues that because the government did not commence a civil forfeiture action within 90 days of her claim, pursuant to 18 U.S.C. § 983(a)(3)(A), the government was required to return the civilly-seized property to her pursuant to 18 U.S.C. § 983(a)(3)(B).  From that premise, Martin contends that the subsequent criminal forfeiture of the same property violated her Fourth Amendment rights.  Br. 48-55.  Again, Martin's argument is not well-founded, and the district court's contrary conclusion (Martin, 460 F. Supp. 2d at 674-76) should be affirmed.[38]

As the district court acknowledged, there is no dispute that the government did not commence a civil forfeiture action within 90 days of February 22, 2005, the date on which Martin withdrew her offers of compromise and filed an administrative claim for the return of the seized property.  Martin, 460 F. Supp. 2d

---

[38]  If this Court agrees with the district court that Martin did not file a timely claim for the return of the civilly-seized property, as set forth in subsection C, above, that issue is "dispositive," (Martin, 460 F. Supp. 2d at 673), and there is no need for the Court to reach the second forfeiture issue addressed in this subsection D.

-130-

672, 675.  See 18 U.S.C. § 983(a)(3)(A).  Nor did the government either obtain

criminal forfeiture warrants within that 90-day period (i.e., by May 23, 2005) or

release the seized property to Martin, as it was required to do under 18 U.S.C.

§ 983(a)(3)(B) if Martin's administrative claim was timely.  Martin, 460 F. Supp.

2d at 675.  Rather, the government did not obtain criminal forfeiture warrants for

the property until July 25, 2005, approximately two months after the 90-day period

had expired.  Id. at 672.  According to Martin, that delay should have "bar[red] the

use of the seized funds at trial," and, accordingly, "a new trial is required."  Br. 55.

Martin is mistaken.

     As the district court correctly explained, the sanction for the government's

missing the 90-day deadline in 18 U.S.C. § 983(a)(3)(A) is set forth in 18 U.S.C.

§ 983(a)(3)(B):  the government "may not take any further action to effect the civil

forfeiture of such property in connection with the underlying offense."  Martin, 460

F. Supp. 2d at 675 (emphasis added).  See id. at 675-76.  At the same time, as the

court recognized, if the government takes the necessary steps "to maintain the

property for criminal forfeiture, [18 U.S.C.] § 983(a)(3)(C) applies, without any

restriction on when those other steps are taken."  Id. at 675.  The second sentence of

Section 983(a)(3)(C) states unequivocally:  "If criminal forfeiture is the only

forfeiture proceeding commenced by the Government, the Government's right to

-131-

continued possession of the property shall be governed by the applicable criminal

forfeiture statute."  18 U.S.C. § 983(a)(3)(C).  Thus, the district court accurately

summarized the interplay between subsections 983(a)(3)(B) and 983(a)(3)(C):

> In other words, although CAFRA's time limit prevents CAFRA from
> serving as the source of authority for the Government to hold the
> property further, CAFRA does not stand in the way when a different
> statutory scheme provides an independent basis for holding the
> property after the CAFRA time limits have elapsed.

Martin, 460 F. Supp. 2d at 675.

At least one other published decision has followed Martin on precisely this

point:  "In circumstances where the government does not take any of the actions set

forth in § 983(a)(3)(B) within the ninety-day period, the second sentence of

§ 983(a)(3)(C) applies if the government later pursues a criminal forfeiture action in

relation to the same assets."  United States v. One Silicon Valley Bank Account,

549 F. Supp. 2d 940, 948 (W.D. Mich. 2008) (citing Martin).  Indeed, that court

added, the second sentence of Section 983(a)(3)(C) "enables the government to

proceed with the criminal forfeiture action despite the fact that the prior civil

forfeiture warrants were rendered invalid by § 983(a)(3)(B)," because of the

government's failure to file a civil complaint within 90 days.  Id.  Another district

court, in an unpublished decision, used a different approach to reach a similar

result.  United States v. Kramer, 2006 WL 3545026 (E.D.N.Y. 2006) (unpublished).

In Kramer, the court acknowledged that the government was no longer in lawful possession of the civilly-seized funds and therefore granted the defendant's motion for return of the money. Id. at *4. Then, however, the court observed that the government could "still seek to restrain the funds" through criminal forfeiture and therefore, "to permit an orderly and efficient process," stayed its order that the government return the seized money until a specified date, "during which time the Government may seek and obtain a seizure warrant from this Court." Id.

Martin cites Burman v. United States, 472 F. Supp. 2d 665, 676-77 (D. Md. 2007), for the proposition that "courts . . . are not in agreement about the proper interpretation of CAFRA's language governing return of property on the facts in this case." Br. 54. The facts in Burman are readily distinguishable from those in the present case, however. In Burman, after the government had civilly seized a small sum of money ($824), the defendant filed an administrative claim for the money, and the district court correctly noted that "[t]he government had 90 days to file a complaint for forfeiture in federal district court or obtain a criminal indictment alleging that the property was subject to forfeiture." Id. at 677. The government did neither, in contrast to the present case, in which the government did obtain criminal forfeiture warrants and subsequently included criminal forfeiture allegations in the indictment. Thus, the district court in Burman had no choice but

-133-

to grant the defendant's motion to set aside the civil forfeiture of the $824. See Burman, 472 F. Supp. 2d at 677-78. The district court in Burman simply was not presented with the question of how to deal with a criminal forfeiture warrant that was issued after the 90-day period for filing a civil forfeiture complaint had expired.

In any event, as the district court in this case acknowledged, the government's error in not obtaining the criminal seizure warrants until after the 90-day period for filing a civil forfeiture complaint had expired was harmless. Martin, 460 F. Supp. 2d at 676. True, the government's tardiness caused a "largely theoretical" "anomaly," pursuant to which, for a relatively brief time, the government "lacked authority to retain the property" that it had initially seized pursuant to civil warrants. Id. But, as the district court explained, even if the court had "required that the property be released" as soon as the 90-day period for filing a civil complaint had expired, the government "could turn right around, get a new criminal forfeiture warrant, and proceed with criminal forfeiture . . . ." Id. Thus, the government's "continued detention of the property" once again "became legal" when the government "obtained the criminal warrants." Id.

While the government's delay in obtaining the criminal forfeiture warrants was regrettable, that delay resulted in the statutory sanction that precluded the government from taking "any further action to effect the civil forfeiture" of the

-134-

property in question. 18 U.S.C. § 983(a)(3)(B). There is simply no support for

Martin's novel contention that the government's failure to file a civil complaint or to

return the civilly-seized property within 90 days of Martin's (tardily filed)

administrative claim triggered "the Exclusionary Rule bar of the use of the seized

funds at trial" (Br. 55), notwithstanding the fact that the government did lawfully

obtain criminal seizure warrants for the same property nearly a year before the start

of the trial. Cf. United States v. Pierre, 484 F.3d 75, 87 (1st Cir.) ("An illegal

seizure of property does not immunize [the property] from forfeiture as long as the

government can sustain the forfeiture claim with independent evidence."), cert.

denied, 552 U.S. 915 (2007). Accord Langbord v. U.S. Dep't of Treasury, 645

F. Supp. 2d 381, 394 (E.D. Pa. 2009).

      Likewise, there is no support for Martin's related claim that "a new trial is

required" because the government did not return her civilly-seized property in

supposed contravention of her Fourth Amendment rights. Br. 55. As the district

court explained, the government was already subject to the one statutory sanction

provided for not returning civilly-seized property within 90 days of Martin's claim

for the initiation of a civil forfeiture proceeding: the government could not take any

further acts to effect the civil forfeiture. See 18 U.S.C. § 983(a)(3)(B); Martin, 460

F. Supp. 2d at 675. The government's distinct criminal forfeiture proceedings,

authorized by proper criminal forfeiture warrants, offer no basis for Martin's Fourth Amendment claim.

   E.  The District Court Had Jurisdiction To Enter The Preliminary and Final Orders Of Forfeiture In 2007, After The Defendants Were Sentenced And The Judgments Were Entered, Inasmuch As The Defendants Had Full Notice Of The Content Of Those Orders When They Were Sentenced.

   In her next challenge to the forfeiture orders in this case, Martin (again joined by Goodwin, Bynum, and Ali) contends that the district court acted in violation of Fed. R. Crim. P. 32.2(b) when it failed to issue a preliminary order of forfeiture at or before sentencing and to include the preliminary forfeiture order that it entered on January 19, 2007 (R. 1081)  as part of the judgments that the court entered earlier that month.  Br. 55-62.  As set forth below, defendants' argument is unavailing,  First, the defendants were well aware of the contents of the forthcoming forfeiture order when they were sentenced, and thus the court's failure to issue the written preliminary forfeiture order at or before sentencing was harmless.  Second, the amended orders of judgment that the district court entered in 2010 cured any technical defect in the judgments entered by the court nearly four years earlier.

   Martin is correct when she observes that the district court's failure to enter the preliminary order of forfeiture at or before sentencing and to include that order

-136-

as part of the judgments constituted a technical violation of Rule 32.2.  See Br. 55.

Prior to that rule's amendment, effective December 1, 2009, Rule 32.2 required that

if the district court "finds that property is subject to forfeiture, it must promptly

enter a preliminary order of forfeiture setting forth the amount of any money

judgment or directing forfeiture of specific property without regard to any third

party's interest in all or part of it."  Fed. R. Crim. P. 32.2(b)(2) (2008).[39]  Further,

the preliminary order of forfeiture was to become final as to a defendant at or before

sentencing and was required to be "made a part of the sentence and be included in

the judgment."  Fed. R. Crim. P. 32.2(b)(3) (2008).

The 2009 amendments to Rule 32.2 substantially modified the language of

the prior rule to clarify the district court's obligations regarding orders of forfeiture

at sentencing.  The new rule provides that the district court "must include the

forfeiture when orally announcing the sentence or must otherwise ensure that the

defendant knows of the forfeiture at sentencing."  Fed. R. Crim. P. 32.2(b)(4)(B)

(2010).[40]  Further, the court "must also include the forfeiture order, directly or by

_____

[39]  To avoid confusion, this brief will use "2008" to refer to the prior version of Rule 32.2 and "2010" to refer to the new version of Rule 32.2 that took effect on December 1, 2009.

[40]  The district court was in substantial compliance with the oral announcement requirement here.  As Martin acknowledges (Br. 57), on December

(continued...)

reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36." Id. As the Advisory Committee Notes to the 2009 amendments explain, the new rule was "intended to clarify what the district court is required to do at sentencing, and to respond to conflicting decisions in the courts regarding the application of Rule 36 to correct clerical errors."

Even prior to the 2009 amendments to Rule 32.2, the more persuasive authority held that a district court's failure to include the preliminary forfeiture order with the judgment did not render the subsequent forfeiture order a nullity if the defendant was aware at the time of sentencing that a forfeiture order would be imposed and did not object to the delay in the issuance of the forfeiture order. For example, the First Circuit explained that the requirement that the order of forfeiture be contained in the judgment was "largely a housekeeping rule and does not itself go to any fundamental rights of defendants." United States v. Yeje-Cabrera, 430 F.3d 1, 15 (1st Cir. 2005). Accord United States v. Koch, 491 F.3d 929, 932 (8th Cir. 2007) ("We agree with other circuits that have enforced forfeiture orders not initially referenced in the judgment of conviction on the ground that Rule

_____

[40](...continued)
19, 2006, just prior to Martin's sentencing the same day, the district court orally announced the forfeiture order that it would "be glad to enter" after a "modified" written order was prepared. 12/19/06 Tr. 55.

32.2(b)(3)'s written judgment requirement 'is largely a housekeeping rule . . . .'")

(quoting Yeje-Cabrera and citing other cases from the Third, Fifth, and Seventh

Circuits).  The First Circuit elaborated that the drafters of the pre-2009 version of

Rule 32.2 "were primarily concerned with enabling the government to obtain a

preliminary order of forfeiture"; to the extent that the drafters also sought to protect

defendants' interests, their focus was on "the defendant's right to notice and an

opportunity to be heard, rather than . . . the written judgment requirement."

Yeje-Cabrera, 430 F.3d at 15.

In an unpublished decision, this Court followed and cited with approval

Yeje-Cabrera and Koch.  United States v. Ereme, 339 Fed. Appx. 340, 342 (4th

Cir.) (unpublished), cert. denied, 130 S. Ct. 772 (2009).  The Court explicitly

rejected the defendant's suggestion, similar to Martin's claim here (Br. 58), "that the

district court's failure to strictly follow Fed. R. Crim. P. 32.2 divested it of subject

matter jurisdiction to issue the preliminary forfeiture order after entering final

judgment." Ereme, 339 Fed. Appx. at 342.[41]  To the contrary, the Court concluded,

"the district court's entry of its preliminary forfeiture order, only ten days after entry

---

[41]  As in the present case, the district court's Rule 32.2 error in Ereme was
apparently two-fold:  because the district court did not issue the preliminary
forfeiture order until ten days after entry of judgment, the district court did not
issue the forfeiture order at or before sentencing, nor did the court include the
forfeiture order as part of the judgment.  See Ereme, 339 Fed. Appx. at 342.

-139-

of judgment, was not jurisdictionally flawed," noting in particular that, as in the

present case, the government had submitted a proposed forfeiture order and that the

operative indictment had included forfeiture allegations referencing specific assets.

Id.  See R. 794, Fifth Superseding Indictment at 64-67 (forfeiture allegations).

Indeed, the district court in the present case had already held two post-trial hearings

on the forfeiture claims prior to Martin's sentencing (on November 21, 2006, and

December 19, 2006), but had directed the government to modify the proposed

forfeiture order that it had previously submitted.  12/19/06 Tr. 55.  Under those

circumstances, the defendants can scarcely claim to have been prejudiced by the

brief interval between the entry of judgments against them in the first two weeks of

2007 and the entry of the preliminary order of forfeiture on January 19, 2007.

Defendants cite the Third Circuit's decision in United States v. Bennett, 423

F.3d 271, 276 (3d Cir. 2005), for the proposition that a preliminary order of

forfeiture entered after a sentence is imposed "is a nullity."  Br. 58.  Bennett does

not assist the defendants, however, because the Third Circuit ultimately affirmed

the district court's amended judgment that, similar to the amended judgments

entered in December 2010 in the present case, included the order of forfeiture.

Bennett, 423 F.3d at 279-82.  In that regard, the Third Circuit noted that "most

courts that have reached the issue have allowed" the use of Fed. R. Crim. P. 36 to

-140-

amend a judgment "to add an obviously warranted order of forfeiture." Id. at 279.[42]

In support of the proposition that the failure to include an order of forfeiture in the

initial judgment is not fatal to the criminal forfeiture, the Third Circuit cited and

quoted at length from this Court's unpublished decision in United States v. Mitchell,

70 Fed. Appx. 707 (4th Cir. 2003) (unpublished), cert. denied, 540 U.S. 1135

(2004).  Bennett, 423 F.3d at 280.  Specifically, Mitchell was quoted with approval

for finding that "'under the specific facts of this case, the failure to incorporate the

forfeiture order into the judgment of conviction and sentence was simply a

ministerial error'" that did not entitle the defendant to relief.  Id. (quoting Mitchell,

70 Fed. Appx. at 714-15).  Accord United States v. Isaacs, 88 Fed. Appx. 654 (4th

Cir. 2004) (unpublished) (affirming the district court's amending a sentence

pursuant to Fed. R. Crim. P. 36 to include an order of forfeiture).

    Notwithstanding the cases allowing a district court to amend a sentence under

Rule 36 to include an order of forfeiture, the defendants further contend that the

district court lost jurisdiction to enter the orders of forfeiture in this case once the

court had sentenced the defendants, entered its judgments, and the defendants had

---

[42] As set forth above, the 2009 amendments to Rule 32.2 explicitly adopted that position, specifying that if a district court failed to include an order of forfeiture in its judgment, the court could correct the judgment "at any time under Rule 36" to include the order of forfeiture.  Fed. R. Crim. P. 32.2(b)(4)(B) (2010).

filed their notices of appeal. Br. 61. Defendants continue that "out of respect for
the appropriate division of authority and jurisdiction between the district and
appellate courts, the district court lacked jurisdiction to tinker with the sentence
after the notice of appeal was filed." Id. Defendants cite no law in support of that
erroneous proposition. To the contrary, Rule 36 provides that a district court may
correct a clerical error in its judgment "at any time." Fed. R. Crim. P. 36.
Moreover, Rule 32.2(c)(2)(2008) makes clear that the district court retained
jurisdiction to "enter a final order of forfeiture by amending the preliminary order as
necessary to account for any third-party rights." Accord Fed. R. Crim. P.
32.2(c)(2)(2010).[43]

By analogy, the Supreme Court's recent decision in Dolan v. United States,
130 S. Ct. 2533 (2010), further rebuts the defendants' argument that the district
court lacked jurisdiction to enter a preliminary order of forfeiture after the
judgments were entered in January 2007. In Dolan, the Supreme Court held that a
district court that misses a statutory deadline to enter an order of restitution

---

[43] If the filing of the defendants' notices of appeal in January 2007 deprived
the district court of jurisdiction to enter the preliminary order of forfeiture that,
under a literal reading of the pre-2009 version of Rule 32.2, should have been
included with the judgments, then logically the district court also lacked
jurisdiction to consider the defendants' motion to vacate the forfeiture order while
their 2007 appeals were pending. R. 1367.

"nonetheless retains the power to order restitution . . . at least where, as here, the

sentencing court makes clear prior to the deadline's expiration that it would order

restitution . . . ." Id. at 2537.  In so holding, the Supreme Court noted that despite

the district court's "delay in determining the restitution amount," the defendant

knew "that restitution would be ordered." Id. at 2542.  Here, of course, the

defendants knew not only that forfeiture was going to be ordered, but the exact

amount of the forthcoming forfeiture order at the time of the sentencing hearings.

Under those circumstances, the fact that the written preliminary order of forfeiture

was not entered until a few weeks later did not deprive the district court of

jurisdiction to enter that order.

In any event, the 2009 amendments to Rule 32.2 have conclusively resolved

the defendants' jurisdictional claim.  Those amendments, which were in effect when

the defendants filed their motion to vacate the prior forfeiture orders on April 15,

2010, make clear what was already the prevailing view, that a district court may

amend a judgment under Rule 36 to include a forfeiture order "at any time."  Fed.

R. Crim. P. 32.2(b)(4)(B) (2010).  Consistent with the spirit of the amended Rule

32.2, the district court entertained the defendants' motion to vacate the forfeiture

orders, notwithstanding the pendency of these consolidated appeals.  After

concluding that its initial "omission from the criminal judgment of the preliminary

-143-

order of forfeiture was an oversight" (11/19/10 Tr. 41), the district court proceeded

to amend the judgments of the defendants affected by the order of forfeiture

pursuant to Rule 36.  R. 1424 (Goodwin); R. 1426 (Martin); R. 1428 (Ali); R. 1432

(Bynum).  The district court thus properly corrected the ministerial error that it had

made with respect to the entry of the judgments nearly four years earlier, though not

in the way that the defendants had hoped.  Given the district court's present

authority under Rule 36 to amend the judgments to include the inadvertently

omitted order of forfeiture, as recognized under Rule 32.2(b)(4)(B) (2010), there is

no merit to defendants' claim on appeal that the criminally-forfeited property

"should be returned" to them.  Br. 62.

>    F.  The District Court's Forfeiture Order Was Not Required To Use The
>        Words "Money Judgment" Or To State That The Forfeited Assets
>        Were In Martin's Possession.

Finally, Martin contends that the forfeiture orders should be reversed because

neither the preliminary nor the final order of forfeiture uses the words "money

judgment" and because there was no indication that she still possessed the money in

question at the time of sentencing.  Br. 62-64.  Martin concedes that these related

issues are "foreclosed by current Fourth Circuit law," but raises them "for

preservation purposes."  Br. 64.

In the first part of her claim, Martin acknowledges that "'[p]ersonal money

-144-

judgments' are addressed in Fed. R. Crim. P. 32.2," but contends that the district court erred because it "did not enter an actual money judgment, other than [to] order [the] forfeiting [of] assets already in the Government's possession." Br. 63. Notwithstanding Martin's opaque claim, the district court did not run afoul of either the 2008 or the 2010 version of Rule 32.2. Under both the prior and the new rule, "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(a)(1) (2008); Fed. R. Crim. P. 32.2(b)(1)(A) (2010). The district court's forfeiture orders in the present case did indeed determine the amount of money that each defendant subject to forfeiture, including Martin, was ordered to pay. R. 1081; R. 1135. Nothing in either the old or new rule requires the district court to use the specific words "money judgment," and Martin cites no authority for her claim to the contrary.

As for the second part of her final forfeiture claim, Martin acknowledges that this Court has held "that forfeiture money judgments were proper, seeking to forfeit assets no longer in existence at the time sentence was imposed." Br. 63-64 (citing United States v. Amend, 791 F.2d 1120, 1127 (4th Cir.), cert. denied, 479 U.S. 930 (1986)). Accord United States v. Vampire Nation, 451 F.3d 189, 201-02 (3d Cir.) ("Given that [21 U.S.C.] § 853 does not contain any language limiting the amount

-145-

of money available in a forfeiture order to the value of the assets a defendant

possesses at the time the order is issued, we think it clear that an *in personam*

forfeiture judgment may be entered for the full amount of the criminal proceeds."),

cert. denied, 549 U.S. 970 (2006).  And while Amend may be a quarter century old,

there is no reason to question its continued vitality.  See, e.g., United States v.

Poulin, 690 F. Supp. 2d 415, 430 (E.D. Va. 2010) (citing Amend for the proposition

that the government need not prove that forfeitable monetary assets are still in

existence when a defendant is convicted and sentenced).  "A rule to the contrary,"

the district court explained in Poulin, "would create a perverse incentive for

defendants to dissipate proceeds in order to avoid forfeiture."  Poulin, 690 F. Supp.

2d at 430.

Notably, neither the preliminary nor the final order of forfeiture in the present

case suffers from the flaw that resulted in a partial vacating of the forfeiture orders

in Amend.  This Court determined in Amend that the special verdict ordering

forfeiture of "[a]ll profits obtained" from the defendant's participation in a criminal

enterprise was a circular "catch-all category of assets" that did not sufficiently

identify the assets to be forfeited.  Amend, 791 F.2d at 1128-29.  Here, in contrast,

both the preliminary and final orders of forfeiture, although they included monetary

sums, specifically identified the amount to be forfeited to the dollar, requiring that

Martin forfeit listed and substitute assets totaling $8,160,000, and that Goodwin, Ali, and Bynum forfeit lesser specified sums.  R. 1081 (preliminary order of forfeiture); R. 1135 (final order of forfeiture).  Martin offers no compelling reason why the district court's approach to the forfeiture of monetary sums should be revisited, even assuming that Martin has adequately preserved the issue for review.[44]

## CONCLUSION

The judgments of the district court should be affirmed.

## REQUEST FOR ORAL ARGUMENT

The United States agrees with appellants that oral argument would assist the Court in deciding some of the issues in these consolidated appeals.

---

[44] Martin points to no place in the district court record in which she challenged the continued vitality of Amend (see Br. 62-64), and the undersigned counsel is not aware of her raising the issue in the district court.  Thus, while Martin claims to be raising the issue on appeal "for preservation purposes" (Br. 64), she appears to be preserving the issue only for plain error review.  See Fed. R. Crim. P. 52(b).

-147-

Respectfully submitted,

ROD J. ROSENSTEIN
United States Attorney

DEBORAH A. JOHNSTON
BONNIE S. GREENBERG
STEFAN D. CASSELLA
Assistant United States Attorneys
District of Maryland

LANNY A. BREUER
Assistant Attorney General

GREG D. ANDRES
Acting Deputy Assistant Attorney General
Criminal Division
U.S. Department of Justice


By:    */s/ Daniel Steven Goodman*
    DANIEL STEVEN GOODMAN
    Appellate Section, Criminal Division
    U.S. Department of Justice
    Main Justice Building, Room 1264
    950 Pennsylvania Avenue, N.W.
    Washington, D.C.  20530
    Telephone:  (202) 514-2338
    Facsimile:  (202) 305-2121
    E-mail:  dan.goodman@usdoj.gov
    Attorney for the United States

February 4, 2011

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared in a 14-point, proportionally spaced, font (Times New Roman) using WordPerfect X4, that the brief contains 33,010 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and therefore, that the brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's order of January 26, 2011, granting the government's motion to file a brief not to exceed 35,000 words in length.

/s/ Daniel Steven Goodman
Daniel Steven Goodman
Appellate Section, Criminal Division
U.S. Department of Justice

-149-

# CERTIFICATE OF SERVICE

I, Daniel Steven Goodman, do hereby certify that on February 4, 2011, I

caused to be served by the electronic case filing (ECF) system a true and correct

PDF copy of the foregoing Page-Proof Brief for the United States upon the

following individuals, counsel for the defendants-appellants:

Michael D. Montemarano, Esq.
5695 Main Street, Suite 201
Elkridge, MD 21075-5016
telephone: (410) 379-0067
counsel for Paulette Martin

Alan D. Bowman, Esq.
Gateway One, Suite 105
Newark, NJ 07102
telephone: (973) 622-2225
counsel for LaNora Ali

Timothy S. Mitchell, Esq.
6301 Ivy Lane, Suite 400
Greenbelt, MD 20770
telephone: (301) 945-9500
counsel for Derrek Bynum

Anthony D. Martin, Esq.
7841 Belle Point Drive, Suite 1100
Greenbelt, MD 20770
telephone: (301) 220-3700
counsel for Learley Goodwin

Marc G. Hall, Esq.
Hall & Cho, P.C.
200A Monroe Street, Suite 310
Rockville, MD  20850
telephone:  (301) 309-6678
counsel for Reece Whiting, Jr.

G. Alan DuBois, Esq.
Office of the Federal Public Defender
150 Fayetteville Street Mall, Suite 450
Raleigh, NC  27601
telephone:  (919) 856-4236
counsel for Lavon Dobie


 */s/ Daniel Steven Goodman*
DANIEL STEVEN GOODMAN
Appellate Section, Criminal Division
U.S. Department of Justice