RECORD NO. 07-4059(L)
**CONSOLIDATED W/ 07-4060, 07-4062, 07-4063, 07-4080, 07-4115**

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### LEARLEY REED GOODWIN; PAULETTE MARTIN; LANORA N. ALI; REECE COLEMAN WHITING, JR.; DERREK LEWIS BYNUM; LAVON DOBIE,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT
The Honorable Roger W. Titus, Presiding

---

## CONSOLIDATED REPLY BRIEF OF APPELLANTS

---

Michael D. Montemarano*
Michael D. Montemarano, PA
5695 Main Street, Suite 201
Elkridge, MD 21075-5061
(410) 379-0067

***Lead Counsel & Counsel for
Appellant Paulette Martin***

Alan D. Bowman
Attorney at Law
Gateway One, Suite 105
Newark, NJ 07102
(973) 622-2225

***Counsel for Appellant
Lanora N. Ali***

Timothy S. Mitchell
Law Office of Timothy S. Mitchel
6301 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 945-9500

***Counsel for Appellant
Derrek Lewis Bynum***

Anthony D. Martin
Anthony D. Martin, PC
Suite 460
7501 Greenway Center Drive
Greenbelt, MD 20770
(301) 220-3700

***Counsel for Appellant
Learley Reed Goodwin***

Marc G. Hall
Hall & Cho, PC
200A Monroe Street
Suite 310
Rockville, MD 20850
(301) 309-6678

***Counsel for Appellant
Reece Coleman Whiting, Jr.***

G. Alan DuBois
Office of Federal Public Defender
150 Fayetteville Street Mall
Suite 450
Raleigh, NC 27601
(919) 856-4236

***Counsel for Appellant
Lavon Dobie***

## <u>TABLE OF CONTENTS</u>

|  |  | Page |
|---|---|---|
| Table of Contents |  | ii |
| Table of Citations |  | vi |
| Supplementary Statement of Facts |  | 2 |

Argument:

**I.    THE FORFEITURE ORDERS SHOULD BE VACATED AND THE FUNDS AND PROPERTY SHOULD BE RETURNED TO THE CLAIMANTS/APPELLANTS  (Issue I in Joint Brief)**

*1. The Court and the Government Overlooked Large Portions of the CBP Notice in Concluding that the CBP Notice set an Absolute Thirty-Five Day Deadline From the Notice's Date to File a Claim Contesting the Forfeiture.*

2

*2. Contrary to the District Court's and the Government's Analysis, the Two Month Delay Between the End of the Ninety Day Period Following Receipt of Appellant Martin's Claims and the Filing of a Seizure Warrant Was Fatal to the Government's Possession of the Appellant Martin's Funds, Compelling Their Return.*

19

*3. The District Court Lacked Jurisdiction to Enter Preliminary Orders of Forfeiture One Month After Imposing Sentence in this Case.*

22

**II.  THE COURT WAS INCORRECT IN PERMITTING THE "EXPERT TESTIMONY" OF DETECTIVE SAKALA.  (Issue III)**

29

**III.  THE PERJURED TESTIMONY ISSUE REGARDING WITNESS ECHARTE WAS PRESERVED.  AND APPELLEE IS INCORRECT IN ITS SUBSTANTIVE ANALYSIS OF THIS. (Issue VII)**

35

**IV. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT LAVON DOBIE OF A VIOLATION OF 18 USC § 924( C), BECAUSE THE GOVERNMENT FAILED TO PROVE THAT FIREARMS AND HEROIN FOUND IN HER HOME WERE CONNECTED IN ANY WAY TO THE MARTIN DRUG CONSPIRACY IDENTIFIED IN THE INDICTMENT AS THE PREDICATE DRUG TRAFFICKING OFFENSE SUPPORTING THE § 924( C) CHARGE. (Issue VIII)**

38

**V.  THE § 851 NOTICE AS TO APPELLANT WHITING WAS INSUFFICIENT, AS WAS THE GOVERNMENT'S PROOF OF HIS PRIOR CONVICTIONS. (Issue XII)**

45

**VI. THE DISTRICT COURT ERRED IN DENYING APPELLANT DOBIE A MITIGATING ROLE ADJUSTMENT (Issue XIV)**

46

**VII. THE USSG FIREARMS ENHANCEMENT WAS INAPPROPRIATELY APPLIED TO APPELLANT MARTIN, AS IT LACKED ANY FOUNDATIONAL EVIDENCE TO SUPPORT IT. (Issue XV)**

50

**VIII. THE SENTENCES IMPOSED UPON APPELLANTS MARTIN AND WHITING WERE SBUSTANTIVFELY UNREASONABLE. (Issue XIV)**

51

Request for Oral Argument                                                           53

Conclusion                                                                           54

# TABLE OF CITATIONS

## *Cases*

*Dolan v. United States*,
    130 S. Ct. 2533 (2010)                        27

*Gall v. United States*,
    552 U.S. 38, 47 (2007)                    52

*Nelson v. United States*,
    555 U.S. __, __ (2009)                   52

*Pepper v. United States*,
    __ U.S. __, 2011 WL 709543 (2010)    52

*United States v. Bennett*,
    423 F.3d 271 (3rd Cir. 2005)          25

*United States v. Carter*,
    564 F.3d 325 (4th Cir. 2009)          49

*United States v. Ereme*,
    339 Fed. Appx. 340 (4th Cir. 2009)    25, 26

*United States v. Gomez*,
    164 F.3d 1354 (11th Cir. 1999)      41

*United States v. Hickman*,
    626 F.3d 756 (4th Cir. 2010)     42, 43, 51

*United States v. Isaacs*,
    88 Fed. Appx. 654, 655 (4th Cir. 2004)    *25*

*United States v. Koch*,
    491 F.3d 929  (8th Cir. 2007)           25

*United States v. Martin*,
    460 F. Supp. 2d 669 (D. Md. 2006)      10, 11, 14, 15, 17,
                                                18, 19, 20, 21

*United States v. Maxwell*,
    34 F.3d 1006 (11th Cir.1994)          41

*United States v. Mitchell*,
    70 Fed. Appx. 707 (4th Cir. 2003)      *25*

*United States v. Perry*,
    560 F.3d 246 (4th Cir. 2009)          40, 41

 *United States v. Randall*,
    171 F.3d 195 (4th Cir. 1999)          41

*United States v. Thomas*,
    67 Fed. Appx. 819 (4th Cir. 2003)      25

*United States v. Yeje-Cabrera*,
    430 F.3d 1 (1st Cir. 2005)          25

### **STATUTES**

18 USC § 924 ( c)                38, 41, 42, 44

18 USC §983                    10, 12, 13, 17., 18,
                                          20, 22

21 USC § 851( c)                45, 46, 50

### *SENTENCING GUIDELINES*

USSG § 3B1                                                    46, 48

### *RULES*

Fed. R. Crim. P. 32.2                          23, 25, 26, 27

Fed. R. Evid. 401 & 403                        31

### *TREATISES, ETC.*

Stefan D. Cassella,
*ASSET FORFEITURE LAW IN THE UNITED STATES*
    (JurisNet LLC 2007)                    23, 27

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———

No. 07-4059 (L)

———

**LEARLEY GOODWIN, ET AL.,**

Appellant,

v.

**THE UNITED STATES OF AMERICA**,

Appellee.

———

JOINT BRIEF OF APPELLANTS

———

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND,
SOUTHERN DIVISION

(Roger W. Titus, U.S.D.J.)

———

Michael D. Montemarano, Esq.
Michael D. Montemarano, P.A.
5695 Main Street, Suite 201
Elkridge, MD 21075-5016
(410) 379-0067
Lead Counsel For Appellants

## SUPPLEMENTARY STATEMENT OF FACTS

Appellants rely upon the statement of facts set out in their initial Brief, and do not contest the facts set forth in the Brief of Appellee, except as noted, *infra*.

Further appropriate facts will be adduced as necessary within each of the individual Arguments, *infra.*

## ARGUMENT

I.    THE FORFEITURE ORDERS SHOULD BE VACATED AND THE FUNDS AND PROPERTY SHOULD BE RETURNED TO THE CLAIMANTS/APPELLANTS  (Issue I in Joint Brief))

*1. The Court and the Government Overlooked Large Portions of the CBP Notice in Concluding that the CBP Notice set an Absolute Thirty-Five Day Deadline From the Notice's Date to File a Claim Contesting the Forfeiture.*

It is axiomatic that in interpreting a document's meaning, whether a contract, statute, notice, jury instructions, or any other written material, that the entire document must be considered and its meaning discerned from the totality of the text. Especially when a notice from a federal agency is involved, as in this case, each part of the notice should be read in conjunction with the other parts. The principal of *in pari materia* (upon the same matter or subject) should be

2

applied, so that if one part of the document is ambiguous, it should be interpreted in light of other portions of the document. Similarly, if the document indicates that it is an integrated document, to be read as a whole, it should be read as a whole and not piecemeal. If a reader considers only a fragment of the document, then the document's true meaning will be missed.

If the CBP Notice is read as a whole, its true meaning, contrary to the meaning ascribed to it by the district court and the Government, is crystal clear. The CBP Notice consists of a three page cover letter, JA 277-279, and two attached forms, a one page form entitled "Election of Proceedings CAFRA Form AF – Publish," JA 280, and a one page form entitled "UNITED STATES CUSTOMS SERVICE SEIZED ASSET CLAIM FORM," JA 281.[1] The relevant text of the CBP Notice is so critical to counsel's argument that we have included the key portions immediately below, as well as including it in its entirety at JA 277 – 281.

> The bank accounts were seized and are subject to forfeiture under the provisions of 18 U.S.C. §981, because Immigration and Customs Enforcement has probable cause to believe that the accounts represent proceeds of illegal activity, which is in violation of 18 U.S.C. §1956.

---

[1]    Appellant Martin received several notices from CBP for the various seized assets, however the notices were substantively the same. A representative sample was provided to the district court and is also provided to this Court.

3

The facts available to Customs and Border Protection indicate that you might have an interest in the seized property. The purpose of this letter is to advise you of the legal options available to you concerning this seizure. Important documents are attached to this letter. Please do not ignore them. Those documents are an "Election of Proceedings" form and a "Seized Asset Claim Form".

You MUST check Box 1 or 3 and return the "Election of Proceedings" form if you wish to contest the forfeiture of the seized property. You may need to complete the "Seized Asset Claim Form", depending on how you complete the "Election of Proceedings" form.

Your legal options are as follows:

1. You may file a petition for relief from the seizure within 30 days from the date of this letter. The provisions of Title 19, United States Code, Section 1618, and Part 171 of the Customs Regulations allow you to do this. The petition need not be in any specific form, but it should include all the facts that you believe warrant relief from forfeiture and include any supporting documentation. All petitions should be filed in duplicate and addressed to 40 South Gay Street, Baltimore, Maryland 21202, ATTN: FPF Office. If you choose this option, you must check Box 1 on the "Election of Proceedings" form.

2. You may file an offer in compromise within 30 days from the date of this letter. The provisions of title 19, United States Code, section 1617, allow you to do this. The offer must specifically indicate that you are making it under the provisions of title 19, United States Code, section 1617. If you are offering money in settlement of the case, you must include a cashier's check in the amount of your offer. The Bureau of Customs & Border Protection may ONLY consider the amount of your offer and will return the full offer if it is rejected. This option may serve to delay the case. If you choose this option, you must check Box 1 on the "Election of Proceedings" form.

3. You may submit an offer to pay the full appraised domestic value of the seized property accompanied by that full payment or an irrevocable letter of credit. The provisions of title 19, United States Code, section 1614, and title 19, Code of Federal Regulations, section 162.44, allow you to do this. If the Bureau of Customs & Border Protection accepts your offer, the property will be immediately

4

released and the payment or letter of credit will be substituted for the seized property. You may still submit a petition or offer in compromise as described above.

4.  You may choose to do nothing. If you take no action, the Bureau of Customs & Border Protection will seek to forfeit the property. The Bureau of Customs & Border Protection will immediately commence administrative forfeiture proceedings under the legal authority of title 19, United States Code (U.S.C.), section 1607, and title 19, Code of Federal Regulations (CFR), Part 162, In order to obtain administrative forfeiture, the Bureau of Customs & Border Protection must publish a notice of seizure and intent to forfeit at the Customhouse for three consecutive weeks. The Bureau of Customs & Border Protection will commence such publication on <u>August 18, 2004</u>. You may request that this office publish the first notice sooner than the date above.

5.  You may abandon the property.  If you choose this option, please check Box 2 and sign and return the "Election of Proceedings" form.

6.  You may choose to file a claim and have that claim referred to the United States Attorney for the commencement of a court forfeiture action. If you choose this option YOU MUST CHECK BOX 3 ON THE "ELECTION OF PROCEEDINGS" FORM AND YOU MUST FULLY COMPLETE THE ATTACHED "SEIZED ASSET CLAIM FORM" If you choose to file a claim directly in response to this letter,   you must do so within 35 days of the date of this letter.

*       *       *       [instructions for lienholders omitted]

        No matter which box you check on the "Election of Proceedings" form, you must also sign and return the form along with your petition, offer, or claim. If you have any questions regarding this matter, please contact the Fines, Penalties & Forfeitures Office at 410-962-2854.

ELECTION OF PROCEEDINGS
CAFRA FORM AF-PUBLISH

5

NOTE: THIS FORM MUST BE COMPLETED AND RETURNED WITH YOUR PETITION OR OFFER. IF YOU DO NOT COMPLETE AND RETURN THIS FORM, THE BUREAU OF CUSTOM AND BORDER PROTECTION SHALL PROCEED TO FORFEIT THE PROPERTY ADMINISTRATIVELY, REGARDLESS OF WHETHER YOU FILE A PETITION OR OFFER.

TO: CUSTOMS FINES, PENALTIES AND FORFEITURES OFFICER:
I understand that the Bureau of Customs & Border Protection under Case No. 2004-1303000099-01 has seized property in which I have an interest.

*Check* ONLY ONE (1) of the following choices:

1. [  ] I REQUEST THAT THE BUREAU OF CUSTOMS & BORDER PROTECTION DELAY FORFEITURE PROCEEDINGS AND CONSIDER MY PETITION OR OFFER ADMINISTRATIVELY. My petition or offer is attached. By making this request, I understand that I am giving up my right for the immediate commencement of administrative forfeiture proceedings, as provided under title 19, United States Code (U.S.C.), section 1607 and title 19, Code of Federal Regulations (CFR), Part 162. If administrative forfeiture has begun, it will be stopped until my petition or offer is considered.  However, I understand that at any time I can request, in writing that the Bureau of Customs & Border Protection begin administrative forfeiture proceedings and Customs will continue to consider my petition or offer. I also understand that at any time I can file a claim with the Bureau of Customs & Border Protection (as described in Box 3 below) and the Bureau of Customs & Border Protection's consideration of my petition or offer will stop and the case will be sent to the U.S. Attorney for court action.

2. [  ] I ABANDON THE PROPERTY AND I REQUEST THAT THE BUREAU OF CUSTOMS & BORDER PROTECTION BEGIN ADMINISTRATIVE PROCEEDINGS TO FORFEIT THE PROPERTY. Please immediately begin a public posting of the notice of seizure and intent to forfeit. I abandon any claim or interest in the property.

3.  [  ] I REQUEST THAT THE CUSTOMS SERVICE SEND MY CASE FOR COURT ACTION. Please immediately send the case to the U.S. Attorney for court action. I have fully completed, signed and attached a SEIZED ASSET CLAIM FORM as required by law. I understand that if I have not fully completed this form, the Bureau of Customs & Border Protection will treat my submission as a petition for relief under Box 1 described above.

*See* complete text at JA 277 – 281.

The three page letter portion of the Notice, JA 277, *see supra,* states that the Notice's purpose "is to advise you of the legal options available to you concerning this seizure." The Notice states that "[i]mportant documents are attached to this letter," JA 277, *see supra,* referencing two attached forms, JA 280-281, an Election of Proceedings form [JA 280, *see* above] and a Seized Asset Claim Form" [omitted from text above]. The letter furthermore admonishes the reader "[p]lease do not ignore them," referring to the two attached forms.

The letter portion of the CBP Notice at JA 277, see above, states "You MUST check Box 1 or 3 and return the "Election of Proceedings" Form if you wish to contest the forfeiture of the seized property" [emphasis as in the original]. Although not stated at this point in the CBP Notice, the reference in the letter, JA 277, *see* above, to checking either Box 1 or Box 3 refers to the "Election of Proceedings" Form, JA 280, *see supra.*

This instruction at JA 277, *see supra*, was clear. The recipient could contest the forfeiture of property by either checking box 1 or box 3 on the Election of Proceedings Form, JA 280. The recipient had an exclusive decision to make between selecting Box 1 and Box 3. The Election of Proceedings Form, JA 280, *see* above, clearly stated at the top "Check ONLY ONE (1) of the following

7

choices" (emphasis in original). Appellant Martin could not pick both Box 1, providing for administrative negotiations, followed by filing a claim if the negotiations did not resolve the matter, and Box 3, which bypassed any administrative negotiations, and sent the matter by the immediate filing of a claim to the U.S. Attorney for action in court.

Turning to the descriptions of the three options provided by the CBP Notice, Box 1 of the Election of Proceedings Form, JA 280, *see supra,* which Appellant Martin selected with the advice of counsel, an option stated in all capital letters in the original, " I REQUEST THAT THE [CBP] DELAY FORFEITURE PROCEEDINGS AND CONSIDER MY PETITION OR OFFER ADMINISTRATIVELY." That option selected by Appellant Martin through Box 1 went on to state that if forfeiture proceedings were underway "it will be stopped until my petition or offer is considered." It also stated that "*at any time* I can file a claim" and that CBP's "consideration of my petition or offer will stop and the case will be sent to the U.S. Attorney for court action" (italics not in original, added for this Reply). The CBP Notice in the Election of Proceedings Form, JA 280, *see supra,* clearly assured Appellant Martin that if an administrative offer were made that "*at any time* I can file a claim." It also assured Appellant Martin that while a "petition or offer is considered" that forfeiture proceedings would be delayed by

8

CBP until a claim were filed.

Box 3 provided in all capital letters in the original that "I REQUEST THAT THE CUSTOMS SERVICE SEND MY CASE FOR COURT ACTION, " JA 280, *see supra,* It then added, in sharp contrast to Box 1, "[p]lease immediately send the case to the U.S. Attorney for court action." Unlike the optioin indicated by checking Box 1, the option that would be selected by checking Box 3 foreclosed any opportunity to allow CBP to consider an administrative settlement.

The third option on the Form, JA 280, *see supra,* if checked indicated that Appellant Martin was abandoning the property – clearly an unappealing option in a situation where about three-quarters of a million dollars had been seized.

Read in its totality, the CBP Notice gave Appellant Martin the three options laid out in the Election of Proceedings Form, JA 280, *see supra*: ***first***, negotiate with CBP, and if that were unsuccessful, then file a claim for court action when those negotiations ran their course, or ***second,*** abandon the property and give up hope of getting it back ever, or ***third***, to skip negotiations with CBP and instead have CBP send the matter to the U.S. Attorney immediately without giving CBP a chance to resolve the matter administratively. Those options were sensibly set forth, especially given the preference for matters to be resolved administratively instead of requiring resort to the courts. The options are also consistent with

federal forfeiture statutes, because 18 USC §983(a)(2)(B) provides that the seizing

agency, here CBP, determines "the deadline set forth in a personal notice letter

(which deadline may not be earlier than 35 days after the date the letter is

mailed)." The forfeiture statute grants CBP discretion to set a deadline of 35 days,

350 days, or two years to file a claim – the only restriction is that the deadline

cannot be shorter than 35 days after the notice letter is mailed.

Nevertheless, by seizing on snippets of the CBP Notice, and not considering

all parts of the CBP Notice, the district court in its published opinion and the

Government in its brief to this Court came to a very different and mistaken

conclusion. Both the district court and the Government maintain in essence that in

making an administrative settlement offer to CBP, Appellant Martin still had to

file a claim within 35 days of the date of the CBP Notice, otherwise she lost all

rights to file a claim at any time. *See Martin*, 460 F. Supp. 2d at 674; Brief of

Appellee at 126-128 (contending at 128 that Appellant Martin's position "ignores

the language of the July 14 letter"). The snippet of the Notice on which the district

court and the Government rely to support this conclusion is the list of six legal

options found on page two of the letter, JA 278, *see supra,* where the only option

addressed in the text on that page regarding filing a claim is option six, which

provides that "you may choose to file a claim" and directed Appellant Martin

solely to Option 3/Box 3 of the Election of Proceedings Form, JA 280, *see supra,*

*see also* Brief of Appellee at 128 (relying on language found at JA 278 only).

Consistent with this view, the district court found and the Government contends

that by not filing a claim within thirty-five days of a date provided in a small

portion of the CBP Notice Appellant Martin procedurally defaulted and could not

file a claim or contest the forfeiture at any later date.

The defects in the Government's and the district court's analysis on this

point are myriad. First, by concentrating exclusively on page two of the cover

letter, JA 278, *see* above, in the CBP Notice, JA 277 – 281, the district court and

the Government disregarded the rest of the CBP Notice. The CBP Notice provided

that "important documents are attached to this letter. Do not ignore them." JA 277,

*see supra.* Those documents specifically included the Election of Proceedings

Form, JA 280, *see supra,* which elaborated on the consequences of choosing

Option 1/Box 1 of that Form, allowing Appellant Martin to later "file a claim at

any time" while CBP was considering the offer. Only by disregarding the "file a

claim at any time" language in Option 1/Box 1 of that Form is it possible to find as

the district court did, *Martin*, 460 F. Supp. 2d at 674, that the CBP Notice

"appear[s] to give claimants an exclusive choice between attempting an offer in

compromise and maintaining their rights under CAFRA."

The Government is also mistaken when in its Brief it asserts at p. 128 "Nothing in the letter suggested that Martin could first choose another of the six legal options and then, if she were dissatisfied with the outcome of her initial choice, file a claim pursuant to option six, even after the 35 day period had long expired." In fact, the CBP Notice in the Election of Proceedings Form, JA 280, at Option 1/Box 1, *see supra,* and the statute properly construed allowed Appellant Martin to do what Appellant Martin did – attempt a settlement with CBP, and when that did not work, to pursue a timely claim to the U.S. Attorney. The Government is wrong that "nothing in the" CBP Notice allowed Appellant Martin to do what she did.

Second, by focusing exclusively on the reference to a 35 day deadline at option 6 of page two of the cover letter JA 278, *see supra,* as the operative "deadline set forth in a personal notice letter," 18 U.S.C. §983(a)(2)(B), the district court and the Government deprived CBP of the discretion provided it in the statute to decide for itself "the deadline set forth in the personal notice letter." The statute grants agencies such as CBP to set different notice deadlines in different letters, and to use its own criteria to decide what that deadline will be. The CBP Notice, as explained at Option 1/Box 1 at JA 280, *see supra,* essentially provided a rolling non-specific deadline to file a claim so long as Appellant

12

Martin timely provided CBP with an administrative settlement offer. On the other hand, and by contrast,  in the CBP Notice at JA 178, *see supra,* there are references to two different specific dates triggering possible specific deadlines to file a claim, depending on what option other than filing a settlement proposal with CBP a recipient chose. Option 4 at JA 278, *see supra,*  refers to publication by notice starting on August 18, 2004, which would trigger a different and later deadline to file a claim than the 35 deadline triggered by the date of July 14 set on the CBP Notice itself at Option 6 at JA 178, *see supra, .* All of this analysis shows that consistent with the statute there are frequently multiple deadlines for claims to be filed and that agencies such as CBP have discretion to follow their own procedures so long as the deadline to file a claim is not too short, i.e. less than 35 days.

In essence, the district court and the Government mistakenly interpret 18 USC §983(a)(2)(B) to require that any reference to a specific date to file a claim in the CBP Notice dictated the deadline to file all claims, regardless of the caveats and exceptions provided by CBP Notice. There is nothing in CAFRA or any other forfeiture statute prohibiting agencies conducting administrative forfeitures from providing flexible situation dependent deadlines to file forfeiture claims while other proceedings relating to the forfeiture are underway.  The district court

mistakenly found such an outcome totally unacceptable.  *Martin*, 460 F. Supp. 2d

at 674 ("it would effectively remove any deadline for the filing of a claim, and so

long as some kind of administrative proceeding is underway, a person who is

dissatisfied with the process could go ahead and file a claim").  However,

CAFRA's text and policy permits agencies such as CBP to adopt procedures

which are solicitous of the rights of persons whose property has been seized for

forfeiture. Especially where the CBP Notice does not implicitly or explicitly

inform the recipient of the letter that the consequences of making an

administrative offer without filing a claim within 35 days is a procedural default,

that statutory interpretation violates Appellant Martin's rights to Due Process prior

to deprivation of her property.

　　Third, neither the administrative agency, CBP, nor the Government,

responded to Appellant Martin's claim as if Appellant Martin had defaulted by

tardily filing a claim. Surely the administrative agency's and the Government's

response to the offer and compromise, claim, and motion for return of property is

relevant in deciding whether Appellant Martin preserved her rights to timely file a

claim or not. CBP's and the Government's response to Appellant Martin's claims

provides insight as to how CBP and the Government interpreted the CBP Notice

before this appeal arrived in this Court.

When Appellant Martin's counsel submitted the settlement proposals to CBP, JA 282 – 283, counsel stated "I understand that so long as these requests are pending, the administrative forfeiture process will be stopped. If I am wrong, and the process will not be stopped pending resolution of our settlement proposal, or your office decides to restart the process at any time, please provide counsel with immediate written notice of the Customs' action," JA 282. Reasonably read, this request was intended to guard against the very outcome provided in the district court's decision – a finding of administrative default. However, CBP never expressed any disagreement with counsel's understanding of the CBP Notice and the fact that a claim could be filed in the words of the Election of Proceedings Form, JA 280, "at any time" during the negotiation process with CBP.

Indeed, again consistent with the text under Option 1/Box 1 of the Election of Proceedings Form. Appellant Martin by counsel filed her claims against those seizures handled by the Port of Baltimore before the Port of Baltimore responded to the settlement proposal/offer in compromise. *Martin*, 460 F. Supp. 2d at 672 ("Martin, through counsel, withdrew her offers in compromise as to the remaining property, filed a claim as to all property, and requested that the claim be forwarded to the U.S. Attorney for court action"); JA 290 – 293 (claims submitted to CBP). This scenario was the scenario expressly provided for under Option 1/Box 1 of the

15

Election of Proceedings Form, providing "that at any time I can file a claim" after making a settlement offer to CBP and "the case will be sent to the U.S. Attorney for court action," JA 280. CBP's instructions were followed to the letter with CBP's assurances that under the circumstances in this case "that at any time I can file a claim."

After declining Appellant Martin's settlement offer in 2005, several months after she filed it in 2004, CBP processed her claim and did not enter a default judgment of forfeiture, as it could have according to the district court's and the Government's analysis in this Court. Furthermore, in contrast to its position in this Court, in the district court the Government did not argue that Appellant Martin defaulted and filed tardy administrative forfeiture claims. When challenged in the district court prior to trial about its continued possession of Appellant Martin's property, the Government did not claim that Appellant Martin's administrative claims were tardy, and rely on an administrative entry of default, instead it operated as if the claims were timely and sought a seizure warrant from the district court to hold the funds during the pendency of the criminal prosecution.

Fourth, the implications of the district court's and the Government's analysis here depriving Appellant Martin of the benefits of timely filing an administrative forfeiture claim are inimical to good public policy. To the extent

16

that the district court saw that the CBP Notice provided multiple deadlines to file a claim, dependent on the option selected on the Election of Proceedings Form, JA 280, *see supra,* , the district court stated that "Customs lacks statutory authority to extend those time limits after it has set a deadline in a personal notice letter," *Martin*, 460 F. Supp. 2d at 674. As we contend, the district court was mistaken on the discretion granted by law to CBP to set forfeiture claim deadlines. Even if the district court were not mistaken, to find after the fact that a government agency provided instructions to a recipient purportedly "to advise you of the legal options" which exceeded the agency's authority, to the recipient's detriment, violates Due Process of law, and fundamental fairness.[2]

The current situation smacks of detrimental reliance on the CBP Notice prejudicing Appellant Martin's right to seek redress in the courts. The district court was mistaken when it stated with respect to the CBP Notice "although Customs' forms and communications may have been misleading, they cannot trump the mandate of the statute and give rise to an estoppel or equitable tolling argument," *Martin*, 460 F. Supp. 2d at 674. The statute's mandate to facilitate the

---

[2] Recall that the CBP Notice referenced numerous statutory provisions and stated that it was "to advise you of the legal options" to respond to property seizures. However, the CBP Notice made no mention of 18 USC §983, the provision which the district court held at §983(a)(2)(B) compelled Appellant Martin to file her claim within thirty-five days of the CBP Notice's date.

processing of claims properly interpreted is consistent with a fair reading of the CBP Notice.

Furthermore, as the district court accurately noted, "CAFRA was enacted in 2000 to curb what Congress perceived as abuses of the existing forfeiture system. CAFRA comprised a series of reforms to strengthen the rights of owners of seized property." *Martin*, 460 F. Supp. 2d at 671-672 (citing legislative history). Essentially, CAFRA was intended as a shield to help protect persons such as Appellant Martin whose property has been seized from abuse and violations of their rights to seek return of property. Instead, as interpreted by the district court and the Government in this Court, the CAFRA statute, specifically 18 USC §983(a)(3)(B), along with the CBP Notice, JA 277 – 281, serves not as a shield but rather as a spear prejudicing Appellant Martin, who simply tried to timely protect her rights in property. In evaluating the interplay between CAFRA's text and the CBP Notice, surely some weight should be given to CAFRA's purpose to make it easier not harder for citizens to protect their rights in property seized by the Government.

This Court should find that Appellant Martin's administrative claims were filed on time, and that the district court made a clearly erroneous factual finding that they were too late.

18

**2. Contrary to the District Court's and the Government's Analysis, the Two Month Delay Between the End of the Ninety Day Period Following Receipt of Appellant Martin's Claims and the Filing of a Seizure Warrant Was Fatal to the Government's Possession of the Appellant Martin's Funds, Compelling Their Return.**

There is no dispute here that CBP received Appellant Martin's claims on February 22, 2005, at the Port of Baltimore, and February 23, 2005, at the Port of Washington, JA 292 – 293; *see also Martin*, 460 F. Supp, 2d at 672 (claims filed on February 22, 2005, motion for return of property filed on July 18, 2005, Government obtains a seizure warrant on July 25, 2005). It is also clear that the Government sought and obtained the seizure warrant two months after the mandatory ninety day period had expired following Appellant Martin filing claims with CBP.

The legal issue reviewed *de novo* by this Court is simple to express – what were the legal consequences of the Government's two month delay in obtaining a seizure warrant after the 90 day period following the filing of claims had expired? The district court and the Government both agree that the failure to file a civil forfeiture action during that 90 day period after the claims were filed or to obtain a seizure warrant or a restraining order against the funds during that 90 day period barred the Government from ever seeking civil forfeiture of the funds. *See Martin*, 460 F. Supp. 2d at 675 (CAFRA "does bar the Government from effecting a civil

forfeiture of Martin's property"); Government's Brief at 131, 134 - 135 (agreeing that the Government lost the right to seek civil forfeiture of Appellant Martin's property due to its failure to act during the 90 day period following receipt of Appellant Martin's claims).

By contrast, however, both the Government and the district court contend that on the facts here the Government had an unlimited amount of time to hold the funds following expiration of the 90 day period following receipt of the claims so long as at some point after that period expired the Government obtained a seizure warrant or a restraining order against the funds. *See Martin*, 460 F. Supp. 2d at 676 ("the criminal forfeiture statutes do not include a time limit"); Brief of Appellee at 134 – 136.

Properly read, the forfeiture statutes do not give the Government the blank check to seek criminal forfeiture whenever it desires to, allowing it to hold funds subject to forfeiture indefinitely following expiration of the 90 day period following filing a claim. Upon receipt of Defendant Martin's claims, CAFRA gave the Government a 90 day period to take any one of three steps, *see* 18 USC §983(a)(3)(A) and (B), none of which it timely did in this case, as the district court properly found. First, it could file a civil forfeiture complaint. No such complaint has ever been filed in this case. Second, it could "obtain a criminal indictment

20

containing an allegation that the property is subject to forfeiture," which it did on

January 19, 2005, *Martin*, 460 F. Supp. 2d at 671, and it could "take the steps

necessary to preserve the right to maintain custody of the property as provided in

the applicable criminal forfeiture statute," which the district court found that it did

not do in the 90 day period, rather it did so two months after that 90 day period

expired. Third, it could return the property to Defendant Martin, which it never

did. Return of property to a claimant like Defendant Martin during or after the 90

day period following the filing of a claim is addressed in both sections (a)(3)(A)

and (B) above. Section (A) commands the Government to either file a civil

forfeiture complaint within 90 days following receipt of a claim "or return the

property." *Most importantly*, Section (B) states that if a civil complaint is not filed

against the property and the property is not both subject to a criminal indictment

and held pursuant to the criminal forfeiture law procedures before the 90 day

period expires, "the Government shall promptly return the property."

      Thus, although two different CAFRA provisions, Sections (A) and

(B), spoke  directly to the situation, the district court failed to compel return of the

property. The district court properly noted that there was a period of time when

"CAFRA required the property's return, and no other warrant authorized its

detention," *Id.* at 676. The district court declared that as to this interim period

21

before the Government obtained a criminal forfeiture seizure warrant "the legality of the detention prior to that point is . . . moot," *id.* at 676. However, the statute explicitly requires in two places, Sections (A) and (B) for return of property, but it was not returned.  There is no exception allowing the property to be retained beyond the 90 days absent timely compliance with the statute. there is no open ended language like that in 18 USC §983(a)(1)(F) letting the Government pursue forfeiture at some later time.

As a matter of statutory interpretation, this Court should find that there is no excuse on the facts of this case for the Government to hold Appellant Martin's property beyond the 90 day period following her filing claims absent compliance with law.

### 3. The District Court Lacked Jurisdiction to Enter Preliminary Orders of Forfeiture One Month After Imposing Sentence in this Case.

Much like the second principal forfeiture issue presented to this Court set forth above, the third principal issue -- the jurisdictional challenge to the timeliness of the district court's entry of a preliminary order  of forfeiture one month after Appellant Martin was sentenced -- is primarily a question of law, not fact. Following entry of guilty verdicts, forfeiture hearings were held on November 21, 2006, and December 19, 2006, both of which involved several defendants. Appellant Martin was sentenced on December 19, 2006, later in the

22

day after that morning's forfeiture hearing. Other defendants joining this motion

were sentenced on dates later in 2006.  The Clerk of the Court filed Appellant

Martin's first judgment and commitment order on January 5, 2007 (the second

amended order including the forfeiture order was entered almost four years later in

December, 2010). The preliminary order of forfeiture applicable to Appellant

Martin was not filed until January 19, 2007, a full month after sentence was

imposed, and almost a full two weeks after the judgment and commitment order

was filed.

The Government concedes that the district court erred in entering the

preliminary order of forfeiture one month after sentencing and two weeks after the

Clerk filed the judgment and commitment order, Brief of Appellee at pp. 136 –

137, although the Government calls this a mere "technical violation of [Fed. R.

Crim. P.] 32.2," *id.*  Even so, Government counsel overlooks his own

acknowledgement, as set forth in his treatise, that "An order of forfeiture that is

not entered until after the defendant is sentenced violates this rule [32.2], and

according to several courts, is therefore a nullity." Stefan D. Cassella, *Asset

Forfeiture Law in the United States* at 601 (JurisNet LLC 2007).

A situation as in this case, which several courts find renders a forfeiture a

nullity, surely is not a mere technical violation. Where the preliminary order of

forfeiture is entered a month after sentence is imposed, the defendant is being

sentenced piecemeal. Indeed, the judgment and commitment orders were not

amended in this case to reflect the imposition of forfeiture as part of the sentence

until early December, 2010 – nearly four years too late.  Brief of Appellee at p.

124. Forfeiture, as well as the length of a sentence of incarceration, the amount of

restitution, the amount of a fine, and the length of a period of supervised release

are all part of a defendant's sentence, which must be imposed absent special

statutory exceptions at one time. Where a preliminary order of forfeiture is entered

well after sentence is imposed, no special exception applies and the prevailing law

holds that the forfeiture in that situation is a nullity, per Government counsel's

treatise and the cases so holding. A district court simply lacks jurisdiction to order

forfeiture when it fails to enter a preliminary order of forfeiture prior to

sentencing.

    To justify the belated entry of the forfeiture orders, and the belated (by four

years) amendment of the judgment and commitment orders to include the

forfeiture, the Government relies on a raft of cases and changes in the federal rules

of criminal procedure which almost entirely address a situation quite different than

the one presented to this Court in this case. The Government's cases almost

entirely rely on decisions arising from entry of a preliminary order of forfeiture

24

*before* sentence, but omission of any reference to that order in the actual judgment and commitment order. The issue in those cases and in Fed. R. Crim. P. 32.2 as modified is whether it is permissible for one court order, the judgment and commitment order, to be amended to acknowledge entry of a prior court order entered before sentence was imposed, omitted from the judgment by mistake. *See* Brief of Appellee at pp. 138 –141  (*citing United States v. Yeje-Cabrera,* 430 F.3d 1 (1st Cir. 2005); *United States v. Koch*, 491 F.3d 929  (8th Cir. 2007); and *United States v. Bennett,* 423 F.3d 271 (3rd Cir. 2005), all of which involved situations where unlike this case the preliminary order of forfeiture was entered *before* sentence was imposed but was accidentally omitted from the judgment and commitment order). With all but one exception, the Fourth Circuit cases cited by the Brief of Appellee at 141 arose from situations unlike this case where the preliminary order of forfeiture was entered *before* sentenced was imposed. *See United States v. Isaacs*, 88 Fed. Appx. 654, 655 (4th Cir. 2004); *United States v. Mitchell*, 70 Fed. Appx. 707 (4th Cir. 2003); *United States v. Thomas*, 67 Fed. Appx. 819 (4th Cir. 2003).

The one exception to this rule is an unpublished non-precedential decision of this Court, *United States v. Ereme*, 339 Fed. Appx. 340 (4th Cir. 2009), cited and discussed in Joint Brief of Appellants at 56- 57, and in the Brief of Appellee at

25

139-140. The Government's reliance on *Ereme* is misplaced. The decision itself states that "Unpublished opinions are not binding precedent in this circuit." In the bulk of the *per curiam* decision, this Court explained that Ereme's challenge to the belated entry of the forfeiture order after sentence was imposed could not be heard because of procedural default on appeal. *See* 339 Fed. Appx. 340 at *3 – 4. This Court's holding was that Ereme "was foreclosed by his prior, unsuccessful appeal from litigating the validity of the preliminary forfeiture order on his subsequent motion to vacate," *Id.* at *4. The remainder of this Court's decision regarding the jurisdictional issues was *dicta*, furthermore this Court noted that the delay in the entry of a preliminary order of forfeiture was due to Ereme's counsel, not the Government or the district court.

The situation before this Court is a very different one than that presented by *Ereme*, where, unlike this case, there was procedural default on appeal and the defense specifically requested a postponement of entry of a preliminary order of forfeiture until after sentence was imposed.

In addition to reliance on cases which on close review are irrelevant to the facts of this case, the Government also relies on the changes to Rule 32.2 in 2009 to support the propriety of the district court's belated entry of a preliminary order of forfeiture a month after sentencing two years earlier in 2007. Brief of Appellee

at 137-138, 143 ("the 2009 amendments to Rule 32.2 have conclusively resolved the defendant's jurisdictional claims"). Appellant Martin disputes that rules changes in 2009 have any relevance to the legality of the district court's actions in 2007. Even if the 2009 revisions to Rule 32.2 have any relevance to earlier proceedings, however, they have no relevance to the facts of this case. In the 2010 Supplement to his 2007 Treatise, *Asset Forfeiture Law in the United States*, Government counsel states at §20-3, on p. 246, that the problem presented by the facts in this case "that arose under the original [pre – 2009] rule was more serious [than the problem raised by situations where preliminary forfeiture orders were entered prior to sentence but were omitted from the judgment] and has not been addressed by the 2009 amendment [to Rule 32.2]." In other words, despite the discussion in the Government's brief of the 2009 amendments to Rule 32.2, and the Government's contention that those 2009 amendments foreclose relief to the Appellants, according to Government counsel's own treatise those 2009 amendments are irrelevant to the issue before this Court in this case.

In closing, the Brief of Appellee at 137, 142-144, makes much of the fact that the revised Rule 32.2, which the Government played a pivotal role in drafting, and the Supreme Court's decision in a totally different context in *Dolan v. United States*, 130 S. Ct. 2533 (2010), both appear to imply that essentially "anything

27

goes" as to entering a belated order of forfeiture so long as a defendant had some level of awareness at sentencing that some forfeiture order would be entered. *See, e.g.*, Brief of Appellee at 143 ("Here, of course, the defendants knew not only that forfeiture was going to be ordered, but the exact amount of the forthcoming forfeiture order at the time of the sentencing hearings"). However, in this case, the Court's comments prior to sentencing about what it intended to do were no substitute for an actual order providing notice to the defendant. Would this Court sanction a district court predicting what sentence of incarceration it would impose on the defendant as a substitute for actually imposing a sentence of incarceration at sentencing? Quite unlikely. Unless a preliminary order of forfeiture is entered *before* sentencing, any comments by the district court about what forfeiture sentence will be entered are speculative predictions, not binding orders. The criminal rules, Due Process, and fairness, as well as efficiency at sentencing require that sentence be imposed collectively on all issues at the same time, absent special exceptions such as restitution. There was no preliminary order of forfeiture prior to sentencing several defendants in this case, and the forfeiture orders as to those defendants are therefore null and void, requiring return of the funds to Appellant Martin and the other Appellants joining this issue.

28

## II.  THE COURT WAS INCORRECT IN PERMITTING THE "EXPERT TESTIMONY" OF DETECTIVE SAKALA.  (Issue III)

The government's brief both obscures and ignores how the district court's ruling permitted Det. Sakala to roam free in his role as "expert," and the breadth and extent of that wandering.  The problem with Det. Sakala's testimony was not that he was qualified as an expert. Nor was the problem with his interpreting the more obvious code words as to their meaning in the drug trade.  In this trial, however, the district court allowed the government to use Det. Sakala to testify as to the meaning of entire conversations, to supply drug quantities where no number could be implied, let alone suggested, to interpret generic words and phrases in a way so as to accord with the government's theory of the case, and to do so with absolutely no methodology as to how he preformed this analysis.  Indeed, the Brief of Appellee specifically acknowledges this conduct, even as it ignores the flawed basis for it.

> During voir dire in the present case, Sakala described his 17 or 18 years of expereince in narcotics investigations.  JA 799-801.  With respect to intepreting conversations among drug dealers, Sakala explained how he would listen for a "conversation that doesn't make sense" when compared to conversations that "sound normal."  JA 801-802.

Brief of Appellee at 53.  Appellants, nearly five years after this testimony, remain

29

at a loss to determine or comprehend how a conversation "doesn't make sense," as compared with one that sounds "normal," when the determination is being made by a suburban Caucasian police officer of about 40 who had worked in the DC metropolitan area for two decades, regarding conversations by individuals who were all African-American, mostly of significantly greater age, and many of whom had origins outside of the DC metropolitan area. The cultural correllation was very nearly non-existent, and the basis for discasrding a conversation as not "normal" was non-existent. To understand this concept, one need look no further than the television this week, and compare the conception or normality shared by counsel for the parties and the members of this Court, when juxtaposed with the array of tattoos sported by the college basketball players in the NCAA tournament and considered "normal" by their peers. Words like "sense" used by Det. Sakala are of limited value, but cannot be discarded; Appellee's reference to "half a tire" is a point well taken, as this "does not make sense on a literal level." Brief of Appellee at 58. Were this the extent of Det. Sakala's testimony, Appellee's dismissive approach to this issue might well draw water. What is, by contrast, "normal" is of such a limited value, and represents such an inchoate construct, bringing to mind Justice Harlan's purported touchstone for identifying pornography – "I know it when I see it"  --  and likewise necessarily required Det.

Sakala to rely upon much more than "expertise" as the law of evidence

comprehends that term, that it cannot even pass the threshold test required by

Fed.R.Evid. 401 and 403.   Plainly Det. Sakala was allowed to go far beyond his

allotted and permitted role as an expert.

A few examples from the Joint Appendix illustrate the problems inherent in

the wide range of opinion allowed by the trial court. The first example

demonstrates the fundamental problem of allowing Det. Sakala to express an

opinion, which not only goes beyond interpretation of code words but also

includes objectionable hearsay in contravention of *Crawford v. Washington,* 541

U.S. 36 (2004).

> By MS. JOHNSTON:
> Q. Can you reference particular portions of that conversation that led you to that conclusion?
>
> A. Sure. The first part of the section where just because—where Ms. Martin says just 'cause you're my niece, that ticket you got for your son to the go to the show, I would never sell him no tickets to no show myself. Meaning she wouldn't sell drugs to him directly.
>
> Q. Why do you believe that that's drugs and not tickets to a concert?
>
> A. Ms. Martin was not selling tickers for any legitimate commerce, we found out. And as we go through the calls, tickets, as we found, was a common code word that was used throughout the wire to reference drugs.Q. Now, in addition—
>
> MR. MONTEMARANO: Objection, Your Honor. Can we be heard at the bench?

31

THE COURT: Come to the bench.

(At the bar of the Court.)
THE COURT: What is your objection to? He already answered the question
when you objected.

MR. MONTEMARANO: Ms. Martin was not involved in legitimate
commerce involving selling tickets we found out. He testifying "we." Last
time I looked, "we" is not on the stand, it is only Detective Sakala.

Secondly, we found out, he's talking about what someone else told him.
This is exactly the point we brought up yesterday and we brought up this
morning. I don't wish to make it sound like that Your Honor, but I have to
phrase it that way if I hope to preserve the record.

I don't really care what he found out. Those people come on, *Crawford*
really gives me that right. I don't really care what "we" testifies to, if Ms.
Johnston has 25 witnesses and we have 24 waiting along with Detective
Sakala. What we—it's inappropriate, Your Honor, and this is exactly the
problem with the detective's testimony and exactly the point we were trying
to make.

SJA 42-43

There are two issues involved with Det. Sakala's answer. First, he was not

interpreting words, rather he was giving an opinion that includes not just the

meaning of words but also the subjective motivations of the parties involved.

More importantly by allowing Det. Sakala to state, "Ms. Martin was not selling

tickets for any legitimate commerce, we found out", the trial court allowed the

detective to include any and all information from any source, in violation of the

confrontation clause and *Crawford*.

Again with Detective Sakala, still on the stand, the following exchange took place:

BY MS. JOHNSTON:

Q. Based upon your training and experience, do you know what Mr. Whiting was asking for when he asked if she had heard anything?

A. Yes.

Q. What is that?

A. He's referring to one of two things. I can't make a determination of exactly which one it is. He's referring to either—

MR. HALL: Object, Your Honor. He doesn't know which one of these two things it is. I don't think he should be expressing an opinion.

THE COURT: Does he have an opinion or is he speculating.

MS. JOHNSTON: Your Honor, I believe he has an opinion.

THE COURT: If he has an opinion, I'll hear the opinion.

BY MS.JOHNSTON:

Q. What is your opinion?

A. He's referring to either Mr. Pernell Philpot returning from California, or Ms. Tiffany Vessels returning from Texas.

JA829

Again Det. Sakala's opinion goes far beyond the mere interpretation of

words. Instead, from the simple phrase uttered by Whiting, "had she heard

anything", Sakala concludes that Whiting is referring to a specific trip by a co-

33

defendant returning from California with drugs. No foundation is laid as to how

Det. Sakala deduces this, and no methodology revealed as to how he reaches such

a specific conclusion from the relatively generic phrase, "have you heard

anything?"

Again, from the direct examinaition of Det, Sakala, this problem is apparent.

> Q. Based, upon your training and experience, what it is Mr. Whiting referring to when he says he might be able to see something, you know?

> MR. HALL: Objection, Your Honor.

> THE COURT: Overruled.

> THE WITNESS: He's going to look at the paperwork—Mr. Echarte's court paper to see if Mr. Echarte is cooperating.

> MR. HALL: Objection.

> THE COURT: Overruled.

> BY MS. JOHNSTON:

> Q. Based on your training and experience, why is that important to the people involved in the drug business?

> A. Mr. Echarte possessed or possesses information that would be useful to the government in prosecution of people in this case.

JA 857-858

Here there was no need for an expert. The jury was quite capable of

deciding what Whiting meant when he said, "might be able to see something." Yet

34

Det. Sakala was allowed to substitute his judgment for that of the jury as to a fairly ordinary non-coded statement. In doing so, Det. Sakala was allowed far greater leeway than any other expert would be allowed under the rules. What the district court ruled in accepting Det. Sakala as an expert, and then permittting him unbridled license to offer his guesswork in the guise of expertise, was to state "I will accept him [Det. Sakala] as an expert who can give an opinion on the subjects described…drug trafficking patterns and the use of coded language in those drug trafficking activities." JA806. What the district court did, however, was to allow Sakala to peer into the mind of the defendants and supply meaning to generic non-coded lanuage, which served depriving the defendants of a fair trial.

## III.  THE PERJURED TESTIMONY ISSUE REGARDING WITNESS ECHARTE WAS PRESERVED.  AND APPELLEE IS INCORRECT IN ITS SUBSTANTIVE ANALYSIS OF THIS.  (Issue VII)

The government first claims and then quickly abandons their position that the objection to Echarte's perjured testimony was not preserved. As well they should, as the transcript makes clear the appellant was fighting to prevent the testimony of Echarte from coming before the jury. The substantive issue before this Court is whether the government knew that it was placing perjured testimony before the jury, and again clearly the government's own brief appears to concede this point. But while the government in its brief denies that it "knowingly" used

35

perjured testimony, the facts as they emerged at trial do not support that claim.

On November 3, 2004, Echarte testified before the Grand Jury as part of the investigation of this case. JA1696. Echarte testified as to a range of subjects but for the purposes of this appeal it was his statements regarding Appellant Whiting that are at issue. Before the grand jury, Echarte described how he met Appellant Whiting through Appellant Martin. Echarte testified that Appellant Whiting was a drug user. JA1663-1664. He also claims that Appellant Whiting purchased 100 grams of heroin on credit that created a drug debt the importance of which soon becomes apparent. JA1665.

At trial, however, and presumably in his preparation for trial, Echarte added much to what he offered before the grand jury. He added, for example, that as a result of this alleged drug debt Appellant Whiting began to drive for him in the transportation of the large quantities of cocaine from Virginia to Maryland. The transactions are described in detail.  This was never mentioned or even alluded to in his grand jury testimony, and on cross he admits that he did not give that portion of his testimony to the grand jury. JA1719-1720.

This was not the only subject about which Echarte committed perjury. Echarte also lied regarding Appellant Martin's daughter Kimberly Rice. Echarte testified to the grand jury that Rice was not involved in her mother's drug business.

36

The government was aware of this perjury because in Echarte's direct testimony government's counsel impeached their witness by bringing out the fact of this lie. JA1672-1673. The government therefore cannot deny that it did not know of Echarte's perjury.

The government is also incorrect in its assessment that the perjured testimony did not seriously affect the outcome of the trial as to Appellant Whiting. The record demonstrates that the evidence was minimal as to Appellant Whiting's role in this matter, but for Echarte's testimony. While the government cites Appellant Whiting's telephone conversations with Appellant Martin they fail to mention that at each and every turn Martin indicates that she has nothing for him. The government mentions a drug ledger but fails to generate testimony whether the alleged amount owed was for the purchases of a user or a seller. JA2105-2106. In short, without Echarte, Appellant Whiting's role was that of a failed purchaser and a drug addict, not a co-conspirator in a major distribution ring. Therefore the perjured testimony of Echarte was of critical importance in the conviction of Appellant Whiting, and his conviction should be reversed.

**IV. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT LAVON DOBIE OF A VIOLATION OF 18 USC § 924( C), BECAUSE THE GOVERNMENT FAILED TO PROVE THAT FIREARMS AND HEROIN FOUND IN HER HOME WERE CONNECTED IN ANY WAY TO THE MARTIN DRUG CONSPIRACY IDENTIFIED IN THE INDICTMENT AS THE PREDICATE DRUG TRAFFICKING OFFENSE SUPPORTING THE § 924( C) CHARGE. (Issue VIII)**

The government's response to this issue does not require an extended reply except to note that it fails, almost completely, to address the argument actually made by Appellant Dobie in her opening brief. Rather than confront the heart of Appellant Dobie's argument which is that the government failed to introduce any evidence tying the heroin and firearm found in her home to the conspiracy charged in the indictment, the government chose instead to focus on issues that were either not in dispute or on facts which were simply irrelevant to the failure of proof identified by Appellant Dobie. The simplest and perhaps only explanation for this otherwise puzzling approach is that the government did not confront Appellant Dobie's argument because it could not– that there is, in fact, no evidence connecting the heroin found in her home with the Martin conspiracy. This being the case, Appellant Dobie's § 924(c) conviction must be reversed.

The first three and one half pages of the government's six page argument on this issue is consumed with a recapitulation of Appellant Dobie's argument and a

38

discussion of boilerplate law which is not in dispute. Finally, the government does state that "the evidence here was sufficient to for the jury to find that Appellant Dobie possessed firearms in connection with charged conspiracy." Brief of Appellee at 34. It then fails to follow this assertion with any evidence which supports it. The government argument rests entirely on the facts that (1) heroin was found in Appellant Dobie's home, (2) that three weeks before Appellant Dobie mentioned to Appellant Martin that she was in possession of a small quantity of heroin and (3) that Appellant Dobie had spoken to Appellant Martin about the arrest of Gwendolyn Levi who had supplied Appellant Martin with heroin in the past. According to the government, these three facts alone were sufficient to show "that the heroin and firearms retrieved from Dobie's residence were tied to the specific conspiracy of which Dobie was convicted." Brief of Appellee at 34-35. It is impossible to discern why this is so.

The first fact–that heroin was found in Appellant Dobie's home– is undisputed but not probative of the issue at hand. There was nothing distinctive about its packaging or chemical composition that would serve to link it to the Martin conspiracy. The third fact–the conversation about Gwendolyn Levi–simply seems irrelevant and, indeed, the government makes no attempt to establish its relevance. It merely cites the existence of the conversation and moves on without providing any explanation of its purported significance. This conversation

39

essentially concerned Appellant Martin's and Appellant Dobie's efforts to determine whether Ms. Levi was cooperating with the police. As far as the record reflects, it had nothing whatsoever to do with heroin dealing in general or with the heroin found in Appellant Dobie's home.

The second fact–the conversation in which Appellant Dobie mentions to Appellant Martin that she had some heroin–was dealt with at length in Appellant Dobie's arguments in the opening brief. Joint Brief at 101-104. Nothing in this conversation suggests either that Appellant Dobie received the heroin *from* Appellant Martin or that she intended to give or sell the heroin *to* Appellant Martin.[3] Apart from the fact it involved two members of the same drug conspiracy–a proposition not in dispute–this conversation sheds no light on whether this particular quantity of heroin bore any connection whatsoever to the charged conspiracy. It did not indicate either the source or the destination of the heroin nor did it suggest any agreement or intent to use the heroin Appellant Dobie mentions in any conspiracy-related activity.

---

[3]It is interesting that the main section header in the government's argument on this issue reads "The Evidence Tied Dobie's Firearms to the Heroin She Received From Martin;" yet nowhere in the body of the argument does the government explicitly make the claim that Appellant Martin was source of the heroin found in Appellant Dobie's home. Brief of Appellee at 31. Indeed, though the government asserts that there is a relationship between this heroin and the Martin conspiracy, it never makes clear exactly what it believes this relationship to be. Accordingly, the header is, at best, inaccurate and, at worst, misleading about the thrust of the government's argument.

The government's citation of to *United States v. Perry*, 560 F.3d 246 (4th Cir. 2009) is inapposite. That case dealt with the question of whether a particular set of firearms found in a house facilitated the drug trafficking activities also occurring in the house or whether their presence was merely coincidental. Here, the question is not whether the firearm found in Appellant Dobie's house may have facilitated *a* drug crime, the question is *which* crime it may have facilitated. This is not a question *Perry* addressed at all. On the other hand, it is precisely the issue addressed in *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999), where this Court held that, in a § 924(c) case, the firearm must facilitate the specific crime alleged in the indictment and no other. Here, the government arguably introduced evidence connecting the firearms to the heroin but failed to connect this heroin to the drug offense alleged in the § 924(c) count. Despite the government's implicit assumptions to the contrary, a conspiracy does not automatically encompass every drug offense committed by a conspirator. *See, e.g. United States v. Gomez,* 164 F.3d 1354, 1356-57 (11th Cir. 1999)(drugs sales by defendant which were unrelated to his activities in a drug conspiracy should not be considered part of the conspiracy's course of conduct); *United States v. Maxwell*, 34 F.3d 1006 (11th Cir.1994)(same). Because the government failed to prove that Appellant Dobie's possession of heroin bore any relation to the conspiracy

41

charged in the § 924(c) count, this heroin may not serve as the predicate for her conviction on this charge.

In the absence of any evidence linking this heroin to the Martin conspiracy, the government floats an even broader (and less supportable) theory of culpability in order to save this conviction. The government posits that a jury could have convicted Appellant Dobie of the § 924(c) charge because the firearms found in her home "could have 'served as protection' or defended [Dobie's] turf'" with respect to other unspecified activities related to the Martin conspiracy. Brief of Appellee at 36. Significantly, the government does not identify any particular instance in which Appellant Dobie may have used a firearm in the manner. The crux of the argument is that because this was a large-scale drug conspiracy, it was fair for the jury to infer that Appellant Dobie must, at some point, have used the firearm found in her home in its furtherance, even though there was no direct evidence that she ever did.

This Court has recently rejected a very similar argument for premising culpability on possible but purely speculative criminal activity. In *United States v. Hickman,* 626 F.3d 756 (4th Cir. 2010), the government charged that a particular conspiracy involved the distribution of one kilogram of heroin. Though the government could not produce proof of specific drug transactions totaling this amount of the drugs, it nonetheless argued that, given the size, scope and duration

42

of the enterprise, the jury could infer that the conspiracy must have encompassed other transactions which would have pushed the drug quantity past the threshold amount. *Hickman,* 626 F.3d at 768. On appeal, this Court rejected this line of reasoning. While recognizing that a jury may extrapolate from the drug quantities involved in particular drug sales to estimate the amount of drugs involved in other sales where the quantity was not specifically known, a trier of fact is not permitted "to extend this extrapolation so far as to fabricate transactions of which there is no evidence." *Id.* at 769.

Here, the government asks this Court to uphold Appellant Dobie's conviction based on a similarly impermissible extrapolation: namely, that because this was a large conspiracy involving many transactions, it is reasonable to infer that Ms. Dobie used a firearm in furtherance on at least one of them. However, as *Hickman* teaches, more than speculation is required to support a conviction, the government must identify a particular conspiracy-related transaction where Appellant Dobie may have possessed a firearm before any inference or extrapolation is even possible. Here, the government can not point to any specific sale, transaction or activity related to the Martin conspiracy where Appellant Dobie may have employed a firearm. Accordingly, the mere scope or duration of the conspiracy provides no basis for inferring beyond a reasonable doubt that such an activity must have occurred.

43

Simply put, the government offered no evidence the heroin found in Appellant Dobie's home was related to the Martin conspiracy–indeed, what evidence there was pointed strongly in the other direction–and no evidence that Appellant Dobie's possessed the firearms in connection with any other offense. Absent such proof, all that is left is speculation; speculation that the heroin bore some unknown connection to the conspiracy's activities; speculation that there may have been some other time Appellant Dobie possessed the firearm in furtherance of the charged conspiracy. This is not enough. In the words of this Court, "Where no evidence exists to guide the trier of fact in determining the outer scope of a conspiracy, the trier may not simply guess at the magnitude or frequency of unknown criminal activity. Unbridled speculation is an impermissible basis for conviction beyond a reasonable doubt." *Id.* at 768-69.

Nothing other than speculation connects the firearm found in Appellant Dobie's home to any activity of the Martin conspiracy, and her § 924( c) conviction must be reversed.

44

## V.  THE § 851 NOTICE AS TO APPELLANT WHITING WAS INSUFFICENT, AS WAS THE GOVERNMENT'S PROOF OF HIS PRIOR CONVICTIONS. (Issue XII)

The government had an obligation to both serve an adequate § 851 notice on Appellant Whiting and to then prove his prior convictions beyond a reasonable doubt.  The government had the burden of proof as to Appellant Whiting's prior convictions.   21 USC § 851(c).

In its brief the government contends that Appellant Whiting's trial testimony was sufficient to prove his convictions for sentencing. Brief of Appellee at 78. But the government ignores its burden to prove the convictions beyond a reasonable doubt. In ruling at sentencing, the district court simply accepted the Government's position and counted all of Appellant Whiting's alleged priors for sentencing purposes. JA 2800-2801. The government's argument and the district court's ruling accepting this impermissibly shift the burden of proof from the government to Appellant Whiting.

In its brief the government again chooses to ignore its sole burden to present and establish proof of Appellant Whiting's priors.  The government states in its brief that "Whiting denied that he had previously been convicted of those felony drug offenses." Brief of Appellee at 77. It simply is not the responsibility of the defendant to make the government's job easier by agreeing at sentencing to the existence of convictions which will ensure a life sentence. With all its resources

45

the government could have obtained certified copies of each conviction and

introduced them. Anything less than that, when challenged by the defendant, is not

adequate to prove the basis for a 21 USC § 851(c) enhancement beyond a

reasonable doubt.  Thus Whiting's sentence should be vacated.

## VI. THE DISTRICT COURT ERRED IN DENYING APPELLANT DOBIE A MITIGATING ROLE ADJUSTMENT (Issue XIV)

In support of its claim that Appellant Dobie did not merit a mitigating role

adjustment for the part she played in the Martin conspiracy, the government

devotes a significant portion of its brief response to Appellant Dobie's argument

to portraying her as a drug dealer. Brief of Appellee at 104. In support thereof, the

government provides a succinct list of items seized from Appellant Dobie's home,

which it claims infers that Appellant Dobie sold drugs, and was therefore

disqualified from receiving any reduction under USSG § 3B1.2. Brief of Appellee

at 104. The fundamental flaw in the government's argument is its failure to

connect any of this evidence to the Martin conspiracy. While this sort of evidence

may suggest that someone in Appellant Dobie's residence may have been dealing

drugs, it does little to prove that these items derived from, benefitted, or were in

any way connected to the Martin conspiracy.

Rather, the majority of the government's evidence of Appellant Dobie's

involvement in the Martin conspiracy consists of recorded communications

between Appellant Dobie and a handful of co-defendants. These conversations, the government maintains, not only demonstrate her "active participation" in the Martin conspiracy, but also support the court's notion that Appellant Dobie did in fact resell drugs obtained from the conspiracy. Brief of Appellee at 105. However, further inquiry into the events surrounding these conversations reveal that the parties did not act in accordance with the activities they purportedly discussed. For example, the record includes no evidence that Appellant Dobie ever resold drugs obtained from Appellant Martin in order to pay for a lawyer. The government also failed to present evidence that, in reliance on Appellant Dobie's discussion of inexpensive cars, John Martin in fact purchased such a car to avoid police seizure or forfeiture. Similarly, there was no evidence of Appellant Dobie's having actually identified a drug supplier for Appellant Martin. Finally, Appellant Dobie was unsuccessful in any attempts to contact Gwen Levi, and therefore no evidence corroborated the government's theory that Appellant Dobie called to "determine whether Levi's arrest was related to Appellant Martin's drug distribution activities." Brief of Appellee at 105. In short, these uncorroborated conversations were nothing more than mere chatter between a minor player and the main actors in this offense.

47

Also lacking in these conversations is any evidence that Appellant Dobie resold any drugs obtained from the Martin conspiracy, as the district court erroneously believed. Accordingly, the government concedes it submitted no evidence of Appellant Dobie's selling drugs in this case, let alone drugs related to the conspiracy. Brief of Appellee at 105. As such, the district court erroneously found that Appellant Dobie had resold drugs, and in basing its denial of the reduction under § 3B1.2 on this inaccurate fact, did so in error. Consequently, the government's argument that the district court properly considered Appellant Dobie's request for a mitigating role reduction cannot stand when there exists a lack of evidence that Appellant Dobie's involvement went beyond mere telephone conversations with a handful of co-defendants, and the district court's analysis was based on the erroneous finding that she resold drugs obtained from Appellant Martin.

The government's argument further falters in its response to Appellant Dobie's assertion that the district court did not properly consider her request for a minor role reduction. Relying on the district court's statements at sentencing, including the court's misapprehension about Appellant Dobie's reselling drugs from the conspiracy, the government contends that the minor role reduction was properly considered. However, as the preceding discussion reveals, Appellant

48

Dobie played a very small part in the Martin conspiracy. The district court acknowledged her role was less than Appellant Martin's, but focused its discussion on the four-level minimal role enhancement and neglected to discuss the alternative, and less stringent, two-level reduction for minor role. JA. 2954-2955. The brief discussion by the sentencing court fails to meet this Court's standard for how district courts are to treat the non-frivolous sentencing arguments of criminal defendants. *See United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009). Appellant Dobie's request for a minor role reduction was neither adequately addressed by the district court, nor was any explanation provided for why the argument was rejected. Consequently, her sentence is procedurally unreasonable.

Thus, because the district court relied on an erroneous fact and did not properly consider whether Appellant Dobie qualified for a minor role reduction, her sentence must be vacated and her case remanded for resentencing.

## VII. THE FIREARMS ENHANCEMENT WAS INAPPROPRIATELY APPLIED TO APPELLANT MARTIN, AS IT LACKED ANY FOUNDATIONAL EVIDENCE TO SUPPORT IT. (Issue XV)

The government discusses at length the firearms possession by other coconspirators, Brief of Appellee, Argument XI, at 87-93, which was not challenged by Appellant Martin.. Joint Brief, Argument XV, at 148-153. What is not provided for this Court's consideration, is any evidence, indeed anything more than the generalized suggestion that such firearms possession by the coconspirators was "reasonably foreseeable." Brief of Appellee 90. This is perhaps unsurprising, in that such evidence does not exist.

As discussed by Appellant Martin, there was a considerable quantum of evidence which suggested that firearms were not used or part of this conspiracy, and therefore were not foreseeable to Appellant Martin. While Appellant Martin contests the meaning of the conversation with Appellant Dobie upon which the government relies, Brief of Appellee, Argument XI, at 90-91, even if this conversation were to be crystal clear regarding the firearms **possession** by Appellant Dobie, there is an entire lack of evidence that this related in any way to the possession **being related to or used in** the narcotics conspiracy, as is argued by Appellant Dobie, Joint Brief Argument VIII, at 97-106, *see also,* Argument IV,

50

*supra.  See United States v. Hickman,* 626 F.3d at 768-769.  The attribution of a firearm to Appellant Martin clearly was founded upon no more than "[u]nbridled speculation."  *Id.*

## VIII. THE SENTENCES IMPOSED UPON APPELLANTS MARTIN AND WHITING WERE SBUSTANTIVFELY UNREASONABLE. (Issue XVI)

In support of its argument against the notion that life sentences for two individuals convicted simply of narcotics trafficking, without more, were reasonable, the government, Brief of Appellee, Argument XII, at 94, discusses at length why such a sentence might be understood to be reasonable.  Far from an argument, however, this discussion is more of a reiteration of the propriety of the USSG determination made by the district court, which drove the sentencing calculus.  What the district court failed to do, and the government fails to illuminate, is how this calculus accords with notions of reasonableness.  Specifically, the district court failed to make clear how this sentence was "sufficient, but not greater than necessary, to comply with the purposes of" 18 USC § 3553(a)(2).

What is particularly noticeable is the absence of any suggestion of a circumstance under which Appellant Martin, with a single prior conviction from twenty years before, and no history of violence or firearms usage, could qualify for

51

a sentence as fully as long as two individuals who faced statutory mandatory life sentences under 18 USC § 851. Such qualification for these other Appellants was put forward by the government based upon serious and repeated violations of the narcotics law in their pasts, but which Appellant Martin did not share. Indeed, the record below is entirely silent regarding "the need to avoid unwarranted sentencing disparities." 18 USC § 3553(a)(6). In this case, disparate defendants were treated the same by the district court, which in this case was unable to discern any difference between the several Appellants. The government appears to be unable to recognize this differentiation among those charged together, as it conflates those with significant priors (as well as significant and independent conduct apart from the conspiracy charged in count one), with Appellant Martin.

While it may be tedious to mention this again, there is no presumption of reasonableness at the trial level for a within-guidelines sentence, nor does the imposition of an outside of Guidelines sentence require the establishment of "extraordinary circumstances." *See Pepper v. United States*, __ U.S. __, 2011 WL 709543, at *13 (2010), *citing Nelson v. United States*, 555 U.S. __, __ (2009) (per curiam) (slip op., at 2), and *Gall v. United States*, 552 U.S. 38, 47 (2007). Affirming these life sentences upon the record below cannot be permitted.

## REQUEST FOR ORAL ARGUMENT

This appeal presents several important issues regarding questions of first impression in this Circuit. Accordingly, Appellant respectfully requests oral argument.

## **CONCLUSION**

For the foregoing reasons, the Appellants herein respectfully request this Court to vacate the convictions and sentences imposed by the United States District Court for the District of Maryland, and to remand their respective causes with an order for a new trial, and to tax the costs of these proceedings to Appellee.


Respectfully submitted,


March 16, 2011                     _____/s/_____
                                   MICHAEL D. MONTEMARANO

                                   Michael D. Montemarano, P.A.
                                   5695 Main Street
                                   Suite 201
                                   Elkridge, MD 21075-5016
                                   (410) 379-0067
                                   Counsel for Appellant Martin
                                       Lead Counsel/CJA Counsel



                                   _____/s/_____
                                   ANTHONY D. MARTIN

                                   7501 Greenway Center Drive
                                   Suite 460
                                   Greenbelt, MD 20770
                                   (301) 220-3700
                                   Counsel for Appellant Goodwin
                                       /CJA Counsel

54

_____/s/_____
MARC G. HALL

Hall & Cho, LLC
200A Monroe Street
Suite 310
Rockville, MD 20850
(301) 309-6780
Counsel for Appellant Whiting
    /CJA Counsel


_____/s/_____
TIMOTHY MITCHELL

6301 Ivy Lane
Suite 400
Greenbelt, MD 20770
(301) 945-9500
Counsel for Appellant Bynum
    /CJA Counsel


_____/s/_____
G. ALAN DUBOIS

Assistant Federal Public Defender
Office of the Federal Defender
150 Fayetteville Street Mall
Suite 450
Fayetteville, NC 27601
(919) 856-4236
Counsel for Appellant Dobie
    /Appointed Counsel

55

_____/s/_____

ALAN G. BOWMAN

Gateway One
Suite 105
Newark, NJ 07102
(973) 622-2225
Counsel for Appellant Ali
    (Retained)


## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because:
        The word count of this brief is 9,592 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        This brief has been prepared in a proportionally spaced typeface using Corel WordPerfect  in Times New Roman, 14 point.




MICHAEL D. MONTEMARANO


March 16, 2011

## **CERTIFICATE OF SERVICE**

In accordance with Rules 25 and 30( c) of the Rules of the United

States Court of Appeals for the Fourth Circuit, I hereby certify that I have this 16th

day of March, 2011, filed this Joint Reply Brief of Appellants, per F.R.A.P. 30( c),

via CM/ECF with the Office of the Clerk of the Court, and forwarded it to Daniel

Goodman, Esq., US Department of Justice, Criminal Appellate Section, 1264 Main

Building, 950 Pennsylvania Avenue, NW, Washington, DC 20530, Counsel for

Appellee.

　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　MICHAEL D. MONTEMARANO